1   QUINN EMANUEL URQUHART
        & SULLIVAN, LLP
2   Alex Spiro (*pro hac vice*)
        alexspiro@quinnemanuel.com
3   Cory D. Struble (*pro hac vice*)
        corystruble@quinnemanuel.com
4   51 Madison Avenue, 22nd Floor
    New York, New York 10010
5   Telephone:   (212) 849-7000
    Facsimile:   (212) 849-7100
6
7   Robert M. Schwartz (Bar No. 117166)
        robertschwartz@quinnemanuel.com
8   Dylan C. Bonfigli (Bar No. 317185)
        dylanbonfigli@quinnemanuel.com
    865 South Figueroa Street, 10th Floor
9   Los Angeles, California 90017-2543
    Telephone:   (213) 443-3000
10  Facsimile:   (213) 443-3100

11  *Attorneys for Plaintiff*

12

13              **UNITED STATES DISTRICT COURT**

14      **CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION**

15

16  SHAWN CARTER, also known as          Case No.  2:21-cv-04848-PA-KS
    JAY-Z, an individual,
17                                        **PLAINTIFF'S OPPOSITION TO**
                                          **DEFENDANTS' MOTION FOR**
18          Plaintiff,                    **SUMMARY JUDGMENT**

19          v.                            Filed Concurrently with Declaration of
                                          Dylan C. Bonfigli; Plaintiff's
20  JONATHAN MANNION, an                  Evidentiary Objections; Plaintiff's
    individual, and JONATHAN             Statement of Genuine Issues of Material
21  MANNION PHOTOGRAPHY LLC, a           Fact and Additional Material Facts;
    New York limited liability company,  [Proposed] Order

22          Defendants.                   The Honorable Percy Anderson

23
                                          Date:      May 16, 2022
24                                        Time:      1:30 p.m.
                                          Courtroom: 9A
25
                                          Trial Date:  July 19, 2022
26

27          **REDACTED VERSION OF DOCUMENT**
            **PROPOSED TO BE FILED UNDER SEAL**
28

# **TABLE OF CONTENTS**

Page

PRELIMINARY STATEMENT ............................................................... 1

PROCEDURAL OBJECTION ................................................................. 2

MATERIAL FACTS .............................................................................. 3

LEGAL DISCUSSION ........................................................................... 7

I.   THE COPYRIGHT ACT DOES NOT PREEMPT JAY-Z'S CLAIMS .......... 7

   A.   Jay-Z's NIL rights are not within the subject matter of copyright. ........ 7

   B.   Jay-Z's ROP is not equivalent to a copyright right. ............................. 13

II.  MANNION'S FIRST AMENDMENT DEFENSE RAISES FACT
    ISSUES ................................................................................................... 14

   A.   The defense turns on "transformative use," not whether Mannion
      made "creative contributions." ............................................................ 14

   B.   "Transformative Use" is a fact-intensive issue. .................................... 16

   C.   Mannion failed to meet his burden on transformative use. .................. 17

III. MANNION HAS NOT ESTABLISHED HIS TIME-BASED
     DEFENSES ............................................................................................ 20

   A.   The single-publication rule is no bar here. ........................................... 20

   B.   Mannion failed to establish laches as a matter of law. ......................... 21

IV.  MANNION'S DAMAGES ARGUMENTS RAISE DISPUTED
     FACTS ................................................................................................... 23

CONCLUSION ...................................................................................... 24

# TABLE OF AUTHORITIES

**Page**

## Cases

*Abdallah v. Int'l Lease Fin. Corp.*,
  2015 WL 13917968 (C.D. Cal. Aug. 5, 2015) ...................................................2

*Batra v. PopSugar, Inc.*,
  2019 WL 482492 (N.D. Cal. Feb. 7, 2019)...............................................8, 12, 14

*Brophy v. Almanzar*,
  2020 WL 8175605 (C.D. Cal. Dec. 4, 2020).......................................................20

*Brown v. Ames*,
  201 F.3d 654 (5th Cir. 2000) ......................................................................passim

*Callahan v. PeopleConnect, Inc.*,
  2021 WL 5050079 (N.D. Cal. Nov. 1, 2021) .....................................................11

*Carter v. Mannion*,
  2021 WL 6752256 (C.D. Cal. Sep. 8, 2021) ................................................passim

*Christoff v. Nestle USA, Inc.*,
  47 Cal. 4th 468 (2009) ......................................................................2, 20, 21

*Clark v. Am. Online Inc.*,
  2000 WL 33535712 (C.D. Cal. Nov. 30, 2000) .................................................24

*Comedy III Productions, Inc. v. Gary Saderup, Inc.*,
  25 Cal. 4th 387 (2001) .................................................................................passim

*Couveau v. Am. Airlines*,
  218 F.3d 1078 (9th Cir. 2000) ...........................................................................21

*Downing v. Abercrombie & Fitch*,
  265 F.3d 994 (9th Cir. 2001) .....................................................................passim

*Fleet v. CBS*,
  50 Cal. App. 4th 1911 (1996) ............................................................................10

*Fraley v. Facebook, Inc.*,
  830 F. Supp. 2d 785 (N.D. Cal. 2011).................................................................23

*Hart v. Massanari*,
  266 F.3d 1155 (9th Cir. 2001) ...........................................................................11

*Hilton v. Hallmark Cards*,
  2007 WL 9733756 (C.D. Cal. Dec. 17, 2007)................................................15, 16

*Hilton v. Hallmark Cards*,
  599 F.3d 894, 910 (9th Cir. 2010) .............................................................16, 17, 18

*In re Jackson*,
  972 F.3d 25 (2d Cir. 202 ........................................................................ 13

*Keller v. Elec. Arts, Inc.*,
  724 F.3d 1268 (9th Cir. 2013) ........................................... 13, 17, 18, 19

*Kling v. Hallmark Cards Inc.*,
  225 F.3d 1030 (9th Cir. 2000) ........................................................... 23

*KNB Enterprises v. Matthews*,
  78 Cal. App. 4th 362 (2000) ................................................................. 9

*Laws v. Sony Music Ent., Inc.*,
  448 F.3d 1134 (9th Cir. 2006) ........................................................... 13

*Leaf Trading Cards, LLC v. Upper Deck Co.*,
  2018 WL 10419777 (N.D. Tex. June 13, 2018) ................................. 18

*Maloney v. T3 Media, Inc.*,
  853 F.3d 1004 (9th Cir. 2017) ....................................................passim

*Miller v. Gammie*,
  335 F.3d 889 (9th Cir. 2003) ............................................................. 11

*Newcombe v. Adolf Coors Co.*,
  157 F.3d 686 (9th Cir. 1998) ................................................. 2, 23, 24

*No Doubt v. Activision Publ'g, Inc.*,
  192 Cal. App. 4th 1018 (2011) ......................................................... 19

*Sarver v. Chartier*,
  813 F.3d 891 (9th Cir. 2016) ........................................................... 165

*Sessa v. Ancestry.com Ops. Inc.*,
  2021 WL 4245359 (D. Nev. Sep. 16, 2021) ............................. 8, 11, 12

*Solano v. Playgirl, Inc.*,
  292 F.3d 1078 (9th Cir. 2002) ........................................................... 23

