# EXHIBIT A

Staci Jennifer Trager (SBN 232659)
strager@nixonpeabody.com
Aaron M. Brian (SBN 213191)
abrian@nixonpeabody.com
**NIXON PEABODY LLP**
One California Plaza
300 S. Grand Avenue, Suite 4100
Los Angeles, CA 90071
Telephone: 213.629.6000
Facsimile: 213.629.6001

Attorneys for *Amicus Curiae*
NOTORIOUS B.I.G. LLC, a
Delaware limited liability company

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SHAWN CARTER,<br><br>                        Plaintiff,<br><br>    vs.<br><br>JONATHAN MANNION, an individual, and JONATHAN MANNION PHOTOGRAPHY LLC, a New York limited liability company,<br><br>                        Defendants. | Case No. 2:21-cv-4848-PA-KS<br><br>***AMICUS CURIAE* BRIEF OF NOTORIOUS B.I.G. LLC IN SUPPORT OF PLAINTIFF SHAWN CARTER'S OPPOSITION TO MOTION FOR SUMMARY JUDGMENT**<br><br>Date: May 16, 2022<br>Time: 1:30 p.m.<br>Judge: Hon. Percy Anderson<br>Courtroom: 9A<br><br>Complaint Filed: June 15, 2021<br>FAC Filed: June 21, 2021<br>Trial Date: July 19, 2022 |

4894-3990-8894.4

*AMICUS CURIAE* BRIEF OF NOTORIOUS B.I.G. LLC IN SUPPORT OF PLAINTIFF SHAWN CARTER'S
OPPOSITION TO MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

Page

I. INTRODUCTION ................................................................................................ 1

II. SUMMARY OF ARGUMENT ......................................................................... 1

III. ARGUMENT ...................................................................................................... 2

    A. The Right to Publicity is a Fundamental Safeguard of Individual Identity ................................................................................ 2

    B. The Transformative Use Test is a Balance of Relative Values .............................................................................................. 4

        1. Application of the Transformative Use Test Should Focus on the Underlying Work ..................................................... 4

        2. Application of the Transformative Use Test Should Account for the Holistic Value of Identity ................................. 6

    C. Preemption Under the Copyright Act Would be Improper ................. 8

        1. Congress Did Not Intend to Preempt the Right of Publicity ......................................................................................... 8

        2. A Person's Name and Likeness Cannot Be Copyrighted .......... 9

        3. The Right Over the Use of a Person's Name and Likeness is Not Equivalent to any Exclusive Right in the Copyright Act ......................................................................... 10

    D. Contract and Consent Issues ................................................................ 11

IV. CONCLUSION ................................................................................................. 13

4894-3990-8894.4

-i-

*AMICUS CURIAE* BRIEF OF NOTORIOUS B.I.G. LLC IN SUPPORT OF PLAINTIFF SHAWN CARTER'S OPPOSITION TO MOTION FOR SUMMARY JUDGMENT

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Federal Cases**

*Ayres v. City of Chicago*,
  125 F.3d 1010 (7th Cir. 1997)...................................................................4, 5

*Brown v. Ames*,
  201 F.3d 654 (5th Cir. 2000).....................................................................8, 9

*C.B.C. Distrib. Mktg., Inc. v. Major League Baseball Advanced Media,*
  *L.P.*,
  505 F.3d 818 (8th Cir. 2007).........................................................................7

*Del Madera Props. v. Rhodes & Gardner*,
  820 F.2d 973 (9th Cir.1987), overruled on other grounds, *Fogerty v.*
  *Fantasy, Inc.*, 510 U.S. 517 (1994) ............................................................10

*Downing v. Abercrombie & Fitch*,
  265 F.3d 994 (9th Cir. 2001)..............................................................8, 9, 10

*Haelan Labs., Inc. v. Topps Chewing Gum, Inc.*,
  202 F.2d 866 (2d Cir. 1953) ..........................................................................2

*Hoepker v. Kruger*,
  200 F. Supp. 2d 340 (S.D.N.Y. 2002)...........................................................5

*Keller v. Elec. Arts, Inc.*,
  724 F.3d 1268 (9th Cir. 2013).......................................................................6

*Laws v. Sony Music Entm't, Inc.*,
  448 F.3d 1134 (9th Cir. 2006)................................................................10, 11

*McFarland v. Miller*,
  14 F.3d 912 (3d Cir. 1994) ............................................................................3