*Winter v. DC Comics*,
  30 Cal. 4th 881 (2003) ....................................................................... 18

*Wishtoyo Found. v. United Water Conserv. Dist.*,
  2018 WL 6265099 (C.D. Cal. Sep. 23, 2018) ................................... 22

*Zox LLC v. Zox*,
  2022 WL 423392 (C.D. Cal. Jan. 11, 2022) ..................................... 22

## **Statutes**

17 U.S.C. § 102 ......................................................................................... 7

17 U.S.C. § 103 ......................................................................................... 7

17 U.S.C. § 106 ......................................................................................... 7

Cal. Civ. Code § 3344 ................................................................................. 23

Cal. Civ. Code § 3425.3 .............................................................................. 20

## **Other Authorities**

Copyright Office Circ. 33 ............................................................................ 7

H.R. Rep. 1476, 94th Cong., 2d Sess. 132 (1976),
   *reprinted in* 1976 U.S.C.C.A.N. 5659 ................................................... 7

*Nat. Conf. of Commissioners of Uniform State Laws,*
   *Proceedings in the Comm. of the Whole*
   (Sep. 12, 1952) ...................................................................................... 21

## **PRELIMINARY STATEMENT**

The Court should deny summary judgment to Defendants Jonathan Mannion and Jonathan Mannion Photography, LLC ("Mannion").  Mannion's motion relies on legal principles this Court rejected when it denied his anti-SLAPP motion last September.  Mannion has failed to meet his evidentiary obligations on his defenses of copyright preemption and a claimed First Amendment right to infringe Plaintiff's statutory and common law right of publicity ("ROP"), and the facts are disputed.

This case is not about whether Mannion is a good photographer or whether he contributed copyrightable expression to the photos Plaintiff Shawn Carter, known as Jay-Z, hired Mannion to take to promote Jay-Z's career.  The issue is whether Mannion has a right to profit from the Jay-Z photos by commercializing them (in "unlimited editions") and plastering them on other merchandise without Jay-Z's permission.  Given the uses Mannion is making of the Jay-Z photos—and photos of others who hired Mannion for similar commercial purposes—the answer is no.

Mannion operates an online store (shop.jonathanmannion.com) where he sells his bootleg merchandize.  He uses the names, images, and likenesses ("NIL") of celebrities to sell inexpensive copies of their photographs and other merchandize onto which he has laminated their NIL.  Mannion does not obtain permission from the subjects of the photos for his commercial purposes.

Jay-Z filed this lawsuit to stop Mannion from profiting from Jay-Z's NIL.  The landing page on Mannion's online store features Jay-Z's NIL.  There, customers have been able to click on Jay-Z's name to purchase merchandize bearing Jay-Z's name, image, or both, such as T-shirts, slipmats, pins, and inexpensive copies (as compared to "fine art" editions) of Jay-Z photos.  Mannion also posts Jay-Z's NIL on social media to promote his store.  Mannion assumes that, because he took those Jay-Z photos, his right to use Jay-Z's NIL is virtually unlimited.  He is wrong.

First, Mannion's argument that Jay-Z's claims are preempted by the Copyright Act fails because Mannion uses Jay-Z's name (which falls outside the

1   scope of copyright) and because, as this Court has already ruled, he uses Jay-Z's

2   likeness "non-consensually on merchandise [and] in advertising."  *Carter v.*

3   *Mannion*, 2021 WL 6752256, at *5 (C.D. Cal. Sep. 8, 2021).

4          Second, Mannion's argument that Jay-Z's claims are barred by the First

5   Amendment fails because this case is not meaningfully different than *Comedy III*

6   *Productions, Inc. v. Gary Saderup, Inc.*, 25 Cal. 4th 387 (2001), which held that an

7   artist who had drawn an image of the actors who portrayed "The Three Stooges" and

8   sold prints and shirts depicting that image, violated their rights.  Mannion also failed

9   to address most of *Comedy III*'s fact inquiries.  And there are disputes as to others.

10         Third, Mannion's argument based on California's single-publication rule fails

11  because Mannion has not established that any of his conduct constituted a "single

12  integrated publication." *Christoff v. Nestle USA, Inc.*, 47 Cal. 4th 468, 477 (2009).

13  In any event, the rule would not bar Jay-Z's claim for injunctive relief.

14         Fourth, Mannion's laches argument fails because Jay-Z filed suit promptly—

15  one month after learning of Mannion's online store—and Mannion has not shown

16  prejudice.  In any event, laches does not bar Jay-Z's claim for injunctive relief.

17         Finally, Mannion's argument that Jay-Z "proffered no evidence sufficient to

18  establish any damages" fails because Jay-Z "did not consent to the use of his

19  likeness" and "was not compensated for the use of his likeness." *Newcombe v. Adolf*

20  *Coors Co.*, 157 F.3d 686, 693 (9th Cir. 1998).  And Mannion's expert concedes that,

21  if liability is found, Jay-Z is entitled to tens of thousands of dollars in damages.

22                       **PROCEDURAL OBJECTION**

23         The Court should deny Mannion's motion because he did not comply with the

24  L.R. 7-3 meet-and-confer requirement.  *Abdallah v. Int'l Lease Fin. Corp.*, 2015

25  WL 13917968, at *7 (C.D. Cal. Aug. 5, 2015).

26                           **AMICUS BRIEFS**

27         Two amici have sought leave to file briefs in Mannion's support.  If the Court

28  grants leave to file them, Jay-Z requests not more than 10 pages, in total, to respond.

# MATERIAL FACTS

Plaintiff Jay-Z is a well-known recording artist, producer, and entrepreneur. SF 106. The general public knows who Jay-Z is and recognizes his name and likeness. SF 104. Thus, his NIL carries significant economic value. SF 108.

Mannion is a photographer who specializes in photographing mainly music celebrities. SF 3. In 1996, when Jay-Z and Mannion were both starting their careers, Jay-Z and his record company commissioned Mannion to take photos of Jay-Z to be used for Jay-Z's debut album *Reasonable Doubt*. SF 110. Mannion understood that he was being hired to take pictures for Jay-Z's album. SF 112.

*Reasonable Doubt*. Jay-Z and the two other owners of Roc-A-Fella, Damon Dash and Kareem Burke, exercised creative control over the *Reasonable Doubt* shoot. SF 113. They selected its theme to evoke the New York Mafia. SF 114. Jay-Z chose the clothing. SF 116. Jay-Z wore jewelry Burke designed or that was Jay-Z's. SF 119, 121-22. Jay-Z, Dash, and Burke held the right to control what Mannion was doing. SF 127-29. Jay-Z picked one of the images as the cover of his album, SF 131, and selected the pose he struck for that photo. SF 131-32.

*Chess Not Checkers*. After *Reasonable Doubt*, Jay-Z enlisted Mannion's services for additional work. SF 7. At a photoshoot for Jay-Z's album *Vol. 1: In My Lifetime*, Mannion took a photo that he later titled "Jay-Z 'Chess Not Checkers.'" SF 20. Mannion knew it would be used to promote Jay-Z and his music. SF 146.