*Medtronic, Inc. v. Lohr*,
  518 U.S. 470 (1996) .......................................................................................8

*Milton H. Greene Archives, Inc. v. Marilyn Monroe LLC*,
  692 F.3d 983 (9th Cir. 2012).........................................................................2

*In re NCAA Student-Athlete Name & Likeness Licensing Litig.*,
   724 F.3d 1268 (9th Cir. 2013) ........................................................................ 3, 10

*Zacchini v. Scripps-Howard Broad. Co.*,
   433 U.S. 562 (1977) ............................................................................................ 3

**State Cases**

*Comedy III Prods. Inc., v. Gary Saderup, Inc.*,
   21 P.3d 797 (Cal. 2001) .......................................................................... 4, 5, 6, 7

*Montana v. San Jose Mercury News, Inc.*,
   34 Cal. App. 4th 790 (1995) ............................................................................... 3

*Palmer v. Schonhorn Enters, Inc.*,
   96 N.J. Super. 72 (1967) ................................................................................. 2, 3

**Federal Statutes**

17 U.S.C. § 101 .......................................................................................................... 2

17 U.S.C. § 102 ...................................................................................................... 8, 9

17 U.S.C. § 103 .......................................................................................................... 8

17 U.S.C. § 106 .............................................................................................. 8, 10, 11

17 U.S.C. § 107 .......................................................................................................... 7

17 U.S.C. § 301 .......................................................................................................... 8

**State Statutes**

Cal. Civ. Code § 3344 ...................................................................................... 3, 8, 10

**Constitutional Provisions**

U.S. Const. amend. I ......................................................................................... 1, 4, 5, 6

**Other Authorities**

Simon G. Davies, *Re-Engineering the Right to Privacy: How Privacy
   Has Been Transformed from a Right to a Commodity, in
   Technology and Privacy: The New Landscape* (Philip E. Agre &
   Marc Rotenberg eds., 1997) ............................................................................. 12

K.J. Greene, *Intellectual Property Expansion, The Good, the Bad, and the Right of Publicity*, 11 Chapman L. Rev. 521, 538 (2008).............................7

H.R. Rep. No. 94-1476 (1976) ........................................................................8

Immanuel Kant, *The Metaphysics of Morals*, Doctrine of Virtue Section 38 (Mary Gregor trans., Cambridge Univ. Press 1996) .........................7

McCarthy, Rights of Publicity and Privacy § 11.13[C] at 11-72-73 (1997)..............................................................................................................9

Mark P. McKenna, *The Right of Publicity and Autonomous Self-Definition,* 67 U. Pitt. L. Rev. 225, 229 (2005)......................................................7

1 M. Nimmer, NIMMER ON COPYRIGHTS, §§ 1.01(B)(1) & 209(F) (1987)...........................................................................................................9, 12

Robert C. Post & Jennifer E. Rothman, *The First Amendment and the Rights of Publicity*, 130 Yale L.J. 86, 121, 165 (2020)........................................7

David E. Shipley, *Three Strikes and They're Out at the Old Ball Game: Preemption of Performers' Rights of Publicity Under the Copyright Act of 1976*, 20 Ariz. St. L.J. 369, 407 (1988) .................................12

Samuel D. Warren & Louis D. Brandeis, *The Right to Privacy*, 4 HARV. L. REV. 193, 211 (1890) ........................................................................2

4894-3990-8894.4

## I.     INTRODUCTION

Notorious B.I.G. LLC, a Delaware limited liability company ("BIG") is the legal representative of the late Christopher George Latore Wallace, p/k/a "Notorious B.I.G." or "Biggie" (hereinafter "Wallace").  Wallace's recordings are well-known and were beloved the world over during his life and remain so after his death.  BIG is a Delaware limited liability company that, *inter alia*, owns and controls the intellectual property rights of Wallace.  BIG is committed to the protection and prosperity of Wallace's music, lyrics, message, persona, name, image, and likeness.

No counsel for a party authored this brief in whole or in part, and no person other than BIG or their counsel made a monetary contribution to the preparation or submission of this brief.

## II.     SUMMARY OF ARGUMENT

For over a century, courts have recognized the existence of and value in the right of publicity.  As the individual's right in his or her persona may present impediments to creativity and expression, courts have carefully balanced this property right with the rights afforded to copyright holders and the protections accorded speakers under the First Amendment.