*New Blue Yankee*. At a later photoshoot, Mannion took a photo of Jay-Z for the cover of *Hits* magazine. SF 147. Mannion knew the purpose was to take photos to promote Jay-Z. SF 148. Jay-Z chose what to wear, including a Yankee jacket and cap. SF 149-52. Mannion later called the photo "Jay-Z 'New Blue Yankee,'" based on a lyric from a Jay-Z song and his love of Yankee's caps. SF 155.

Apartment 4B. In 2016, Burke, one of the owners of Roc-A-Fella, hosted a pop-up event called "Apartment 4B" to celebrate *Reasonable Doubt*'s 20th anniversary. SF 176. Mannion says that pictures from the shoot were displayed and

1   that "t-shirts imprinted with some of the photos were available for sale."  SF 73.

2   But Burke asked Jay-Z for permission to host the event, and Jay-Z approved.  SF

3   177.  It lasted two days.  SF 178.  Jay-Z attended for about one hour.  SF 179.

4 ██████████████████████████████████████████

5 ████████████████████████████████████████  █

6 ██████████████████████████████████████████

7 ████████████████████████████████████████████

8 ████████████████████████████████████████████

9 ███████████████████████████████████████████

10 █████████████████████████████████

11         After Jay-Z learned of this, and that t-shirts bearing his likeness had been

12   sold, his attorney sent Burke a cease-and-desist letter stating that the license

13   agreement did "not license any of [Jay-Z]'s publicity rights to CoS or Mr. Burke."

14   SF 185-86.  "CoS and Mr. Burke had sole responsibility under the License

15   Agreement for clearing all third-party rights to make use of the images identified in

16   [the license agreement]." SF 186.  CoS and Jay-Z later settled the matter.  SF 187.

17         <u>Mannion's Exploitation of Jay-Z's NIL</u>.  Mannion has built a business trading

18   on the NIL of Jay-Z (and other celebrities).  SF 91.  On his online store, Mannion

19   has sold "Mannion Merch," such as shirts, hoodies, pins, slipmats, and pictures

20   bearing Jay-Z's likeness, and shirts bearing Jay-Z's name.  SF 192-93.  Mannion

21   uses Jay-Z's name to advertise these products.  SF 197.  Some are depicted below:

22   | Slipmats |
23   | (Bonfigli Dec., Ex. |
24   | OO) |



JAY Z BODY - SLIP MAT
12"x12"

SHOP NOW

JAY Z REASONABLE DOUBT -
SLIP MAT
12"x12"

SHOP NOW

| Pictures (Bonfigli Dec., Ex. TT.) |  |
| --- | --- |
| Magnets and Pins (Mannion Dec., Exs. 12, 13.) | |
| Shirts (Mannion Decl., Ex. 11) | |

Mannion also uses Jay-Z's NIL to advertise his photography business, his online store, and its products, including products unrelated to Jay-Z.  SF 197.  For example, Mannion has a "Related Products" link on the pages the display Jay-Z's NIL, which he uses to lure his customers to merchandize having no connection to Jay-Z, that is, he uses Jay-Z's NIL as "click bait," SF 204, as shown below:

Mannion does not stop there.  He sends out marketing "e-mail blasts to the public" containing Jay-Z pictures and products for the online store.  SF 205.  He uses a picture of Jay-Z on the store's landing page.  SF 61-62.  He posts Jay-Z pictures to his Instagram page, which includes a hyperlink to his store and promotes his Mannion Merch.  SF 207-09.  He has advertised products bearing Jay-Z's NIL on his Instagram.  SF 210.  And he has posted "never before seen" Jay-Z pictures of his Instagram to, for example, "build attention" for a sales event he hosted.  SF 214.

Mannion never received Jay-Z's permission to sell any of this merchandize or otherwise use Jay-Z's NIL, whether on the web site, Instagram page, or anywhere else.  SF 220.  Mannion has not paid Jay-Z for these uses.  SF 218.

The Lawsuit.  Jay-Z learned of Mannion's online store in or around May 2021, SF 222, and filed this lawsuit about one month later.  Dkt. 1 at 11.  Mannion moved to dismiss, asserting that Jay-Z's claims were barred by the First Amendment and preempted by the Copyright Act.  Dkt. 26.  This Court denied the motion.  Dkt. 39.  The Court held that that Mannion's sale of Jay-Z "merchandise," such as t-shirt and slipmats, was "alone sufficient to undermine [his] contention that [he] is entitled to a transformative use defense as a matter of law at this stage of the proceedings."  *Id.* at 7.  It also held that Mannion's sale of "t-shirts and slipmats with Jay-Z's name and image" were "sufficient at this stage of the proceedings to state plausible claims

for violations of Jay-Z's common law and statutory rights of publicity that are not preempted by the Copyright Act." *Id.* at 9.

## LEGAL DISCUSSION

### I.      THE COPYRIGHT ACT DOES NOT PREEMPT JAY-Z'S CLAIMS

A state law claim is preempted if: (1) "the subject matter of the state law claim falls within the subject matter of copyright as described in 17 U.S.C. §§ 102 and 103," and (2) "the rights asserted under state law are equivalent to the rights contained in 17 U.S.C. § 106." *Carter*, 2021 WL 6752256, at *5. Mannion cannot establish either element here.

When Congress adopted the Copyright Act, it made clear that it did not intend to preempt claims seeking to protect the kinds of rights at stake in this case: "The evolving common law rights of 'privacy,' 'publicity,' and trade secrets ... would remain unaffected as long as the causes of action contain elements, such as an invasion of personal rights or a breach of trust or confidentiality, that are different in kind from copyright infringement." H.R. Rep. 1476, 94th Cong., 2d Sess. 132 (1976), *reprinted in* 1976 U.S.C.C.A.N. 5659, 5748; *see Brown v. Ames*, 201 F.3d 654, 661 (5th Cir. 2000) ("As noted in the legislative history of section 301, Congress was aware of the operation of state law on rights of privacy and publicity, and indicated its intention that such state law causes of action remain."). Mannion's reading of the case law cannot be squared with these foundational principles.

### A.      Jay-Z's NIL rights are not within the subject matter of copyright.

#### 1.      The subject matter of copyright does not include names.

Mannion uses Jay-Z's name as an integral part of the advertising and sale of the photos and other goods. SF 164, 197. He is not selling art photos that depict scenery, wildlife, or models. He titles the photos and merchandize with Jay-Z's name, or mentions that Jay-Z is the subject, or both. SF 164-65, 195.

But a person's name (including a stage name) does not fall within the subject matter of copyright. *See* Copyright Office Circ. 33 (copyright.gov/circs/circ33.pdf)

at 3.  Indeed, copyright law has nothing to say about protecting or using someone's name.  Thus, Mannion's use of Jay-Z's name as part of the title of his photos and other merchandize, and use of Jay-Z's name as a link to those goods, cannot be preempted.  *Batra v. PopSugar, Inc.*, 2019 WL 482492, at *4 (N.D. Cal. Feb. 7, 2019) (no preemption when claim involved "misappropriation of photographs" with the use of "Plaintiff's 'name and/or other identifying information' associated with Plaintiff's likeness"); *see Downing v. Abercrombie & Fitch*, 265 F.3d 994, 1000 (9th Cir. 2001) (no preemption where, *inter alia*, photographer wrote plaintiffs' names "at the bottom of the photograph").  Preemption does not apply even where a defendant uses a person's (Jay-Z's) name merely to "identify the source of a copyrighted work."  *Brown*, 201 F.3d at 658.