The right as currently recognized is not a static proclamation nor a finished product by any means.  Indeed, it must necessarily evolve alongside incessant societal and technological advancements as the concepts of privacy and publicity are continually redefined.  Notwithstanding, it has always coexisted with numerous other rights and has been judicially and legislatively curtailed over time.  Its evolution is not therefore the harbinger of doom, but reflects a collective acknowledgment of its placement among the larger fabric of law and policy.

The right of publicity must be carefully fitted against the First Amendment's guarantee of free speech with recognition of both the individual's contribution to the "value" of a good as well as the "value" of an individual themselves.

As it pertains to the Copyright Act, 17 U.S.C. § 101 *et seq*., both the specific facts at issue in this proceeding and the relevant jurisprudence at large make clear that such claims as set forth by Plaintiff Shawn Carter must be recognized as independent and cognizable, beyond the reach of preemption.

A final consideration is that the temptation to resolve such disputes by reference to contract principles is both impractical and insufficient. This Court must wade into the foray utilizing the same fact-intensive analyses previously employed by the numerous judges presented with such disputes.

## III.   ARGUMENT

### A.   <u>The Right to Publicity is a Fundamental Safeguard of Individual Identity</u>

The right to publicity began as a form of privacy and has grown from a tort to a broader right. *See* Samuel D. Warren & Louis D. Brandeis, *The Right to Privacy*, 4 Harv. L. Rev. 193, 211 (1890) ("The right of property in its widest sense, including all possession, including all rights and privileges, and hence embracing the right to an inviolate personality, affords alone that broad basis upon which the protection which the individual demands can be rested."); *Haelan Labs., Inc. v. Topps Chewing Gum, Inc.*, 202 F.2d 866, 868 (2d Cir. 1953) (recognizing the right as a property right); *Milton H. Greene Archives, Inc. v. Marilyn Monroe LLC*, 692 F.3d 983, 992 (9th Cir. 2012) ("The California statutory right of publicity is deemed . . . a property right, freely transferable and descendible[.]").

"[T]he basic and underlying theory" of the right of publicity is "is that a person has the right to enjoy the fruits of his own industry free from unjustified interference. It is unfair that one should be permitted to commercialize or exploit or capitalize upon another's name, reputation or accomplishments[.]" *Palmer v. Schonhorn Enters, Inc.*, 96 N.J. Super. 72, 79 (1967) (citation omitted). "A famous individual's name, likeness, and endorsement carry value and an unauthorized use

4894-3990-8894.4

-2-

*AMICUS CURIAE* BRIEF OF NOTORIOUS B.I.G. LLC IN SUPPORT OF PLAINTIFF SHAWN CARTER'S OPPOSITION TO MOTION FOR SUMMARY JUDGMENT

harms the person both by diluting the value of the name and depriving that individual of compensation.  Unauthorized use of an individual's name is nothing short of an appropriation of the attributes of one's identity."  *McFarland v. Miller*, 14 F.3d 912, 919 (3d Cir. 1994) (citation omitted); *see also Zacchini v. Scripps-Howard Broad. Co.*, 433 U.S. 562, 576 (1977) (recognizing protection of the right of publicity reflects the legislative and judicial judgment that "[n]o social purpose is served by having the defendant get free some aspect of the plaintiff that would have market value and for which he would normally pay").  For some, this value will continue long after their death, providing an important source of income for their families and beneficiaries.  These individuals and their beneficiaries rely on right of publicity laws to protect and prevent misappropriation of one of their greatest assets.

Notwithstanding, under statutory and common law, the right of publicity is subject to ascertainable boundaries and external pressures.  For example, California's statutory right of publicity exempts any "use of a name, voice, signature, photograph, or likeness in connection with any news, public affairs, or sports broadcast or account, or any political campaign."  Cal. Civ. Code § 3344(d).  California's common law right of publicity also does not extend to "publication of matters in the public interest."  *Montana v. San Jose Mercury News, Inc.*, 34 Cal. App. 4th 790, 793 (1995) (citation omitted) (acknowledging "the right of the public to know and the freedom of the press to tell it" trump publicity rights); *see also In re NCAA Student-Athlete Name & Likeness Licensing Litig.*, 724 F.3d 1268, 1282 (9th Cir. 2013).  As discussed further below, friction with the First Amendment and the Copyright Act provide further restraints.  In short, existing limits on the right of publicity already ensure that the exercise of that right will not unduly interfere with artistic expression (or news reporting, or public commentary, or other valuable forms of communication).