### 2.   Jay-Z's NIL in still images is not copyrightable.

The rights arising under copyright law do not include rights to a person's image when captured in a still photograph.  Although Section 102 of the Copyright Act gives copyright status to photographs, "[a] person's [NIL] is not a work of authorship within the meaning of" that section.  *Downing*, 265 F.3d at 1004 (rejecting preemption of state NIL claim arising from use of plaintiffs' photos in clothing catalog).  That is true even where a person's NIL is "embodied in a copyrightable photograph."  *Id.*

This has long been the law, and it was before a Ninth Circuit panel decided *Maloney v. T3 Media, Inc.*, 853 F.3d 1004 (9th Cir. 2017) which, as noted below, Mannion stretches beyond its bounds.  Even so, *Maloney* held that "preemption turns on how a copyrighted photograph is used," and that if the defendant goes "beyond … mere republication," there is no preemption.  *Id.* at 1013.  A defendant goes beyond "mere republication" when, for example, the defendant exploits the plaintiff's persona to the defendant's "commercial advantage," *Sessa v. Ancestry.com Ops. Inc.*, 2021 WL 4245359, at *15 (D. Nev. Sep. 16, 2021), or uses the plaintiff's NIL "to attract viewers to [a] [web]site," *Maloney*, 853 F.3d at 1012

n.6, or uses the plaintiff's NIL "non-consensually on merchandise [and] in advertising," *Carter*, 2021 WL 6752256, at *5.  Mannion has done those things.

A trio of cases illustrates these principles.  First, in *Brown*, plaintiffs claimed the defendant violated their ROP by, *inter alia*, using their photos on posters and other merchandise.  201 F.3d at 656-57 (cited approvingly in *Downing*, 265 F.3d at 1004).  The defendant asserted preemption.  But the court disagreed because "the tort of misappropriation of a name or likeness protects a person's *persona*," and "[a] *persona* does not fall within the subject matter of copyright." *Id.* at 658.

Next, in *KNB Enterprises v. Matthews*, 78 Cal. App. 4th 362, 366 (2000), a website operator displayed photos of models and charged users a subscription fee.  Even though the parties agreed that the models' photos were not used to suggest a commercial endorsement of the website, the court held that the model's ROP claims —based solely on displaying their photos—were not preempted, "because a human likeness is not copyrightable, even if captured in a copyrighted photograph." *Id.* at 365.  "[T]he subject of the claims [were] the models' likenesses, which [was] not copyrightable even though 'embodied in a copyrightable work such as a photograph.'" *Id.* at 374.  And the models' likenesses were used "to attract viewers to [the] [web]site." *Maloney*, 853 F.3d at 1012 n.6.

Finally, in *Downing*, Abercrombie & Fitch ("A&F") used a photo of surfers and their names in its catalog.  265 F.3d at 999.  On that page, A&F advertised shirts similar to those the surfers wore in the photo. *Id.*  The surfers sued for violation of their ROP. *Id.* at 1000.  A&F argued that the claims were preempted. *Id.* at 1003.  The Ninth Circuit rejected that and instead "agree[d] with the approach taken by the Fifth Circuit [in *Brown*] and the reasoning employed in [*Matthews*]." *Id.* at 1004.  Although "[t]he photograph itself, as a pictorial work of authorship, is subject matter protected by the Copyright Act," "it [was] not the publication of the photograph itself, as a creative work of authorship, that [was] the basis for [the surfer's] claims." *Id.* at 1003.  Rather, it was the use of the surfers' "likenesses and their names in the

1   published photograph." *Id.* Critically, "[a] person's name or likeness is not a work

2   of authorship within the meaning of [section 102]." *Id.* at 1004.

3        After *Downing*, the Ninth Circuit decided *Maloney*, the case on which

4   Mannion relies heavily.  There, student athletes whose photos were taken as they

5   played in a tournament alleged that the defendant exploited their likeness by selling

6   non-exclusive licenses permitting consumers to download digital files for "non-

7   commercial art use." *Maloney*, 853 F.3d at 1007.  *Maloney* held that the athletes'

8   NIL claims were preempted because the athletes did "not allege that their names and

9   likenesses were ever used in connection with the sale of any merchandise," nor did

10  "they contend that their likenesses were ever used in any advertising." *Id.* at 1018.

11  Instead, the images had been licensed to individuals for "non-commercial art use."

12  *Id. Maloney* held that a publicity-right claim is preempted if it challenges the mere

13  distribution of a copyrighted work for non-commercial "personal use." *Id.* at 1016.

14  Even if that panel was in a position to state such a rule as to still photos (and as

15  noted below, that is not clear), Mannion omits a key part of the decision: A

16  "publicity-right claim is not preempted when it targets non-consensual *use* of one's

17  name or likeness on merchandise or in advertising." *Id.* at 1011. And because

18  Mannion is engaging in this kind of activity, *e.g.*, SF 164-65, 193, 195, 197,

19  *Maloney* is inapposite and his preemption defense is untenable.[1]

20       Further, *Downing* forecloses Mannion's reliance on *Maloney* to argue that the

21  sale of pins, slipmats, magnets, and pictures depicting a celebrity's photo are "mere

22  republication[s]" that fall within the subject matter of copyright.  Mot. at 11-12.  In

23  _____

24  [1] The *Maloney* panel may have been led astray by the argument that the Copyright

25  Act does not grant lesser rights to photos than to other pictorial works.  853 F.3d at
    1019.  But the issue is not whether photos enjoy lesser rights under *copyright law*.

26  As all of the other courts cited above recognize, the issue is whether, in a still photo,
    a person's image or likeness is *copyrightable subject matter*.  For over 25 years,

27  starting with *Fleet v. CBS*, 50 Cal. App. 4th 1911, 1921 (1996), courts have held that

28  it is not and that the ROP claim is not preempted.

1   *Downing*, the Ninth Circuit "agree[d] with the approach taken" in *Brown*, under

2   which an ROP claim challenging the use of the plaintiffs' names and likenesses

3   "on … posters" was not preempted.  265 F.3d at 1004.  *Maloney* thus cannot be read

4   to preempt an ROP claim challenging the use of a celebrity's NIL, even on a mere

5   photo reprint: *Downing* predates *Maloney* and one Ninth Circuit panel is bound by

6   the "reasoning or theory" of a prior panel, *Miller v. Gammie*, 335 F.3d 889, 893 (9th

7   Cir. 2003) (en banc), "unless overruled by the court itself sitting en banc, or by the

8   Supreme Court," *Hart v. Massanari*, 266 F.3d 1155, 1171 (9th Cir. 2001).

9   　　　Read properly, *Maloney* holds that copyright law preempts ROP claims when

10   a defendant sells licenses that allow consumers to download images for "non-

11   commercial art use," 853 F.3d at 1007, but not when the defendant plasters that

12   image on posters, t-shirts, or even photographic printing paper and then sells those

13   products, as Mannion has been doing here.  Cases decided after *Maloney* recognize