Views expressed in support of curtailing the right of privacy portray it as a cancer that, if not diligently monitored and excised at every opportunity, will grow to overwhelm every right it abuts thereby silencing creativity, extinguishing free expression, and devaluing other forms of intellectual property rights.  Yet risk of precisely the opposite is equally at risk.  The increase in methods of capturing and disseminating images coupled with the steady reduction in truly private spaces only underscores the importance of safeguarding this right.

### B.    The Transformative Use Test is a Balance of Relative Values

For over a century, courts have wrestled with the interplay between this property right and the First Amendment.  As media evolved, the courts resolved the consequential intrusions on individual rights, by striking a careful balance between the competing interests.  Yet while there exists an inherent tension between the protected property right in one's identity and the right to speak and create, that tension arises from the necessary and proper balance between those speech rights protected by the First Amendment and the property rights in the fruits of an individual's endeavors, which are his or her own to control.

### 1.    Application of the Transformative Use Test Should Focus on the Underlying Work

The California Supreme Court crafted the transformative use test as a way to balance the intellectual property rights in one's persona with the free expression rights of content creators.  While not a perfect correlation, the court found that "the purpose and character of the use . . . [factor] seem[ed] particularly pertinent to the task of reconciling the rights of free expression and publicity."  *Comedy III Prods. Inc., v. Gary Saderup, Inc.,* 21 P.3d 797, 809 (Cal. 2001) (citing 17 U.S.C. §107(1)).  Resistance to the recognition of an individual's right to govern their identity is rooted in a concern that artists will be prevented from creating and selling expressive works.  *See, e.g., Ayres v. City of Chicago,* 125 F.3d 1010, 1014

(7th Cir. 1997) ("T-shirts are a medium of expression prima facie protected by the free-speech clause of the First Amendment, and they do not lose their protection by being sold.").  The worry is that permitting a right of publicity would equate to an unrestricted veto power over the reproduction and distribution of a photograph. *Comedy III Prods.,* 21 P.3d at 807 ("What the right of publicity holder possesses is not a right of censorship, but a right to prevent others from misappropriating the economic value generated by the celebrity's fame[.]").  But it is not the impairment of artistic expression that is at issue but the underlying commercial nature of the photograph.

The case of *Hoepker v. Kruger*, 200 F. Supp. 2d 340 (S.D.N.Y. 2002) is illustrative.  There, the court reasoned that memorabilia from the Museum of Contemporary Art L.A. ("MOCA")—t-shirts and refrigerator magnets—imprinted with copies of artwork were artistic works rather than commercial goods.  *Id.* at 353.  Mr. Mannion attempts to analogize that the placement of the photographs on various "physical products…does not change their status as expressive works," Dkt. 82 at 16, but the photographs here are different in a crucial respect.  Unlike the expressive works sold by MOCA which were created primarily to artistically express a viewpoint, *see Hoepker,* 200 F. Supp. 2d at 342, Mr. Mannion's photographs were taken to accomplish Plaintiff's commercial goals to promote his albums, Dkt. 94 at 20.  Moreover, when the public views MOCA's t-shirt memorabilia, the depiction is understood to be merely reference to the artistic work. *See Hoepker*, 200 F. Supp. 2d at 353 ("the museums are selling art, albeit on t-shirts and refrigerator magnets").

In this case, the photographs on t-shirts and slipmats are making use of Plaintiff's name, image, and likeness for commercial gain.  Put another way, these products are not being purchased by consumers for what they "say" but rather for what they are – a tangible piece of Plaintiff's identity.

### 2. Application of the Transformative Use Test Should Account for the Holistic Value of Identity

In the same way that an expressive activity "does not lose its constitutional protection because it is undertaken for profit," *Comedy III*, 21 P.3d at 802, no amount of creative contribution will warrant shelter behind the First Amendment when "the marketability and economic value of the challenged work derive[s] primarily from the fame of the celebrity depicted." *Keller v. Elec. Arts, Inc.,* 724 F.3d 1268, 1274 (9th Cir. 2013).

This case clearly illustrates why the analysis must focus on the individual and not the work as a whole. Defendants point to Mr. Mannion's "creative contributions" including the "lighting, composition, poses, angles, and props" as evidence of the transformative nature of the photographs. Dkt. 82 at 19. In so doing, Defendants' suggest that a few minimal alterations would add enough creative expression to avoid liability, even with such a painstakingly literal depiction of Plaintiff or obvious reference to Plaintiff's identity. Such an interpretation would eradicate the careful balance the transformative use defense was intended to recognize, rendering claims for all but the most egregious infringements moot.