14   that it applies narrowly, and only when a defendant "merely display[s] or

15   publish[es]" photos of the plaintiff but not when the defendant exploits the

16   plaintiff's persona to the defendant's "commercial advantage."  *Sessa*, 2021 WL

17   4245359, at *15.  Thus, in *Sessa*, the district court held that, where the defendant

18   had sent emails with the plaintiffs' likeness to potential customers, copyright law

19   did not preempt the plaintiffs' ROP claims, because the defendant was "trading on

20   customers' curiosity about"  *Id.*  And unlike *Maloney*, and as is the case here, the

21   defendant's website offered more than "limited rights to [an] image alone," such as

22   "information about the plaintiff."  *Id.*[2]

23

24   ─────────────────

24   [2] Mannion's reliance on *Callahan v. PeopleConnect, Inc.*, 2021 WL 5050079, at *12

25   (N.D.  Cal. Nov. 1, 2021), is also misplaced.  That case involved the mere use of a

25   photo to "*advertis[e] … the copyrighted work itself*."  Mannion's use of Jay-Z's

26   **name** and likeness, along with other identifying information, goes beyond merely

26   advertising photos and is intended to serve "as a marketing / press & publicity tool,"

27   SF 201, as described above.  Mannion uses Jay-Z's image "to attract viewers to [his]

28   site." *Maloney*, 853 F.3d at 1012 n.6 (citing *Matthews*, 78 Cal. App. 4th at 366).

Similarly, in *Batra*, a website posted images of an Instagram "influencer" that featured the influencer's "name and/or other identifying information" in the "headers for the Instagram posts." 2019 WL 482492, at *1, *4. The influencer's claims were not preempted. She alleged not only "an unlawful use of her likeness," but also "the misappropriation of non-photographic elements of her likeness and identity," such as her name. *Id.* at *4. The defendant argued, as Mannion does here, that she "only alleged use of her likeness within an existing copyrightable work (i.e., a photograph)," but the court rejected that argument because the defendant "misappropriated [the influencer's] likeness and identity in text, in addition to … photographs." *Id.* Thus, the influencer's ROP claims were not preempted, including to the extent they challenged the use of her photos. *Id.*

### 3.      Mannion's uses are not subject to preemption.

Applying these principles, Mannion can find no refuge in the Copyright Act. As this Court held in denying Mannion's motion to strike, Jay-Z's claims "target[] non-consensual use of [his] [NIL] on merchandise [and] in advertising." *Carter*, 2021 WL 6752256, at *5. Mannion's uses of Jay-Z's NIL go beyond the "mere republication" of pictures. *Maloney*, 853 F.3d at 1014. Mannion has sold merchandise bearing Jay-Z's likeness. Mannion has used Jay-Z's name to advertise and sell t-shirts bearing Jay-Z's name, which is not a subject of copyright law.

As to the prints, they are not "mere republications[s]" of photos, *id.*, but rather "merchandise"—like the posters in *Brown* that bore the plaintiffs' names and likenesses. *Downing*, 265 F.3d at 1004. That is confirmed by the fact that they are packaged in an envelope stamped "MANNION," bear Mannion's signature, the title of the picture, and the date and location of the shoot. SF 195. Mannion also is advertising pictures with Jay-Z's name in the titles, along with other information that ties the photos to Jay-Z, such as his album name and song lyrics. SF 155, 164-65. Mannion is thus unlawfully "trad[ing] on" the public's recognition of Jay-Z's name and persona. *Sessa*, 2021 WL 4245359, at *15.

Moreover, Mannion uses Jay-Z's NIL to advertise his photography business, his online store, and its products—including by tying Jay-Z's NIL to products unrelated to Jay-Z.  SF 197.  To those ends, Mannion has posted 27 pictures (at least) of Jay-Z to his Instagram page, including posts with links to his online store.  SF 64.  Mannion prominently displays a picture of Jay-Z on the landing page of his online store.  SF 200.  Mannion sends out mass marketing "e-mail blasts to the public" containing pictures of Jay-Z and products on Mannion's online store.  SF 205.  The webpages on which Jay-Z pictures are offered for sale contain advertisements for "Related Products," including products unrelated to Jay-Z, such as Mannion hoodies.  SF 204.  And Mannion recognizes that posting an image of Jay-Z to a website is "a marketing / press & publicity tool."  SF 201.  At bottom, Mannion runs a hip-hop memorabilia bazaar to sell Mannion Merch that pilfers the NIL rights of famous recording artists.  SF 91-102.  That goes beyond what courts have held to be within the subject matter of copyright.[3]

**B.    Jay-Z's ROP is not equivalent to a copyright right.**

A state law claim is not preempted if it protects rights "qualitatively different from … copyright rights" and "ha[s] an extra element which changes the nature of the action."  *Laws v. Sony Music Ent., Inc.*, 448 F.3d 1134, 1143 (9th Cir. 2006).  That is the case here.  First, because names are not copyrightable subject matter, the right to exclude others from making unauthorized use of one's name is, by definition, qualitatively different from copyright and adds an extra element not present in a copyright claim.

Second, California ROP claims include additional "extra elements."  One is the appropriation of the plaintiff's rights to the defendant's advantage.  *See Keller v.*

---

[3]  Mannion also asserts Jay-Z's "claims are preempted under the principles set forth by the Second Circuit in *In re Jackson*, 972 F.3d 25, 33-42 (2d Cir. 2020)."  Mot. at 15.  But the "implied-preemption" analysis in *In re Jackson* has no support in Ninth Circuit precedent, nor has Mannion established it applies to these facts.

1  *Elec. Arts, Inc.*, 724 F.3d 1268, 1273 n.4 (9th Cir. 2013).  The other is that an ROP

2  claim under Section 3344 also requires "'a knowing use by the defendant as well as

3  a direct connection between the alleged use and the commercial purpose.'"  *Id.*

4      Mannion uses Jay-Z's name and likeness, for example, on merchandise and

5  for advertising.  The use of Jay-Z's name is not a "subject" that is governed by

6  section 106, because the commercial exploitation of Jay-Z's name and likeness to

7  Mannion's advantage differs from the rights of reproduction granted by section 106.

8  *Batra*, 2019 WL 482492, at *4.  Mannion is also using Jay-Z's persona to sell

9  pictures by titling them with references to Jay-Z's albums and song lyrics.  SF 155.

10  Mannion's misappropriation of Jay-Z's name and persona, along with Jay-Z's

11  likeness as captured in photos, makes the rights Jay-Z asserts "not equivalent to the

12  rights of copyright holders."  *Batra*, 2019 WL 482492, at *4.

13  **II.   MANNION'S FIRST AMENDMENT DEFENSE RAISES FACT ISSUES**

14      **A.   The defense turns on "transformative use."**

15      Mannion's argument begins with his assertion that he contributed creative

16  expression to the Jay-Z photos.  Mot. at 15.  True or not, it is irrelevant to the

17  governing legal standard: whether the photos "contain[] significant transformative

18  elements," such that they have been "transformed into something more than a mere

19  celebrity likeness or imitation."  *Comedy III*, 25 Cal. 4th at 391, 407.  That the

20  pictures are "expressive" is immaterial.  Indeed, in *Comedy III*, the California

21  Supreme Court noted that the defendant artist's "portraits of The Three Stooges

22  [were] expressive works," *id.* at 396, but rejected the defense.  *Id.* at 409.