Nor does the requirement that the value be "primarily" derived from the identity of the individual necessitate a comparison of the relative commercial values of the subject and the photograph. Indeed, the reduction of an individual to a monetary figure is both simplistic and appalling. Rather, there is inherent value in a person's identity both as a reflection of their right to dignity and self-definition. Guarding against Defendants' proposed encroachment embodies a recognition of efforts by performers, athletes, and public figures to carefully cultivate their image. Public policy and precedent mandate the recognition and protection of both the commercial and non-commercial rights of individual identity.

The transformative use test is derived from the "fair use" defense applicable in copyright infringement suits.  17 U.S.C. § 107.  Given its copyright-based roots, the transformative use test focuses primarily upon weighing important economic interests against freedom of expression.  *Comedy III*, 21 P.3d at 807 (noting "the necessary implication of this observation is that the right of publicity is essentially an economic right").

Part of the challenge for mediating disputes between these overlapping doctrines is that the right of publicity and trademark laws are commonly thought of as concerned solely with market-based interests.  However, "the interests that states typically intend to vindicate by providing rights of publicity to individuals," are not only economic, but also "non-monetary interests," including "protecting natural rights."  *C.B.C. Distrib. Mktg., Inc. v. Major League Baseball Advanced Media, L.P.,* 505 F.3d 818, 824 (8th Cir. 2007).

These natural rights have been described to include the right of dignity, *see* Robert C. Post & Jennifer E. Rothman, *The First Amendment and the Rights of Publicity*, 130 Yale L.J. 86, 121, 165 (2020)), the right of personhood (K.J. Greene, *Intellectual Property Expansion, The Good, the Bad, and the Right of Publicity*, 11 Chapman L. Rev. 521, 538 (2008), and an individual's interest in autonomous self-definition, *see* Mark P. McKenna, *The Right of Publicity and Autonomous Self-Definition,* 67 U. Pitt. L. Rev. 225, 229 (2005).  The determination of intellectual property rights and commercialization of one's identity is nonetheless inseparable from foundational notions of human dignity.  *See* Immanuel Kant, *The Metaphysics of Morals,* Doctrine of Virtue Section 38 (Mary Gregor trans., Cambridge Univ. Press 1996) (recognizing human beings should be treated as ends in-and-of-themselves, and not simply as means to an end).

Incessant developments in technology mean that artists and performers are continually re-introduced to new generations of fans interacting with their works for

the first time – even after their death.  The right of publicity acknowledges and protects the importance of this enduring legacy.  *See* Cal. Civ. Code § 3344.  The right of publicity was borne of this recognition and courts must be wary of any encroachment that would erode these fundamental principles.

### C.   Preemption Under the Copyright Act Would be Improper

#### 1.   Congress Did Not Intend to Preempt the Right of Publicity

In deciding whether or not a right of publicity claim is preempted by copyright law, the Ninth Circuit applies a two-part test.  "First, the content of the protected right must fall within the subject matter of copyright as described in 17 U.S.C. §§ 102 and 103.  Second, the right asserted under state law must be equivalent to the exclusive rights contained in section 106 of the Copyright Act." *Downing v. Abercrombie & Fitch*, 265 F.3d 994, 1003 (9th Cir. 2001).

Notably Section 301 does not preempt state law "rights and remedies that are different in nature from the rights comprised in a copyright."  H.R. Rep. No. 94-1476, at 132 (1976).  Indeed, Congress specifically identified the right of publicity as an exception to Section 301 preemption because it is "different in kind from copyright infringement."  *Id.*; *see also Brown v. Ames*, 201 F.3d 654, 661 (5th Cir. 2000) ("As noted in the legislative history of section 301, Congress was aware of the operation of state law on the rights of privacy and publicity, and indicated its intention that such state law causes of action remain.").

Given Congress's express recognition that Section 301 was not meant to subsume the right of privacy, especially clear statutory preemption language is needed to conclude otherwise.  *See, e.g., Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996) (holding express preemption provisions must be construed narrowly in light of "federalism concerns and the historic primacy of state regulation of matters of health and safety").  Not only is there no such language in Section 301, but right of publicity claims do not satisfy either of the two prerequisites for preemption.