23      There, an illustrator with more than 25 years of experience in selling his work

24  drew a portrait of the actors who famously portrayed "The Three Stooges."  *Id.* at

25  393.  From his drawing, he created lithographic and silkscreen masters, which he

26  then used to print pictures and make t-shirts that he offered for sale.  *Id.*  The owner

27  of The Three Stooges' ROP sued.  *Id.*  Like Mannion, the artist argued that "all

28  portraiture involves creative decisions, that therefore no portrait portrays a mere

literal likeness, and that accordingly all portraiture, including reproductions, is protected by the First Amendment." *Id.* at 408. The California Supreme Court rejected this "categorical approach," explaining that "when an artist's skill and talent is manifestly subordinated to the overall goal of creating a conventional portrait of a celebrity so as to commercially exploit his or her fame, then the artist's right of free expression is outweighed by the right of publicity." *Id.* "[A]n artist depicting a celebrity must contribute something more than a "merely trivial" variation, but must create something recognizably "his own." *Id.*

To illustrate, the *Comedy III* Court pointed to "[t]he silkscreens of Andy Warhol," which "have as their subjects the images of such celebrities as Marilyn Monroe, Elizabeth Taylor, and Elvis Presley." *Id.* "Through distortion and the careful manipulation of context, Warhol was able to convey a message that went beyond the commercial exploitation of celebrity images and became a form of ironic social comment on the dehumanization of celebrity itself." *Id.* at 408-09.

As to the lithograph and t-shirts, the Court did not discern a "significant transformative or creative contribution" from the artist. *Id.* at 409. His artistic "skill" was "manifestly subordinated to the overall goal of creating literal, conventional depictions of The Three Stooges so as to exploit their fame." *Id.* And "the marketability and economic value of [the] work derive[d] primarily from the fame of [The Three Stooges]." *Id.* Thus, if the illustrator wished "to continue to depict The Three Stooges as he has done," he needed their permission. *Id.* at 410.

This Court applied *Comedy III* to reach the same conclusion in Paris Hilton's ROP claims against Hallmark Cards. The Court denied Hallmark's anti-SLAPP motion based on Hallmark's assertion of the same "transformative use" defense. *Hilton v. Hallmark Cards*, 2007 WL 9733756, at *3 (C.D. Cal. Dec. 17, 2007). Like Jay-Z here, Ms. Hilton sued Hallmark for misappropriation of her ROP when it sold greeting cards that superimposed a picture of her head on a cartoon waitress's body and used Hilton's "That's Hot" catchphrase from her television show *The Simple*

*Life*.  *Id.* at *1.  Given the similarity between the second prong of the anti-SLAPP statute and the summary-judgment standard, the question was whether Hallmark could establish transformative use as matter of law, or as the Ninth Circuit wrote in affirming the decision, "no trier of fact could reasonably conclude that the card was not transformative."  *Hilton v. Hallmark Cards*, 599 F.3d 894, 910 (9th Cir. 2010).

This Court rejected Hallmark's argument and held that Hilton had made "a prima facie showing of facts which, if accepted by the trier of fact, would negate such defense."  *Hilton*, 2007 WL 9733756, at *2-3.  Those facts included the similarity of Hilton's depiction in the card and her appearance in *The Simple Life*, from which the Court was unable to conclude "that the card [was] significantly transformative."  *Id.* at *3.  There was "the potential … that the card [was] sufficiently evocative of an image Hilton ha[d] presented of herself that Hallmark [was] merely capitalizing on Hilton's notoriety."  *Id.*  The Ninth Circuit affirmed, noting that "merely merchandising a celebrity's image without that person's consent … does not amount to a transformative use."  *Hilton*, 599 F.3d at 910.[4]

**B.    "Transformative Use" is a fact-intensive issue.**

In denying Mannion's anti-SLAPP motion and motion to dismiss, the Court held: "As the Ninth has explained, the California Supreme Court 'envisioned the application of the [transformative use] defense as a question of fact.'" *Carter*, 2021 WL 6752256 at *5 (quoting *Hilton*, 599 F.3d at 910).  That is because the transformative use issue requires resolution of five fact-intensive factors.

"First, if the celebrity likeness is one of the raw materials from which an original work is synthesized, it is more likely to be transformative than if the

---

[4]   Mannion's reliance on *Sarver v. Chartier*, 813 F.3d 891 (9th Cir. 2016), to argue that the First Amendment protects artists who transform the stories of individuals into art (Mot. at 15), is misplaced because, *inter alia*, the plaintiff in that case was not a celebrity and had not "invest[ed] time and money to build up economic value in a[n] … identity."  *Id.* at 905.

depiction or imitation of the celebrity is the very sum and substance of the work in question." *Keller*, 724 F.3d at 1274. *Id.* "Second, the work is protected if it is 'primarily the defendant's own expression'—as long as that expression is 'something other than the likeness of the celebrity.'" *Id.* "Third, to avoid making judgments concerning 'the quality of the artistic contribution,' a court should conduct an inquiry 'more quantitative than qualitative' and ask 'whether the literal and imitative or the creative elements predominate in the work.'" *Id.* Fourth, "a subsidiary inquiry" into whether "the marketability and economic value of the challenged work derive primarily from the fame of the celebrity depicted" is "useful in close cases." *Id.* Last, "'when an artist's skill and talent is manifestly subordinated to the overall goal of creating a conventional portrait of a celebrity so as to commercially exploit his or her fame,' the work is not transformative." *Id.*

Because this is an affirmative defense, Mannion bears the burden. *Hilton*, 599 F.3d at 912. Here, all factual inferences must be drawn in Jay-Z's favor.

### C.   Mannion failed to meet his burden on transformative use.

To begin, Mannion's motion fails to even address most of the factors. And the facts are, at best, in dispute as to those he does address. His evidence consists primarily of a boilerplate list of "myriad creative contributions" that any skilled photographer makes to any photograph. Mot. at 19-20 (asserting, e.g., "Mannion chose the composition, angle, exposure, shutter speed, and the exact moment to capture in pushing the shutter release"). But as noted above, the issue is not whether he had a meaningful hand in taking the photos. The issue is whether the photos are transformative of Jay-Z's likeness. Based on the five factors, they are not.

**1.   Sum and Substance.** For Mannion, there is (at best) a factual dispute as to whether Jay-Z's likeness "is the very sum and substance of the work[s] in question." *Comedy III*, 25 Cal. 4th at 406. Looking at the pictures, there is little else besides Jay-Z (or others) to be seen. SF 156. Mannion disagrees. He asserts that Jay-Z's likeness is merely one of the "raw materials" he used to create "original

artistic" pictures.  Mot. at 18.  Although Jay-Z believes that a reasonable jury could resolve this factor in his favor only, this is for the jury to decide, based on its examination of the images.  Mannion's products depicting Jay-Z are not meaningfully different from the greeting card in *Hilton* that depicted Paris Hilton or the t-shirts and prints in *Comedy III* that depicted The Three Stooges, which failed to satisfy this prong.  *See also Leaf Trading Cards, LLC v. Upper Deck Co.*, 2018 WL 10419777, at *2 (N.D. Tex. June 13, 2018) (baseball trading cards were not transformative where defendant used actual photos of the players).