## 2.     A Person's Name and Likeness Cannot Be Copyrighted

The Copyright Act was never intended, and cannot fairly be construed, to give companies or individual photographers the unfettered right to appropriate the commercial value of a person's name or likeness by the expedient of using copyrightable photographs.

"The 'work' that is the subject matter of the right of publicity is the persona, i.e., the name and likeness of a celebrity or other individual. A persona can hardly be said to constitute a 'writing' of an 'author'" under the Copyright Act. *Downing*, 265 F.3d at 1003-04 (quoting 1 *Nimmer on Copyright* §1.01[B][1][c] at 1-23 (1999)) (alteration omitted); *see also id*. at 1004 ("The 'subject matter' of a Right of Publicity claim is not a particular picture or photograph of plaintiff. Rather, what is protected by the Right of Publicity is the very identity or persona of the plaintiff as a human being.") (quoting McCarthy, *Rights of Publicity and Privacy* § 11.13[C] at 11-72-73 (1997)); *see also id*. ("The subject matter of Appellants' statutory and common law right of publicity claims is their names and likenesses."); *Brown*, 201 F.3d at 658 ("A persona does not fall within the subject matter of copyright."); 17 U.S.C. § 102(a)(1)-(8) (explaining examples of "works of authorship" include literary, musical, dramatic, choreographic, pictorial, sculptural, audiovisual, and architectural works; motion pictures; and sound recordings).

Equating an individual's likeness with an author's work unreasonably stretches the definitions of "writing" and "original works of authorship." The intangible proprietary interests associated with his or her likeness derive from the individual's efforts, and the efforts of those committed to supporting them, not from a photographer's creativity. They are not confined to nor do they depend upon any particular fixation. Rather, they can and must be protected by the right of publicity notwithstanding their depiction in a copyrighted photo as it affords protection where none exists under copyright law and preemption should not bar relief.

**3.**     **The Right Over the Use of a Person's Name and Likeness is
Not Equivalent to any Exclusive Right in the Copyright Act**

To satisfy the "equivalent rights" part of the preemption test, the alleged
misappropriation must be equivalent to rights within the general scope of copyright
as specified by section 106 of the Copyright Act. *Del Madera Props. v. Rhodes &
Gardner*, 820 F.2d 973 (9th Cir.1987), overruled on other grounds, *Fogerty v.
Fantasy, Inc.*, 510 U.S. 517 (1994).  And, conversely, "[t]o survive preemption, the
state cause of action must protect rights which are qualitatively different from the
copyright rights . . . .  The state claim must have an extra element which changes
the nature of the action." *Id*.  The Ninth Circuit in *Downing* held, on similar facts,
that a plaintiff's right of publicity "claims are not equivalent to the exclusive rights
contained in § 106." *Downing*, 265 F.3d at 1005.  And *Laws v. Sony Music
Entertainment, Inc*., 448 F.3d 1134 (9th Cir. 2006), confirmed that "not every right
of publicity claim is preempted by the Copyright Act." *Id*. at 1145.

To establish a common law right-of-publicity claim under California law,
however, the plaintiff must establish "(1) the defendant's use of the plaintiff's
identity; (2) the appropriation of plaintiff's name or likeness to defendant's
advantage, commercially or otherwise; (3) lack of consent; and (4) resulting
injury." *NCAA Student-Athletes*, 724 F.3d at 1273 n.4 (citation omitted).  To
establish a statutory claim, the plaintiff must prove "all the elements of the common
law cause of action plus a knowing use by the defendant as well as a direct
connection between the alleged use and the commercial purpose." *Id*. (quotation
omitted); Cal. Civ. Code § 3344.

California right-of-publicity claims thus include at least one extra element
that "change[s] the nature of the action" from one arising under Section 106: the
appropriation of the plaintiff's name or likeness to the defendant's advantage.  Here,
Mr. Mannion has ostensibly used both Plaintiff's name and likeness to his
advantage.  Likewise, while Section 106 gives copyright holders the exclusive right

-10-

to reproduce, distribute, and display copyrighted photographs, right of publicity claims do not challenge the mere reproduction of a copyrightable photograph. Instead, they challenge the appropriation of the commercial value of the likenesses and identities reproduced therein.  Because Section 106 does not grant a right to such forms of commercial appropriation, the right of publicity claim is not equivalent, and therefore not preempted.