**2.      Primarily the defendant's own expression.**  To establish this factor, Mannion must show that the Jay-Z pictures are "primarily the defendant's own expression rather than the celebrity's likeness" and "something recognizably his own." *Comedy III*, 25 Cal. 4th at 406, 408; *accord Keller*, 724 F.3d at 1274.  To support this prong, Mannion lists boilerplate "myriad creative contributions" he says he made.  Mot. at 18-19.  But the process Mannion employed to take the photos has no bearing on whether they are primarily Jay-Z's likeness.  The California Supreme Court rejected this in *Comedy III* when it rejected the defendant's argument that "all portraiture involves creative decisions, that therefore no portrait portrays a mere literal likeness." 25 Cal. 4th at 408.  And there is a factual dispute here even as to whether the "contributions" Mannion claims were instead the result of creative decisions by Jay-Z and his team.  SF 113-30.  Ultimately it is for the jury to decide whether the Jay-Z pictures are "recognizably [Mannion's] own" work.  No matter how accomplished Mannion says he is, the jury can conclude his work is not recognizable as coming from him, which it must for him to carry this factor.

**3.      Literal vs.  Creative.**  Mannion failed to address whether, on a more quantitative than qualitative basis, "the literal and imitative or the creative elements predominate in the work." *Keller*, 724 F.3d at 1274.  Regardless, the facts do not point only (or at all) in his favor.  Unlike the works at issue in *Winter v. DC Comics*, 30 Cal. 4th 881, 890 (2003), the pictures of Jay-Z are not caricatures, parodies,

cartoons, or collages.  SF 158-61.  To the contrary, Mannion concedes that they are literal depictions of Jay-Z, as he appeared in front of the camera.  SF 156-57.  Nor does Mannion's "style" predominate over Jay-Z's likeness in the way that icon Andy Warhol's style predominated over those he depicted.  *Comedy III*, 25 Cal. 4th at 408-09; *see No Doubt v. Activision Publ'g, Inc.*, 192 Cal. App. 4th 1018, 1034 (2011) (video game avatars of band members were not transformative because, *inter alia*, the avatars were "literal recreations" of them).  If video game avatars are not sufficiently transformative, nor are Mannion's literal photos of Jay-Z.

**4.   Marketability/Value.**  Mannion does not address whether "the marketability and economic value of the challenged work derive primarily from the fame of the celebrity depicted." *Keller*, 724 F.3d at 1274.  Mannion does not have the renown where the public purchases pictures because he took them.  SF 171.   His expert said that only a tiny percentage of the public even know who he is.  SF 171.  Jay-Z's expert testified that the market for Mannion's merchandise is not the fine-art market but rather the celebrity memorabilia market.  SF 172.  Such consumers buy an item because of its connection to a celebrity, not because of its artistic value or the photographer's acclaim.  SF 173.  Mannion's expert confessed that Jay-Z is "of course" the primary driver of the pictures' marketability and value.  SF 163.  That alone is sufficient evidence for Jay-Z to carry this factor.  And as Mannion himself admitted, "not every artist that [he] photograph[s] will rise to the level where somebody would be interested in buying" pictures of the artist because "[n]obody cares about some guy who never made it and was a one hit wonder." SF 169.

**5.   Purpose.**  No matter how skilled or creative Mannion may be, he conceded that his "skill" was "manifestly subordinated to the overall goal of creating … conventional portrait[s] of [Jay-Z] so as to commercially exploit his … fame." *Comedy III*, 25 Cal. 4th at 408.  Mannion admitted that the purpose of taking Jay-Z's picture was to promote Jay-Z, his music, and his career.  SF 112, 148, 175.  It was not to enable Mannion to sell Merch out the back door; it was to accomplish

Jay-Z's commercial goals to promote his albums. *Comedy III*, 25 Cal. 4th at 409 ("depictions of The Three Stooges" were intended "to exploit their fame"). The parties understood this when Jay-Z hired Mannion. SF 110, 112, 148, 175.

Summary judgment is inappropriate because there are genuine disputes as to material facts that require the jury's resolution. *See, e.g.*, *Brophy v. Almanzar*, 2020 WL 8175605, at *3 (C.D. Cal. Dec. 4, 2020) (section 3344 photograph case).

## III.   **MANNION HAS NOT ESTABLISHED HIS TIME-BASED DEFENSES**

### A.   **The single-publication rule is no bar here.**

Mannion argues that Jay-Z's claims are time-barred because his conduct is "traceable" to his "display" of the photos on a 2013 version of his website and that, under the "single-publication rule" the clock started in 2013 and could never start anew. Mot. at 21. The single-publication rule (Cal. Civ. Code § 3425.3) states:

> No person shall have more than one cause of action for damages
> for … invasion of privacy or any other tort founded upon any
> single publication or exhibition or utterance, such as any one
> issue of a newspaper or book or magazine or any one
> presentation to an audience or any one broadcast over radio or
> television or any one exhibition of a motion picture.

But that rule has no application to this case. First, on its face the rule is limited to certain forms of "single" publication or exhibition, such as "any one broadcast over radio or television." *Christoff*, 47 Cal. 4th at 481. This case does not involve an issue of a paper, book, magazine, or TV broadcast or film exhibition.

Second, when a defendant makes a "conscious, deliberate choice to continue, renew or expand [its] use" of infringing material, the limitations period starts anew. *Id.* at 486. "If any such decisions occurred during the period defined by the statute of limitations, plaintiff should be able to recover damages caused by publication pursuant to those decisions." *Id.* Here: Mannion has varied his use of Jay-Z's NIL, by offering new Jay-Z products and discontinuing others. *E.g.*, SF 40, 224. And it

1  continues to occur.  Mannion continues to exploit Jay-Z's name and likeness on

2  Mannion's webpage and online store after Jay-Z filed this lawsuit, SF 199-200,

3  which constitutes a "conscious, deliberate choice."  *Christoff*, 47 Cal. 4th at 486.[5]

4  Third, Mannion must establish a "single integrated publication," which

5  factually he cannot do.  Mannion argues that he "displayed photographs of [Jay-Z]

6  on [his] website no later than April 2013; on the current version of the website's

7  landing page by May 2014; and on [his] online store by April 2018."  Mot. at 21.

8  But Mannion did not establish which pictures of Jay-Z were displayed, when they

9  were displayed, whether the pictures were displayed for a commercial purpose, or

10  whether each picture was displayed consistently from the date of posting to present.

11  As to other merchandise, Mannion argues that he "caused slipmats imprinted with

12  photographs of [Jay-Z] to be created in November 2015 and first offered them for

13  sale on [his] online store by December 2015."  Mot. at 21.  Again, Mannion did not

14  establish that the slipmats were consistently offered for sale from December 2015 to

15  January 2021.  Rather, the record is silent as to the process and decisions Mannion

16  made to sell Jay-Z slipmats between December 2015 and January 2021.