### D.   Contract and Consent Issues

Contracts can solve some of the problems associated with the right of publicity's murky intersection with copyright privileges, insofar as a contract can clarify advertising and merchandising rights.  For example, in *Laws,* the plaintiff signed a contract explicitly giving up "the exclusive worldwide right in perpetuity . . . to lease, license, convey or otherwise use or dispose of such master recordings." *Laws,* 448 F.3d at 1136.[1]  But contract law is not a panacea.

The simplest and most common shortcoming is the lack of privity between right of publicity holders and copyright holders.  As is increasingly the case, photographers are hired directly by magazines or publication outlets to provide content bearing a person's name, image, or likeness.  While a public figure has contractual rights against the publication, a robust right of privacy remains their sole method for protecting the use and dissemination of the resulting content. Beginning and ending the analysis with a formulaic determination of whether the photographer holds a valid copyright or whether they have breached a provision of the contract with the magazine turns a cold shoulder to the person with arguably the

---

[1] *Laws* can easily be distinguished from this matter insofar as Defendants have not made such an allegation, and Plaintiff never entered into a contract waiving the publicity rights held in connection with the photos at issue.  Instead, Defendants admit that "Plaintiff signed a 2009 license agreement [specifically for] the use of seven . . . photographs for an advertisement for Rhapsody" (Dkt. 82 at 14) thereby demonstrating the parties' understanding that there was no such previously existing waiver.  As such, *Laws* directly undermines the Motion, as it holds that "not every right of publicity claim is preempted by the Copyright Act." *Laws,* 448 F.3d at 1145.

most at stake.  Moreover, an overreliance upon a 'market solution' would necessarily result in further encumbrances upon contractual arrangements and result in a contraction of creative content.  *See, e.g.*, Simon G. Davies, *Re-Engineering the Right to Privacy: How Privacy Has Been Transformed from a Right to a Commodity, in Technology and Privacy: The New Landscape*, 143, 160 (Philip E. Agre & Marc Rotenberg eds., 1997) ("Privacy's journey from the political realm to the consumer realm invokes a new set of relationships and values.  Placing privacy in the 'free market' environment along with such choices as color, durability, and size creates an environment in which privacy becomes a costly 'add-on.'") (internal citations omitted).

In the absence of an express contractual relation, it is tempting to refer to notions of consent or implied agreements.  But neither should affect the determination of whether a right of publicity claim withstands preemption.  Although asserting the claim against the commercial use of an authorized work that comes within the subject matter of copyright (the photograph), the publicity interest at stake is not transformed by consent to pose for the photograph, and the ownership of copyright in the photograph does not equate to a right of unfettered use.  *See* David E. Shipley, *Three Strikes and They're Out at the Old Ball Game: Preemption of Performers' Rights of Publicity Under the Copyright Act of 1976*, 20 Ariz. St. L.J. 369, 407 (1988) (recognizing copyright ownership does not give the holder license to violate the right of publicity just as it does not give the author of a book freedom to libel someone or to violate a person's right of privacy).

Notwithstanding any such consent, the publicity interest at stake is independent of any resulting photograph.  This is because it seeks to protect the value associated with a person's likeness as opposed to the photograph itself.  *See* 1 M. Nimmer, NIMMER ON COPYRIGHTS, §§ 1.01(B)(1) & 209(F) (1987).  While the copyright holder may argue that consent to the photo impliedly authorizes its commercial use, this defense is necessarily a fact-specific analysis depending upon,

*inter alia*, the circumstances of the photograph, the particular version of the

person's likeness, the parties' statements and understandings, etc.  But, the right of

publicity cannot be dismissed on preemption grounds simply because the likeness is

contained in a copyrighted photograph in which the person consented to appear.

## IV.   CONCLUSION

The right of publicity is a unique and essential means of protecting the name,

reputation, and accomplishments of an individual, even long after their

death.  These individuals and their beneficiaries rely on right of publicity laws to

protect and prevent misappropriation of their greatest and most vulnerable assets.

As set forth herein, public policy and precedent mandate the recognition and

protection of both the commercial and non-commercial rights of individual identity

both as a form of intellectual property and as an inherent right of all human beings.


Dated:      May 2, 2022                    Respectfully submitted,
                                           NIXON PEABODY LLP



                                           By:*/s/ Staci Jennifer Trager*
                                               Staci Jennifer Trager
                                               Aaron Brian
                                               Attorneys for *Amicus Curiae*
                                               NOTORIOUS B.I.G. LLC