17  Finally, on its face the statute refers to barring a "claim for damages."  Thus,

18  even if the facts aligned in Mannion's favor, Jay-Z is still entitled to an injunction.[6]

19  **B.   Mannion failed to establish laches as a matter of law.**

20  To establish his affirmative defense of laches, Mannion must show both "an

21  unreasonable delay" by the plaintiff and prejudice.  *Couveau v. Am. Airlines, Inc.*,

22

---

23  [5]  Mannion argues that since 2016 his website has invited licensing inquiries.  Mot.
24  at 21. That is irrelevant.  Jay-Z does not seek to prevent Mannion from licensing the
    *copyrights* to any photos.  And Mannion's statement about licensing inquiries is not
25  a "single integrated publication" of any of Jay-Z's NIL.

26  [6] *See also Nat. Conf. of Commissioners of Uniform State Laws, Proceedings in the
    Comm. of the Whole* (Sep. 12, 1952) Uniform Single Publication Act at 914
27  (regarding provision that "[n]o person shall have more than one cause of action for
28  damages," Dean Prosser commented, "we don't want to touch injunctions").

1  218 F.3d 1078, 1083 (9th Cir. 2000).  "Because the application of laches depends on
2  a close evaluation of all the particular facts in a case, it is seldom susceptible of
3  resolution by summary judgment." *Id.*  And "laches typically does not bar
4  prospective injunctive relief ... [because] almost by definition, [a] plaintiff's past
5  dilatoriness is unrelated to a defendant's ongoing behavior that threatens future
6  harm." *Wishtoyo Found. v. United Water Conserv. Dist.*, 2018 WL 6265099, at *63
7  (C.D. Cal. Sep. 23, 2018).  Mannion has failed to establish the defense here.

8      *First*, there has been no "unreasonable delay."  Jay-Z learned that Mannion
9  was selling Jay-Z products on the online store around May 2021, SF 222, and sued
10  him one month later.  SF 223.  That is not an unreasonable delay.  Mannion argues
11  that Jay-Z knew of Mannion's copyright licensing, which created a duty of inquiry.
12  Mot. at 22. ████████████████████████████████████████
13  ████████████████████████████████████████████████
14  Mannion was thus telling anyone listening that he was ***respecting*** Jay-Z's NIL
15  rights, not infringing them.  At a minimum, this is an issue for the jury to decide.

16      Mannion's other argument is that Jay-Z knew of an agreement between
17  Mannion and Kareem Burke "a couple years" ago that "rang the alarm." Mot. at 23.
18  But Mannion failed to show when that was or that it happened more than two years
19  before Jay-Z sued.  *See Zox LLC v. Zox*, 2022 WL 423392, at *5 (C.D.  Cal. Jan.
20  11, 2022) (laches determination is made "with reference to the limitations period").

21      *Second*, Mannion has no evidence of prejudice.  This case is about Mannion's
22  commercial use of Jay-Z's NIL, *e.g.*, SF 91, and Mannion concedes that he neither
23  sought nor received permission from Jay-Z to do so, SF 216, 219.  Mannion says he
24  is prejudiced because: (1) the art director for the *Reasonable Doubt* album—who
25  was ***not*** present for the photoshoot, SF 134—died within the last 10 years; (2) two
26  former employees of Island Def Jam "had limited recall" of unspecified "events";
27  and (3) Jay-Z's "companies[] only retain documents for six months in the normal

28

1  course." Mot. at 24.  Even if those facts were not disputed—they are, SF 77, 80,

2  81—Mannion does not explain how they bear on the case or show actual prejudice.[7]

3  ## IV.   <u>MANNION'S DAMAGES ARGUMENTS RAISE DISPUTED FACTS</u>

4          Mannion argues that there is no damages causation.  But he misses the mark.

5  "In cases involving celebrity plaintiffs, the mere allegation that the plaintiff was not

6  compensated has been deemed sufficient to satisfy the injury prong." *Fraley v.*

7  *Facebook, Inc.*, 830 F.  Supp. 2d 785, 807 (N.D. Cal. 2011).  Jay-Z thus need not

8  identify lost licensing opportunities or show the diminution in the value of his NIL.

9  His available damages include "the economic value of the use of [his] [NIL],"

10  *Solano v. Playgirl, Inc.*, 292 F.3d 1078, 1090 (9th Cir. 2002), and "any profits from

11  the unauthorized use' … or the $750 minimum statutory damage amount and

12  punitive damages." *Id.* (quoting Cal. Civ. Code § 3344).  Thus, in *Newcombe* the

13  Ninth Circuit held that a baseball pitcher was injured when his likeness was used in

14  an advertisement because he "did not consent" and "was not compensated for the

15  use of his likeness." 157 F.3d at 693.  Here too, Jay-Z "did not consent to the use of

16  his likeness" and was "not compensated for the use of his likeness." *Id.*  That alone

17  is fatal to Mannion's "damages" argument.  *Id.*

18          Mannion also asserts that Jay-Z has no damages.  That is not true.  Jay-Z's

19  damages expert will testify that, based on his decades of experience in the celebrity-

20  licensing industry and his review of Jay-Z's licensing deals, the fair market value of

21  Jay-Z's name and likeness, as used by Mannion, is "conservatively in the range of

22  $5 million to $15 million." SF 84.  Even Mannion's expert concedes that Mannion

23  _____

24  [7] Mannion's argument that Jay-Z waited "over seven years" to challenge the use of
   photos on Mannion's site (Mot. at 23) is unsupported.  There is no evidence Jay-Z

25  knew of the website "over seven years" ago; Jay-Z learned of it in May 2021.  SF

26  222.  Moreover, Mannion did not establish that seven years ago he displayed Jay-
   Z's photo on his website in a commercial manner, SF 222, which means Mannion

27  failed to establish that Jay-Z "knew or should have known about the potential claim

28  at issue." *Kling v. Hallmark Cards Inc.*, 225 F.3d 1030, 1036 (9th Cir. 2000).

would owe Jay-Z $5,553 in royalties or up to $44,425 in maximum damages, if liability were established.  SF 230-33.  Thus, there is ample evidence Jay-Z suffered damage as a result of the unauthorized and uncompensated use of his NIL.  *See, e.g.*, *Newcombe*, 157 F.3d at 693; *Clark v. Am. Online Inc.*, 2000 WL 33535712, at *8 (C.D. Cal. Nov. 30, 2000) (denying MSJ because plaintiffs were entitled to lost profits of "the fair market value of the [celebrity's] name as used by defendant").

As to punitive damages, there is a dispute whether Mannion used Jay-Z's NIL willfully and in conscious disregard to Jay-Z's rights.  SF 243.  Mannion knew that "moving into merch brings up another layer of conversation that should be had," but he never had that conversation to get Jay-Z's permission before doing so.  SF 87.

## CONCLUSION

The Court should deny Defendants' motion for summary judgment.

Dated:  April 22, 2022

Respectfully submitted,

QUINN EMANUEL URQUHART
    & SULLIVAN, LLP
Alex Spiro
Robert M. Schwartz
Cory D. Struble
Dylan Bonfigli

By _____
        Robert M. Schwartz
        *Attorneys for Plaintiff*

Case No. 2:21-cv-04848-PA-KS