1  QUINN EMANUEL URQUHART
        & SULLIVAN, LLP
2  Alex Spiro (*pro hac vice*)
        alexspiro@quinnemanuel.com
3  Cory D. Struble (*pro hac vice*)
        corystruble@quinnemanuel.com
4  51 Madison Avenue, 22nd Floor
   New York, New York 10010
5  Telephone:  (212) 849-7000
   Facsimile:   (212) 849-7100
6
7  Robert M. Schwartz (Bar No. 117166)
        robertschwartz@quinnemanuel.com
8  Dylan C. Bonfigli (Bar No. 317185)
        dylanbonfigli@quinnemanuel.com
   865 South Figueroa Street, 10th Floor
9  Los Angeles, California 90017-2543
   Telephone:  (213) 443-3000
10 Facsimile:   (213) 443-3100

11 *Attorneys for Plaintiff*

12

13             **UNITED STATES DISTRICT COURT**

14     **CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION**

15

16 | SHAWN CARTER, also known as | Case No.  2:21-cv-04848-PA-KS |
17 | JAY-Z, an individual, | **PLAINTIFF'S MOTION IN LIMINE** |
   | | **NO. 2 (TO EXCLUDE TESTIMONY** |
18 |             Plaintiff, | **FROM JEFFREY SEDLIK);** |
   | | **DECLARATION OF DYLAN C.** |
19 |          v. | **BONFIGLI** |
20 | JONATHAN MANNION, an | The Honorable Percy Anderson |
   | individual, and JONATHAN | |
21 | MANNION PHOTOGRAPHY LLC, a | Date:        July 11, 2022 |
   | New York limited liability company, | Time:        1:30 p.m. |
22 | | Courtroom: 9A |
   |             Defendants. | |
23 | | Trial Date:  July 19, 2022 |

24

25

26

27

28

1    TO THE COURT, ALL PARTIES, AND THEIR COUNSEL OF RECORD

2    PLEASE TAKE NOTICE that on July 11, 2022, at 1:30 p.m. or as soon as the

3 matter may be heard, in Courtroom 9A of the above-titled Court, located at 350 W.

4 1st Street, Los Angeles, California 90012, Plaintiff Shawn Carter will, and hereby

5 does, move *in limine* for an order excluding the opinions of Defendants' expert,

6 Jeffrey Sedlik. This motion is based on the grounds that Mr. Sedlik's opinions are

7 not relevant, *see* Fed. R. Evid. 401, 402, and, if presented, they will likely cause

8 unfair prejudice to Plaintiff, confuse the issues, mislead the jury, and waste trial

9 time. *See* Fed. R. Evid. 403. Additionally, Mr. Sedlik's opinions do not satisfy the

10 requirements of Rule 702 of the Federal Rules of Evidence and *Daubert v. Merrell*

11 *Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993).

12    This motion is based on this notice; the memorandum of points and

13 authorities; the declaration of Dylan C. Bonfigli; all pleadings, records, and papers

14 on file in this action; such other matters of which this Court may take judicial

15 notice; and upon such other evidence and oral argument as may be considered by the

16 Court before or at the hearing on this application.

17    The evidence subject to this motion includes: JX-140 and JX-141.

18    This motion is made following a conference of counsel pursuant to Local

19 Rule 7-3 and Section II.B of this Court's Civil Trial Scheduling Order (ECF No.

20 52), which took place on May 20, 2022.

21 DATED:  June 17, 2022              QUINN EMANUEL URQUHART
                                      & SULLIVAN, LLP
22

23

24    By /s/ Robert M. Schwartz
      _____
25      Alex Spiro (*pro hac vice*)
        Robert M. Schwartz
26      Cory D. Struble
        Dylan C. Bonfigli
27      *Attorneys for Plaintiff*

28

# **TABLE OF CONTENTS**

**Page**

I.    PRELIMINARY STATEMENT ................................................................ 1

II.   SEDLIK'S OPINION THAT MANNION MADE "CREATIVE DECISIONS" IS IRRELEVANT AND IMPROPER .................................. 2

III.  SEDLIK'S OTHER OPINIONS ARE EQUALLY IRRELEVANT ............. 4

IV.   CONCLUSION ..................................................................................... 5

DEFENDANTS' OPPOSITION ......................................................................... 6

I.    INTRODUCTION .................................................................................. 6

II.   RELEVANT BACKGROUND ................................................................ 6

III.  ARGUMENT ........................................................................................ 7

    A.    Plaintiff Does Not Dispute Professor Sedlik's Expert Qualifications ................................................................................ 7

    B.    Professor Sedlik May Properly Testify as to Mannion's Creativity, Authorship, and Expression in the Photographs ............... 8

        1.    Plaintiff's Motion Improperly Seeks Determination of Legal Claims and Defenses ..................................................... 8

        2.    Professor Sedlik's Testimony Is Not Merely "Parroting," But Provides Valuable Insight for the Jury ............................. 9

    C.    Professor Sedlik's Testimony as to Industry Custom Is Relevant ....... 12

    D.    There Is No Basis Whatsoever for Exclusion of Rebuttal Testimony ................................................................................... 14

IV.   CONCLUSION ................................................................................... 14

PLAINTIFF'S REPLY ..................................................................................... 16

    A.    Sedlik's testimony is irrelevant and improper. ............................... 16

    B.    Sedlik's "industry custom" opinions are irrelevant. ...................... 17

    C.    Sedlik's testimony should be limited to rebuttal. ........................... 18

CONCLUSION .............................................................................................. 18

DECLARATION OF DYLAN C. BONFIGLI .................................................... 20

ATTESTATION STATEMENT ........................................................................ 22

1

## <u>TABLE OF AUTHORITIES</u>

2

<u>Page</u>

3

## <u>Cases</u>

4   *Bakst v. Cmty. Mem'l Health Sys., Inc.*,
5        No. CV0908241MMMFFMX, 2011 WL 13214315 (C.D. Cal. Mar. 7,
         2011).................................................................................................8

6   *Benson Tower Condo. Owners Ass'n v. Victaulic Co.*,
7        702 F. App'x 537 (9th Cir. 2017)...................................................12

8   *Brittney Gobble Photography, LLC v. Sinclair Broad. Grp., Inc.*,
9        No. CV SAG-18-03384, 2021 WL 5359671 (D. Md. Nov. 17, 2021) .......... 3, 11

10  *Comedy III Prods., Inc. v. Gary Saderup, Inc.*,
11       25 Cal. 4th 387, 21 P.3d 797 (2001)......................................3, 9, 16

12  *Danjaq LLC v. Sony Corp.*,
13       263 F.3d 942 (9th Cir. 2001)..........................................................14

14  *Daubert v. Merrell Dow Pharm., Inc.*,
15       509 U.S. 579 (1993) .......................................................................1

16  *Dep't of Toxic Substances Control v. Technichem, Inc.*,
         No. 12-CV-05845-VC, 2016 WL 1029463 (N.D. Cal. Mar. 15, 2016).........3, 11

17  *Dykzeul v. Charter Commc'ns, Inc.*,
18       No. CV185826DSFGJSX, 2021 WL 4522545 (C.D. Cal. Feb. 3, 2021)...........12

19  *Elliott v. Versa CIC, L.P.*,
20       349 F. Supp. 3d 1000 (S.D. Cal. 2018).............................................9

21  *Huawei Techs., Co. v. Samsung Elecs. Co.*,
22       340 F. Supp. 3d 934 (N.D. Cal. 2018)..............................................2

23  *ITN Flix, LLC v. Hinojosa*,
24       686 F. App'x 441 (9th Cir. 2017) ................................................. 5, 17

25  *Jones v. Corbis Corp.*,
         815 F. Supp. 2d 1108 (C.D. Cal. 2011) ..........................................14

26

27  *Karol W. Corp. v. Smith News Co., Inc.*,
         No. CV1207695BROVBKX, 2013 WL 12084485 (C.D. Cal. Aug. 23,
28       2013)................................................................................................11

-ii-

*Messick v. Novartis Pharms. Corp.*,
   747 F.3d 1193 (9th Cir. 2014)..............................................................12, 13

*Midwest Television, Inc. v. Scott, Lancaster, Mills & Atha, Inc.*,
   205 Cal. App. 3d 442, 252 Cal. Rptr. 573 (1988)........................................13

*Navarro v. Procter & Gamble Co.*,
   No. 1:17-CV-406, 2021 WL 868586 (S.D. Ohio Mar. 8, 2021)................. 3, 11

*No Doubt v. Activision Pub'g, Inc.*,
   192 Cal. App. 4th 1018, 122 Cal. Rptr. 3d 397 (2011)...............................3, 9

*People v. Kinder Morgan Energy Partners, L.P.*,
   159 F. Supp. 3d 1182 (S.D. Cal. 2016).......................................................14

*Primiano v. Cook*,
   598 F.3d 558 (9th Cir. 2010)......................................................................13

*Sanchez v. Jiles*,
   No. CV1009384MMMOPX, 2012 WL 13005996 (C.D. Cal. June 14, 2012)
   .......................................................................................................... 4, 11, 17

*Shuler v. City of L.A.*,
   849 F. App'x 671 (9th Cir. 2021) ................................................................5

*Siqueiros, et al., Plaintiffs, v. General Motors.*,
   No. 16-CV-07244-EMC, 2022 WL 74182 (N.D. Cal. Jan. 7, 2022)..........3, 4, 10

*Sportspower Ltd. v. Crowntec Fitness Mfg. Ltd.*,
   2020 WL 3213704 (C.D. Cal. Feb. 3, 2020)................................................18

*United States v. L.E. Cooke Co.*,
   991 F.2d 336 (6th Cir. 1993).......................................................................12

*United States v. Rogers*,
   769 F.2d 1418 (9th Cir. 1985).......................................................................7

*Winter v. DC Comics*,
   30 Cal. 4th 881 (2003) ................................................................................2

## **Rules and Regulations**

Fed. R. Civ. P. 26(a)(2)(D) ..............................................................................14

Fed. R. Evid. 401, 402 ................................................................................. 1, 2

1

Fed. R. Evid. 403 ................................................................................1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# I.     <u>PRELIMINARY STATEMENT</u>

Plaintiff Shawn Carter, p/k/a Jay-Z, moves to exclude Defendants' witness, Jeffrey Sedlik, from testifying as an expert.  Sedlik teaches photography.  He proposes to offer testimony that "Mannion made countless subjective creative decisions" that resulted in "creative photographs."  (Report [Bonfigli Dec. Ex. B] at 18-22.)  True or not, any decisions that Mannion made in taking photographs, and whether they were "creative," is irrelevant to his "transformative use" defense or any other claim or defense.

In fact, Sedlik's opinion is precisely the type of improper witness-bolstering—i.e., parroting back what a fact witness said, with the aim of putting an "expert" label on it—for which his testimony has been excluded in the past. Sedlik's opinion simply adopts Mannion's narrative as true and gives it the imprimatur of expert testimony without further validation or application of scientific or any other methodology.  His report discloses no investigation, testing, or anything else beyond pointing out non-scientific, non-expert (irrelevant) statements about Mannion's photographs.  None of this meets the *Daubert* standards.  The Court should exclude that testimony.

The Court should also exclude Sedlik's remaining opinions.  They are irrelevant statements about industry customs that have no bearing on this case.  For example, he proposes to testify that it is customary for photographers to sell copies of photographs without obtaining permission from the persons depicted in the photos.  These opinions would prejudice Jay-Z by suggesting that the fact-finder decide the case on an improper basis, such as that Defendants' actions were permissible because they were consistent with the practices of other lawbreakers. Just as it is no defense to a speeding ticket to say that others were speeding, it is no defense to infringement of name, image, and likeness rights to say that others act with the same contempt for those rights.

## II.   <u>SEDLIK'S OPINION THAT MANNION MADE "CREATIVE DECISIONS" IS IRRELEVANT AND IMPROPER</u>

Only relevant evidence is admissible.  Fed. R. Evid. 401, 402.  Expert testimony should be excluded also when the fact-finder "is in as good a position as the expert to draw conclusions from the evidence, and is capable of drawing its own inferences." *Huawei Techs., Co. v. Samsung Elecs. Co.*, 340 F. Supp. 3d 934, 992 (N.D. Cal. 2018).

Sedlik's primary opinion is that Mannion contributed "original authorship and expression" to the photos of Jay-Z that Mannion took. (Report [Bonfigli Dec. Ex. B] at 19.)  To reach this decision, he "started with a list" of creative decisions that all photographers make and then "asked Mr. Mannion whether or not he did these things and if he had anything to add." (Sedlik Tr. [Bonfigli Dec. Ex. A] at 149:5-17, 152:10-22.)

Based on Mannion's responses, Sedlik's report recites a boilerplate list of "examples of original authorship [Mannion] exercised," such as that he "arranged wardrobe, props, accessories," "creatively applied exposure," "creatively selected the lens focal length," and "creatively and dynamically selected the position of the camera for each scene, for desired effect." (Report [Bonfigli Dec. Ex. B] at 18-19.) Sedlik admitted, however, that he "did not separately validate with other parties or other sources that Mr. Mannion actually did the things that he claimed to do." (Sedlik Tr. [Bonfigli Dec. Ex. A] at 157:21-158:18.)

Sedlik's opinion that Mannion "made countless subjective creative decisions" and that "the expression embodied in the Photographs … is in great measure the result of Mr. Mannion's creative vision" is not relevant. (Report [Bonfigli Dec. Ex. B] at 18-22.)  Mannion's transformative use defense can be resolved "simply by viewing the work in question and, if necessary, comparing it to an actual likeness of the person or persons portrayed." *Winter v. DC Comics*, 30 Cal. 4th 881, 891-92 (2003).

That is particularly true here given that the photographs at issue, by Mannion's own admission, are literal depictions of Jay-Z as he appeared when he stood in front of Mannion's camera. (Mannion Tr. [Bonfigli Dec. Ex. E] at 196:20-197:3, 197:24-198:13, 209:12-23, 215:3-18); *cf. Comedy III Prods., Inc. v. Gary Saderup, Inc.*, 25 Cal. 4th 387, 405 (2001) ("When artistic expression takes the form of a literal depiction or imitation of a celebrity for commercial gain, directly trespassing on the right of publicity without adding significant expression beyond that trespass, the state law interest in protecting the fruits of artistic labor outweighs the expressive interests of the imitative artist."); *No Doubt v. Activision Publ'g, Inc.*, 192 Cal. App. 4th 1018, 1030 (2011) (rejecting transformative use defense when video game did not "transform the avatars [of band members] into anything other than exact depictions of [the band members] doing exactly what they do as celebrities"). Thus, Sedlik's opinions about the "subjective creative decisions" made by Mannion leading up to taking photographs of Jay-Z are not relevant to his transformative use defense or any other issue.

Sedlik's opinion is doubly impermissible because it is also improper expert bolstering of witness testimony for which courts have excluded his opinion in the past.[1] An expert "may not restate or summarize record evidence and then state a conclusion without applying a methodology that is reliable and which evinces his/her expertise." *Siqueiros v. General Motors LLC*, 2022 WL 74182, at *9–10 (N.D. Cal. Jan. 7, 2022). In other words, an expert may not merely "parrot" or "regurgitate information given to him by other sources." *Dep't of Toxic Substances*

---

[1] *See Brittney Gobble Photography, LLC v. Sinclair Broad. Grp., Inc.*, 2021 WL 5359671, at *9 (D. Md. Nov. 17, 2021) (excluding Sedlik's opinions because he merely "parrot[ed] [plaintiff's] arguments" in an attempt to "lend them the imprimatur of expert testimony"); *Navarro v. Procter & Gamble Co.*, 2021 WL 868586, at *10 (S.D. Ohio Mar. 8, 2021) (excluding Sedlik's "opinion on fraud damages" because it "amount[ed] to little more than parroting back [plaintiff's] own estimates, coupled with his stamp of approval, with no clear basis for explaining why that stamp was warranted").

*Control v. Technichem, Inc.*, 2016 WL 1029463, at *1 (N.D. Cal. Mar. 15, 2016). That type of testimony "does not aid [the fact-finder's] understanding of the facts beyond what they can glean" from the expert's sources, and the expert's "'opinions' do nothing more than lend the special aura of credibility associated with expert testimony to" the person whose testimony the expert parrots. *Sanchez v. Jiles*, 2012 WL 13005996, at *32-35 (C.D. Cal. June 14, 2012).

Sedlik admitted at his deposition that he adopted Mannion's narrative about the creative choices he made in taking the photographs and that he did nothing to validate that narrative. (Sedlik Tr. [Bonfigli Dec. Ex. A] at 152:10-22; 157:21-158:18.)  Then, based solely on Mannion's say-so, Sedlik opines that "the expression embodied in the Photographs—and the value represented in the Photographs—is in great measure the result of Mr. Mannion's creative vision, his subjective decisions made in the course of authoring the Photographs, and his ability and intent to express his personal views and perspective on Mr. Carter and hip-hop culture." (Report [Bonfigli Dec. Ex. B] at 23.)  That is improper bolstering, and Sedlik has plainly not "appli[ed] a methodology that is reliable and which evinces his[] expertise." *Siqueiros*, 2022 WL 74182, at *9–10.

Relatedly, Sedlik's opinion lacks foundation because it does not consider all the relevant facts.  For instance, Sedlik opined that Mannion was the one who picked out the "wardrobe, props, accessories" (Report [Bonfigli Dec. Ex. B] at 19), ignoring testimony that it was actually Plaintiff and his team who did so (*see, e.g.*, Burke Tr. [Bonfigli Dec. Ex. D] at 12:15-13:6, 13:12-14:25, 16:3-24).  Yet Sedlik inexplicably credits Mannion with this "creative choice" based on Mannion's word and without any validation.  Sedlik's testimony will serve only to add an unwarranted imprimatur of an expert to Mannion's version of events.

### III.   SEDLIK'S OTHER OPINIONS ARE EQUALLY IRRELEVANT

Sedlik offers many other opinions that are not relevant or are impermissible legal opinions.  These include opinions that: (1) "[p]hotographers typically retain

copyright ownership of the copyrights in the photographs they create" (Report [Bonfigli Dec. Ex. B] at 25); (2) "compensation derived by photographers for the creation of a photograph … is typically insufficient to operate a sustainable business" (*id.* at 27); (3) "Mr. Mannion generates revenue from photography assignments and secondary/derivative markets" (*id.* at 30); (4) "Mr. Carter exploited and continues to exploit Mr. Mannion's Photographs and copyrights" (*id.* at 31); (5) "[p]hotographers leverage diverse conduits to distribute and display their photographs to the public" (*id.* at 33); (6) "photographers typically display, offer and sell fine art prints, and publish photographs to websites and social media platforms, without obtaining model releases from celebrities or other persons depicted in photographs" (*id.* at 35); (7) "[p]hotographers typically license limited rights to their clients in the music industry" (*id.* at 37); and "[t]he photographs would not exist without Mr. Mannion, his creative visions and original expression" (Rebuttal Report [Bonfigli Dec. Ex. C] at 8).

These opinions have no bearing on any of the claims or defenses in this case. Opinions about these customs and practices in the photography industry and how photographers make money do not "tend to prove" any of Defendants' affirmative defenses. Nor are the opinions relevant to Jay-Z's right-of-publicity claims. Rather, these opinions would merely confuse the fact-finder by "suggest[ing] [a] decision on an improper basis," *Shuler v. City of L.A.*, 849 F. App'x 671, 673 (9th Cir. 2021), such as that Defendants' actions were permissible because photographers "typically … sell fine art prints without obtaining model releases." Whether that is true, it has nothing to do with the issues that the factfinder will decide in this case. "[I]ndustry custom is irrelevant, given that it cannot make legal that which is illegal." *ITN Flix, LLC v. Hinojosa*, 686 F. App'x 441, 444 (9th Cir. 2017).

## IV.   **CONCLUSION**

The Court should exclude the opinions of Jeffrey Sedlik.

**DEFENDANTS' OPPOSITION**

**I.     INTRODUCTION**

Jeffrey Sedlik is a well-respected professional and instructor in the field of photography.  Plaintiff's attempts to exclude Professor Sedlik's testimony from trial fail on all accounts.

*First*, Plaintiff cannot exclude Professor Sedlik from testifying as to Defendant Jonathan Mannion's creative contributions to the photographs at issue. This testimony is clearly relevant to Defendants' First Amendment defense. Plaintiff's argument that such testimony is irrelevant because this defense is legally defective is an improper attempt to seek a dispositive ruling by way of a motion in limine.  Nor can Plaintiff demonstrate that this testimony is improper "bolstering"— Professor Sedlik is not regurgitating facts, but supplying a well-informed analysis.

*Second*, Professor Sedlik must be permitted to testify as to photography industry customs and practices.  As explained below, such testimony is relevant both as rebuttal to Plaintiff's proffered expert testimony purportedly about photography, and also to show Plaintiff's awareness of Defendant's conduct in question, which goes to elements of both Plaintiff's claims and Defendant's affirmative defenses.

Accordingly, Plaintiff's motion should be denied in its entirety.

**II.     RELEVANT BACKGROUND**

Plaintiff asserts claims arising from Defendant Jonathan Mannion Photography LLC's ("JMP") use of eight photographs shot by Defendant Jonathan Mannion ("Mannion") and featuring Plaintiff (the "Photographs").  First Amended Complaint ("FAC") at ¶ 20-21; PTCO § VI.A.

Professor Jeffrey Sedlik is an expert in the field of professional photography. Declaration of Dylan Bonfigli ("Bonfigli Decl.") Ex. B at 2-8.  On March, 14, 2022, Professor Sedlik submitted a preliminary expert report offering his opinion, *inter alia*, as to Defendant Mannion's "original expression" in the Photographs and general industry practices.  *Id.* at 18-38.  On March 31, 2022, Professor Sedlik

1  submitted a rebuttal expert report, in which Professor Sedlik rebutted certain

2  opinions proffered by Plaintiff's designated expert, Meghan Mahn Miller. *Id.* Ex. C.

3  Professor Sedlik has been designated to testify at the trial in this matter for both

4  Defendants' case-in-chief, and to rebut the testimony of Ms. Miller, if necessary.

5  Declaration of Lika Miyake ("Miyake Decl.") Ex. P (Witness List).

6  **III.   ARGUMENT**

7     **A.   Plaintiff Does Not Dispute Professor Sedlik's Expert Qualifications**

8        "[A] witness qualified as an expert by knowledge, skill, experience may

9  testify as to his specialized knowledge if it will assist the trier of fact to understand

10  the evidence or determine a fact in issue." *United States v. Rogers*, 769 F.2d 1418,

11  1425 (9th Cir. 1985).  Plaintiff's motion in limine raises no dispute whatsoever with

12  respect to Professor Sedlik's "knowledge, skill, [and] experience."  Professor Sedlik

13  has been an internationally recognized advertising photographer and commercial

14  director for more than 30 years.  Bonfigli Decl. Ex B (Preliminary Expert Report) at

15  2-8.  Professor Sedlik also has more than 35 years of experience in the field of

16  professional music photography in particular. *Id.*

17        Not once in his motion does Plaintiff argue that this ample experience does

18  not qualify Professor Sedlik to testify as an expert in this matter.  Not only does

19  Plaintiff raise no general objection to Professor Sedlik's qualifications, he also does

20  not object to Professor's Sedlik qualifications to opine upon the specific topics that

21  are the subject of his expert opinion—*e.g.,* Defendant Mannion's creative

22  contributions, general industry practices, *etc.*  Plaintiff is now foreclosed from

23  raising any such objections in reply to this motion in limine.

24

25

26

27

28

**B.** <u>**Professor Sedlik May Properly Testify as to Mannion's Creativity,**</u>
<u>**Authorship, and Expression in the Photographs**</u>

1.  <u>Plaintiff's Motion Improperly Seeks Determination of Legal</u>
    <u>Claims and Defenses</u>

Plaintiff first argues that Professor Sedlik's report is "irrelevant" because Defendants' First Amendment transformative use defense can be resolved on the face of the Photographs. Mot. at 2:22-3:15. While thus implicitly acknowledging the logical link between Professor Sedlik's opinion and Defendants' First Amendment defense, Plaintiff nevertheless argues that Professor Sedlik's testimony is still irrelevant because a factfinder can make the legal determination that the First Amendment defense does not apply—and thus, no further evidence on the issue is needed. This is wholly improper.

As the Court clearly states in its Civil Trial Scheduling Order, the purpose of a motion in limine is "limited to alerting the Court to significant evidentiary issues that can be addressed and resolved prior to trial." CTSO at 8:2-4. "Motions in limine are not to be used as disguised motions for summary judgment." *Id.*; *see also Bakst v. Cmty. Mem'l Health Sys., Inc.*, No. CV0908241MMMFFMX, 2011 WL 13214315, at *3 (C.D. Cal. Mar. 7, 2011) ("A motion in limine is not a proper vehicle by which to seek summary judgment on all or a portion of a claim"). Although brought as a motion in limine, Plaintiff's motion relies on authority establishing that a court can assess transformativeness based on the works in question alone (*i.e.*, by examining the Photographs), as a summary matter. Mot. 2:22-8 (quoting *Winter*). While Defendants agree that courts *could* rule on transformativeness at summary judgment, that is not a basis to limit the evidence that reaches whatever factfinder is tasked with resolving this issue.

Further, Plaintiff contends that the Photographs are mere "literal depictions" (Mot. 3) and thus that testimony beyond the Photographs themselves is insufficient

to establish that the Photographs are transformative.[2]  Asking the Court to either assume or determine that the Photographs are mere "literal depictions" goes to the ultimate question of transformativeness and effectively asks the Court to rule on this issue of law.  This is improper.  *Elliott v. Versa CIC, L.P.*, 349 F. Supp. 3d 1000, 1002 (S.D. Cal. 2018) (a motion in limine "is not a proper vehicle for a party to ask the Court to weigh the sufficiency of the evidence to support a particular claim or defense, because [t]hat is the function of a motion for summary judgment, with its accompanying and crucial procedural safeguards") (internal quotations omitted).

### 2. Professor Sedlik's Testimony Is Not Merely "Parroting," But Provides Valuable Insight for the Jury

Plaintiff's second argument is that Professor Sedlik's testimony should be excluded because he is being used to "parrot" and improperly "bolster" Defendant Mannion's own testimony.  This argument is baseless—Professor Sedlik is applying his specialized expertise in order to assist the jury in contextualizing and understanding the significance of Defendant Mannion's creative process.

Professor Sedlik is in no way "regurgitating" facts provided to him by Defendant Mannion.  Plaintiff's blithe recitation of Professor Sedlik's testimony completely belies the valuable analysis that Professor Sedlik has contributed.  In fact, Professor Sedlik did not formulate his testimony by repeating information he learned from Mr. Mannion; his process was exactly the opposite.  As Professor Sedlik explains, based upon his many years of experience in the field of professional

---

[2] While the determination of Defendants' First Amendment defense is thus not appropriate within the context this motion in limine, to be clear, Plaintiff is mistaken as to the state of the relevant law.  Neither *Comedy III Prods., Inc. v. Gary Saderup, Inc.*, 25 Cal. 4th 387, 21 P.3d 797 (2001) (considering transformative use in the context of a charcoal drawing of the Three Stooges printed on t-shirts) nor *No Doubt v. Activision Pub'g, Inc.*, 192 Cal. App. 4th 1018, 122 Cal. Rptr. 3d 397 (2011) (considering transformative use where music group No Doubt was depicted as avatars in video game) involves photography.  Neither is dispositive even if Plaintiff characterizes the Photographs as "literal depictions."

photography—which experience, again, Plaintiff has not disputed—Professor Sedlik analyzed the Photographs and was able to identify a number of "common universal steps to the process of the artistry of a photographer in adding meaning to somebody's likeness through their creative steps." Miyake Decl. Ex. Q at 151:4-7. Professor Sedlik then confirmed with Defendant Mannion that he followed those steps, and how. *Id.* at 152:19-22. Based upon this information, Professor Sedlik concluded that Defendant Mannion had made significant contributions of original authorship to the Photographs. Bonfigli Decl. Ex. B. at 18-24. Thus, Professor Sedlik is not simply a mouthpiece for Defendant Mannion. Rather, Professor Sedlik's testimony provides valuable context for the jury to understand the significance and extent of Defendant Mannion's creativity. The lay factfinder would likely have no awareness of the multiple creative decisions that photographers make, such as "Color Control," "Texture Control," "Lens Focal Length," and "Shift Tilt," and simply take for granted much of the authorship exercised by Defendant Mannion. Professor Sedlik has the relevant expertise to name and explain such details to the jury so that they can more fully appreciate Defendant Mannion's contribution to the Photographs. That is precisely the purpose of an expert witness—to assist the factfinder through specialized knowledge.

Further, even though Mr. Mannion can also testify about specific technical choices he made and artistic elements he incorporated into his Photographs, Defendants are presenting this information to the jury through an expert, who can provide analysis and contextualization beyond the specific photographer and Photographs. Defendants will not present duplicative testimony and Defendants, not Plaintiff, are entitled to control Defendants' case in chief and decide which witness will provide this testimony.

This case is distinguishable from the authorities cited in Plaintiff's brief. All of Plaintiff's cases concern circumstances in which the nominal expert did not apply any methodology whatsoever. *See, e.g., Siqueiros, et al., Plaintiffs, v. General*

*Motors.*, No. 16-CV-07244-EMC, 2022 WL 74182, at *9 (N.D. Cal. Jan. 7, 2022) (improper expert testimony simply restated factual testimony); *Dep't of Toxic Substances Control v. Technichem, Inc.*, No. 12-CV-05845-VC, 2016 WL 1029463, at *1 (N.D. Cal. Mar. 15, 2016) (improper expert testimony simply "repeated the contents" of source materials); *Sanchez v. Jiles*, No. CV1009384MMMOPX, 2012 WL 13005996, at *32 (C.D. Cal. June 14, 2012) (improper expert testimony simply repeated witness's state of mind). As explained above, here, Professor Sedlik applied his methodology, namely, an analysis of Defendant Mannion's creative contributions to the Photographs. Equally inapposite are Plaintiff's citations to prior unrelated cases involving Professor Sedlik's testimony. Professor Sedlik is not here to opine upon ultimate legal questions in dispute as in *Brittney Gobble Photography, LLC v. Sinclair Broad. Grp., Inc.*, No. CV SAG-18-03384, 2021 WL 5359671, at *9 (D. Md. Nov. 17, 2021), nor is he purporting to calculate fraud damages like in *Navarro v. Procter & Gamble Co.*, No. 1:17-CV-406, 2021 WL 868586 (S.D. Ohio Mar. 8, 2021). Here, Professor Sedlik is "utiliz[ing] expert knowledge and reliable methods to offer observations beyond the scope of average lay observers." *Karol W. Corp. v. Smith News Co.*, Inc., No. CV1207695BROVBKX, 2013 WL 12084485 (C.D. Cal. Aug. 23, 2013) (denying motion to exclude Sedlik's expert testimony).

Finally, Plaintiff is incorrect to argue that Professor Sedlik's testimony is inadmissible bolstering because he did not consider "all the relevant facts"—meaning, in Plaintiff's view, that he did not consider certain testimony stating persons other than Defendant Mannion may have at times been responsible for picking out "wardrobe, props, and accessories." Mot. at 4:19-26. Professor Sedlik's opinion assumes only that Defendant Mannion chose location, props and wardrobe for "certain shoots." Bonfigli Decl. Ex. B. (Sedlik Report) at 19. Thus, Professor Sedlik already accounts for the fact that Defendant Mannion wasn't always in charge of such decisions, and still, Professor Sedlik, based upon his experience and examination of the Photographs, deemed Mannion's contribution to be sufficiently

creative.  Miyake Decl. Ex. Q (Sedlik Depo. Tr.) 182:6-15 (testifying that he did not verify Defendant Mannion's account of the photographs' creation with third parties, but found it consistent with the aesthetics and styling of the photographs' appearance).  If there are any issues as to the veracity of any particular facts upon which Professor Sedlik relied, this is not a basis to exclude his testimony.  Rather, Plaintiff is welcome to question Professor Sedlik regarding any purported discrepancies during his cross-examination.  *Dykzeul v. Charter Commc'ns, Inc*., No. CV185826DSFGJSX, 2021 WL 4522545, at *8 (C.D. Cal. Feb. 3, 2021) ("weaknesses in the factual basis of an expert witness' opinion ... bear on the weight of the evidence rather than on its admissibility)" *quoting United States v. L.E. Cooke Co*., 991 F.2d 336, 342 (6th Cir. 1993).  The jury is well capable of hearing Professor Sedlik's opinion and drawing their own conclusions as to the reliability of his foundation.  There is no reason to withhold this testimony from them.

## C.   Professor Sedlik's Testimony as to Industry Custom Is Relevant

Lastly, Plaintiff argues that Professor Sedlik's testimony regarding certain photography industry customs and practices is irrelevant as he alleges it does not "tend to prove" any claims or defenses.[3]  The relevancy requirement as applied to expert testimony is a "low bar," "demanding only that the evidence logically advances a material aspect of the proposing party's case." *Messick v. Novartis Pharms. Corp*., 747 F.3d 1193, 1196 (9th Cir. 2014) (internal quotations omitted); *see also Benson Tower Condo. Owners Ass'n v. Victaulic Co.,* 702 F. App'x 537,

---

[3] Plaintiff characterizes his argument as addressing "opinions [] about customs and practices in the photography industry and how photographers make money." Mot. at 5:19-20.  However, not all of the specific opinions which Plaintiff identifies appear to be about customs and practices—including foundational testimony such as that "Mr. Mannion generates revenue from photography assignments and secondary/derivative markets," "Mr. Carter exploited and continues to exploit Mr. Mannion's Photographs and copyrights," and "the photographs would not exist without Mr. Mannion, his creative visions, and original expression,"  Mot. at 5:7-16.  It is unclear what Plaintiff's dispute is with this testimony, and Defendants herein address only those arguments which have been decipherably raised.

541 (9th Cir. 2017); *Primiano v. Cook*, 598 F.3d 558, 565 (9th Cir. 2010) ("Reliable expert testimony need only be relevant, and need not establish every element that the plaintiff must prove, in order to be admissible."). Professor Sedlik's testimony as to industry custom and practice more than meets this standard.

First, this testimony is relevant to rebut the testimony proffered by Plaintiff's designated expert in the field of celebrity memorabilia, Megan Mahn Miller. Ms. Miller based her expert opinion upon the price of Defendants' photographic prints at auction rather than prices offered through galleries because she claimed that fine-art galleries were not "transparent" in their pricing. Miyake Decl. Ex. R (Miller Expert Report) ¶ 24. In rebuttal, Professor Sedlik testified as to industry practices and customs in saying that, in general, photography prices at auction are significantly lower than those offered through fine-art galleries. Bonfigli Decl. Ex. C (Sedlik Rebuttal Report) at 19. He also pointed out that prices of prints by Mr. Mannion and his peers were readily available through gallery websites and the photographers' own websites. This testimony is relevant and helpful to the jury in their assessment of Ms. Miller's testimony.

This testimony is also relevant as it "logically advances a material aspect of [Defendants'] case." *Messick,* 747 F.3d at 1196. Specifically, Professor Sedlik's testimony that photographers "typically display, offer and sell fine art prints and publish photographs to websites and social media platforms, without obtaining model releases from celebrities or other persons depicted in the photographs" (Mot. 5:11-14) shows that Defendant Mannion's conduct was consistent with his peers. Contrary to Plaintiff's characterization, Defendant does not argue that this industry custom itself renders Defendant Mannion's conduct lawful. This evidence tends to show that Plaintiff had constructive notice that photographers openly and publicly sell photographs of Plaintiff. *Midwest Television, Inc. v. Scott, Lancaster, Mills & Atha, Inc.*, 205 Cal. App. 3d 442, 451, 252 Cal. Rptr. 573, 579 (1988) ("The prevailing industry custom binds those engaged in the business even though there is

1   no specific proof that the particular party to the litigation knew of the custom"). Indeed, Desiree Perez, CEO of Plaintiff's Company Roc Nation, testified that she was aware of various photographers displaying and selling photographs of Plaintiff without his permission.   Miyake Decl. Ex. S (Perez Depo Tr.) 86:21-111:19.   These facts and testimony are relevant to show Plaintiff's constructive and actual notice of Defendants' uses, and his subsequent inaction manifests implied consent thereto. *Jones v. Corbis Corp.*, 815 F. Supp. 2d 1108, 1113 (C.D. Cal. 2011), aff'd, 489 F. App'x 155 (9th Cir. 2012).   In addition, this testimony is relevant to laches because it shows that, despite the fact that he knew or should have known about the sale of photographs of him, Plaintiff unreasonably delayed in bringing suit.   *Danjaq LLC v. Sony Corp.*, 263 F.3d 942, 951 (9th Cir. 2001).

## D.      There Is No Basis Whatsoever for Exclusion of Rebuttal Testimony

Finally, none of Plaintiff's arguments, which virtually all pertain to relevance, apply to Professor Sedlik's testimony in rebuttal to Ms. Miller, given that rebuttal testimony is intended only to "rebut evidence on the same subject matter identified by an initial expert witness." Fed. R. Civ. P. 26(a)(2)(D), *People v. Kinder Morgan Energy Partners, L.P.*, 159 F. Supp. 3d 1182, 1191 (S.D. Cal. 2016).   Professor Sedlik should be permitted to testify for this reason alone.

## IV.   CONCLUSION

For the foregoing reasons, Defendants respectfully request that Plaintiff's motion to exclude Professor Sedlick's opinion be denied in its entirety

1    DATED:  June 17, 2022          WILLENKEN LLP

2

3                                    By /s/ Paul J. Loh
                                        _____
4                                       Paul J. Loh
                                        Lika C. Miyake
5                                       Kenneth M. Trujillo-Jamison

6                                       ROCKSTONE LEGAL
7                                       Sarah Hsia (*pro hac vice*)

8                                       PAUL HASTINGS LLP
9                                       Steven A. Marenberg
                                        *Attorneys for Defendants*
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**PLAINTIFF'S REPLY**

A.   <u>Sedlik's testimony is irrelevant and improper.</u>

Plaintiff showed that Sedlik's opinion that "Mannion made countless subjective creative decisions," resulting in "creative photographs," is not relevant and serves to improperly bolster Mannion's equally irrelevant testimony on this issue with the imprimatur of expert opinion. *Supra* at 2.  As to relevance, Defendants' "transformative use" defense can be resolved "simply by viewing the work in question and, if necessary, comparing it to an actual likeness of the person or persons portrayed." *Winter*, 30 Cal. 4th at 891-92.  The factfinder can look at the Jay-Z photos and determine whether Plaintiff's likeness was "so transformed that it has become primarily [Mannion's] own expression rather than [Plaintiff's] likeness." *Comedy III*, 25 Cal. 4th at 406.[4]  Defendants cite no right-of-publicity case in which a photographer has been allowed to offer opinions like the ones Sedlik plans to offer. *See supra* at 8-12.

Rather than address Plaintiff's arguments, Defendants argue that this motion is tantamount to a dispositive motion on their "transformative use" defense. *Supra* at 8-9.  But Plaintiff's motion does not ask this Court to resolve the defense as a matter of law.  Rather, the motion seeks to exclude Sedlik's opinion that "Mannion made countless subjective creative decisions" because that opinion has no bearing on the defense. *Supra* at 2.  If the Court excludes that opinion, Defendants can still put on a "transformative use" defense at trial, as long as it addresses the factors deemed relevant under *Comedy III* and the other controlling cases.

---

[4]  This is true whether or not the photos are characterized as "literal depictions," *supra* at 9, which Mannion admitted they are, Mannion Tr. [Bonfigli Dec. Ex. E] at 209:12-23.  The Court need not decide that issue to exclude Sedlik, as Defendants suggest, *supra* at 9, because the issue for the factfinder is whether the photos themselves are transformative, not whether Mannion's contributions are deemed "sufficiently creative" by another photographer, *supra* at 11-12.

1    Defendants' opposition confirms that they want Sedlik to bolster Mannion's
2    testimony with irrelevant opinions.  They admit "Mannion can also testify about
3    specific technical choices he made and artistic elements that he incorporated into his
4    Photographs," but say they would rather "present[] this information to the jury
5    through an expert, who can provide analysis and contextualization beyond the
6    specific photographer."  *Supra* at 10.  That is, Defendants want Sedlik to tell the jury
7    about the "creative decisions" Mannion supposedly made and how those decisions
8    resulted in photos embodying "Mannion's creative vision."  *Supra* at 2.  Defendants
9    are not entitled to have a photography expert do so.  Sedlik's only purpose is to
10   regurgitate Mannion's statements from an interview to lend them "the special aura
11   of credibility associated with expert testimony."  *Sanchez*, 2012 WL 13005996, at
12   *32.

13       Nor do Defendants show that Sedlik applied any methodology in reaching his
14   opinions.  Indeed, Defendants admit Sedlik "***did not verify*** … Mannion's account …
15   with third parties" and instead "***assumes*** … that … Mannion chose location, props
16   and wardrobe for '***certain shoots***.'"  *Supra* at 11-12 (emphasis added).  Sedlik's
17   assumptions lack foundation and are contrary to testimony that—for the photoshoots
18   at issue—Mannion ***did not*** select the props or wardrobe.  *Supra* at 4 (citing Burke
19   Tr. [Bonfigli Dec. Ex. D] at 12:15-13:6, 13:12-14:25, 16:3-24).  And Defendants do
20   not say that Sedlik will opine that Mannion made those decisions at the relevant
21   photoshoots, despite resting his opinion as to Mannion's "creative contributions" on
22   Mannion having allegedly made such decisions at "certain [other] photoshoots."
23   *Supra* at 11.

24       **B.    Sedlik's "industry custom" opinions are irrelevant.**

25       Plaintiff showed that Sedlik's opinions about "industry custom and practice"
26   are irrelevant because "industry custom … cannot make legal that which is illegal."
27   *ITN Flix*, 686 F. App'x at 444 n.1.  Defendants' response is nonsense.  They say
28   Sedlik will show that "Mannion's conduct was consistent with his peers," such that

-17-

Plaintiff had "constructive and actual notice of Defendants' uses" of his NIL, resulting in "implied consent." *Supra* at 13-14. This "attenuated chain of reasoning" with "multiple unsubstantiated leaps in logic, without any basis" is "pure speculation [that] fail[s] to comply with Rule 702." *Sportspower Ltd. v. Crowntec Fitness Mfg. Ltd.*, 2020 WL 3213704, at *5 (C.D. Cal. Feb. 3, 2020). In any event, Plaintiff testified that he does not "know what photographers do" and is not an "expert to say what a photographer typically does." Carter Tr. (Bonfigli Dec. Ex. F) 58:7-21. There is no basis for imputing knowledge of "industry custom" to Plaintiff to prove that he knew of Defendants' unlawful conduct and consented to it.

Plaintiff argued that a number of Sedlik's other opinions "are not relevant or are impermissible legal opinions." *Supra* at 4-5 (listing them). Defendants make no attempt to explain how these opinions are relevant. *Supra* at 12 n.3. Instead, they claim it is "unclear what Plaintiff's dispute is with the testimony." *Id.* The "dispute" is that the testimony is "not relevant." *Supra* at 4-5. By failing to articulate how the testimony is relevant, Defendants failed to carry their threshold burden to show relevance. And Defendants abandoned these opinions by not including them in the expert-witness offer of proof. *See* ECF No. 146 at 2-9.

**C.** **Sedlik's testimony should be limited to rebuttal.**

Defendants contend Sedlik should be allowed to rebut Ms. Mahn Miller's reliance on auction prices by testifying that prices at auction are lower than at galleries and that gallery prices are publicly available. *Supra* at 13. If the Court permits Sedlik to testify at all, he should be limited to rebutting Ms. Mahn Miller's opinion on these two narrow issues.

**CONCLUSION**

The Court should exclude the affirmative opinions of Jeffrey Sedlik and limit his testimony to rebutting Ms. Mahn Miller's opinions.

1  DATED:  June 17, 2022

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

QUINN EMANUEL URQUHART
& SULLIVAN, LLP


By /s/ Robert M. Schwartz
    Alex Spiro (*pro hac vice*)
    Robert M. Schwartz
    Cory D. Struble
    Dylan C. Bonfigli
    *Attorneys for Plaintiff*

# DECLARATION OF DYLAN C. BONFIGLI

I, Dylan C. Bonfigli, declare as follows:

1.     I am an attorney admitted to practice before this Court.  I am associated with Quinn Emanuel Urquhart & Sullivan, LLP, counsel of record for Plaintiff Shawn Carter, professionally known as Jay-Z.  I make this declaration in support of Plaintiff's Motion in Limine No. 2.  I make this declaration on personal, firsthand knowledge, and if called and sworn as a witness, I could and would testify competently to the facts set forth below.

2.     Plaintiff's Motion in Limine No. 2 seeks to exclude the opinions of Defendants' photography expert, Jeffrey Sedlik.

3.     The subject matter of Plaintiff's Motion in Limine No. 2 has been discussed with opposing counsel, and opposing counsel stated that such matter may be mentioned or displayed in the presence of the jury before it is admitted in evidence and has refused to stipulate that such matter will not be mentioned or displayed in the presence of the jury unless and until it is admitted in evidence.

4.     Plaintiff will be prejudiced if Plaintiff's Motion in Limine No. 2 is not granted because Mr. Sedlik's opinions are not relevant and, if presented, they will likely cause unfair prejudice to Plaintiff, confuse the issues, mislead the jury, and waste trial time.  As stated in Plaintiff's Motion in Limine No. 2, Mr. Sedlik's opinions are irrelevant and would improperly bolster Defendant Jonathan Mannion's testimony, and Mr. Sedlik's opinions may mislead the jury into incorrectly believing, for example, that Defendants' actions were lawful because they purportedly adhered to industry custom.

5.     Attached as **Exhibit A** is a true and correct copy of excerpts from the deposition of Jeffrey Sedlik taken on April 8, 2022.

6.     Attached as **Exhibit B** is a true and correct copy of the Preliminary Expert Report of Professor Jeffrey Sedlik, dated March 14, 2022.

7.     Attached as **Exhibit C** is a true and correct copy of the Rebuttal Expert Report of Professor Jeffrey Sedlik, dated March 31, 2022.

8.     Attached as **Exhibit D** is a true and correct copy of excerpts from the deposition of Kareem Burke taken on March 7, 2022.

9.     Attached as **Exhibit E** is a true and correct copy of excerpts from the deposition of Jonathan Mannion taken on March 13, 2022.

10.    Attached as **Exhibit F** is a true and correct copy of excerpts from the deposition of Shawn Carter taken on March 4, 2022.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on June 17, 2022, at Los Angeles, California.


By   */s/ Dylan C. Bonfigli*
_____
Dylan C. Bonfigli

## **ATTESTATION STATEMENT**

I, Robert M. Schwartz, the filer of this Joint Motion in Limine, attest pursuant to Civil L.R. 5-4.3.4(a)(2) that all other signatories listed, and on whose behalf the filing is submitted, concur in the filing's content and have authorized the filing.

DATED:  June 17, 2022                         QUINN EMANUEL URQUHART
                                                              & SULLIVAN, LLP


                                                    By  /s/ Robert M. Schwartz
                                                          Robert M. Schwartz
                                                          *Attorneys for Plaintiff*

# Exhibit A

Excerpts from the April 8, 2022 Deposition of
Jeffrey Sedlik

```
 1                 UNITED STATES DISTRICT COURT

 2                 CENTRAL DISTRICT OF CALIFORNIA

 3

 4     SHAWN CARTER, also known as
       JAY-Z, an individual,
 5
                         Plaintiff,
 6        vs.                                No. 2:21-cv-04848-PA-KS

 7     JONATHAN MANNION, an individual,
       and JONATHAN MANNION, an
 8     individual, and JONATHAN MANNION
       PHOTOGRAPHY LLC, a New York
 9     limited liability company,

10                       Defendants.
       _____/
11

12

13        VIDEOTAPED DEPOSITION OF PROFESSOR JEFFREY SEDLIK

14            appearing remotely at Encino, California

15                   Friday, April 8, 2022

16

17

18

19

20

21

22

23     Reported by:
       Natalie Y. Botelho
24     CSR No. 9897

25     Job No. 5174577
```

Page 1

```
 1     you where to stop.  All right.  Stop.  Okay.
 2     Q.          We're looking at Page 19, starting at
 3     Page 19 and going for several pages in your report.
 4     We did look at this very briefly earlier in your
 5     deposition.  Do you have -- do you see that now on
 6     the screen?
 7     A.          I do.  This is a list, as I was just
 8     saying, of creative -- of the creative tools
 9     employed by a photographer, tools and techniques
10     employed by a photographer in creating their
11     expression, and it's common across multiple
12     photographers.
13                 So for one photographer, it might be the
14     exact same list as for another photographer, but the
15     way that they employ it might be slightly different.
16     So my process was to discuss a list with Mr. Mannion
17     and to get his confirmation as to what actual
18     activity or actual tools he employed and what he did
19     not.
20     Q.          Okay.  So with respect to the list of
21     steps or process for Mr. Mannion's photography of
22     Jay-Z that you describe starting on Page 19 of your
23     report and going for three or four pages after that,
24     with respect to that list, you describe, for
25     example, in each one what Mr. Mannion did.  You see
```

Page 149

```
1    Q.         We're wasting time.  I'll withdraw the
2    question.  You don't have to answer the question I'm
3    withdrawing it.  There you go.  We'll speed this up.
4              Where you wrote, "Mr. Mannion conducted
5    extensive pre-planning for many of his shots -- "his
6    shoots," rather -- I'm trying to find out, how do
7    you know that?  And I think your answer is, "Because
8    he told me that."  Right?
9    A.         No, my -- I actually gave you a direct --
10   Q.         No, look, sir, I'm not interested in the
11   epistemology of the writing of storytelling where
12   these criteria or steps come from.  I accept that
13   you think they're valid.  I'm not quarreling with
14   you about any of that.  I just want to know how you
15   found out that Mr. Mannion did these things you say
16   he did.  Real simple question.  How do you know he
17   did these things?
18              MR. HSU:  Objection; argumentative.
19              THE WITNESS:  I started with a list of
20   these things, and then I asked Mr. Mannion whether
21   or not he did these things and if he had anything to
22   add to these things.
23              MR. SCHWARTZ:  Q.  Thank you.
24   A.         Or if he did not -- if he said "No, I
25   didn't do that," then I -- then I did not state that
```

Page 152

1    inconsistent with, I asked further questions so that

2    I could get to the actual expression that he imbued

3    and the techniques that he used to get there --

4    tools and techniques.   That's my answer.

5    Q.        Okay.  We got on this line of questioning

6    because I asked you if you did anything other than

7    talking to Mr. Mannion to validate what you wrote

8    about what he did.

9              So let me ask the question this way:  With

10   reference to the second bullet point on Page 19 of

11   your report, did you do anything, other than hearing

12   what Mr. Mannion had to tell you, to validate the

13   assertion in your report that, quote, "For certain

14   shoots, Mr. Mannion personally selected, coordinated

15   and arranged wardrobe, props, accessories,

16   backdrops, sets, set decoration, and other scenic

17   elements in order to achieve a desired original

18   expression," closed quote?

19             MR. HSU:  Objection; argumentative, asked

20   and answered.

21             MR. SCHWARTZ:  Q.  Again, the emphasis

22   here, sir, is, other than talking to Mr. Mannion

23   about this topic, did you do anything to validate

24   the assertion he told you that he did these things?

25             MR. HSU:  Same objections.

1              THE WITNESS:   My answer was that I
2      simultaneously viewed the photographs so that I
3      could determine whether, based on my knowledge,
4      training, experience, and education, his -- the
5      answers were consistent with the photographs that I
6      was viewing.
7              To help this line of questioning along, so
8      that we can move on, I did not separately validate
9      with other parties or other sources that Mr. Mannion
10     actually did the things that he claimed to do.  As
11     an expert, I'm allowed to rely on an interview of
12     the person.  I'm not parroting Mr. Mannion, but I am
13     relying on his description of what he did.
14             And you'll note that it says "for certain
15     shoots" in this sentence, because in my experience,
16     there would be also stylists that are involved in
17     shoots, and Mr. Mannion would be directing those
18     stylists who are also --
19             MR. SCHWARTZ:  Q.  Are you finished with
20     your answer?  You froze.
21             MR. HSU:  Okay.  Yeah, I think he froze.
22             MR. SCHWARTZ:  Let's give him a moment to
23     unfreeze.
24             THE VIDEOGRAPHER:  He looks pretty still
25     frozen.  Would you like to go off the record,

                                        Page 158

1          I, JEFFREY SEDLIK, do hereby declare under

2     penalty of perjury that I have read the foregoing

3     transcript; that I have made any corrections as

4     appear noted, in ink, initialed by me, or attached

5     hereto; that my testimony as contained herein, as

6     corrected, is true and correct.

7          EXECUTED this _____ day of
      _____,

8
      20__, at _____, _____.

9              (City)                    (State)

10

11

12

13

14

15         _____

16                   Jeffrey Sedlik

17

18

19

20

21

22

23

24

25

Page 301

```
 1              CERTIFICATE OF REPORTER

 2

 3          I, Natalie Y. Botelho, a Certified

 4   Shorthand Reporter, hereby certify that the witness

 5   in the foregoing deposition was by me duly sworn to

 6   tell the truth, the whole truth, and nothing but the

 7   truth in the within-entitled.

 8          The said deposition was taken down in

 9   shorthand by me, a disinterested person, at the time

10   and place therein stated, and that the testimony of

11   said witness was thereafter reduced to typewriting,

12   by computer, under my direction and supervision;

13          That before completion of the deposition,

14   review of the transcript [X] was|[ ] was not

15   requested.  If requested, any changes made by the

16   deponent (and provided to the reporter) during the

17   period allowed are appended hereto.

18          I further certify that I am not of counsel

19   or attorney for either or any of the parties to the

20   said deposition, nor in any way interested in the

21   event of this cause, and that I am not related to

22   any of the parties thereto.

             DATED:  April 13, 2022

23

24

         Natalie Y. Botelho, CSR No. 9897

25

                                        Page 302
```

# Exhibit B

March 14, 2022 Preliminary
Expert Report of Jeffrey Sedlik

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**WESTERN DIVISION**

SHAWN CARTER, also known
as JAY-Z, an individual,


     *Plaintiff,*


    -against-


JONATHAN MANNION, an
individual, and JONATHAN
MANNION PHOTOGRAPHY LLC, a
New York limited liability
company,


    *Defendants.*

Case No. 2:21-cv-04848-PA-KS

Judge: Hon. Percy Anderson

<u>**PRELIMINARY EXPERT REPORT OF PROFESSOR JEFFREY SEDLIK**</u>

Submitted March 14, 2022

CONFIDENTIAL

I have been engaged by defendants Jonathan Mannion ("Mr. Mannion") and Jonathan Mannion Photography LLC ("JMP") in the above-referenced matter ("Matter") brought by Plaintiff Shawn Carter ("Mr. Carter") against Mr. Mannion and JMP (collectively, "Defendants") to provide expert testimony as set forth below.

I have been asked by Defendants to provide expert opinions on the following topics:

- the creative and technical elements and choices employed by a photographer of Mr. Mannion's caliber, and how Mr. Mannion's subjective selection, arrangement and combination of those creative elements ultimately resulted in unique, original, expressive photographs; and
- practices, standards, and procedures in the photography industry, both in general and with respect to licensing, copyright, management, markets, and other issues that have arisen in the Matter; and
- if requested by Mr. Mannion, I will rebut opinions expressed by Mr. Carter's experts on these and other topics.

My opinions are based in part on more than 25 years of service in high-level positions in trade associations and standard-setting bodies in the photography, advertising, product marketing, technology, and design industries. I have been an internationally recognized advertising photographer and commercial director for more than 30 years, working with many clients, observing and interacting with large numbers of professional photographers, videographers, other photographers, advertising agencies, design firms, corporate clients, stock photography and footage agencies, product manufacturers, and others in the United States and abroad.

I have worked in the music industry for more than 35 years, creating and licensing photographs for editorial and commercial uses on music packaging, advertising, publicity and merchandise, to music industry clients such as Arista Records; Bass Player; BMG/RCA Records; Capitol Records; CBS/Sony Music; CD Review; Concord Records; Downbeat; Geffen Records; GRP Records; Guitar Magazine; Island

Records; Jazz Times; Jazziz; JVC Musical Industries; Korg, Inc.; LaFace Records; MCA International; MCA Records; Membran Records; MTV Networks; Music Connection; Polygram Records; Pulse; Q Magazine; Rhino Records; Rolling Stone; Select; Spin; Sugar Hill Records; Telarc International; Universal Music Group; VH-1; Virgin Records; Warner Brothers Records; Windham Hill Records; Word Records; Yamaha; Zildjian and others. I have in addition served as a licensing agent for the estates of music and celebrity photographers, supplying licensed photography to the music industry. I have been an invited speaker at conferences organized by the National Academy of Recording Merchandisers, educating music industry professionals on topics including copyright, licensing, contractual terms, and right of publicity. I have also owned and operated a publishing company, producing and selling music photography-related products for more than 25 years.

In addition to my personal knowledge, my opinions are based on an independent examination of documents and materials produced in the Matter to date. Should additional relevant information become available, I respectfully reserve the right to amend or supplement my opinions as necessary.

This Expert Report ("Report") has been prepared in connection with the above-referenced Matter. Section V of the Report outlines my opinions.

If called upon as a witness in this Matter, I could and would provide the following testimony.

## I.    QUALIFICATIONS

I currently serve as the President and CEO of the PLUS Coalition. "PLUS" is an acronym for "Picture Licensing Universal System." The PLUS Coalition is a non-profit, international standards body and trade association representing the shared business interests of all industries involved in the creation, licensing, and use of visual art, including photographers, illustrators, videographers, advertisers, advertising agencies, graphic design studios, publishers, artists' representatives, museums, libraries, stock image agencies, and all other image licensees and licensors. The PLUS Coalition develops, propagates, and maintains universal

standards for use by licensees and licensors in transactions involving visual art. As a founding member of the PLUS Board of Directors, I developed the core concept of the Coalition and its copyright licensing standards.

I am the past National President of the Advertising Photographers of America ("APA"), the leading trade association for commercial photographers and videographers in the United States. I also served APA as Chief National Advisor on Licensing and Copyright, and provided leadership-level guidance on topics including copyright, photography, videography, advertising, industry standards, contract terms, model release terms, and business practices. I represented the APA in discussions with the United States Copyright Office and worked with organizations around the world to develop and maintain standards for licensing terms, licensing agreements, model releases, and other photography-related business matters. On a local basis, I also served on the Board of Directors and Legal Affairs Committee of the Los Angeles Chapter of the APA, and as Chairman of the Model Release Working Group, charged with developing international standards for model releases, communication of usage rights, and model release workflow.

I currently serve on the Photo Metadata Working Group for the International Press Telecommunications Council ("IPTC"), the global standards body for photography metadata, with a particular focus on the news industry. In the past, I have served on the Digital Image Submission Guidelines Working Group for Universal Digital Image Guidelines ("UPDIG"), and as an "Invited Expert" on the Permissions and Obligations Working Group of the World Wide Web Consortium ("W3C"). Until November 2019, I served as a Director of the American Society for Collective Rights Licensing ("ASCRL"), a collective management organization for the visual arts. I also serve as a legal and legislative advisor to the American Society of Media Photographers ("ASMP"), and as a member of the ASMP Copyright Speakers Bureau. I authored the "Photography Licensing" chapter of *ASMP Professional Business Practices in Photography*, the predominant business operations reference for professional photographers.

I am a frequent speaker at copyright events hosted by the United States Copyright Office, the United States Patent Office, and the United States Department of Commerce. At the request of the Register of Copyrights, I served as a guest instructor at Stanford Law School in conjunction with a United States Copyright Office-sponsored Copyright Practicum. I have been engaged by the United States Copyright Office to train new Registration Examiners on visual art copyright registration issues from 2010 to present. In 2021, I was appointed by the Librarian of Congress to serve as an advisor to the Librarian on her efforts to modernize the Copyright Office.

I have been a faculty member of the American Law Institute for Continuing Legal Education events, providing instruction on licensing practices and on the practical application of copyright law in the visual arts. I have been a guest speaker and guest instructor on copyright law and licensing for leading institutions and organizations, including Duke University School of Law, New York University School of Law, Oxford University School of Law, American University Washington College of Law, Antonin Scalia George Mason University Law School, Fordham University School of Law, Joint Photographic Experts Group (JPEG), International Federation of Reproduction Rights Organizations, the Smithsonian Institution, International Confederation of Societies of Authors and Composers, National Association of Recording Merchandisers, Digital Library Federation, the Copyright Society of the United States, and others.

In addition, I have testified repeatedly before the Judiciary Committees of both the United States Senate and House of Representatives, summoned to advise Congress on copyright law issues and legislative reform. I work closely with legislators, stakeholder groups, and the United States Copyright Office on legislation, regulations, and policy issues related to copyright protections, registration, and remedies. I have assisted legislators and government agencies in drafting and revising federal copyright legislation. I am an active participant in the Copyright Alliance, serving on the Creators Advisory Board, Academic Advisory Board, and the United States Copyright Office Modernization Working Group.

In addition to my work in the United States, I serve on the Advisory Board of the Beijing Intellectual Property Expertise Center of Judicature, a governmental agency overseeing copyright matters before the People's Court of China. I also serve as a founding Director of the Linked Content Coalition ("LCC"), a global non-profit organization dedicated to facilitating and expanding the legitimate use of content through interoperable identifiers and metadata. I have also been a partner in the Rights Data Integration initiative, a European Commission project focusing on the integration of systems that manage and trade intellectual property rights online across all types of content, usage, and media. I was a partner in the Copyright Hub initiative in the United Kingdom, and a participant in the European Commission's Metadata Image Library Exploitation project. I was a partner in the Initiative for a Competitive Online Marketplace, based in Vienna, Austria, and have been an invited speaker on intellectual property law at the House of Lords of the Parliament of the United Kingdom.

Adobe Systems, creator of Photoshop, Lightroom, Premiere, After Effects, and other digital image, video and design software, selected me to be a member of its "Prerelease Team" and its "Adobe Photographers' Council," a group of twelve leading artists who advise the company on trends in digital photography, video, and the visual arts industry at large.

Selected honors include the 2005 Industry Leadership Award from the International Photography Council of the United Nations, the 2006 PhotoMedia Photographer of the Year award, the 2007 APA Industry Advocacy Award, and in 2008, a "Lifetime Achievement Award," a Clio Award (for excellence in directing digital video) and an honorary Master's Degree from the Brooks Institute of Photography, recognizing "Mastery of the Craft and Business of Photography."

I am a long-time faculty member and Professor at the Art Center College of Design in Los Angeles, where I sit on the Intellectual Property Committee and teach advanced courses on the artistic, technical, production, legal, and business aspects of traditional and digital photography and videography. My curriculum includes advanced instruction on legal topics such as copyright law, copyright registration,

copyright licensing, and contract interpretation. Technical topics include digital techniques and advanced lighting for photography and video of people, products, and automobiles. I also provide instruction on advertising, marketing, branding, and consumer behavior.

After more than 30 years as an award-winning commercial photographer, videographer, cinematographer, and studio owner, I continue to operate an advertising and entertainment photography and production company in California, creating photography, video, commercials, and design, with a client list that includes such companies as Nike, Federal Express, Farmers Insurance, SBC, GTE, NBC, Sony, AT&T, Blue Cross, Epson, IKEA, United Airlines, Warner Brothers, Toyota, Nestlé, Disney, Bank of America, and others. My publishing company, Mason Editions, produces and distributes fine photographic reproductions.

I frequently provide forensic image analysis in civil and criminal matters, and provide consulting services to organizations and individuals on issues related to copyright, licensing, negotiating, and business practices and procedures related to photography, videography, other visual artworks, advertising, and modeling. I have testified as an expert witness during the period 2002 to present, in litigation involving visual arts, copyright, metadata, advertising, branding, graphic design, right of publicity/privacy, model releases, breach of contract, criminal matters, and other topics. Matters in which I have provided testimony within the last four years are:

*Laspata Decaro Studio Corporation v. Rimowa GmbH et al.*
United States District Court, Southern District of New York
Case # 16-cv-00934-LGS

*Glen Craig v. UMG Recordings, Inc. et al.*
United States District Court, Southern District of New York
Case # 16 Civ. 5439 (JPO)

*Brittney Gobble Photography, LLC v. WENN Limited et al.*

6

United States District Court, Eastern District of Tennessee, Knoxville Division
Case # 3:16-cv-00306

*The Andy Warhol Foundation for the Visual Arts, Inc. v. Goldsmith et al.*
United States District Court, Southern District of New York
Case # 1:17cv2532

*Jason Putsche v. Alley Cat Allies, Inc.*
United States District Court, Southern District of Maryland
Case # 8:17-cv-00255-PWG

*Yves Michel Fontaine v. MMLery LLC, 61-73 Ellwood, LLC, 533 41st Street*
Realty, LLC and Sharp Management Corp.
Supreme Court of the State of New York, County of Kings
Case # 6580/12

*Brittney Gobble Photography, LLC v. Sinclair Broadcast Group, Inc., et al.*
United States District Court, District of Maryland, Baltimore Division
Case # 1:18-cv-03403-RDB

*D'Pergo Custom Guitars, Inc. v. Sweetwater Sound, Inc.*
United States District Court, District of New Hampshire
Case # 1:17-CV-000747-LM

*Annette Navarro McCall v. The Procter and Gamble Company*
United States District Court, Southern District of Ohio, Western Division
Case # 1:17-cv-00406-TSB

*Optimum Imaging Technologies LLC v. Canon, Inc.*
United States District Court, Eastern District of Texas, Marshall Division
Case # 2:19-CV-246-JRG

*Intersal, Inc., v. Susi H. Hamilton, Secretary, North Carolina Department of Natural*

*and Cultural Resources, in Her Official Capacity, North Carolina Department of Natural and Cultural Resources, and State of North Carolina*
General Court of Justice, Superior Court Division, North Carolina, Wake County
Case # 115 CVS 9995

*Cora Skinner et al., v. Red Tape, Inc,* d/b/a Stiletto's & Red Tape VI, Inc., d/b/a Stiletto's
United States District Court, Southern District of Texas, Brownsville Division
Case # 1:19-cv-186

*Mireya Rios v. Fekkai Retail, LLC, Blue Mistral, LLC*
United States District Court, Central District of California
Case # 2:20-cv-08743-PA-MRW

*Evox Productions LLC v. AOL, Inc. Oath, Inc., and Verizon Media, Inc.*
United States District Court, Central District of California, Western Division
Case # 2:20-cv-02907-JWH-JEM

*Michael Gaffney v. Muhammad Ali Enterprises, LLC, Authentic Brands Group LLC, and Roots of, Inc., d/b/a "Roots of Fight"*
United States District Court, Southern District of New York
Case # 1:18-CV-08770, 1:20-CV-07113

*Nicklen et al v. Mashable, Inc. et al*
United States District Court, Southern District of New York
Case #1:20-CV-10300

My publication list is included in my curriculum vitae, a copy of which is attached to the Report as *Curriculum Vitae* (Exhibit A).

8

## II.   COMPENSATION

My work on the Matter is billed at $850 per hour. My compensation is not contingent upon, dependent upon, or related in any way to the outcome of the Matter.

## III.   MATERIALS CONSIDERED

In preparation for the Report and for the expert testimony that I may be called on to provide, I have considered the materials listed in *Materials Considered* (Exhibit B).

## IV.   BACKGROUND

Plaintiff Shawn Carter, also known as "Jay-Z," is a music artist residing in Los Angeles, California.[1]

Defendant Jonathan Mannion is a professional photographer residing in New York, NY.[2]

Defendant Jonathan Mannion Photography LLC is incorporated in New York County, NY,[3] engaged in offering photography services, selling prints and other reproductions of photographs, and licensing photography copyrights, among other activities.[4]

Mr. Mannion created various photographs depicting Mr. Carter's likeness or name (the "Photographs").[5] Mr. Carter asserts that Defendants made unauthorized use of Mr. Carter's likeness and name by producing, offering, and selling prints, slip mats and shirts depicting Mr. Carter or Mr. Carter's name, and that in so doing,

---

[1] First Amended Complaint ("FAC") ¶ 7.
[2] *Id.* ¶ 8, 20.
[3] *Id.* ¶ 9.
[4] Telephonic interview of Jonathan Mannion, March 10, 2022 ("Mannion Interview").
[5] *Id.* ¶ 21.

Defendants violated Mr. Carter's right of publicity.[6] Mr. Carter filed suit against Defendants on June 15, 2021.[7]


## V.   DISCUSSION


### A.   The Photographer, Jonathan Mannion

Mr. Mannion is an accomplished, well-known, and respected professional photographer and visual artist.[8] Mr. Mannion began creating photography primarily focused on hip-hop culture in the mid-1990s, and continues his work today.[9]

In or about 1993, Mr. Mannion began training under noted photographers Richard Avedon, Steven Klein, Marc Hom, Ben Watts, and others, while also creating his own photography.[10] Mr. Mannion transitioned to full-time professional photography in or about 1996.[11] Mr. Mannion has created photography for use on over 300 album covers,[12] and has photographed "over 500 of the most important rappers, actors, athletes, artists, designers, and tastemakers of his era."[13]

Like other leading celebrity portrait photographers, Mr. Mannion's photographs shape the public personas of his subjects, and serve to define those artists — and their music — in the public eye.

---

[6] *See generally* FAC.
[7] *See generally* Complaint.
[8] *See, e.g.*, https://www.jonathanmannion.com/about, *last accessed Mar. 17, 2022.*
[9] *Id.*
[10] *Id.*
[11] Deposition of Jonathan Mannion ("Mannion Depo.") at 56:1-5.
[12] https://www.jonathanmannion.com/about, *last accessed Mar. 17, 2022.*
[13] *Id.*

Representative examples of artists photographed by Mr. Mannion include:[14]

40, 2Chainz, 50 Cent, A$AP Rocky, Aaliyah, Afeni Shakur, AKA, Akon, Anthony Hamilton, ASAP MOB, Ashanti, AZ, Baby G, Beanie Sigel, Beatnutz, Beenie Man, Big Boi, Big Daddy Kane, Big Krit, Big Pun, Big Star, Big Tymers, Biggie, Birdman, Biz Markie, Bobbito Garcia, Bone Thugs-N-Harmony, Boyz In Da Hood, Brandy, Buju Banton, Bun B, Bunji Garlin, Busta Rhymes, Camoflage, Cannibis, Capleton, Capone-N-Noreaga, Carl Thomas, Case, Cash Money, Cassidy, Cassie, Cassper Nyovest, Chamillionaire, Charlie Baltimore, Chingy, Chris Brown, Chris Lighty, Chris Paul, Christina Milian, Ciara, Clark Kent, Clipse, Common, Craig Mack, Cuban Link, Cypress Hill, D' Angelo, D.O.C., D12, Damon Dash, Dave Chappelle, David Beckham, Dem Franchize Boyz, Devin The Dude, Diddy, Diplomats, Dirty Boys, Disturbing Tha Peace, DJ Clue, DJ Khaled, DJ Quik, DMC, DMX, Dom Kennedy, Doug E Fresh, Dr. Dre, Drake, DUBB, Dungeon Family, Dunk Ryders, Dwyane Wade, E-40, Elephant Man, Ella Mai, Eminem, Erick Sermon, Erykah Badu, Estelle, Eve, Fabolous, Faith Evans, Fat Joe, Fat Man Scoop, Firm, The, Foxy Brown, Frankie J, Fredro Starr, Freeway, Fugees, Funkmaster Flex, Future, G Malone, Game, The, Gang Starr, Gary Clark Jr., Genius, Ginuwine, Gotti, Gucci Mane, G-Unit, Heavy D, Henchman, Horace Brown, Hot Karl, Ice Cube, Ice T, India Aire, Insanity, J. Holiday, Ja Rule, Jadakiss, Jah Cure, Jaheim, Jasmin Sullivan, Jay Z, Jayo Felony, Jaz O, Jazze Pha, Jermaine Dupri, Jill Scott, Joe, Joey Badass, Juvenile, Kane & Able, Kanye West, Kareem Black, Keith Sweat, Kelis, Kes, Keyshia Cole, Killer Mike, KMC, Kool G Rap, Kool Keith, Krayzie Bone, Kurtis Blow, Kurupt, L. Boogie, Lady Luck, Lady May, Lalah Hathaway, Lamar Odom, Lance Armstrong, Lauriana Mae, Lauryn Hill, Lil Boosie, Lil Mama, Lil Wayne, Lil' Bow Wow, Lisa Lopez, LL Cool J, Logic, Loon, Lords Of The Underground, LOX, Ludacris, Luniz, The, Lupe Fiasco, Maceo, Machel Montano, Mack 10, Mack Wilds, Mad Lion, Magic Johnson, Malik Yoba, Manny Fresh, Mario Winans, Mary J Blige, Mase, MC Hammer, MC Janik, MC Serch, McGruff, Meek Mill, Memphis Bleek, Method Man, Missy Elliot, Mo' Thugs, Mobb Deep, Montell Jordan, Mos Def, Murder Inc., Murder

---

[14] MANNION005943.

Mill, Murphy Lee, Mystikal, Nas, Nasty C, Nelly, Neptunes, The, Ne-Yo, Nia Long, Nick Cannon, Nigel Sylvester, Nikki Minaj, Nipsey Hussle, Nivea, Noreaga, N'SYNC, NTM, Obie Trice, Ol' Dirty Bastard, Olivia, Omar Epps, Omarion, Organized Konfusion, Outkast, Pastor Troy, Paul Pierce, Pele, Penny Hardaway, Pimp C, Playa, Playaz Circle, Play-N-Skillz, PNB, Pretty Ricky, Problem Child, Prodigy, Profyle, Purple Ribbon All-Stars, Q-Tip, Quincy Jones, Raekwon, Rah Digga, Rakim, Rashad, Ray Allen, Ray Cash, Ray J, Redman, Retna, Richie Rich, Rick Ross, Riky Rick, Rock Steady Crew, Rosario Dawson, Rouge, Roy Jones Jr., RUN DMC, Rupee, Salt N Pepa, Scarface, Sean Paul, Shabba Ranks, Shaggy, Shaquille O'Neal, Shyne, Sleepy Brown, Slick Rick, Snoop Dogg, Sole, Soul 4 Reel, St. Lunatics , Stack$, Stevie J, Stomy Bugsy, Strokes, The, Styles P, Suge Knight, Sum 41, Swizz Beatz, SZA, T.I., Tamba Hali, Tank, Tech N9ne, Teddy Pendergrass, Tego Calderon, Terror Squad, Theophilus London, Timbaland & Magoo, Tish Hyman, TLC, Toni Braxton, Tony Yayo, Too Short, Tracy McGrady, Trae The Truth, Travie McCoy, Travis Scott, Trick Daddy, Tricky, Trina, Trombone Shorty, Twista, Tyra Banks, Tyson Beckford, Usher, Victor Cruz, Vince Carter, Warren G, Wayne Wonder, Westside Connection, Wu-Tang, Wyclef Jean, X-Men, Xzibit, Yao Ming, Yo Gotti, Young Buck, Young Jeezy, Young Money, and Youngbloodz.

Representative examples of Mr. Mannion's clients include:[15]

Record/music companies: Sony BMG, Universal Music Group, Virgin Records, Arista Records, Motown Records, Interscope Records, Columbia Records, Epic Records, Roc-a-fella, Island Def Jam, Ruff Ryders, Shady Records, Bad Boy Records, Blackground Records, Atlantic Records, Tommy Boy Records, Jive Records, Penalty Records, Elektra, Bungalo Records, Mercury Records, Relativity Records, Hollywood Records, Geffen Records, Concorde Records, Loud Records, Priority Records, Roadrunner Records, Delabel, DreamWorks Records; Magazines/media: Rolling Stone, Billboard, Essence, Slam Magazine, The Source, Scratch Magazine, Complex Magazine, Men's Fitness, Men's Health, People, Trace, XXL, Vibe, The Fader, Dime, Honey Magazine,

---

[15] MANNION009676

Dime, Jane Magazine, Game Magazine, Inked Magazine, Untold Magazine, Touch Magazine, Pride Magazine, Teen People, Rap Pages, Mix Magazine, Drop Magazine, TV Guide, CNN, ESPN, BET, Showtime, Warner Brothers, SoBe Entertainment, Vice TV, Viacom; Other: Apple, Beats By Dre, Sirius Radio, Reebok, Nike, Adidas, Diagio, Hennessy, Moët & Chandon, Courvoisier, Johnnie Walker, FRS, 24 Hour Fitness, PepsiCo, Coca-Cola, Bushmills, Cadillac, BMW, Sputnik Creative, Guitar World, Apple Bottoms, Rocawear, J. Crew, Sony Playstation, 3 Vodka, Vokal, and Makaveli Clothing.

Mr. Mannion's photography is offered and sold by art galleries, and has been included in exhibitions such as at the Marlborough Gallery, Milk Gallery, Annenberg Space for Photography, La Belleviloise Gallery, Worchester Art Museum, International Center for Photography, London's Saatchi Gallery, the Houston Contemporary Arts Museum, Lagos Photo Festival, and Morrison Hotel Gallery, among others.[16]

Below I provide representative examples of Mr. Mannion's photography, and licensed reproductions.

---

[16] *E.g.,* https://www.vanityfair.com/style/2020/01/contact-high-hip-hop-exhibit; http://adcglobal.org/jonathan-mannion-show-at-milk-gallery-in-nyc/; https://www.saatchigallery.com/press/release/right_here_right_now; https://camh.org/event/dirty-south/; https://www.filmsnotdead.com/back-in-the-days-x-jonathan-mannion/; http://www.lagosphotofestival.com/exhibit/jonathan-mannion; *all accessed Mar. 17, 2022.*

Figure A-01: Examples of Mr. Mannion's photography.



Figure A-02: Examples of licensed reproduction of Mr. Mannion's photographs.



**B.**   **Mr. Mannion's Photographs of Mr. Carter**

Mr. Mannion was first engaged to photograph Mr. Carter in 1996, for the cover art for Mr. Carter's "Reasonable Doubt" debut album.[17] During the period 1996 through 2006, Mr. Mannion photographed Mr. Carter on multiple occasions at the request of Mr. Carter, Mr. Carter's associated companies, or third-party music labels, magazines, or other companies.[18]

Below are representative examples of Mr. Mannion's Photographs of Mr. Carter. Each such Photograph is unique, but each evidences a common thread of authorship: Mr. Mannion's distinct creative vision and expressive intent.

---

[17] Mannion Depo. at 175:12-14.
[18] Mannion Depo. at 242:18-243:2 & Ex. 106.

16

Figure B-01: Examples of Mr. Mannion's Photographs of Mr. Carter.



C.      **Mr. Mannion's Original Expression in the Photographs[19]**

Mr. Mannion produces creative photographs, carefully selecting, arranging, and coordinating visual elements within his compositions. Before creating a photograph, Mr. Mannion conducts research into the history and background of his subjects. Mr. Mannion then develops concepts intended by Mr. Mannion to communicate Mr. Mannion's desired expression to the public. Mr. Mannion gathers props, creates backdrops, instructs or collaborates with stylists about wardrobe, and discusses his concepts with his subjects. Mr. Mannion then creates photographs based on those previsualized concepts, and also based on concepts that Mr. Mannion develops dynamically during a photo session.

Mr. Mannion made countless subjective creative decisions in the course of authoring each Photograph of Mr. Carter. These decisions were guided by Mr. Mannion's unique combination of training, experience, personality, aesthetic sensibility, memories, and other factors. Mr. Mannion planned for each shoot, researching and choosing the locations for their light, textures, storytelling potential and use as backgrounds, and selecting equipment necessary to achieve the Photographs he previsualized. Mr. Mannion anticipated and responded dynamically to the subject matter and shooting environment; exercised control over the visual rendition of the scene; decided which elements to include or exclude, and where to place those elements within the frame; determined how to juxtapose people, objects, and other compositional elements for desired effect; controlled the placement and interplay of color, tone, contrast, light, and shade; controlled perspective, distortion, and selective focus to guide the viewer's eye through the Photograph; and selected the precise moment at which to capture the ultimate Photograph.

Based on my examination of the Photographs, I find that Mr. Mannion endeavored to create Photographs of the highest quality, effect, and value.

---

[19] Mannion Interview.

The creation of each Photograph involved a series of subjective creative decisions, all aimed at achieving Mr. Mannion's desired expression in the ultimate result. Importantly, the unique expression resulting from the combination of subjective decisions made by Mr. Mannion is embodied in the Photographs. An appreciation of those creative decisions will provide a more informed understanding of Mr. Mannion's original authorship and expression in the Photographs. Below, I describe examples of the original authorship exercised by Mr. Mannion, as is evident in the Photographs:

- <u>Storytelling/concept</u>:  Mr. Mannion conducted extensive pre-planning for many of his shoots, including conducting research to identify visual and artistic inspiration in pursuit of his creative goals, selecting locations, props, and wardrobe to fit his preconceived themes and creative ideas.
- <u>Styling, Sets, and Set Decoration</u>:  For certain shoots, Mr. Mannion personally selected, coordinated, and arranged wardrobe, props, accessories, backdrops, sets, set decoration, and other scenic elements in order to achieve a desired original expression.
- <u>Locations</u>:  For certain shoots, Mr. Mannion selected the locations or studios to achieve his desired original expression, and to identify and take advantage of the best available natural or artificial light.
- <u>Subject Direction</u>:  Mr. Mannion determined the positions, actions, and poses of Mr. Carter and other subjects in the Photographs, interacting with and directing all of his subjects to craft his desired creative expression. By encouraging and motivating his subject/s, Mr. Mannion guided them into the poses and expressions that enabled Mr. Mannion to achieve his artistic vision.
- <u>Exposure</u>:  Mr. Mannion creatively applied exposure to selectively render highlights, shadows, and tones throughout each scene for desired effect, guiding the viewer's eye through the scene.
- <u>Depth of Field</u>:  Mr. Mannion creatively applied depth of field (also known as "depth of focus") to selectively render areas of the scene at various levels of focus, to guide the viewer's eye through the scene.

- <u>Focal Point</u>:  Mr. Mannion creatively selected a focal point for each scene, to render a specific point in sharpest focus, so as to emphasize that point in the Photograph.
- <u>Camera Choice</u>:  Mr. Mannion selected the camera best suited to achieve his desired creative expression, including selecting between digital and film cameras and selecting the exact model and format of camera (large format, panoramic, medium format, 35mm, 16mm, Polaroid cameras, etc.) for the purposes of achieving Mr. Mannion's desired artistic effects. Mr. Mannion's digital photography demonstrates a high level of competence with professional digital equipment and with employing advanced photographic techniques to achieve a desired creative result.
- <u>Film Choice</u>:  For film-based projects, Mr. Mannion selected and controlled film type, exposure and development to allow him to control color, contrast, and other elements for a desired creative result.
- <u>Camera Position</u>:  Mr. Mannion creatively and dynamically selected the position of the camera for each scene, for desired effect. Mr. Mannion selected camera positions to affect the appearance of perspective, the juxtaposition of elements in the frame, the relative size of the various elements,  distortion of those elements, the overall composition, and to assert artistic control over other creative aspects of each Photograph for desired effect. Even a slight variation in camera position can achieve dramatically different creative results.
- <u>Camera Angle</u>:  Mr. Mannion creatively selected a camera angle (relative to the subject/s) for each photograph, to control perspective, shape, composition, and juxtaposition of objects depicted in the scene, and to assert artistic control over other creative aspects of the Photographs for desired effect.
- <u>Camera Height</u>:  Mr. Mannion creatively selected a camera height for each Photograph to control perspective, shape, composition, depth, and juxtaposition of objects, and to assert artistic control over other creative aspects of the Photographs for desired effect.

- <u>Lens Focal Length</u>:  Mr. Mannion creatively selected the lens focal length for each Photograph to control perspective, composition, and distortion, and to assert artistic control over other creative aspects of the Photographs for desired effect.
- <u>Shift/Tilt</u>: In using large-format cameras, Mr. Mannion manipulated the shift and tilt of the camera to affect the focus and perspective in particular areas of the Photographs, for desired creative effect.
- <u>Composition</u>:  Mr. Mannion creatively selected a composition for each Photograph. Mr. Mannion enjoyed infinite options for the composition of each of the Photographs, and from those, subjectively and precisely selected a single composition or sequence of compositions for desired effect.
- <u>Foreground, Midground, Background</u>:  Mr. Mannion creatively selected a foreground, midground, and background for each of the Photographs, to emphasize or deemphasize each area, and to achieve a desired creative effect.
- <u>Artificial Lighting</u>:  Where Mr. Mannion elected to employ artificial lighting in the creation of a Photograph, Mr. Mannion selected and controlled the light-to-subject distance, light height, light angle, light modifiers, light position relative to the camera, fill lighting, and the relative intensity of light in various areas of the frame, for desired creative effect.
- <u>Natural Lighting</u>:  Where Mr. Mannion elected to employ natural light in the creation of a photograph, Mr. Mannion exercised control over the effect of the natural light within each scene, by determining subject position, camera position, the use of open sun, natural open shade, artificial open shade, reflector material, reflector position, reflector angle, reflector distance, the size, position, material, distance and angle of light diffusing panels (a.k.a. "silks"), the use of natural fill (open sky, buildings, floors, pavement, etc.).
- <u>Mixed Lighting</u>:  Where Mr. Mannion employed mixed lighting, Mr. Mannion used both artificial and natural lighting to achieve a desired creative result. By combining flash and daylight, and by controlling

shutter speed in combination with the intensity of the flash lighting falling on the subject, Mr. Mannion controlled the rendering of the foreground, subject, and background.

- <u>Color Control</u>:  Mr. Mannion creatively selected his compositions to control the rendition of colors, for desired creative effect.
- <u>Texture Control</u>:  Mr. Mannion selectively controlled the appearance of texture in the Photographs, for desired creative effect.
- <u>Decisive Moment</u>:  Mr. Mannion carefully selected the precise moment at which Mr. Mannion captured each Photograph, for desired creative effect. Mr. Mannion's selection of the moment of capture determined the ultimate creative expression in the Photographs. The Photographs evidence Mr. Mannion's sensitivity to the decisive moment. Mr. Mannion dynamically repositioned the camera, identifying artistically pleasing compositions, and selecting moments that achieved ideal creative interpretations of each scene. Selecting the decisive moment when using film cameras requires particular expertise, as the photographer is unable to preview the photographs in real time to determine if the desired photograph has been captured.
- <u>Post-Processing</u>:  After capturing the Photographs, Mr. Mannion applied or directed additional creative expression in the photographic darkroom and post-processing software to achieve desired effects, making global and local adjustments to the Photographs, controlling the rendering of contrast, color, density, noise, and other factors, controlling light and shade through burning and dodging, removing objects to clean up the frame, eliminating imperfections, and enhancing the appearance of skin, hair, and facial details.

The above subjective creative decisions are only a subset of the original authorship exercised by Mr. Mannion in creating the Photographs.

Mr. Mannion enjoyed infinite creative options for depicting each scene. His subjective creative vision and decisions, original authorship, and capabilities in visual storytelling and portraiture resulted in the ultimate expression

embodied in the Photographs. When Mr. Mannion created the Photographs, there were an infinite number of possible photographic outcomes, each dependent on subjective creative decisions made by Mr. Mannion. When independently creating the Photographs, Mr. Mannion made a series of subjective creative decisions to achieve the precise expression and unique interpretation desired by Mr. Mannion. As discussed above, the Photographs each demonstrate substantial, subjective, original creative expression by Mr. Mannion.

By selecting a photographer of Mr. Mannion's caliber to create photographs of a music artist of Mr. Carter's caliber for packaging, advertising, publicity or editorial projects, a client typically seeks and relies on the photographer's experience, expertise, creative talents, and capabilities, with the expectation that the photographer will exercise his unique creative vision to independently author photographs of a quality suitable to advance the subject's business interests.

Mr. Carter repeatedly selected Mr. Mannion to create Photographs for use in Mr. Carter's business projects, demonstrating that Mr. Carter appreciated Mr. Mannion's creative vision, technical skills, and ability to create visually interesting, dynamic, and successful Photographs.

While the Photographs depict Mr. Carter's likeness, the expression embodied in the Photographs — and the value represented in the Photographs — is in great measure the result of Mr. Mannion's creative vision, his subjective decisions made in the course of authoring the Photographs, and his ability and intent to express his personal views and perspective on Mr. Carter and hip-hop culture.

With countless creative variables at play, if one hundred photographers are each assigned to make one photograph of a particular subject, one hundred unique photographs will invariably result, despite the fact that the same person is featured in each photograph. Each such portrait is the result of the individual photographer's desired expression of the subject's likeness. Below I

23

provide examples of Mr. Carter's likeness in various photographs created by various photographers. While each such photograph depicts the same person (Mr. Carter), there is wide variance in Mr. Carter's appearance in each photograph, reflecting the significant impact of the creative skills and vision of each photographer.

Figure C-01: Examples of depictions of Mr. Carter's likeness in photographs created by various photographers.[20]



[20] gavinbond.com; claypatrickmcbridge.com; dannyclinch.com; armendjerrahian.com; arthurelgort.com; hamishbrown.com; supervisionnewyork.com (Jake Chessum); arimarcopoulos.com; martinschoeller.com; leannmueller.com; philknott.com; matthewrolston.com; rankinphoto.uk.co; ravenbvarona.com; danwintersphoto.com

**D.    The Business Model for Photographers Relies on Secondary Licensing and Exploitation of Derivatives and Derivative Markets**

Based on my knowledge, training and experience, photographers, like other creators, typically rely on both primary and derivative markets for their works. Photographers typically retain copyright ownership of the copyrights in the photographs they create, so as to permit monetization of those photographs throughout the lifetime of the copyrights.

The creation of a photograph is often only the first event in a long series of events throughout the copyright life of that work. Revenue (if any) initially generated by the photographer on creation of a photograph is often insufficient to provide an incentive for the photographer to create new works. Instead, photographers and their heirs expect, plan for, and depend upon myriad opportunities to monetize their works in the diverse, global derivative markets for photographs.

As a result, the purpose for which a photograph is initially created is rarely representative of the many purposes for which the photograph may serve during its copyright life when repeatedly licensed and sold in the derivative markets. For example, a photograph initially created for an editorial feature in a particular magazine article may, at any point during the copyright life of the work, be licensed by the photographer to the original client, to the subject, or other clients, for all manner of uses, both commercial and editorial. At any point during the copyright life of the work, the photographer who created the photograph may elect to exhibit the photograph in fine art galleries, offer and sell fine art prints of the photograph to collectors, and pursue other derivative uses.

A photograph that has seldom or never been monetized may be monetized at any time at the discretion of the photographer. A photographer may elect against the licensing or sale of the work for any period of time — determined

by the artist — in an effort to protect, maintain, or enhance the value of the work in the derivative marketplace.

A photographer may focus on a particular derivative market for a period of time, and then shift to another derivative market. The photographer may at any time adopt a new or different strategy for monetizing the work in the derivative marketplace, and in so doing, significantly increase (or decrease) the revenue stream generated by the photograph. For example, a photographer may at any time submit the photograph to an agent or other representative or party and authorize that party to develop and exploit new or different derivative markets for the photograph. Examples include submission of the photograph to a stock photography agency, gallerist, or licensing agent.

The monetization opportunities for a photograph are dynamic, in that the perceived value of the photograph may vary with time. For example, licensing revenue generated by a photograph of a public figure may temporarily increase exponentially if that person is involved in a scandal or passes away. The value of a photographer's works on the fine art market may increase significantly as the result of a new project, positive review, effective promotional campaign, high-dollar auction sale, significant exhibition, or other event. Of course, the photographer may assign or transfer copyright ownership to another party, who may then monetize the photograph in the same or different derivative markets, in the same or different manners.

The photographer may, at any time during the copyright life of the work, elect to create and monetize variations of the photograph, such as new derivative works in the same or different media. The photographer may colorize a previously black and white photograph, or create a black and white version of a color photograph. The photographer may add or remove visual elements to or from the photograph using paint, pencil, pen, digital tools, video editing or other techniques. The photographer may create derivatives

26

at different sizes, or may recompose the photograph by cropping, editing or otherwise manipulating the photograph. The photographer may elect to render the photograph or portions of the photograph as a charcoal sketch, pencil sketch, painting, woodcut, line drawing, mosaic, embroidered work, sculpture, engraving, screened print, lithograph, or in any other medium. The photographer, as the copyright owner, has the discretion to create derivative works in any, all, or none of the above manners, and has the discretion to determine the point in time at which derivatives will be made, at any time during the copyright life of the photograph.

When the photographer eventually dies, the photographer's heirs may, at any point during the remaining 70 years of the copyright life of the work,[21] elect to make derivatives or to monetize the photograph in the same or different markets.

For the aforementioned reasons, the history of a photograph — its past licenses, sales, derivative markets, and the quantity and character of the variations derived — may be an inaccurate, misleading, and otherwise unreliable indicator in determining the future purposes for (or methods by which) that photograph may be exploited throughout its copyright life, in any and all derivative versions, in any and all derivative markets, by the photographer and the photographer's heirs, successors, and assigns. The history of revenues generated from the exploitation of a photograph may not be a reliable indicator of the potential future revenues from that photograph, as there are many variables in play (including the discretion of the photographer and the photographer's heirs) in determining when — and when not — to exploit the photograph.

E.    **Practices and Models Employed in Licensing Photography Copyrights**

As discussed above, compensation derived by photographers for the creation of a photograph (often expressed as a "Creative Fee" or "Photographer's

---

[21] In general, copyright endures for a term consisting of the life of the author plus 70 years after the author's death. 17 U.S.C. § 302.

Fee") is typically insufficient to operate a sustainable business. Leveraging their exclusive rights under copyright law, photographers typically earn compensation not only for the creation of photographs, but also require a "Usage Fee" or "License Fee" in exchange for granting a licensee the right to exploit the artist's copyrights in the photographs.[22] A photographer may elect to combine a Creative/Photographer's Fee with a Usage/License Fee and present a single fee contemplating both the creation and the scope of use of the photographs.

When photographers accept assignments to create photographs, they typically grant their clients limited rights at first with the expectation and intention that those clients will later return to purchase licenses for additional uses and for additional periods of use. These "Rights Managed" ("RM") licenses require a license fee based primarily on the scope of the rights granted. In RM licensing, the greater the scope of usage desired, the greater the licensing fee required of the client. The scope of use permitted under RM licenses spans the full spectrum, from very narrow to very broad.

The license scope is defined generally by the media in which the photographs may be reproduced, distributed, and displayed, subject to temporal and geographic limitations. The license is often more specifically defined by limitations on versions, placements, size, quantity, languages, and industries in which the photographs may be reproduced, distributed, displayed, and transformed.

After creating photographs, many photographers monetize their copyrights by licensing additional rights to the initial client, such as by granting license renewals and extensions, and by granting licenses for use of additional

---

[22] While some photographers may elect to only specify a "Photographer's Fee" or "Creative Fee" on their estimates and invoices, such estimates and invoices typically include or contemplate the client's scope of use of the photographs in that single fee, which combines compensation both for the creation and use of the photographs. Similarly, some photographers employ a "Day Rate" as a fee compensating the artist for the artist's time dedicated to creating photographs. While a "Day Rate" typically excludes the fee applicable to licensed use of the resulting photographs, some artists may incorporate a License Fee into a Day Rate, by adjusting the Day Rate to contemplate the scope of the license granted.

images, or in additional media or regions. Clients benefit from this model, at first paying only for the rights they need, and then later acquiring additional rights from the photographer on an ad hoc basis, spreading licensing expenditures across multiple budget periods, and avoiding expenditure on the advance purchase of rights they may never need. Photographers often also license photographs to parties other than the commissioning client, throughout the copyright life of the photographs. A long-standing rights model, RM licensing is the most common form of licensing in the assignment marketplace.

In the alternative, photographers may agree to assign copyright ownership to their clients through an express, written assignment of copyright. Or, under limited circumstances, photographers may agree in writing in advance to create photographs under work-made-for-hire terms, whereby copyright ownership vests with the commissioning client upon creation.

In addition to commissioning photographs under the RM model for assignment work as discussed above, individuals or entities interested in using existing photographs may acquire rights to those existing photographs.

Any existing photograph, whether created by a photographer on commission or created by a photographer independently and speculatively, is a "Stock Image" that may be offered for licensed usage by clients. This offering is either made directly by the photographer (either affirmatively or upon inquiry), or by an intermediary "stock agency" acting as an authorized licensor.

Clients may acquire rights to Stock Images under various licensing models. While photographers typically offer photographs only under the RM model, stock agencies may offer photographs under one or more models, including (1) Rights Managed Licensing, described above; (2) Royalty Free Licensing;

(3) Microstock Licensing; (4) Subscription Licensing; and other new and evolving models. Exceptions exist.[23]

Based on my review of the documents, materials, and testimony available to me in this Matter, and with a reasonable degree of certainty, Defendants offer photography licenses only under the RM model, under which the license fee is determined in greatest measure by the proposed scope of use of a photograph by a prospective licensee. Defendants do not currently offer licenses through stock agencies or automated licensing websites.[24]

My opinions on photography licensing models are based on my personal knowledge and experience as a professional photographer and trade association leader charged with establishing and developing industry standards and associated photography licensing terms and agreements.

## F.   Mr. Mannion's Business Model

Mr. Mannion generates revenue from photography assignments and secondary/derivative markets, such as stock licensing and fine art print sales, to sustain his business and to support himself.[25]

As the sole copyright owner of his photographs, Mr. Mannion may offer and sell copyright licenses to clients throughout the world, and may also elect to withhold or deny licenses to anyone (including the subjects depicted in the photographs), for any reason, and at any time. For example, Mr. Mannion, at his sole discretion, may decline to offer or remove any of Mr. Mannion's photographs from the licensing marketplace in order to preserve the value of the copyrights, to mitigate infringement issues, or simply because he determines, at his discretion, that he does not wish to license or publish a

---

[23] This is not intended to serve as a comprehensive description of all practices related to copyright licensing in the photography industry.
[24] Mannion Interview.
[25] *Id.*

photograph. Defendants only offer photography licenses through direct negotiations, on a case-by-case basis.[26]

Mr. Mannion intends to continue to monetize his copyrights throughout the copyright life his photographs by offering licenses for all manner of usages, in all manner of media, potentially including usages for which Mr. Mannion has not yet sold licenses.[27] Mr. Mannion may further monetize his photographs (and derivatives thereof) in prospective and developing derivative markets, including derivative markets in which he has not yet participated.

Mr. Mannion also relies on revenue generated by sales of prints and other reproductions of his photographs. Mr. Mannion intends to continue to create and sell fine art prints of his photographs. Mr. Mannion may at his discretion create and sell derivative works of his photographs.[28]

## G.    Mr. Carter's Exploitation of Mr. Mannion's Photographs

Mr. Carter exploited and continues to exploit Mr. Mannion's Photographs and copyrights on Mr. Carter's products, and in Mr. Carter's advertising, branding and publicity campaigns. Mr. Carter and Mr. Carter's related companies and record labels relied on and continue to rely on Mr. Mannion's Photographs to create, build, maintain, and promote Mr. Carter's public persona and brand, and to generate revenue and profits for Mr. Carter and Mr. Carter's affiliates. Below are examples of Mr. Carter's exploitation of Mr. Mannion's Photographs and copyrights.

---

[26] Mannion Interview.
[27] *Id.*
[28] *Id.*

Figure G-01: Examples of the commercial exploitation of Mr. Mannion's Photographs and copyrights by Mr. Carter and his record labels.



**H.**    **Mr. Mannion's Publication and Sale of Reproductions of Mr. Mannion's Photographs is Consistent with Standard Practice and Leverages Customary Conduits for Creative Expression in Photography**

Photographers leverage diverse conduits to distribute and display their photographs to the public, as the visual embodiment of their views and ideas. By custom and practice in the photography industry, photographers express their views and ideas by publishing their photographs in media such as websites, social media platforms, blogs, vlogs, books, magazines, brochures, other editorials, videos, films, posters, presentations, interviews, and prints.

Photographers may use any and all of these channels (and more) to promote and draw attention to their creative works, in an effort to achieve the broadest possible public exposure of the visual expression of their ideas, and to contribute to public debate on the broadest possible scale. By custom and practice in the photography industry, photographers may elect to distribute and display individual photographs, groups of photographs, or entire bodies of work for this purpose. Photographers often elect to most prominently feature their best works, in order to draw maximum attention to their expression, and to secure additional opportunities to create new works and thus further their expressive intent.

In particular, the distribution, offering, and sale of fine art prints is a critical conduit for the expression of a photographer's ideas to the public, for a contribution to the public debate on the view and ideas embodied in the photographs, and as one of the primary means by which a photographer exploits the rights enjoyed by the photographer during the copyright life of a photograph.

Mr. Mannion's reproduction, distribution and display of Mr. Mannion's Photographs of Mr. Carter is a typical and customary effort by Mr. Mannion to achieve broad public exposure of his views and ideas. Below I provide representative examples of the publication of photographs of Mr. Carter by

other photographers, in the same manner as Mr. Mannion's publication of his Photographs of Mr. Carter on Mr. Mannion's websites.

Figure H-01: Examples of the public display of photographs of Mr. Carter's likeness by photographers.[29]



[29] gavinbond.com; claypatrickmcbridge.com; dannyclinch.com; armendjerrahian.com; arthurelgort.com; hamishbrown.com; supervisionnewyork.com (Jake Chessum); arimarcopoulos.com; martinschoeller.com; leannmueller.com; philknott.com; matthewrolston.com; rankinphoto.uk.co; ravenbvarona.com; danwintersphoto.com

I.      **Model Releases for Print Sales, Websites and Social Media**

By custom and practice in the photography industry, photographers typically display, offer and sell fine art prints, and publish photographs to websites and social media platforms, without obtaining model releases from celebrities or other persons depicted in photographs. As described above, these are examples of conduits for photographers' expression of views and ideas.

Mr. Mannion's publication of Photographs of Mr. Carter on Mr. Mannion's websites and social media accounts, together with Mr. Mannion's offering and sale of fine art prints of Mr. Mannion's Photographs of Mr. Carter, is consistent with the custom and practice in the photography industry.

Below I provide examples of various photographers' websites featuring photographs of celebrities.

35

Figure I-01: Examples of the display of photographs of celebrities on photographers' websites.[30]



[30] philknott.com; matthewrolston.com; leannmueller.com; hamishbrown.com; ravenbvarona.com; martinschoeller.com; gavinbond.com; armendjerrahian.com; danwintersphoto.com; arthurelgort.com; arimarcopoulos.com; dannyclinch.com; rankinphoto.uk.co; claypatrickmcbridge.com; supervisionnewyork.com (Jake Chessum);

36

**J.      Photographic Licensing in the Music Industry**

Photographers typically license limited rights to their clients in the music industry, granting the licensees rights that may include the right to reproduce and distribute photographs on product packaging, in advertising, in publicity, and (or) on merchandise. In the 21st century, as in the 20th century, the license fee paid to photographers by their clients is typically based on the scope of rights requested by the licensee, with a greater fee applying to broad uses, and a lesser fee applying to lesser uses. Where a photographer agrees to assign copyright ownership to a client, or to create works on a "work made for hire" basis, the applicable fees are typically substantially greater than fees applicable to a limited license. As these fees are often cost prohibitive to licensees, Photographers typically retain copyright ownership and license limited rights to their clients, providing license renewals and extensions as needed. This licensing model suits both photographers and their clients, as under this model, clients need not risk unnecessary excess investment in photographs for which clients may not later require additional usages.

Examples of licenses issued by Defendants to Mr. Carter or his affiliated companies are typical of licenses issued by photographers to their clients in the music industry, providing limited rights in exchange for a reasonable license fee, permitting Mr. Carter to make limited exploitation of Mr. Mannion's Photographs in the manner described in the license documents. Such examples include:

On August 3, 2009, JMP granted a limited usage license to S. Carter Enterprises authorizing it to make limited use of a Photograph created during a photo shoot related to Mr. Carter's Blueprint album, which Photograph was ultimately used for the cover of The Black Album,

37

which Photograph was previously created by Mr. Mannion, depicting Mr. Carter's likeness.[31]

On August 3, 2009, JMP granted a limited usage license to S. Carter Enterprises authorizing S. Carter Enterprises and/or Rocawear to make limited use of a Photograph created in relation to the cover of the album entitled "Vol. 3... Life and Times of S. Carter," previously created by Mr. Mannion, depicting Mr. Carter's likeness.[32]

In an agreement dated as of August 4, 2009, Mr. Mannion granted a limited usage license to Mr. Carter authorizing Mr. Carter to make limited use of seven (7) Photographs (the Photographs embodied on the covers of the albums entitled "Reasonable Doubt," "In My Lifetime, Vol. 1," "Vol. 2... Hard Knock Life," "Vol. 3... Life and Times of S. Carter," "The Dynasty: Roc La Familia," "The Blueprint" and "The Black Album") previously created by Mr. Mannion, depicting Mr. Carter's likeness.[33]

On August 23, 2010, JMP granted a limited usage license to Random House Publishing Group authorizing it to make limited use of one Photograph created during the photo shoot for Mr. Carter's album entitled "In My Lifetime, Vol. 1," which Photograph was previously created by Mr. Mannion, depicting Mr. Carter's likeness.[34]

By custom and practice in the music photography industry, a photographer's invoices typically describe the rights granted to the licensee, and may specify other terms and conditions, reflecting the parties' mutual understanding.

---

[31] MANNION001771.
[32] MANNION000866.
[33] CARTER0004466.
[34] MANNION000940.

## VI.  RIGHT TO SUPPLEMENT

My opinions hereinabove are to a reasonable degree of certainty for a photography licensing and copyright expert, based on my training, education, knowledge experience, and review of the materials listed in *Materials Considered* (Exhibit B). I understand that Mr. Carter may offer expert testimony to support Mr. Carter's claims in the Matter, and I expect that additional information and documents may come to light subsequent to my submission of the Report. If requested by Defendants, I may offer supplemental reports and/or rebuttal testimony to the opinions expressed by Mr. Carter and Mr. Carter's experts, in accordance with the Court's scheduling order.

Respectfully Submitted,

_____   March 18, 2022
Professor Jeffrey Sedlik

39

Index to Exhibits

A        Professor Jeffrey Sedlik Curriculum Vitae

B        List of Materials Considered

**EXHIBIT A**

# PROFESSOR JEFFREY SEDLIK
## Curriculum Vitae

## Contact Information

Mailing Address    145 North Sierra Madre Boulevard, Studio 4, Pasadena, California 91107 USA
Telephone          626.808.0000 (LA)    212.447.1255 (NYC)    213.716.6627 (Cell)
Email              expert@sedlik.com

## About Professor Sedlik

President & CEO of the PLUS Coalition, the international standards body for the licensing of visual artworks. Professional photographer, educator, publisher, forensic analyst, graphic designer, product designer, expert witness, fundraiser, negotiator, and consultant. Past National President of the Advertising Photographers of America (APA), a leading trade association in the commercial photography industry. APA Chief Advisor on Licensing and Copyright. 2005 Photography Industry Leadership Award, International Photography Council.  2006 Photography Person of the Year, Photo Media Magazine. 2007 Industry Leadership Award, Advertising Photographers of America.

Advises clients on industry trends, business practices, copyright and contract issues, branding, fair use, copyright registration validity, public domain works, moral rights, work-made-for-hire, merchandising/packaging infringements, Creative Commons,  asset identification systems, asset management systems, asset licensing systems, stock photography industry practices and methodologies, metadata standards, rights languages, valuation of photographs/photography, illustrations, graphic designs, and other visual artworks and related services, licensing, rights of publicity/privacy, social media technologies and terms, web project development, investment and acquisition opportunities, strategic partnerships, art history, historical practices and technologies in photography, digital and traditional photographic and design techniques and workflows, repair and restoration of photographic prints, forensic analysis of photographs and videos, graphic design, product design, publishing, photography-related software design, patents of photography-related technologies and procedures, and product manufacture. Provides expert witness and consulting services on these and other matters related to photography, illustration, visual art, advertising, design, and the modeling industry.  Provides expert testimony on actual damages, statutory damages, causal nexus for disgorged profits, and other damages and liability arising from breach of contract, infringement of copyright, trade dress, trademark, removal/alteration/falsification of copyright management information, DMCA violations, rights of publicity/privacy, loss/damage/theft of visual artworks, image manipulation, creative expression, original authorship, substantial similarity, independent economic value, employment status, sale tax and other issues. Provides photogrammetric services and forensic analysis of images and video.  Serves as a Professor at the Art Center College of Design.  An accomplished and experienced educator, conducts advanced seminars and workshops for professionals, and teaches college-level courses on copyright, licensing, advertising, design and related business practices.

## Professional Experience

**PLUS Coalition, Inc.**, 2005 – Present.  Serves as President and CEO for the global standards body for the image licensing industries. A non-profit organization, Picture Licensing Universal System ("PLUS") is dedicated to the development and maintenance of international licensing standards and systems in the photography, illustration,

publishing, advertising, graphic design, museum, library, and education communities in 120 countries. Directed recruitment of trade organizations and other interested parties worldwide and supervised development and implementation of licensing standards, and development of a global rights registry.

**PLUS Coalition, LTD.**, 2005 – Present.  Serves as President, CEO and Director of the London-based subsidiary of the PLUS Coalition, Inc.

**Sedlik Productions/Sedlik Design,** 1986 – Present. Serves as President of a leading commercial photography, design, and film production company.  Also serves as Producer, Director, Photographer, and Director of Photography, creating photography, film and video productions for advertising agencies, graphic design studios, the entertainment industry, and other clients. Operates SedlikStock, a subsidiary dedicated to licensing existing Sedlik images for advertising, editorial and merchandizing usage via affiliates including stock photography agencies and publishers. Maintains relationships with major photography industry manufacturers, testing and demonstrating analog and digital equipment and software. Provides graphic design, advertising design and product design and manufacturing services.

### Partial Client List- Sedlik Productions/Sedlik Design

**Clients:** 3m; 20th Century Fox; A&E Television Network; ABR Information Services; Alpo; AmSouth Bank; Andazia, Inc; Arista Records; Association of Tennis Professionals; AT&T; Avery Dennison; Bank of America; Barrington Music Products; BBC;  Blue Cross; BMG/RCA Records; Bristol Myers Squibb; Buena Vista Pictures; Bureau of Census; CareAmerica; Chesebrough-Ponds; CBS/Sony Music; Cedars Sinai; Century 21; Cherokee; Columbia Pictures; Computer Associates; Concord Records; Conroy's Florist; Direct TV; Disney; Doubleday; Dreyfus; Epson; Essilor; Farmers Insurance; Federal Express; Fitzgerald-Hartley Co.; Ford; Gannon/Hartley; Geffen Records; Georgia Pacific; Great Performances; Great Western Bank; GRP Records; GTE; Guinness Museum; Hanna-Barbera; Harcourt Publishers; Hopper Papers; Ikea; Infiniti Automobiles; Island Records; Janssen Pharmaceuticals; JVC Musical Industries; Kraft Food Products; Korg, Inc.; LaFace Records; Laura Ashley; Levi Strauss; Mark Taper Forum; Missouri Historical Society; MCA Records; MCA International; Metro Goldwyn Mayer; Microsoft; Motion Picture & TV Fund; Movieland; MSN; MTM Entertainment; MTV Networks; Navisite; NBC Television; Neenah Paper; Nestle'; New World Pictures; Nike; Pacific Bell; Palm Press; Paramount Pictures; Phillip Morris; Polygram Records; Pomegranate Books; Potlatch; Prentice-Hall; San Diego Zoo; Schering Plough; SBC; Signature Eyewear; Smithsonian Institution; Sony Inc.; Southern Natural Gas; Spanish Tourism Office; Sugar Hill Records; Taco Bell; Telarc International; Toyota; Turner Broadcasting; U. C. Press; United Airlines; United Way; Universal Studios; VH-1; Warner Brothers Records; Web TV; Windham Hill Records; Word Records; World Savings; Yamaha; Zellerbach; Ziff-Davis; Zildjian

**Advertising Agencies & Design Firms:** Alan Sekuler & Associates; Asher Gould; BBDO;  Bozell, Brierley & Partners; Brooks-Gruman Advertising; Campbell, Mithun, Esty; Cline, Davis, & Mann; Cross & Associates Design; Dailey & Associates; Davis, Elen; Daymark; DDB Needham, Worldwide; Deutsch; Douglas Oliver Design; DVC Marketing; DZN; The Design Group; East/West Network; Fitzgerald & Associates; FKQ Advertising; FP Horak Advertising; Foote, Cone, & Belding; GBF Ayer; Goodby Silverstein; Grey Advertising; Hill & Knowlton; Huerta Design; Ikkanda Design; Interbrand; J. Walter Thompson; Kang & Lee; Kaufman/Stewart; Ketchum Advertising; Klemtner Advertising; Kovel Kresser; Kuester Group; Lehman Millet, Inc; Lintas Campbell Ewald; Mangos; Mediatrix; Melia Design Group; Ogilvy & Mather; OZ Advertising; Phillips Ramsey; Poppe-Tyson; Potter Katz & Partners; John Ryan Company; Saatchi & Saatchi; Seineger Advertising; Slaughter Hanson; SmithKlein Beecham; Strike Group; Team One Advertising; Team Creatif; Torre Lazur; Tracy-Locke; Tribe Design; Vrontikis Design; White Rhino Advertising; Young & Rubicam

**Editorial:** American Film; Arts & Entertainment; CD Review; Cosmopolitan; Details; Downbeat; Elle; Entertainment Weekly; Glamour; GuestInformant; Imperial Press; In Focus; Interiors & Sources; Jazziz; Jazz Times; Life; Los Angeles Magazine; Los Angeles Times Magazine; Mirabella; Music Connection; Newsweek; Photo District News; People; Premiere; Pulse; Q Magazine; Rolling Stone; Select; Spin; Time-Life

## Other Professional Experience

**Copyright Public Modernization Committee (CPMC) of the Library of Congress.** 2021 – Present. Appointed by Librarian of Congress Carla Hayden to serve as her advisor on the modernization of the Copyright Office.

**Linked Content Coalition, (LCC)** 2013 – Present.  Serves as a Founding Director of the Linked Content Coalition (LCC), a UK-based, not-for-profit global consortium of standards bodies and registries. LCC members are organizations engaged in creating and managing data standards associated with content of one or more types, particularly for identifiers, metadata, and messaging. The purpose of the LCC is to facilitate and expand the legitimate use of content in the digital network through the effective use of interoperable identifiers and metadata.

**American Society of Collective Rights Licensing (ASCRL),** 2014 – Present. Serves as Founding Director of ASCRL, a non-profit collecting society engaged in collecting and distributing  foreign and domestic royalties to authors and copyright owners in visual works in the United States.

**Copyright Alliance (CA),** 2016 – Present. Serves as Board member on the Copyright Alliance Creators Advisory Board and Academic Advisory Board, collaborating with leading organizations and experts in the creative industries on copyright-related issues including education, legislation, advocacy, and other efforts.

**Advertising Photographers of America (APA)**. Served as National President , 2000 – 2002. Directed and supervised all operations of the largest trade organization representing advertising photographers, leading more than seventy volunteer board members located in all areas of the country. Advised federal and state legislators, and senior officials at the Small Business Administration and US Copyright Office. Serve  as Chair of the Model Release Working Group, charged with developing international standards for model releases, communication of usage rights,  and model release workflow. Served on the Board of Directors of the APA Los Angeles Chapter, and on that chapter's Legal and Legislative Committee, Advocacy Committee and Sales Tax Committee. Serve as Chief Advisor on Licensing and Copyright, 2002 – 2012, and 2018 – Present.

**Beijing Intellectual Property Expertise Center of Judicature (JZSC),** 2007 – Present. Advisor to Chinese governmental agency and the People's Court of China on intellectual property issues in China.

**IPTC Photo Metadata Working Group,** 2006 – Present. Active participant in the International Press Telecommunications Council (IPTC) standards body. Member of the IPTC Photo Metadata Working Group, charged with establishing and maintaining standards for embedded metadata in digital photographs. Co-authored the IPTC Photo Metadata White Paper 2007 and the IPTC-PLUS Photo Metadata Toolkit.

**Universal Photographic Digital Imaging Guidelines (UPDIG),** 2004 – Present.  Active participant in working group charged with developing worldwide standards in the commercial application of digital imaging technologies.

**Consultant and Expert Witness,** 2000 – Present. Provide consulting services, forensic analysis and expert testimony on legal, business, and technical matters related to digital and traditional photography, illustration, marketing, and other topics.

**United States Copyright Office**, 2008 – Present. Advises senior staff members on topics including copyright registration, regulatory, re-engineering and professional workflow issues. Alpha test consultant for online electronic copyright registration system.

**Adobe Photographer's Council,** 2004 – 2010. Advised Adobe Systems on matters related to Adobe products and services, including digital photography technologies, stock photography, and industry standards.

**Adobe Pre-release Testing,** 2004 – Present. Provides pre-release testing services to Adobe, both alpha and BETA testing of Adobe products and services.

**Founder, Digital Technology Advisory Council**, 2002. Founded advisory council comprised of high-level representatives from each of the leading photography industry manufacturers.

**Advisory Board Member, WorkbookStock,** 2000 – 2006. Served on the advisory board of WorkbookStock, a leading stock photography agency. Consulted on the development of a vendor contract, copyright registration procedures, and web interface.

**Advisory Board Member, Exactly Vertical**, 1998 – 2000. Served on the advisory board of Exactly Vertical, a company offering interactive business management solutions for photographers. Consulted on issues including web interface, software design, copyright registration, merchandizing, stock licensing, photographers' workflows, and branding.

**Other, 1996 – Present:** Numerous additional consulting  engagements under NDA, including the identification and analysis of investment opportunities, strategic partnerships, acquisition targets, product development and launch strategies, advisory council recruitment, fundraising, negotiations, mediation, and deal brokering.


## Awards & Recognition

**APA Photography Industry Leadership Award,** 2007. Presented by Advertising Photographers of America.

**Photography Person of the Year,** 2006. Presented by Photo Media Magazine.

**ICP Photography Industry Leadership Award,** 2005. Presented by the International Photography Council, a non-governmental organization of the United Nations.

**Mamiya Award of Excellence in Photo Education**, 1999. Recognized as a leading arts educator. Selected from all college-level photography instructors, nationwide.

**The Clio Awards. Silver Clio, Director of Photography, Rich Media Advertising**, 1999.

**Selected Additional Awards and Recognition:** Print's Regional Design Annual. Award of Excellence, 1999; Ozzie Awards. Silver Ozzie for Best Photography, 1999; Art Directors Club. Excellence in Photography, 1999; Art Directors Club. Excellence in Photography, 1999; PDN/Nikon Award of Excellence in Self Promotion, 1998; Advertising Photographers of America. Best in Show, 1998; Communication Arts Award of Excellence in Editorial Photography, 1998; The One Show Award for Excellence in Advertising, 1997; Communication Arts Award of Excellence, Unpublished Work, 1997; Communication Arts Award of Excellence in Self Promotion, 1996; Communication Arts Award of Excellence in Advertising Photography, 1994; Communication Arts Award of

Excellence, Book Series, 1993; Art Direction Magazine Creativity Award, 1992; Communication Arts Award of Excellence in Editorial Photography, 1992; Communication Arts Award of Excellence in Advertising Photography, 1991; Communication Arts Award of Excellence in Editorial Photography, 1990; Art Direction Magazine. Creativity Award, 1990.

## Articles Authored

**ASMP Professional Business Practices in Photography, 2008.** Contributing author.

**United States House Judiciary Committee.** "The Orphan Works Dilemma: Challenges & Recommendations," 2006. Treatise submitted to the House Judiciary Committee by invitation of the General Counsel, in relation to the U.S. Copyright Office "Report on Orphan Works."

**Photo District News.** Contributor to Photo District News, the photography industry's primary trade publication. Authored the "Ask the Expert" column, writing on subjects of business management, licensing, copyright, and creativity.

**In Focus.** Contributor to In Focus Magazine, the magazine of the Advertising Photographers of America, writing on subjects including business management, industry trends, protecting the value of photography, licensing, copyright, creativity.

**Wraparound.** Founder and regular contributor to Wraparound Magazine, writing on legal and business topics.

**APA/LA News Magazine.** Contributor to the news magazine published by the Advertising Photographers of America, Los Angeles Chapter.

**Photo Media.** "Get Down to Business" Fall, 2000

**IPTC Photo Metadata White Paper 2007.** Co-author.

## Professional Societies

**Advertising Photographers of America (APA)**

**American Institute of Graphic Arts (AIGA)**

**American Society for Collective Rights Licensing (ASCRL)**

**American Society of Media Photographers (ASMP)**

**American Society of Picture Professionals (ASPP)**

**Copyright Alliance (CA)**

**Copyright Society of the United States of America (CSUSA)**

**Photography Instructors Education Association (PIEA)**

**PLUS Coalition, Inc. (PLUS)**

**Pro Imaging (PI)**

## Selected Speaking Engagements

**American Photographic Artists,** 2020. *"Why Register Copyright?"*

**United States House of Representatives, Committee on the Judiciary,** 2020. Testimony on proposed amendments to the Copyright Act.

**United States Copyright Office**, 2020. Invited speaker on the development and efficacy of Standard Technical Measures and Copyright Management Information under the Digital Millennium Copyright Act.

**United States Senate, Committee on the Judiciary, Subcommittee on Intellectual Property,** 2020**.** Testimony on proposed amendments to the Copyright Act.

**Copyright Society of the USA,** 2019. "Expert Witnesses in Copyright Matters"

**Copyright Society of the USA - Copyright Technology Conference**, 2019**.** "Rational Approaches to Online Image Licensing."

**Copyright Society of the USA,** 2018. "Perfect Storm: Embedding, Linking and Copyright Infringement."

**United States Department of Commerce,** 2018. "Developing the Marketplace for Copyright Works: Licensing and Monetization."

**American Society of Media** Photographers, 2018. "Understanding New Copyright Regulations for Group Registration of Photographs"

**United States Copyright Office,** 2017. "Original Expression and Authorship in Photography."

**Photo+ Expo,** 2017. "They Stole My Work. Now What?"

**Copyright Society of the USA,** 2017.  Mid-winter Meeting**. "**TMI About CMI: The Rash of Recent Claims Under Section 1202 Regarding Removal of Copyright Management Information.

**United States Copyright Office,** 2016. "Copyright Licensing in the Visual Arts."

**International Federation of Reproduction Rights Organizations (IFRRO),** 2016**.** Annual General Meeting. "Licensing Reproduction Rights."

**Joint Photographic Experts Group (JPEG),** 2016. JPEG Committee Meeting – JPEG Privacy & Security Workshop: "Embedded Rights Metadata in Photographs."

**Duke University Law School and New York University Law School**, 2016. "Copyright Office for the 21st Century: Registration and Recordation Functions"

**United States Copyright Office,** 2016. California Roundtable on Section 512: "Applicable Legal Standards," "Scope and Impact of Safe Harbors," "Technological Standards and Solutions."

**Legal Issues in Museum Administration Conference,** 2015. Smithsonian Institution. "Copyright Clearance and Cultural Heritage."

**International Press Telecommunications Council (IPTC) Conference,** 2015. "The Application of Rights Metadata in Photographs."

**Initiative for a Competitive Online Marketplace (ICOMP),** 2015. "How the Digital and Creative Economies Can Prosper Together."

**International Federation of Reproduction Rights Organizations (IFRRO),** 2015**.** Annual General Meeting. "Measuring the Use of Visual Works."

**United States Patent and Trademark Office,** 2015. **"**Copyright, Culture, Art and Science in the Digital Age: Hot Topics in the Visual Arts. Painting, Photography and Sculpture – Toward a Copyright Hub."

**Stanford University Law School,** 2014-2015. Copyright Practicum: **"**Copyright in Visual Artworks Identification, Metadata, Registration, Licensing."

**United States House of Representatives Judiciary Subcommittee on the Courts, Intellectual Property, and the Internet**, 2014. Testimony at hearing entitled "Preservation and Reuse of Copyrighted Works."

**United States Copyright Office**, 2014. "Orphan Works & Mass Digitization Round Table."

**United States Copyright Office:** 2014. "US Copyright Office Recordation Reengineering Roundtable."

**International Confederation of Societies of Authors and Composers (CISAC).** 2013. "World Creators' Summit - Orphan Works: Balancing Access and Creator's Rights."

**International Press Telecommunications Council (IPTC). IPTC Metadata Conference**, 2013. "Metadata Technology. What the Future Might Bring."

**California Visual Resources Association Conference**, 2014. Image Rights: "Leveraging Rights Metadata to Maximize Access and Minimize Liability."

**United States Patent and Trademark Office.** 2013. "Copyright Policy, Creativity, and Innovation in the Digital Economy."

**National Association of Recording Merchandisers (NARM) Conference,** 2013. "Managing Photographic and Video Archival Assets."

**Advertising Photographers of America (APA)**, 2013. "Social Media, the PLUS system, and Strategic Licensing in the Internet Age."

**Copyright and Technology Conference, 2012**. Rights Registries and Copyright Hubs: "The Holy Grail, or the Enemy of the Good?"

**ICON LA Illustration Conference**, 2010.  **"**Illustrators and Copyright."

**Picture Archive Council of America, International Conference**, 2004.  Image Licensing in the 21st Century

**Createasphere EXPLORE Entertainment Technology Exposition**, 2010. Digital Asset Management Workflows

**American Society of Media Photographers**, 2010. Copyright and the New Economy: Issues Facing Visual Artists

**Photo+ Expo**, 2009. "Strategic Copyright Licensing."

**Museum Computer Network**, 2009. "Copyright in the Cultural Heritage Sector."

**Smithsonian Institution**, 2009. "Beyond the Copyright Field: Current Trends in Rights and Licensing Metadata."

**Photo Marketing Association**, 2008. "Breakthroughs in Photo Archiving using Metadata"

**Picture Archive Council of America International Conference**, 2008. "Copyright in the Stock Image Industry."

**Henry Stewart DAM Symposium**, 2008. "Rights, Images and PLUS: Challenges & Solutions"

**IDEAlliance XMP Open Content Metadata Summit**, 2008. "Leveraging XMP to Advance Industry Standards"

**Picture Archive Council of America**, 2007. "Finding  Common Ground: Setting Standards in a Time of Change."

**Library of Congress**, 2007. "Image Preservation with PLUS."

**Japan Photographer's Union**, 2007. "Photography & Copyright: International Issues."

**Digital Library Federation, Fall Forum**, 2007. "Facilitating Fair Licensing of Digital Images,Determining Copyright."

**Museum Computer Network Conference**, 2007. "Museums and Intellectual Property: Challenges and Solutions."

**IDEAlliance XMP Open Content Metadata Summit**, 2007. "Advanced Metadata Workflow Strategies."

**American Society of Picture Professionals, Education Conference**, 2006.  "Strategic Licensing: The Art & Science of Maximizing Your Profits."

**International Press Telecommunications Council (IPTC) Conference**, 2006. "PLUS and IPTC, Collaborating on Rights Metadata Standardization."

**Coordination of European Picture Agencies Press Congress (CEPIC) Conference**, 2006. "Implementing International Standards in Image Licensing."

**Oxford University**, 2006.  "Digital Object Identifiers and Copyright."

**Miscellaneous Events and Engagements,** 1977 – Present. Invited speaker/panelist at the industry's major trade shows, speaking on topics including copyright, licensing, advertising, branding, design, publishing, product development, self-promotion, stock image licensing and technical issues. Lectured on photography at LAUSD

Community Adult School. Speaks before groups of photographers and creatives worldwide. Wrote and produced the APA "Real World" seminar series on topics ranging from estimating, to licensing, to producing. Participated in the development of Digital Imaging for Photographers, a leading seminar series dedicated to cutting- edge digital techniques and equipment.  Speaker at the "PDN on the Road" seminar series, on copyright, licensing, and stock photography.  Speaker at the ASMP Strictly Business Workshops, ASMP Copyright Symposiums, Copyright & Technology Conferences, Digital Asset Management Conferences, World Copyright Summits, Copyright Office Roundtables, and many other events.

## Foundation, Community Service and Charitable Work

**Warren King Foundation**, President, 2000–2002. Created foundation providing endowed photography scholarships to promising photography students. Produced a fundraising event attended by photographers, educators, government officials and media. Lobbied Los Angeles Unified School District to re-launch abandoned arts education programs in local schools. Arranged for an arts teacher to receive a lifetime achievement award at the Kennedy Center.

**Other Community Service and Charitable Work.** Conduct visiting lectures on the art and history of photography for elementary school students in the Los Angeles Unified and Pasadena Unified School Districts. Judge photography exhibitions at the high school, college, and amateur, and professional levels.  Photograph pro-bono or reduced-fee public service campaigns for charitable organizations such as the LA Times "Reading by Nine" program, Jewish Family Services, Motion Picture and Television Fund, United Way, and others. Volunteered time to leadership in the Boy Scouts and public schools. Donated original photographic prints to each of the Focus on Aids annual fundraising auctions 1987-2003, Woodcraft Rangers, Pediatric Aids Foundation, and other vital charitable organizations.

**Boy Scouts of America,** Eagle Scout, 1972-1977.

## Academic

**Continuing Education,** 1986-Present. Attends workshops and seminars on business, legal and technical issues affecting photographers, illustrators, designers, and other visual creators, with an emphasis on intellectual property, business management, stock photography, and digital technology courses. Consults with manufacturers and distributors in testing new equipment and software applications  to stay abreast of the latest developments in digital imaging, design, and manufacturing technologies.

**Brooks Institute,** 2008, MFA, HC.

**Art Center College of Design,** 1986,  BFA.

**University of California at Santa Barbara,** 1980-1983, Liberal Studies major with emphasis in Art, Art History, Economics, Business Management.

**EXHIBIT B**

**MATERIALS CONSIDERED**

| Type | Description | Reference |
|---|---|---|
| Complaint | First Amended Complaint | |
| Motion | Motion to Strike | |
| Opp | Opposition to Motion to Strike | |
| Reply | Reply re Motion to Strike | |
| Order | Order on Motion to Strike | |
| Answer | Answer | |
| Produced doc | Rhapsody release fully executed | CARTER0004466 |
| Depo Transcript/exs | Kareem Biggs Burke deposition transcript and exhibits | |
| Depo Transcript/exs | Shawn Carter deposition transcript and exhibits | |
| Depo Transcript/exs | Jeff Kempler deposition transcript and exhibits | |
| Depo Transcript/exs | Harold Richard Patrick deposition transcript and exhibits | |
| Depo Transcript/exs | Leonard Santiago deposition transcript and exhibits | |
| Rog responses | 211210_001_Plaintiff's O&R to Mannion 1st Set of Rogs | |
| Rog responses | 211210_002_Plaintiff's O&R to Mannion Photography 1st Set of Rogs | |
| RFP responses | 211210_003_Plaintiff's O&R to Defs. 1st Set of RFPs. | |
| Rog responses | 211215_001_Defts' Objections and Responses to Pltf's First Set of Interrogatories | |
| RFP responses | 211215_002_Defts' Objections and Responses to Pltf's First Set of Requests for Production | |
| RFA responses | 211215_003_Defts' Objections and Responses to Pltf's First Set of Requests for Admission | |
| RFA responses | 220119_Pl's O&R 1st Set of RFAs | |
| RFA responses | 220127_Mannion'sAmended Responses to Pltf's RFA Nos. 13 & 16 | |
| Rog responses | 220202_001_Pls Supp O&R Mannion 1st Set of Rogs | |
| RFA responses | 220211_PI Supp O&R 1st Set RFAs | |
| Rog responses | 220214_001_Defts' Suppl. Response to Interrogatory No. 1. | |
| Rog responses | 220217_001_Pltf's Second Supp Resps Mannion Rogs | |
| Rog responses | 220218_001_Defts' Second Supplemental Response to Interrogatory No. 1 | |
| RFP responses | 220224_Defts' Object. & Resps. to Pltf's Second Set RFPs | |
| RFP responses | 220307_001_Defts' Object. & Responses to Pltf's Third Set of RFPs | |
| RFA responses | 220307_002_Defts' Object. & Responses to Pltf's Second Set of RFAs | |
| Rog responses | 220307_003_Defts' Object. & Responses to Pltf's Second Set of Interrogatories | |
| RFA responses | 220307_006_Pltf's O&R 2d Set of RFAs | |
| Produced doc | Def Jam UMG invoice | MANNION001067 |
| Produced doc | Fame Wall Tee product page | MANNION000307 |
| Produced doc | Got You All product page | MANNION000329 |
| Produced doc | Chess product page | MANNION000360 |
| Produced doc | Yankee product page | MANNION000434 |
| Produced doc | RD Jay-Z product page | MANNION000438 |
| Produced doc | Last Laugh product page | MANNION000479 |
| Produced doc | S. Carter usage | MANNION000863 |
| Produced doc | Rocawear 10th Anniversary use | MANNION000866 |
| Produced doc | Collection of invoices | MANNION000915 |
| Produced doc | Spiegel Grau agmt | MANNION000938 |
| Produced doc | Random House agmt | MANNION000940 |
| Produced doc | BET invoice | MANNION000947 |
| Produced doc | tour merch negotiations Ohwesnere email | MANNION000987 |
| Produced doc | Revolt invoice | MANNION001159 |
| Produced doc | email parent WAM invoice | MANNION001481 |
| Produced doc | WAM invoice | MANNION001486 |
| Produced doc | WAM email | MANNION009232 |
| Produced doc | WAM print purchase | MANNION009296 |
| Produced doc | Ohneswere email | MANNION010942 |
| Produced photo | Jay Z Special Edition Tattoo photo | MANNION001140 |
| Produced photo | misc scans Jay-Z photos1 | MANNION001826 |
| Produced photo | misc scans Jay-Z photos2 | MANNION001827 |
| Produced photo | misc scans Jay-Z photos3 | MANNION001828 |
| Produced photo | misc scans Jay-Z photos4 | MANNION001832 |
| Produced photo | Chess Not Chckers photo | MANNION004334 |
| Produced photo | Beyond a Reasonable Doubt photo | MANNION005687 |
| Produced photo | Jay-Z photo | MANNION008235 |
| Produced photo | Jay Z Godfather photo | MANNION008243 |
| Produced photo | Vol 2 Hard Knock Life cover photo | MANNION009251 |

1

| Produced photo | The Blueprint cover photo | MANNION009252 |
| Produced photo | Jay Z Pano Car photo | MANNION009338 |
| Produced doc | Mannion licensing list (2020) | MANNION010330 |
| Produced doc | Mannion Client List (2018) | MANNION009676 |
| Photo on website | Biggy Palladium Party | NA |
| Photo on website | Cash Money | NA |
| Photo on website | Ice Cube | NA |
| Photo on website | Kanye | NA |
| Photo on website | Lil Wayne | NA |
| Photo on website | LL Cool J | NA |
| Photo on website | Yasiin Bey | NA |
| Photo on website | Nikki Minaj | NA |
| Photo on website | Ol Dirty Bastard | NA |
| Photo on website | Outkast | NA |
| Photo on website | Rick Ross | NA |
| Photo on website | Usher | NA |
| Photo on website | Missy Elliot | NA |
| Photo on website | Crown Royal Big Boi | NA |
| Photo on website | The Game: The Documentary | NA |
| Photo on website | DJ Khaled: Major Key | NA |
| Photo on website | Eminem: The Eminem Show | NA |
| Photo on website | Hennessy DJ Chino | NA |
| Photo on website | Beckham | NA |
| Photo on website | Ja Rule: The Last Temptation | NA |
| Photo on website | BMW ad | NA |
| Produced doc | Neg log | NA |
| Photo from Mannion | Dr. Dre | NA |
| Photo from Mannion | Tony Hawk | NA |
| Photo from Mannion | Gary Clark Jr. | NA |
| Photo from Mannion | Diddy | NA |
| Photo from Mannion | Snoop Dogg | NA |
| Photo from Mannion | Diddy 2 | NA |
| Photo from Mannion | Dr. Dre 2 | NA |
| Photo from Mannion | Aaliyah | NA |
| Photo from Mannion | Diddy 3 | NA |
| Photo from Mannion | Snoop Dogg 2 | NA |
| Photo from Mannion | Travis Scott | NA |
| Photo from Mannion | DMX Flesh of my flesh photo | NA |
| Photo from Mannion | Eminem 2 | NA |
| Photo from Mannion | Aaliyah 2 | NA |
| Photo from Mannion | Kobe Bryant | NA |
| Photo from Mannion | Bushmills Aaron Paul ad | NA |
| Photo from Mannion | Crown Royal Big Boi | NA |
| Photo from Mannion | Deweezy Mountain Dew | NA |
| Photo from Mannion | Deweezy Mountain Dew 2 | NA |
| Photo from Mannion | Gucci Mane | NA |
| Photo from Mannion | Shaq | NA |
| Photo from Mannion | Drake Fader cover | NA |
| Photo from Mannion | Kanye Fader cover | NA |
| Photo from Mannion | Eminem XXL cover | NA |
| Photo from Mannion | Baby and Lil Wayne XXL cover | NA |
| Photo on website | Jay-Z Vol. 1 - In My Lifetime cover | NA |
| Photo on website | Jay-Z The Black Album cover | NA |
| Photo on website | Jay-Z The Blueprint cover | NA |
| Photo on website | Jay-Z The Dynasty cover | NA |
| Photo on website | Jay-Z Vol. 1 - Hard Knock Life cover | NA |
| Photo on website | Jay-Z Vol. 3 - Life and Times of S. Carter cover | NA |
| Photo on website | Jay-Z Reasonable Doubt cover | NA |
| Photo on website | Got You All In Check photo | NA |
| Photo on website | New Blue Yankee photo | NA |
| Photo on website | Last Laugh photo | NA |
| Photo | Dynasty eye in hands photo | NA |
| Photo | Dynasty photo | NA |
| Photo | Stress Magazine 1 | NA |
| Photo | Stress Magazine 2 | NA |
| Photo | Marcy Jay | NA |

2

| | | |
|---|---|---|
| Photo | Raiders hat | NA |
| Photo | Concert | NA |
| Photo | Blueprint 1 shoot | NA |
| Photo | Blueprint 1 shoot 2 | NA |
| Photo | Hustler hoodie | NA |
| Photo | Blueprint 1 shoot 3 | NA |
| Photo | Vol 1 cover photo | NA |
| Photo | Vol 2 shoot | NA |
| Photo | Marcy Jay 2 | NA |
| Photo | Fade to Black poster image | NA |
| Produced doc | Neg Log | MANNION005943 |
| Produced doc | Client List Updated | MANNION009676 |
| Depo Transcript/exs | Jonathan Mannion Depo Transcript and Exhibits | NA |
| | Telephonic Interview of Jonathan Mannion March 10, 2022 | |
| | Websites identified in Report | |

1

## PROOF OF SERVICE

2

**STATE OF CALIFORNIA**

3

**COUNTY OF LOS ANGELES**

4

    I am employed in the County of Los Angeles, State of California.  I am over the age of 18 and not a party to the within action.  My business address is 707 Wilshire Boulevard, Suite 3850, Los Angeles, CA 90017.

5

6

    On the date below, I served the foregoing document(s), described as

7

**PRELIMINARY EXPERT REPORT OF PROFESSOR JEFFREY SEDLIK**

8

9

    ☒ By placing ☐ the original ☒ true copies thereof enclosed in sealed envelopes addressed as follows:

10

11

## SEE ATTACHED SERVICE LIST

12

☒  **(VIA ELECTRONIC SERVICE)**  The document was served via electronic transfer upon the parties listed using their e-mail addresses as shown in the service list.  I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

13

14

15

☒  **(FEDERAL)**  I declare that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

16

17

    Executed on **March 18, 2022**, at Los Angeles, California.

18

19

Julie Contreras

(Type or Print Name)             Signature

20

21

22

23

24

25

26

27

28

197598.1

<u>**SERVICE LIST**</u>

*Shawn Carter, also known as Jay-Z vs. Jonathan Mannion, et al.*
USDC Central District Case No. 2:21-cv-04848-PA-KS

Alex Spiro (*Pro Hac Vice*)                    *Attorneys for Plaintiff*
Cory Struble (*Pro Hac Vice*)
Quinn Emanuel Urquhart & Sullivan, LLP
51 Madison Avenue, 22nd Floor
New York, NY 10010
alexspiro@quinnemanuel.com
corystruble@quinnemanuel.com
Tel:  (212) 849-7000
Fax:  (212) 849-7100

Robert M. Schwartz                              *Attorneys for Plaintiff*
Dylan C. Bonfigli
Quinn Emanuel Urquhart & Sullivan, LLP
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017-2543
robertschwartz@quinnemanuel.com
dylanbonfigli@quinnemanuel.com
Tel:  (213) 443-3000
Fax:  (213) 443-3100

Steven A. Marenberg                             *Attorneys for Defendants*
Kiaura Clark
Paul Hastings LLP
1999 Avenue of the Stars, 27th Fl.
Los Angeles, California 90067
stevenmarenberg@paulhastings.com
kiauraclark@paulhastings.com
Tel:  (310) 620-5710
Fax: (310) 620-5810

Sarah Hsia                                       *Attorneys for Defendants*
Rockstone Legal
229 W. 36th Street, 8th Floor
New York, NY 10018
sarah@rockstonelegal.com
Tel: (876) 855-6676

197598.1

# Exhibit C

March 31, 2022 Rebuttal
Expert Report of Jeffrey Sedlik

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**WESTERN DIVISION**

SHAWN CARTER, also known
as JAY-Z, an individual,


      *Plaintiff,*


  -against-


JONATHAN MANNION, an
individual, and JONATHAN
MANNION PHOTOGRAPHY LLC, a
New York limited liability
company,


      *Defendants.*

Case No. 2:21-cv-04848-PA-KS

Judge: Hon. Percy Anderson

**REBUTTAL EXPERT REPORT OF PROFESSOR JEFFREY SEDLIK**

Submitted March 31, 2022

CONFIDENTIAL

I have been engaged by defendants Jonathan Mannion ("Mr. Mannion") and Jonathan Mannion Photography LLC ("JMP") in the above-referenced matter ("Matter") brought by Plaintiff Shawn Carter ("Mr. Carter") against Mr. Mannion and JMP (collectively, "Defendants") to provide expert testimony as set forth in the Preliminary Expert Report of Professor Jeffrey Sedlik, dated March 18, 2022 ("Preliminary Report").

I have been asked by Defendants to provide expert opinion in rebuttal to certain of the opinions proffered by Plaintiff's expert Megan Mahn Miller ("Ms. Miller") in the Expert Witness Report of Megan Mahn Miller ("Miller Report") dated March 18, 2022.

This Rebuttal Report ("Report") has been prepared in connection with the above-referenced matter. Section IV of the Report outlines my opinions.  If called upon as a witness in this matter, I could and would provide the following testimony.

## I.    QUALIFICATIONS

My qualifications and publication list are described in the Preliminary Report.

## II.    COMPENSATION

My compensation is described in the Preliminary Report.

## III.    MATERIALS CONSIDERED

In addition to my personal knowledge, my opinions are based on an independent examination of documents and materials listed in Exhibit A. Should additional relevant information come to light, I respectfully reserve the right to amend or supplement my opinions as necessary.

If called upon as a witness in this Matter, I could and would provide the following testimony in rebuttal of the opinions expressed by Ms. Miller in the Miller Report.

## IV.    REBUTTAL

## A.    Memorabilia and Ms. Miller

Mr. Mannion is a photographer engaged in creating fine art portraits. His works are offered and sold directly and by galleries as fine art. Mr. Mannion operates in the fine art world.

As described in Ms. Miller's report, Ms. Miller has been a professional in the memorabilia industry for more than 16 years.[1] Throughout the Miller Report, Ms. Miller refers to her experience in the memorabilia industry. Ms. Miller operates in the memorabilia world.

Ms. Miller persistently attempts to misclassify Mr. Mannion's photographs of Mr. Carter ("the Photographs")  as memorabilia, incorrectly conflating "memorabilia" and "fine art" as if the two terms are synonymous. This is not surprising, given Ms. Miller's background, experience and training.[2] But the actual definitions of these two terms are instructive:

"Memorabilia" (Ms. Miller's world) is:"*objects kept or collected because of their historical interest, especially those associated with memorable people or events*.""[3]

"Fine Art" (Mr. Mannion's world) is: *"creative art, especially visual art whose products are to be appreciated primarily or solely for their imaginative, aesthetic, or intellectual content; OR, an activity requiring great skill or accomplishment." *[4]

---

[1] Expert Qualifications, Megan Mahn Miller; Miller Report at ¶ 21-23.
[2] *Id.*
[3] "Memorabilia." Powered by Oxford Lexico, Lexico.com, 2022, www.lexico.com/en/definition/memorabilia, March 30, 2022.
[4] "Fine Art." Powered by Oxford Lexico, Lexico.com, 2022, www.lexico.com/en/definition/fine_art, March 30, 2022.

In Ms. Miller's world, the association of an object with a memorable person (or event) is the primary factor in establishing that an object has value. Examples of memorabilia offered and sold by Ms. Miller's former employer Julien's Auctions, presented below, are further instructive.[5]



Lot #3

ELVIRA GIRL SCOUT MEMBERSHIP CARD AND HORSEBACK RIDING MEMENTOS

| Estimate | $ 100 - $ 200 |
|---|---|
| Winning Bid | $ 448 |
| Status | Sold |

Lot #129

JAMES BROWN SIGNED AND INSCRIBED BASEBALL

| Estimate | $ 600 - $ 800 |
|---|---|
| Winning Bid | $ 768 |
| Status | Sold |

---

[5] Elvira: https://www.julienslive.com/auctions/catalog/id/371; James Brown: https://www.julienslive.com/lot-details/index/catalog/365/lot/158378; Stallone: www.julienslive.com/auctions/catalog/id/400?page=10; Robert Evans: www.julienslive.com/auctions/catalog/id/422



Lot #469

SYLVESTER STALLONE POLO PANTS

| | |
|---|---|
| Estimate | $ 500 - $ 700 |
| Winning Bid | $ 256 |
| Status | Sold |

Lot #6

ROBERT EVANS BOUDOIR LAMP

| | |
|---|---|
| Estimate | $ 25 - $ 50 |
| Starting | $ 25 |

In Ms. Miller's world, market value is derived in greatest measure from the strength of an object's association with a person. Elvira's Girl Scout membership card, a ball signed by James Brown, Sly Stallone's polo pants, and Robert Evans' boudoir lamp are all memorabilia objects, each deriving its market value from the strength of its connection to a celebrity.

In my experience, the aesthetic qualities and authorship of a memorabilia object are typically secondary to the identity of the celebrity with whom the object is associated, and the strength of the object's association to that celebrity. While it is true that certain photographs may fall within the universe of objects that may be deemed a memorabilia object, buyers in that market are typically more concerned with the strength of a photograph's connection to a celebrity — where the photograph depicts a celebrity, is authored by a celebrity, or was once owned by or autographed by a celebrity — rather than the aesthetic qualities of the photograph, the creative expression in the photograph, or the identity of the photographer. In other words, in Ms.

4

Miller's world of memorabilia, even the worst photographs may hold significant value, purely by strength of connection to a celebrity.

Given that Ms. Miller has spent her entire career evaluating, appraising, offering and selling objects on the strength of their association with celebrities, it is unsurprising that Ms. Miller evaluates Mr. Mannion's Photographs in the same manner, opining that the value of Mr. Mannion's Photographs is derived from the association of those Photographs with Mr. Carter, not from the strength of Mr. Mannion's creative expression in the Photographs. In reference to the value of Mr. Mannion's Photographs of Mr. Carter at issue in this Matter, Ms. Miller opines:

> *The reason these photographs have the commercial appeal they do is because they depict Jay-Z.[6]*

> *If the celebrity aspect were removed, so too would the marketability and economic value...[7]*

> *...members of the public purchase products such as the prints depicting Jay-Z that Mannion is selling because they feel a connection to the celebrity when viewing those product[8]*

> *Their marketability and economic value are derived primarily from their inclusion of Jay-Z.[9]*

> *...members of the public are buying these prints primarily because of Jay-Z's fame and celebrity...[10]*

---

[6] *Id.* at ¶ 19.
[7] *Id.*
[8] *Id.*
[9] *Id.*
[10] *Id.* at ¶ 21.

> *…the photos he has taken are, in my opinion, primarily purchased by the general public because of their subjects: celebrities.[11]*

> *…members of the public purchase prints of photographs of Jay-Z and other celebrities from Mannion's website primarily because of the fame of the celebrity depicted — not because Mannion was the photographer.[12]*

> *…these photographs still, in my opinion, derive their primary marketability and economic value from the fame of the celebrity (or celebrities) depicted.[13]*

> *…these additional photographs of Jay-Z, like the photographs in paragraph 5 above, derive their primary marketability and economic value from the fame and celebrity of Jay-Z (and/or the other celebrities depicted).[14]*

Ms. Miller's opinions are fatally flawed by incorrect application of a memorabilia market valuation standard and methodology to Mr. Mannion's photographs, notwithstanding that Mr. Mannion operates in the fine art marketplace and has never operated in the memorabilia marketplace.

The memorabilia and fine art marketplaces are vastly different worlds, with different customers who have different desires and different purchasing criteria. For example, the legendary photographer Irving Penn is recognized worldwide as  one of the great masters of photography. His work focused on portraiture and fashion. His portrait subjects included the most famous celebrities in the world — actors, artists, poets, authors, royalty, musicians and others. And yet, the record price paid at auction for a print of one of Penn's works was not for a celebrity portrait. In a 2018 auction held by auction house Christie's New York, a 19" x 19" print of Penn's 1948 portrait

---

[11] *Id.* at ¶ 23.
[12] *Id.* at ¶ 22.
[13] *Id*. at ¶ 26.
[14] *Id.*

6

"Cuzco Children" brought a record price of $529,000.[15] Below is a copy of
that portrait, together with examples of Penn's iconic celebrity portraits.



Cuzco Children, 1948 by Irving Penn

   

Miles Davis 1986     Truman Capote 1965     Robert DeNiro 1993     Pablo Picasso 1957

While nearly all of Penn's celebrity portrait subjects were world renowned,
and while each of their likenesses is immediately recognizable in the
photographs, their widespread fame and popularity was eclipsed by two
anonymous Peruvian children in tattered clothes standing on a bare tile floor

---

[15] Christie's (March 31, 2022) www.christies.com/en/lot/lot-5056795.

7

in Cuzco. Clearly, in the fine art marketplace, pricing is not driven by the identity of celebrity subjects.

In evaluating Mr. Mannion's Photographs based on her knowledge and experience in the memorabilia marketplace, Ms. Miller fails to contemplate, recognize, and attribute the value of Mr. Mannion's artistic original expression in the Photographs. Ms. Miller ignores the fact that in the fine art marketplace, different photographs of the same celebrity can and often do have different values determined in great measure by the quality of the original expression inherent in the depiction of that celebrity, and by the result of the photographer's subjective creative decisions in making the photograph.

In short, contrary to Ms. Miller's repeated attestations, in Mr. Mannion's marketplace the value of a photograph is not derived exclusively or primarily from the subject matter of the photograph. The value of Mr. Mannion's Photographs is derived substantially from Mr. Mannion's original expression in the Photographs.

## B.    The Photographs Would Not Exist Without Mr. Mannion, His Creative Vision and Original Expression

In reference to Mr. Mannion's Photographs of Mr. Carter at issue in this Matter, Ms. Miller opines:

> *The photographs would not exist, as they do today, without the albums Jay-Z recorded and without the popularity and celebrity of Jay-Z.*[16]

Mr. Mannion exercised his creative vision and artistic capabilities to develop concepts, translate meanings and purposes, pre-visualize solutions, and make innumerable subjective decisions in the creation of the original

---

[16] *Id.* at ¶ 19.

expression existing today as Mr. Mannion's photographic depictions of Mr. Carter.[17]

Mr. Mannion's original expression in the Photographs, more fully described in the Preliminary Report, was not a mere literal, imitative depiction of Mr. Carter's likeness. Mr. Mannion instead brought meaning, context, message, and character to the Photographs, translating concepts through expression including but not limited to storytelling and concepting; styling, sets and set decoration; locations; subject direction; exposure; depth of field; focal point; camera choice; film choice; camera position; camera angle; camera height; lens focal length; shift/tilt; composition; foreground, midground, background; artificial lighting; natural lighting; mixed lighting; color control; texture control; decisive moment; and post-processing.[18] These subjective creative decisions are only a subset of the original authorship exercised by Mr. Mannion in creating the Photographs in which Mr. Carter's likeness was raw material; one element among myriad elements considered, selected, coordinated, arranged, and synthesized by Mr. Mannion to achieve Mr. Mannion's desired creative expression, which predominates over Mr. Carter's contribution of likeness.

As described in more detail in the Preliminary Report, "*Mr. Mannion made countless subjective creative decisions in the course of authoring each Photograph of Mr. Carter. These decisions were guided by Mr. Mannion's unique combination of training, experience, personality, aesthetic sensibility, memories, and other factors. Mr. Mannion planned for each shoot, researching and choosing the locations for their light, textures, storytelling potential and use as backgrounds, and selecting equipment necessary to achieve the Photographs he previsualized. Mr. Mannion anticipated and responded dynamically to the subject matter and shooting environment; exercised control over the visual rendition of the scene; decided which elements to include or exclude, and where to place those elements within*

---

[17] Telephonic interview of Jonathan Mannion, March 10, 2022 ("Mannion Interview").
[18] *Id.*

*the frame; determined how to juxtapose people, objects, and other compositional elements for desired effect; controlled the placement and interplay of color, tone, contrast, light, and shade; controlled perspective, distortion, and selective focus to guide the viewer's eye through the Photograph; and selected the precise moment at which to capture the ultimate Photograph... The creation of each Photograph involved a series of subjective creative decisions, all aimed at achieving Mr. Mannion's desired expression in the ultimate result. Importantly, the unique expression resulting from the combination of subjective decisions made by Mr. Mannion is embodied in the Photographs."*

Ms. Miller's approach defies logic, as it is irrefutable that the particular depictions of Mr. Carter embodied within Mr. Mannion's Photographs would not exist without Mr. Mannion. Had Mr. Carter not engaged Mr. Mannion to create the Photographs, Mr. Carter would not be depicted in the unique creative contexts that Mr. Mannion conceived and realized in the Photographs. Further, at the time that Mr. Mannion was first engaged by Mr. Carter, none of the albums referenced by Ms. Miller existed. Mr. Mannion's development and creation of the Photographs served (and continues to serve) to visually define those successive albums in the public eye, and to establish, develop, and promote Mr. Carter's public persona and brands.

C.  **When You Look at a Photograph, You See <u>the Photograph</u>**

In reference to Mr. Mannion's Photographs of Mr. Carter at issue in this Matter, Ms. Miller opines:

> *...when members of the public look at these photographs, they see Jay-Z...*[19]

In reality, anyone "looking at" one of Mr. Mannion's Photographs of Mr. Carter is by definition "seeing" Mr. Mannion's Photograph of Mr. Carter, not Mr. Carter himself. In "looking at" Mr. Mannion's Photograph of Mr. Carter, the

---

[19] Miller Report at ¶ 17.

viewer is in fact "seeing" a particular, unique depiction of Mr. Carter, created by Mr. Mannion, resulting from Mr. Mannion's subjective, original expression.

Ms. Miller apparently fails to understand that professional photographers don't take pictures. They make them.

### D.  Ms. Miller's Opinions Are Founded on Flawed Examples

Ms. Miller claims that "*A number of other photographers who primarily or exclusively photograph celebrities have made statements supporting my opinions.*" To support that claim, she provides quotes about the work of three famous photographers: Jim Marshall, Bob Gruen and Henry Diltz. In doing so, Ms. Miller takes quotes out of context and mischaracterizes both the statements quoted and the photographers' works.

The late Jim Marshall was my friend. The estate of Jim Marshall is my client. Photographers Bob Gruen and Henry Diltz are my fellow photographers and associates. I communicate with the Marshall estate, Mr. Gruen and Mr. Diltz in the course of my work in the photography industry. I am personally familiar with their works and writings.

Ms. Miller provided the following quote from Mr. Marshall (emphasis added by Ms. Miller):

> [W]hen someone sees a picture I've taken of Merle Haggard or Alice Walker, **I think what they see is the subject in the photograph and not a 'Jim Marshall' signature piece ... [W]hen you see my pictures it's about the person in the photograph, not me — not the guy behind the lens.**[20]

Amelia Davis worked closely with Mr. Marshall for many years, assisting Mr. Marshall and running his business operations. She is the author or co-author

---

[20] Miller Report at ¶ 20.a.

of several of Mr. Marshall's books. Ms. Davis now owns and runs the Jim Marshall estate. I am in regular communication with Ms. Davis. I contacted Ms. Davis and asked her if Ms. Miller's quote could be correctly interpreted as to indicate that the value of a photograph of a celebrity arises from the celebrity, not the photographer's creative expression. Ms. Davis replied that Ms. Miller had truncated Mr. Marshall's quote and used it out of context. The entirety of the Marshall quote reveals the exact opposite:[21]

> ...when someone sees a picture I've taken of Merle Haggard or Alice Walker, I think what they see is the subject in the photograph and not a "Jim Marshall" signature piece. I think my style is that I don't have a style—I never do anything the same twice. When you see my pictures, it's about the person in the photograph, not me—not the guy behind the lens. I want someone to see those people, not my picture of them. When I'm able to capture the essence of my subject and show something of what they do or reveal who this person is, then I've achieved what I want to do.

Ms. Davis advised that this statement should be interpreted to mean that when Mr. Marshall — a master photographer and a legend in the photography community — was successful in applying his artistic skills to create original expression in a portrait, the photographer's efforts would be transparent to a viewer of the resulting photograph. In other words, the Marshall quote chosen by Ms. Miller disproves her opinions, as it is the photographer, not the celebrity, who achieves the goal of creating a successful photograph.

Ms. Davis also provided the below statement, written by actor Michael Douglas, excerpted by Ms. Davis from the foreward of *Not Fade Away: The*

---

[21] See Exhibit B. E-mail exchange with Amelia Davis, Owner, Jim Marshall Photography LLC, (March 31, 2022); E-mail exchange with Bob Gruen, photographer, (March 31, 2022); E-mail exchange with Henry Diltz, photographer, (March 31, 2022); E-mail exchange with Timothy White, photographer and co-owner, Morrison Hotel Gallery, (March 31, 2022). ("Sedlik E-mail Correspondence with Photographers").

*Rock n' Roll Photography of Jim Marshall*, the same book quoted by Ms. Miller in the Miller Report:[22]

> *Jim's pictures of the music makers are extraordinary for many reasons. As a human being and an artist, he has never shied away from honesty. His style is very "in your face," and yet he inspires trust and confidence in the people he photographs, and the shared intimacy is caught in the millisecond. And there it is forever… There's a quality to Marshall's work that encapsulates an essence of "Hey, baby, we're all in this together. Let's try to look after one another." His images are at once larger than life and yet private and off-guard. His photographs genuinely remind us that the performers are human and, in many cases, lonely wanderers. Whether it is a glimpse of Carlos Santana meditating on a guitar riff in the middle of a Cinco de Mayo crowd, or Janis Joplin alone backstage, Jim always manages to capture the vulnerability of the performer.*

In the reference to the book from which Ms. Miller quoted, musician Carlos Santana wrote of Jim Marshall:

> *In the same way that you can't separate John Coltrane or Miles Davis from their music, you can't separate Jim Marshall from his photographs. He captures the soul of each musician and immortalizes us in liquid light.[23]*

Ms. Miller provided the following quote from Bob Gruen's website (emphasis added by Ms. Miller):

---

[22] *Id.*
[23] Carlos Santana, Jim Marshall Photography LLC (March 31, 2022, 12:15 AM), https://www.jimmarshallphotographyllc.com/not-fade-away-rock-roll-photography-jim-marshall

> *…he is "one of the most well-known and respected photographers in Rock and Roll" and that "[b]y the mid '70s he was already regarded as one of the foremost **documenters** of the scene…"[24]*

With her emphasis on "documenters" in the quote, Ms. Miller appears to imply that master photographers like Mr. Gruen are nothing but mindless drones equipped with shutter fingers. I contacted Mr. Gruen to ask if Ms. Miller's quote should be understood to indicate that Mr. Gruen merely "documented" scenes that he encountered through the decades. Mr. Gruen explained that Ms. Miller's interpretation is incorrect, and that in Mr. Gruen's view, he — as the photographer — creates the original expression and value in the photograph through myriad subjective creative decisions. He explained that the value of a photograph arises from the photographer's expression of the celebrity, and not from the fact that a celebrity is depicted in the photograph. He further explained that the text on the website (which was written by his publicist) should not be interpreted to indicate that Mr. Gruen merely recorded the scene, but should instead be interpreted to mean that Mr. Gruen is a visual storyteller and that collectively his photographs — each of which result from his substantial original expression — tell the story of our times.[25]

Ms. Miller provided the following quote from Henry Diltz's biography at the Morrison Hotel Gallery website (emphasis added by Ms. Miller):

> *Mr. Diltz is "an extraordinary rock n' roll photographer unlike any other," "a **visual historian** of the last four decades of popular music," and that he has "generat[ed] new and vibrant photographs that inspire the rock n' roll fan in each of us." [26]*

I contacted Mr. Diltz and asked him about Ms. Miller's quote, which is not attributed to him on the gallery website. I asked Mr. Diltz if he considers

---

[24] Miller Report at ¶ 16.b.
[25] See Exhibit B. ("Sedlik E-mail Correspondence with Photographers")
[26] Miller Report at ¶ 19.c.

14

himself to be a visual historian. Mr. Diltz explained that a truly successful photograph can create history, and that rather than merely memorializing a person or scene, he interacts with his subject to create a visual moment that would not have otherwise existed, then exercises his artistic skills to create original expression. Mr. Diltz emphasized to me that the value of a photograph is derived from and determined by the photographer's creative approach in depicting the subject and scene, and not from the subject (celebrity or otherwise) depicted in a photograph. [27]

I then contacted Timothy White, celebrity photographer and co-owner of the Morrison Hotel Gallery with Mr. Diltz and others. I asked Mr. White for his view (as a leading gallerist) on the photographs of Mr. Marshall, Mr. Gruen, Mr. Diltz and Mr. Mannion. Mr. White explained that, in his view, the value of the work of all four photographers — as well as Mr. White's own photographs — arises from the creative expression of the photographer, not from the person depicted in the photograph. He explained that every photograph of a celebrity is unique to the photographer and that the photographer's vision shapes the creative result. Mr. White also confirmed that Mr. Mannion is a renowned and respected photographer, and advised that based on the high quality of Mr. Mannion's works, he expects the value of those works to appreciate considerably over time.[28]

## E.    Ms. Miller is Confused about the Relevance of Titles in Photography

In reference to Mr. Mannion's titling of Photographs of Mr. Carter at issue in this Matter, Ms. Miller opines:

> ...Mannion is advertising each of these photos with Jay-Z's name as the first word in the title, such as "Jay-Z 'Prayer Hands' Print" and "Jay-Z 'New Blue Yankee' Print..."[29]

---

[27] See Exhibit B. ("Sedlik E-mail Correspondence with Photographers")
[28] See Exhibit B. ("Sedlik E-mail Correspondence with Photographers")
[29] Miller Report at ¶ 17.

> *…this type of titling or labeling helps with search-engine optimization. Including a celebrity's name in the title of the item being offered for sale, as Mannion is doing, increases the likelihood that a person searching for items associated with that celebrity will be directed to the item being offered for sale and purchase it.[30]*

> *…Mannion appears to have titled most of these photographic prints so that the public will associate them with Jay-Z by using titles that refer to Jay-Z explicitly or by referring to Jay-Z's albums, such as the "Black Album" and "Hard Knock Life V2."[31]*

While sensationalist, promotional titling may be commonplace in her memorabilia industry, Ms. Miller apparently lacks understanding of titling practices in fine art photography. Photographers typically assign descriptive titles to their works. A photograph of a person is often titled with that person's name, or a narrative title referencing the photograph's concept, location captured, theme, gesture, or other subject matter references. Where a photograph is initially used by a particular client or in a particular project or body of work, a photographer may reference the names of the client, project, job, or body of work in the title. These titles are often derived for ease of reference in discussions with clients, staff, gallerists and others regarding the photographs, and to simplify filing of negatives, prints, proof sheets, files and business records.

It is that simple. With a reasonable degree of certainty based on my knowledge, training and experience, any references to Mr. Carter and Mr. Carter's albums in the titles of Mr. Mannion's Photographs are descriptive, narrative references for practical, utilitarian purposes, and provide no indication that Mr. Mannion believes that the value of his Photographs is derived from Mr. Carter's name or likeness. Ms. Miller's focus on Mr. Mannion's Photograph titles is misplaced.

---

[30] *Id.* at ¶ 18.
[31] *Id.* at ¶ 26.

### F.    Ms. Miller is Confused about Editions

In reference to Mr. Mannion's practice of offering open edition prints, Ms. Miller opines:

> From reviewing Mannion's website and sales records, I understand that, of the prints depicting Jay-Z he has sold, they are predominantly "open edition" prints.[32]

I understand from Mr. Mannion that this is correct.[33]

> Open edition prints are handled differently by different photographers, estates, and galleries.[34]

I agree.

> Traditionally, open editions are unnumbered, not signed by the photographer, do not come with a certificate of authenticity, and the number that a photographer may create and sell is unlimited. Some outlets, however, do sign and number open editions; it appears that Mannion does this.[35]

I disagree. Based on my experience and personal knowledge, some photographers number, and the vast majority of photographers sign, their open edition prints. Some photographers offer certificates or letters of authenticity when selling open edition prints. I understand that Mr. Mannion has signed and numbered open edition prints.[36] Ms. Miller's experience in her memorabilia industry is understandably different from Mr. Mannion's or my own experience in the fine art photography business.

---

[32] Miller Report at ¶ 12.
[33] Mannion Interview.
[34] Miller Report at ¶ 12.
[35] Id.
[36] Matute Dep. Tr. 115:5-116:25.

> *Open edition prints are good for memorabilia collectors who are not*
> *concerned about the artistic merit of a photo and may simply desire*
> *an image of their favorite celebrity. In my experience, open edition*
> *prints are often purchased by less sophisticated collectors and persons*
> *who are less concerned with the re-sale value of the print.*[37]

I agree with Ms. Miller as to the desires and priorities of memorabilia buyers. I disagree with Ms. Miller as to the sophistication of collectors who purchase open edition prints. Many photographers and their estates do not offer limited edition prints, or they may offer limited edition prints of only certain photographs. In many cases, limited editions of prints of certain photographs sold out long ago and are no longer available. For these reasons, in my experience, even the most sophisticated buyers of fine art photography seek out and purchase open edition prints without hesitation.

> *Unlike open edition prints, limited edition prints have a fixed number of*
> *prints from the beginning of a print run. The number of limited edition*
> *prints is selected by the photographer before production, and no more*
> *can be created for that specific edition after they are all sold.*[38]

In my experience, with respect to fine art prints, photographers do not use the term "print run." That may be a term frequently employed in Ms. Miller's memorabilia industry, but is not generally used in the fine art industry, except to refer to a press run for a book, newsletter, magazine, catalog or similar publications. Many photographers offer multiple, separate limited editions of individual photographs, varying the size, border width, printing method or other characteristics for each edition.

---

[37] Miller Report at ¶ 13.
[38] *Id.* at ¶ 14.

### G.   Ms. Miller is Confused About Fine Art Photography Pricing

Ms. Miller opines that "*Fine art galleries are generally not transparent on their pricing, so I am unable to say, in an apples-to-apples manner, what retail prices are charged for prints of a certain photographer's work.*" [39]

In my experience, fine art galleries are transparent on their pricing. In my experience, Ms. Miller could simply call any gallerist, ask for the price at which the gallerist will sell a particular print, and the gallerist will gladly provide that pricing information. Despite this, Ms. Miller claims that she was forced to "look to the secondary auction market" for print pricing.[40] While auction prices can be a touchpoint for evaluating fine art photography, they are in my experience inaccurate measures in isolation. Nearly any photography gallerist will confirm that auction pricing is typically significantly lower than gallery pricing, but that there are additional costs and risks associated with auction purchases. Ms. Miller erred in failing to contact galleries to obtain pricing information to support her analysis. Further, Ms. Miller erred in failing to seek out pricing for prints of photographs of Mr. Carter, as offered by various galleries.

In my experience, pricing in the fine art photography marketplace is affected by numerous factors. As discussed at length above, unlike the pricing in the memorabilia marketplace, pricing in the fine art marketplace is not determined by the strength of the association of the photograph with a celebrity, and is instead determined in great measure by the aesthetic qualities of the photograph, and by the photographer. Market pricing for various photographers' works varies widely, as does pricing for various works of a particular photographer.

With respect to Mr. Mannion's photographs, I understand from Mr. Mannion that he only recently began to offer prints of his works for sale.[41] I further

---

[39] *Id.* at ¶ 24.
[40] *Id.*
[41] Mannion Interview

understand from Mr. Mannion that he desires to make his creative works accessible to collectors — including to collectors with limited funds — and that for this reason, he elected to offer and sell prints of some of his works for as little as $50, in particular during the Covid epidemic.[42] It is my further understanding that Mr. Mannion's pricing for his "Saturday Edition Prints" does not differentiate the value of Mr. Mannion's Photographs of Mr. Carter from Mr. Mannion's photographs of other music artists.[43]

## H.    Ms. Miller is Confused About Mr. Mannion's Relative Market Position

Ms. Miller opines at length about a number of photographers, their fame and recognition relative to Mr. Mannion.

About Gordon Parks, Ms. Miller opines *"Gordon Parks is an example of a photographer who is well respected and considered a 'fine art' photographer."* [44] Ms. Miller is apparently unfamiliar with Mr. Parks, his life and work. Mr. Parks was one of the great *photojournalists* of our time. The fact that his photojournalistic and documentary work is respected and collected as fine art does not magically transform Mr. Parks into a "fine art photographer." Ms. Miller is confused about Mr. Parks and his work.

Ms. Miller's focus on pricing of the works of Mr. Parks and photographer Milton Greene[45] is also misplaced. Mr. Parks' most popular works were created between 60 and 80 years ago, and Mr. Greene's most popular works were created 50 to 60 years ago. By contrast, most of Mr. Mannion's works were created within the last 20 years, and his best work may be yet to come. It is common for a photographer's works to achieve maximum recognition and value many decades after creation. For that reason, market pricing for the works of Mr. Parks and Mr. Greene is an inaccurate measure of the relative value of Mr. Mannion's works.

---

[42] Miller Report at ¶ 21. And, Mannion Dep. 77:17–78:9, March 13, 2022.
[43] MANNION000510; MANNION000516.
[44] Miller Report at ¶ 23.
[45] *Id.* at ¶ 16.c.

Ms. Miller suggests that Mr. Mannion is not a successful photographer because he is not represented by "fine art galleries," [46] (apparently overlooking his relationship with the Morrison Hotel Gallery), and because Mr. Mannion elects to price some of his works for public accessibility. Ms. Miller overlooks Mr. Mannion's reputation as the photographer who not only defined the genre of hip-hop photography, but is widely acknowledged and respected as a master of that genre, and of interpretive portraiture in general.

## VI.  RIGHT TO SUPPLEMENT

My opinions hereinabove are to a reasonable degree of certainty for a photography licensing and copyright expert, based on my training, education, knowledge experience, and review of the materials listed in *Materials Considered* (Exhibit A). I understand that Mr. Carter may offer additional expert testimony to support Mr. Carter's claims in the Matter, and I expect that additional information and documents may come to light subsequent to my submission of the Report. If requested by Defendants, I may offer supplemental reports and/or additional rebuttal testimony to the opinions expressed by Mr. Carter and Mr. Carter's experts, in accordance with the Court's scheduling order.

Respectfully Submitted,


_____     March 31, 2022
Professor Jeffrey Sedlik


---
[46] *Id.* at ¶ 11.

Index to Exhibits

A       Materials Considered

B       Sedlik Email Correspondence wtih Photographers

**EXHIBIT A**

**MATERIALS CONSIDERED**

| Type | Description | Reference |
|---|---|---|
| Complaint | First Amended Complaint | |
| Motion | Motion to Strike | |
| Opp | Opposition to Motion to Strike | |
| Reply | Reply re Motion to Strike | |
| Order | Order on Motion to Strike | |
| Answer | Answer | |
| Produced doc | Rhapsody release fully executed | CARTER0004466 |
| Depo Transcript/exs | Kareem Biggs Burke deposition transcript and exhibits | |
| Depo Transcript/exs | Shawn Carter deposition transcript and exhibits | |
| Depo Transcript/exs | Jeff Kempler deposition transcript and exhibits | |
| Depo Transcript/exs | Harold Richard Patrick deposition transcript and exhibits | |
| Depo Transcript/exs | Leonard Santiago deposition transcript and exhibits | |
| Rog responses | 211210_001_Plaintiff's O&R to Mannion 1st Set of Rogs | |
| Rog responses | 211210_002_Plaintiff's O&R to Mannion Photography 1st Set of Rogs | |
| RFP responses | 211210_003_Plaintiff's O&R to Defs. 1st Set of RFPs. | |
| Rog responses | 211215_001_Defts' Objections and Responses to Pltf's First Set of Interrogatories | |
| RFP responses | 211215_002_Defts' Objections and Responses to Pltf's First Set of Requests for Production | |
| RFA responses | 211215_003_Defts' Objections and Responses to Pltf's First Set of Requests for Admission | |
| RFA responses | 220119_Pl's O&R 1st Set of RFAs | |
| RFA responses | 220127_Mannion'sAmended Responses to Pltf's RFA Nos. 13 & 16 | |
| Rog responses | 220202_001_Pls Supp O&R Mannion 1st Set of Rogs | |
| RFA responses | 220211_PI Supp O&R 1st Set RFAs | |
| Rog responses | 220214_001_Defts' Suppl. Response to Interrogatory No. 1. | |
| Rog responses | 220217_001_Pltf's Second Supp Resps Mannion Rogs | |
| Rog responses | 220218_001_Defts' Second Supplemental Response to Interrogatory No. 1 | |
| RFP responses | 220224_Defts' Object. & Resps. to Pltf's Second Set RFPs | |
| RFP responses | 220307_001_Defts' Object. & Responses to Pltf's Third Set of RFPs | |
| RFA responses | 220307_002_Defts' Object. & Responses to Pltf's Second Set of RFAs | |
| Rog responses | 220307_003_Defts' Object. & Responses to Pltf's Second Set of Interrogatories | |
| RFA responses | 220307_006_Pltf's O&R 2d Set of RFAs | |
| Produced doc | Def Jam UMG invoice | MANNION001067 |
| Produced doc | Fame Wall Tee product page | MANNION000307 |
| Produced doc | Got You All product page | MANNION000329 |
| Produced doc | Chess product page | MANNION000360 |
| Produced doc | Yankee product page | MANNION000434 |
| Produced doc | RD Jay-Z product page | MANNION000438 |
| Produced doc | Last Laugh product page | MANNION000479 |
| Produced doc | S. Carter usage | MANNION000863 |
| Produced doc | Rocawear 10th Anniversary use | MANNION000866 |
| Produced doc | Collection of invoices | MANNION000915 |
| Produced doc | Spiegel Grau agmt | MANNION000938 |
| Produced doc | Random House agmt | MANNION000940 |
| Produced doc | BET invoice | MANNION000947 |
| Produced doc | tour merch negotiations Ohwesnere email | MANNION000987 |
| Produced doc | Revolt invoice | MANNION001159 |
| Produced doc | email parent WAM invoice | MANNION001481 |
| Produced doc | WAM invoice | MANNION001486 |
| Produced doc | WAM email | MANNION009232 |
| Produced doc | WAM print purchase | MANNION009296 |
| Produced doc | Ohneswere email | MANNION010942 |
| Produced photo | Jay Z Special Edition Tattoo photo | MANNION001140 |
| Produced photo | misc scans Jay-Z photos1 | MANNION001826 |
| Produced photo | misc scans Jay-Z photos2 | MANNION001827 |
| Produced photo | misc scans Jay-Z photos3 | MANNION001828 |
| Produced photo | misc scans Jay-Z photos4 | MANNION001832 |
| Produced photo | Chess Not Chckers photo | MANNION004334 |
| Produced photo | Beyond a Reasonable Doubt photo | MANNION005687 |
| Produced photo | Jay-Z photo | MANNION008235 |
| Produced photo | Jay Z Godfather photo | MANNION008243 |
| Produced photo | Vol 2 Hard Knock Life cover photo | MANNION009251 |

| | | |
|---|---|---|
| Produced photo | The Blueprint cover photo | MANNION009252 |
| Produced photo | Jay Z Pano Car photo | MANNION009338 |
| Produced doc | Mannion licensing list (2020) | MANNION010330 |
| Produced doc | Mannion Client List (2018) | MANNION009676 |
| Photo on website | Biggy Palladium Party | NA |
| Photo on website | Cash Money | NA |
| Photo on website | Ice Cube | NA |
| Photo on website | Kanye | NA |
| Photo on website | Lil Wayne | NA |
| Photo on website | LL Cool J | NA |
| Photo on website | Yasiin Bey | NA |
| Photo on website | Nikki Minaj | NA |
| Photo on website | Ol Dirty Bastard | NA |
| Photo on website | Outkast | NA |
| Photo on website | Rick Ross | NA |
| Photo on website | Usher | NA |
| Photo on website | Missy Elliot | NA |
| Photo on website | Crown Royal Big Boi | NA |
| Photo on website | The Game: The Documentary | NA |
| Photo on website | DJ Khaled: Major Key | NA |
| Photo on website | Eminem: The Eminem Show | NA |
| Photo on website | Hennessy DJ Chino | NA |
| Photo on website | Beckham | NA |
| Photo on website | Ja Rule: The Last Temptation | NA |
| Photo on website | BMW ad | NA |
| Produced doc | Neg log | NA |
| Photo from Mannion | Dr. Dre | NA |
| Photo from Mannion | Tony Hawk | NA |
| Photo from Mannion | Gary Clark Jr. | NA |
| Photo from Mannion | Diddy | NA |
| Photo from Mannion | Snoop Dogg | NA |
| Photo from Mannion | Diddy 2 | NA |
| Photo from Mannion | Dr. Dre 2 | NA |
| Photo from Mannion | Aaliyah | NA |
| Photo from Mannion | Diddy 3 | NA |
| Photo from Mannion | Snoop Dogg 2 | NA |
| Photo from Mannion | Travis Scott | NA |
| Photo from Mannion | DMX Flesh of my flesh photo | NA |
| Photo from Mannion | Eminem 2 | NA |
| Photo from Mannion | Aaliyah 2 | NA |
| Photo from Mannion | Kobe Bryant | NA |
| Photo from Mannion | Bushmills Aaron Paul ad | NA |
| Photo from Mannion | Crown Royal Big Boi | NA |
| Photo from Mannion | Deweezy Mountain Dew | NA |
| Photo from Mannion | Deweezy Mountain Dew 2 | NA |
| Photo from Mannion | Gucci Mane | NA |
| Photo from Mannion | Shaq | NA |
| Photo from Mannion | Drake Fader cover | NA |
| Photo from Mannion | Kanye Fader cover | NA |
| Photo from Mannion | Eminem XXL cover | NA |
| Photo from Mannion | Baby and Lil Wayne XXL cover | NA |
| Photo on website | Jay-Z Vol. 1 - In My Lifetime cover | NA |
| Photo on website | Jay-Z The Black Album cover | NA |
| Photo on website | Jay-Z The Blueprint cover | NA |
| Photo on website | Jay-Z The Dynasty cover | NA |
| Photo on website | Jay-Z Vol. 1 - Hard Knock Life cover | NA |
| Photo on website | Jay-Z Vol. 3 - Life and Times of S. Carter cover | NA |
| Photo on website | Jay-Z Reasonable Doubt cover | NA |
| Photo on website | Got You All In Check photo | NA |
| Photo on website | New Blue Yankee photo | NA |
| Photo on website | Last Laugh photo | NA |
| Photo | Dynasty eye in hands photo | NA |
| Photo | Dynasty photo | NA |
| Photo | Stress Magazine 1 | NA |
| Photo | Stress Magazine 2 | NA |
| Photo | Marcy Jay | NA |

2

| | | |
|---|---|---|
| Photo | Raiders hat | NA |
| Photo | Concert | NA |
| Photo | Blueprint 1 shoot | NA |
| Photo | Blueprint 1 shoot 2 | NA |
| Photo | Hustler hoodie | NA |
| Photo | Blueprint 1 shoot 3 | NA |
| Photo | Vol 1 cover photo | NA |
| Photo | Vol 2 shoot | NA |
| Photo | Marcy Jay 2 | NA |
| Photo | Fade to Black poster image | NA |
| Produced doc | Neg Log | MANNION005943 |
| Produced doc | Client List Updated | MANNION009676 |
| Depo Transcript/exs | Jonathan Mannion Depo Transcript and Exhibits | NA |
| | Telephonic Interview of Jonathan Mannion March 10, 2022 | |
| | Websites identified in Report | |
| (documents cited by Albert-Levy | Re Reasonable Doubt Shoot | CARTER0002524 |
| (documents cited by Albert-Levy | Adams SC Work for Hire Agreement- Final fully executed (002)(6746927.1).pdf | CARTER0004365 |
| (documents cited by Albert-Levy | Brand Campaign Agreement Jay Z FINAL Fully Executed Tiffany(6746929.1).pdf | CARTER0004372 |
| (documents cited by Albert-Levy | Executed BRAND AMBASSADOR AGREEMENT Project Red(5584281.1).pdf | CARTER0004400 |
| (documents cited by Albert-Levy | Guest Appearance Contract (Jay-Z) (FE) letterman SC(6746934.1).pdf | CARTER0004423 |
| (documents cited by Albert-Levy | No sig - SC Branding LLC fso Shawn Carter pka Jay-Z - Overall - Certificate of Engagement - FE.pdf | CARTER0004432 |
| (documents cited by Albert-Levy | SC Branding PUMA Creative Services Agreement 1.11.21_Fully executed(6746786.1).pdf | CARTER0004436 |
| (documents cited by Albert-Levy | Santiago email | CARTER0004492 |
| (documents cited by Albert-Levy | Santiago email | CARTER0004496 |
| (documents cited by Albert-Levy | Santiago/Davidov texts | MANNION000870 |
| (documents cited by Albert-Levy | Edition 50_Chess Not Checkers .xlsx | MANNION001107 |
| (documents cited by Albert-Levy | 0001756.MSG | MANNION001510 |
| (documents cited by Albert-Levy | 0002758.MSG | MANNION001557 |
| (documents cited by Albert-Levy | DOC000281589.pdf | MANNION001656 |
| (documents cited by Albert-Levy | DOC000281596.pdf | MANNION001661 |
| (documents cited by Albert-Levy | Jay Z sales_2019-06-15_2022-01-19.csv | MANNION001711 |
| (documents cited by Albert-Levy | Biggs Notes.docx | MANNION002651 |
| (documents cited by Albert-Levy | sales_2015-01-19_2022-02-18.csv | MANNION003547 |
| (documents cited by Albert-Levy | DOC000013011.pdf | MANNION010093 |
| (documents cited by Albert-Levy | sales_2016-03-01_2022-02-09 recd from MM 20220209.csv | MANNION010104 |
| (documents cited by Miller) | Reasonable Doubt Shoot Notes.jpg | MANNION000013 |
| (documents cited by Miller) | 8579416S-shop-jonathanmannion-com-2021-11-30-22-22-10.pdf | MANNION000360 |
| (documents cited by Miller) | 8579484S-shop-jonathanmannion-com-2021-11-30-22-30-08.pdf | MANNION000434 |
| (documents cited by Miller) | 8579487S-shop-jonathanmannion-com-2021-11-30-22-30-33.pdf | MANNION000438 |
| (documents cited by Miller) | 10ae7.eml | MANNION000998 |
| (documents cited by Miller) | Jay Z sales_2019-06-15_2022-01-19.csv | MANNION001711 |
| (documents cited by Miller) | C-11 160711 20 Years Later_ Behind the Lens of Jay's Reasonable Doubt I News I BET - www.bet.com.pdf | MANNION001719 |
| (documents cited by Miller) | Jay Magnet.eps | MANNION001862 |
| (documents cited by Miller) | Biggs Notes.docx | MANNION002651 |
| (documents cited by Miller) | sales_2016-03-01_2022-02-09 recd from MM 20220209.csv | MANNION010104 |
| cited by Miller and Albert-Levy | Deposition of Davidov with exhibits | NA |
| cited by Miller and Albert-Levy | Deposition of Fleishman with exhibits | NA |

3

| | | |
|---|---|---|
| cited by Miller and Albert-Levy | Deposition of Perez with exhibits | NA |
| cited by Miller and Albert-Levy | Deposition of Burke vol 2 with exhibits | NA |
| Interview | Telephonic Interview of Timothy White | |
| Interview | Telephonic Interview of Amelia Davis | |
| Interview | Telephonic Interview of Henry Diltz | |
| Interview | Telephonic Interview of Bob Gruen | |
| Correspondence | Email Correspondence with Photographers (See Exhibit B) | |
| Website | https://www.juliensauctions.com/ | |
| Reports | Plaintiff Shawn Carter's Initial Disclosure of Expert Witnesses with exhibits | |
| Document | Printout of "Saturday Edition Prints" from shop.jonnathanmannnion.com (page 1) | MANNION000510 |
| Document | Printout of "Saturday Edition Prints" from shop.jonnathanmannnion.com (page 2) | MANNION000516 |
| Deposition | Deposition of Marjoriet Matute with exhibits | |

**EXHIBIT B**

| | |
|---|---|
| **From:** | AMELIA DAVIS |
| **To:** | expert@sedlik.com |
| **Subject:** | Re: Jim Marshall quote |
| **Date:** | Thursday, March 31, 2022 12:59:09 PM |

Hi Jeff

Yes, the below email accurately represent our telephone discussion.
Thanks

Amelia

> On Mar 31, 2022, at 11:51 AM, Professor Jeff Sedlik <expert@sedlik.com> wrote:
>
> Thanks Amelia!
>
> Below are my notes from our call, in narrative form.

> [W]hen someone sees a picture I've taken of Merle Haggard or Alice Walker, **I think what they see is the subject in the photograph and not a 'Jim Marshall' signature piece ... [W]hen you see my pictures it's about the person in the photograph, not me — not the guy behind the lens.**

Amelia Davis worked closely with Mr. Marshall for many years, assisting Mr. Marshall and running his business operations. She is the author or co-author of several of Mr. Marshall's books. Ms. Davis now owns and runs the Jim Marshall estate. I am in regular communication with Ms. Davis. I contacted Ms. Davis and asked her if Ms. Miller's quote could be correctly interpreted as a statement indicating that the value of a photograph of a celebrity arises from the celebrity, not the photographer's creative expression. Ms. Davis advised that Ms. Miller truncated the quote and used it out of context, and that the statement should be interpreted to mean that when Mr. Marshall — a master photographer and a legend in the photography community — was successful in applying his artistic skills to create original expression in a portrait, the photographer's efforts would be transparent to a viewer of the resulting photograph. In other words, the Marshall quote chosen by Ms. Miller disproves her opinions, as it is the photographer, not the celebrity, who achieves the goal of creating a successful photograph.

In the reference to the book from which Ms. Miller quoted, musician Carlos Santana wrote of Jim Marshall:

> *In the same way that you can't separate John Coltrane or Miles Davis from their music, you can't separate Jim*

*Marshall from his photographs. He captures the soul of each musician and immortalizes us in liquid light.*

----

Can you please respond to confirm that my notes accurately represent our telephone discussion. Please advise of any incorrect information or revisions needed.

Thanks Again!
Jeff

---

**From:** AMELIA DAVIS <ameliadavis1@mac.com>
**Sent:** Thursday, March 31, 2022 11:35 AM
**To:** Jeffrey Sedlik <jeffsedlik@gmail.com>
**Subject:** Re: Jim Marshall quote

Hi Jeff

I just found two more paragraphs from "Not Fade Away" Forward by Michael Douglas that are very relevant. Here they are below.

Amelia

"Jim's pictures of the music makers are extraordinary for many reasons. as a human being and an artist, he has never shied away from honesty. his style is very "in your face," and yet he inspires trust and confidence in the people he photographs, and the shared intimacy is caught in the millisecond. And there it is forever.

There's a quality to Marshall's work that encapsulates an essence of "Hey, baby, we're all in this together. Let's try to look after one another." His images are at once larger than life and yet private and off-guard. His photographs genuinely remind us that the performers are human and, in many cases, lonely wanderers. Whether it is a glimpse of Carlos Santana meditating on a guitar riff in the middle of a Cinco de Mayo crowd, or Janis Joplin alone backstage, Jim always manages to capture the vulnerability of the performer."

On Mar 27, 2022, at 11:09 AM, AMELIA DAVIS <ameliadavis1@mac.com> wrote:

Hi Jeff

Thank you for the call.

Exh B: Page 2

The opposing counsel has taken a quote from Jim Marshall out of context from Jim's book, " Not Fade Away".  Please see the whole quote below from his Introduction.

"I like to photograph people when they're doing what they do best. I think a few times I've acted like the asshole superstar photographer and lost some gigs and clients. But when someone sees a picture I've taken of Merle Haggard or Alice Walker, I think what they see is the subject in the photograph and not a "Jim Marshall" signature piece. I think my style is that I don't have a style—I never do anything the same twice. When you see my pictures, its about the person in the photograph, not me—not the guy behind the lens. I want someone to see those people, not my picture of them. When I'm able to capture the essence of my subject and show something of what they do or reveal who this person is, then I've achieved what I want to do. It's such an elusive thing, and sometimes I feel like a sniper waiting for that shot or moment to happen. It's the same discipline —steady, aim, focus, squeeze done jerk. Ive never had any formal training, and I don't like theatrics in photography, but I've asked a lot of questions from other photographers like Joe Rosenthal, Jerry Stoll, Peter Breinig—a lot of guys. I'm not afraid to ask when I don't know, and I've made a lot of mistakes."

Thank you.

Amelia


AMELIA DAVIS
Jim Marshall Photography LLC
www.jimmarshallphotographyllc.com
ameliadavis1@mac.com

Follow us on Instagram, Facebook
Twitter

<PastedGraphic-6.tiff>

| | |
|---|---|
| **From:** | Bob Gruen |
| **To:** | expert@sedlik.com |
| **Subject:** | Re: Confirming our telephone discussion |
| **Date:** | Thursday, March 31, 2022 12:53:20 PM |

yes, this is an accurate representation of my call....
thanks
Bob

Bob Gruen Studio
55 Bethune Street  - A202
New York, NY 10014
212 691 0391
bobgruen01@aol.com


-----Original Message-----
From: Professor Jeff Sedlik <expert@sedlik.com>
To: bobgruen01@aol.com
Sent: Thu, Mar 31, 2022 3:48 pm
Subject: Confirming our telephone discussion

~~~

Hi Bob, thanks for the call. Great catching up!

Here is the quote discussed

...he is "one of the most well-known and respected photographers in Rock and Roll" and that
"[b]y the mid '70s he was already regarded as one of the foremost documenters of the
scene..."

And here are my notes from my call with you, in narrative form:

----

I contacted Mr. Gruen to ask if Ms. Miller's quote should be understood to indicate that Mr.
Gruen merely "documented" scenes that he encountered through the decades. Mr. Gruen
explained that Ms. Miller's interpretation is incorrect, and that in Mr. Gruen's view, he — as
the photographer — creates the original expression and value in the photograph through
myriad subjective creative decisions. He explained that the value of a photograph arises from
the photographer's expression of the celebrity, and not from the fact that a celebrity is
depicted in the photograph. He further explained that the text on the website (which was
written by his publicist) should not be interpreted to indicate that Mr. Gruen merely recorded
the scene, but should instead be interpreted to mean that Mr. Gruen is a visual storyteller and
that collectively his photographs — each of which result from his substantial original
expression — tell the story of our times.

----

Can you please respond to confirm that my notes accurately represent our telephone discussion. Please advise of any incorrect information or revisions needed.

Thanks Again Bob!
Jeff
213 716 6627

| | |
|---|---|
| **From:** | Henry Diltz |
| **To:** | expert@sedlik.com |
| **Subject:** | Re: confirming phone discussion |
| **Date:** | Thursday, March 31, 2022 1:48:25 PM |

Hello Jeff,

The notes you sent me from our phone call represent exactly what I said and reflect accurately my views.

Henry Diltz

On Mar 31, 2022, at 1:02 PM, Professor Jeff Sedlik <expert@sedlik.com> wrote:

Hi Henry, thanks for the call.

Here is the quote discussed

> *Mr. Diltz is "an extraordinary rock n' roll photographer unlike any other," "a **visual historian** of the last four decades of popular music," and that he has "generat[ed] new and vibrant photographs that inspire the rock n' roll fan in each of us."*

And here are my notes from our call, in narrative form.

> I contacted Mr. Diltz and asked him about Ms. Miller's quote, which is not attributed to him on the gallery website. I asked Mr. Diltz if he considers himself to be a visual historian. Mr. Diltz explained that a truly successful photograph can create history, and that rather than merely memorializing a person or scene, he interacts with his subject to create a visual moment that would not have otherwise existed, then exercises his artistic skills to create original expression. Mr. Diltz explained that even where two photographers stand shoulder to shoulder while creating photographs of a celebrity, their respective creations can be – and often are – substantially different, resulting from each photographer's original expression and desired creative outcome.  Mr. Diltz emphasized to me that the value of a photograph is derived from and determined

by the photographer's creative approach in depicting the subject and scene, and not from the subject (celebrity or otherwise) depicted in a photograph.

Can you please respond to confirm that my notes accurately represent our telephone discussion. Please advise of any incorrect information or revisions needed.

Thanks Again Henry

Jeff

~~~

| | |
|---|---|
| **From:** | Timothy White |
| **To:** | expert@sedlik.com |
| **Subject:** | Re: Confirming discussion |
| **Date:** | Thursday, March 31, 2022 2:42:10 PM |

Confirmed.  This quote is from our conversation.

Sent from my iPhone

> On Mar 31, 2022, at 2:41 PM, Professor Jeff Sedlik <expert@sedlik.com> wrote:
>
> Hi Timothy, thanks for the call.
>
> Here are  my notes from my call with you, in narrative form:
>
> ----
>
> > I then contacted Timothy White, celebrity photographer and co-owner of the Morrison Hotel Gallery with Mr. Diltz and others. I asked Mr. White for his view (as a leading gallerist) on the photographs of Mr. Marshall, Mr. Gruen, Mr. Diltz and Mr. Mannion. Mr. White explained that, in his view, the value of the work of all four photographers — as well as Mr. White's own photographs — arises from the creative expression of the photographer, not from the person depicted in the photograph. He explained that every photograph of a celebrity is unique to the photographer and that the photographer's vision shapes the creative result. Mr. White also confirmed that Mr. Mannion is a renowned and respected photographer, and advised that based on the high quality of Mr. Mannion's works, he expects the value of those works to appreciate considerably over time.
>
> ----
>
> Can you please respond to confirm that my notes accurately represent our telephone discussion. Please advise of any incorrect information or revisions needed.
>
> Thanks Again,
> Jeff
> ~~~
>
> 213 716 6627

# Exhibit D

Excerpts from the March 7, 2022 Deposition of Kareem Burke

```
 1              UNITED STATES DISTRICT COURT
 2              FOR THE DISTRICT OF CALIFORNIA
 3
 4
 5     _____
                                   )
 6     SHAWN CARTER, also known    )
       as JAY-Z,                   )
 7                                 )
                Plaintiff,         )
 8                                 )
          vs.                      ) Civil Action No.
 9                                 ) 2:21-cv-04848-PA-KS
       JONATHAN MANNION,           )
10     et al.,                     )
                                   )
11                Defendants.      )
       _____)
12
13
14
15        VIDEOTAPED DEPOSITION OF KAREEM BURKE
16              Monday, March 7, 2022
17                   Volume II
18
19
20
21
22     Reported by:
       LORI M. BARKLEY
23     CSR No. 6426
24     Job No. 5104651
25     PAGES 191 - 225
```

Page 1

| | | |
|---|---|---|
| 1 | everyone else can see. | 09:14:58 |
| 2 | MR. STRUBLE:  Yes.  Let's just do a screen | 09:14:59 |
| 3 | share, that will be quicker. | 09:15:01 |
| 4 | And what exhibit number is it, Dylan? | 09:15:02 |
| 5 | MR. BONFIGLI:  24. | 09:15:04 |
| 6 | MR. STRUBLE:  All right.  So I am | 09:15:05 |
| 7 | introducing an exhibit previously marked as | 09:15:10 |
| 8 | Exhibit 24, which is the complaint in this action. | 09:15:12 |
| 9 | And Dylan will pull it up on screen and navigate to | 09:15:19 |
| 10 | the photo, this photo. | 09:15:25 |
| 11 | Q.   So you recognize this photo as one of the | 09:15:41 |
| 12 | photos taken during the photo shoot for Reasonable | 09:15:43 |
| 13 | Doubt, correct? | 09:15:46 |
| 14 | A.   Yes. | 09:15:46 |
| 15 | Q.   All right.  Who is responsible for selecting | 09:15:49 |
| 16 | the clothing that Mr. Carter wore at the Reasonable | 09:15:50 |
| 17 | Doubt photo shoot? | 09:15:54 |
| 18 | A.   I mean, I think he -- he picked out his | 09:15:56 |
| 19 | clothes, but I took them shopping to a store, one of | 09:15:59 |
| 20 | my favorite stores, to get all the clothes, so | 09:16:03 |
| 21 | Take 6, I believe it's closed down now.  It was on | 09:16:07 |
| 22 | First Avenue and 60 something street, but I took them | 09:16:11 |
| 23 | there to get all the clothes.  I still have the hat, | 09:16:15 |
| 24 | my hat from the photo shoot. | 09:16:18 |
| 25 | Q.   When you responded "he picked out the | 09:16:24 |

Page 12

Veritext Legal Solutions
866 299-5127

| | | |
|---|---|---|
| 1 | clothes," were you referring to -- | 09:16:25 |
| 2 | A.   Jay-Z, Jay-Z picked out his own clothes for | 09:16:27 |
| 3 | it, but I took them to the store.  So I would have | 09:16:30 |
| 4 | picked out my suit.  I'm sure Jay would have picked | 09:16:32 |
| 5 | out his own, and Dame would have picked out his own | 09:16:35 |
| 6 | as well. | 09:16:41 |
| 7 | Q.   And when you referenced still having the | 09:16:44 |
| 8 | hat, are you referring to the hat that's in the photo | 09:16:45 |
| 9 | that we're looking at here in Exhibit 24? | 09:16:47 |
| 10 | A.   No.  The hat that I wore at the photo shoot. | 09:16:49 |
| 11 | Q.   I see. | 09:16:54 |
| 12 | What kind of store was Take 6? | 09:16:55 |
| 13 | A.   It might have been appointment only, but it | 09:17:02 |
| 14 | was -- it was a luxury store that made suits. | 09:17:06 |
| 15 | Q.   And I think you referenced going to Take 6 | 09:17:12 |
| 16 | with them -- | 09:17:14 |
| 17 | A.   Jay-Z -- I'm sorry.  Cut you off. | 09:17:16 |
| 18 | Jay-Z and Damon. | 09:17:17 |
| 19 | Q.   Was Mr. Mannion with you when you all went | 09:17:29 |
| 20 | to Take 6? | 09:17:32 |
| 21 | A.   I don't remember that.  He could have been, | 09:17:34 |
| 22 | but I don't believe -- I don't know. | 09:17:36 |
| 23 | Q.   Do you see in the photo in Exhibit 24 that | 09:17:46 |
| 24 | Mr. Carter is wearing a pinky ring? | 09:17:49 |
| 25 | A.   Yes. | 09:17:51 |

Page 13

| | | |
|---|---|---|
| 1 | Q.   What do you know about that pinky ring? | 09:17:54 |
| 2 | A.   I designed it. | 09:17:57 |
| 3 | Q.   Were you a jewelry designer at the time? | 09:18:00 |
| 4 | A.   No.  But I designed all the jewelry that we | 09:18:03 |
| 5 | wore around that time, the bracelets, rings, might | 09:18:06 |
| 6 | have been a chain. | 09:18:17 |
| 7 | Q.   Did Mr. Mannion have any involvement in | 09:18:17 |
| 8 | designing that pinky ring? | 09:18:19 |
| 9 | A.   No, not at all. | 09:18:21 |
| 10 | Q.   And so the suit that Mr. Carter is wearing | 09:18:27 |
| 11 | in this photo, is that a suit that would have been | 09:18:34 |
| 12 | purchased at Take 6? | 09:18:37 |
| 13 | A.   Yes. | 09:18:38 |
| 14 | Q.   Earlier I asked you if Mr. Mannion was with | 09:18:54 |
| 15 | you when you all went to Take 6 and you responded | 09:18:56 |
| 16 | along the lines of:  I don't remember him being | 09:18:59 |
| 17 | there.  He could have been, but I don't believe -- I | 09:19:01 |
| 18 | don't know. | 09:19:05 |
| 19 | I want to clarify your answer.  Is it | 09:19:05 |
| 20 | correct that you have no memory of Mr. Mannion being | 09:19:07 |
| 21 | present with you, Damon Dash, and Jay-Z at Take 6 to | 09:19:11 |
| 22 | purchase clothes for the Reasonable -- | 09:19:15 |
| 23 | A.   Yes, I have no memory. | 09:19:17 |
| 24 | Q.   You have no memory of him being there? | 09:19:21 |
| 25 | A.   No memory of him. | 09:19:23 |

Page 14

```
 1    photograph and the document there.              09:21:52

 2         A.   Yes.                                   09:21:55

 3         Q.   Do you recognize that photo?           09:21:57

 4         A.   Yeah.                                  09:21:59

 5         Q.   Okay.   Was this photo taken in connection  09:22:00

 6    with the Reasonable Doubt photo shoot?          09:22:03

 7         A.   Yes.                                   09:22:08

 8         Q.   Do you see that there is a -- do you   09:22:08

 9    recognize the individuals in this photo?        09:22:13

10         A.   Yes.                                   09:22:19

11         Q.   Who are they?                          09:22:19

12         A.   Myself and Damon Dash.                 09:22:20

13         Q.   Okay.   And you see a pile of cash in that  09:22:23

14    photo?                                          09:22:27

15         A.   Yes.                                   09:22:28

16         Q.   To whom -- I'm sorry.                  09:22:33

17              Whom did that cash belong?             09:22:34

18         A.   To us.                                 09:22:39

19         Q.   Okay.   That was your cash that you had at  09:22:39

20    the photo shoot that day?                       09:22:41

21         A.   Yeah.                                  09:22:42

22         Q.   Do you remember whose idea it was to take a  09:22:45

23    photo with the pile of cash?                    09:22:46

24         A.   Damon.                                 09:22:49

25              MR. STRUBLE:   Okay.   Let's look at the other  09:23:02
```

Page 16

1           I declare under penalty of

2       perjury under the laws of the State

3       of California that the foregoing is

4       true and correct.

5           Executed on _____, 2022, at

6       _____, _____.

7

8

9

10          _____

11              SIGNATURE OF WITNESS

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                    Page 221

1   STATE OF CALIFORNIA        ) ss.

2   COUNTY OF LOS ANGELES      )

3

4        I, Lori M. Barkley, CSR No. 6426, do hereby

5   certify:

6        That the foregoing deposition testimony

7   taken before me at the time and place therein set

8   forth and at which time the witness was administered

9   the oath;

10       That the testimony of the witness and all

11  objections made by counsel at the time of the

12  examination were recorded stenographically by me, and

13  were thereafter transcribed under my direction and

14  supervision, and that the foregoing pages contain a

15  full, true and accurate record of all proceedings and

16  testimony to the best of my skill and ability.

17       I further certify that I am neither counsel

18  for any party to said action, nor am I related to any

19  party to said action, nor am I in any way interested

20  in the outcome thereof.

21       IN WITNESS WHEREOF, I have subscribed my

22  name this 10th day of March, 2022.

23

24

25       LORI M. BARKLEY, CSR No. 6426

Page 222

# Exhibit E

Excerpts from the March 13, 2022
Deposition of Jonathan Mannion

CONFIDENTIAL UNDER THE TERMS OF PROTECTIVE ORDER

```
 1    **CONFIDENTIAL UNDER THE TERMS OF PROTECTIVE ORDER**

 2                  UNITED STATES DISTRICT COURT

 3                FOR THE DISTRICT OF CALIFORNIA

 4

 5

 6    _____
                             )
 7    SHAWN CARTER, also known )
      as JAY-Z,               )
 8                            )
              Plaintiff,      )
 9                            )
         vs.                  ) Civil Action No.
10                            ) 2:21-cv-04848-PA-KS
      JONATHAN MANNION,       )
11    et al.,                 )
                              )
12            Defendants.     )
      _____)
13

14

15

16        VIDEOTAPED DEPOSITION OF JONATHAN MANNION

17                Jersey City, New Jersey

18                Sunday, March 13, 2022

19                     Volume I

20

21

22    Reported by:
      LORI M. BARKLEY
23    CSR No. 6426
24    Job No. 5131261
25    PAGES 1 - 300
```

Page 1

CONFIDENTIAL UNDER THE TERMS OF PROTECTIVE ORDER

```
 1    circle of family and friends?                   12:55:12

 2        A.    I would.                               12:55:14

 3        Q.    Okay.  Do you think people would buy it with  12:55:14

 4    the same frequency if it were not of Jay-Z but were  12:55:15

 5    of just this alter ego unknown person who works in a  12:55:19

 6    clothing store in Brooklyn?                      12:55:25

 7        A.    It's hard to tell.  I think, you know,  12:55:29

 8    people have different -- sorry.  People have     12:55:33

 9    different ways that they enjoy photographs, right.  12:55:40

10    Some take it purely just because it's a gorgeous  12:55:42

11    photograph.                                      12:55:45

12            So I think there's a percentage that would  12:55:46

13    absolutely buy this image if it was some guy from a  12:55:48

14    Brooklyn clothing store.  You know --            12:55:52

15        Q.    Not my question, though, that was not my  12:55:55

16    question.                                        12:55:58

17            Would they buy it with the same frequency  12:55:58

18    that they buy it because it's Jay-Z?             12:56:00

19        A.    Maybe.                                 12:56:04

20        Q.    The image of Jay-Z in the Jay-Z Reasonable  12:56:07

21    Doubt album cover photo that we're looking at here,  12:56:18

22    that's Jay-Z in the photo, right?                12:56:24

23        A.    It is Jay-Z in the photo.              12:56:26

24        Q.    And that's what he looked like when he was  12:56:30

25    standing in front of your camera, correct?       12:56:33
```

Page 196

CONFIDENTIAL UNDER THE TERMS OF PROTECTIVE ORDER

```
 1        A.    It feels like an odd question, but yes, that    12:56:39

 2   is -- that is what was in front of my lens after          12:56:42

 3   guidance was given to him of how to present himself.      12:56:46

 4        Q.    Right --                                        12:56:49

 5        A.    And he oddly didn't like, so -- but yes,        12:56:50

 6   that's what he looked like in front of my lens.           12:56:53

 7              MR. SCHWARTZ:  Okay.  Let's take a look at,     12:56:56

 8   Dylan, if we could go to tab 67.  I'm sorry, tab 66.      12:57:21

 9              Oh, you know what?  I think -- yeah.  I         12:57:25

10   apologize.  We can just scroll -- maybe we can,           12:57:28

11   tab 66, I think it's Exhibit 60, apologies.               12:57:31

12              MR. BONFIGLI:  So tab 66 is what you want?      12:57:45

13              MR. SCHWARTZ:  Correct.  I think it's part      12:57:47

14   of -- it was previously marked as Exhibit --             12:57:48

15              MR. BONFIGLI:  Yeah.  We already had it,        12:57:51

16   yes.                                                      12:57:53

17              MR. SCHWARTZ:  Sorry about that.                12:57:53

18              MR. BONFIGLI:  I'm tracking it now.             12:57:54

19              (Technology discussion.)                        12:58:21

20              MR. SCHWARTZ:  I guess it's the complaint,      12:58:30

21   is that Exhibit 24?  I just really wanted you to go       12:58:31

22   back to the complaint and go to the next page.  There    12:58:35

23   we go.                                                     12:58:37

24        Q.    See the image of Jay-Z Beyond a Reasonable     12:58:39

25   Doubt at the top of this page?                            12:58:41
```

Page 197

CONFIDENTIAL UNDER THE TERMS OF PROTECTIVE ORDER

| | | |
|---|---|---|
| 1 | A.    I do. | 12:58:43 |
| 2 | Q.    And this -- the person in that photograph is | 12:58:43 |
| 3 | Jay-Z, right? | 12:58:49 |
| 4 | A.    Yes, it is. | 12:58:52 |
| 5 | Q.    And that's what he looked like when he stood | 12:58:53 |
| 6 | in front of your camera and you took his photograph, | 12:58:56 |
| 7 | right? | 12:58:59 |
| 8 | A.    Again, I think it dumbs it down, yes, that | 12:59:01 |
| 9 | is what he looked like.  But, you know, the posing | 12:59:04 |
| 10 | composition and all that, you know, it's fair that | 12:59:06 |
| 11 | it's more complex than, yes, this is the person in | 12:59:09 |
| 12 | front of my lens.  Yes, this is what I captured in | 12:59:13 |
| 13 | front of my lens. | 12:59:17 |
| 14 | Q.    Right. | 12:59:18 |
| 15 | And you have not digitally or physically | 12:59:18 |
| 16 | altered Jay-Z's image, or I should say, you did not | 12:59:21 |
| 17 | digitally or physically alter the appearance or -- of | 12:59:26 |
| 18 | Jay-Z's image in this photograph, did you? | 12:59:31 |
| 19 | A.    I did actually. | 12:59:34 |
| 20 | Q.    In what ways? | 12:59:35 |
| 21 | A.    He had a small blemish on his cheek that I | 12:59:39 |
| 22 | thought would be more flattering if it was removed. | 12:59:42 |
| 23 | Q.    Other than removing the small blemish on his | 12:59:46 |
| 24 | cheek, you have not otherwise digitally or physically | 12:59:48 |
| 25 | altered this image, correct? | 12:59:53 |

Page 198

CONFIDENTIAL UNDER THE TERMS OF PROTECTIVE ORDER

```
 1        A.   January 8, 1999, yeah.  You have a larger      13:14:53

 2   image than I do.                                          13:14:59

 3        Q.   And that's the -- that's the photograph or a    13:15:00

 4   photograph, I should say, of Jay-Z that you took?         13:15:04

 5        A.   It is.                                          13:15:07

 6        Q.   And this is, you sell prints of this            13:15:08

 7   photograph on your website, correct?                      13:15:12

 8        A.   Yeah.                                           13:15:14

 9        Q.   And it says Jay-Z above his left shoulder,      13:15:16

10   or whatever, left arm, correct?                           13:15:21

11        A.   It does.                                        13:15:24

12        Q.   And when you took this photograph, this is      13:15:25

13   what Jay-Z looked like when he stood in front of your     13:15:27

14   camera, correct?                                          13:15:31

15        A.   Definitely.                                     13:15:33

16        Q.   And it's a depiction, a literal depiction of    13:15:35

17   Mr. Carter as he appeared at the time you took the        13:15:42

18   photo, right?                                             13:15:45

19        A.   If you dumb it down to that, I would say        13:15:52

20   yes.  But certainly there's a lot more photographic       13:15:56

21   considerations that I would offer happening in order      13:15:59

22   for this image to be achieved, but this is what he        13:16:04

23   looked like in front of my lens.                          13:16:07

24        Q.   Got it, okay.  Thank you.                       13:16:09

25             And when you were hired for the photo shoot     13:16:10
```

Page 209

CONFIDENTIAL UNDER THE TERMS OF PROTECTIVE ORDER

| | | |
|---|---|---|
| 1 | bottle, correct? | 13:35:31 |
| 2 | A.   He does. | 13:35:32 |
| 3 | Q.   Do you know anything about any of the kids | 13:35:33 |
| 4 | that are surrounding him in the photograph? | 13:35:36 |
| 5 | A.   So they were kids that were -- when we did | 13:35:40 |
| 6 | the photo shoot for In My Lifetime V1, those kids | 13:35:46 |
| 7 | were around.  I believe some of them are actually his | 13:35:50 |
| 8 | nephews or sons of perhaps some of his friends. | 13:35:53 |
| 9 | So some might have just been kids that were | 13:36:00 |
| 10 | just hanging about, and then the others I think were | 13:36:03 |
| 11 | known by Jay's crew. | 13:36:07 |
| 12 | Q.   That's all I have on this.  Actually hang | 13:36:18 |
| 13 | on.  The image that we see in this photo of Jay-Z, | 13:36:21 |
| 14 | that's his image, right? | 13:36:25 |
| 15 | A.   Jay-Z appears in this image.  That is what | 13:36:29 |
| 16 | he looked like when he was in front of my lens, but | 13:36:32 |
| 17 | certainly there's plenty of considerations that make | 13:36:35 |
| 18 | this image a special one beyond his presence. | 13:36:38 |
| 19 | Q.   Now, you were involved at an event that took | 13:36:45 |
| 20 | place at the Prophecy gallery that celebrated one of | 13:36:51 |
| 21 | the anniversaries of the release of Reasonable Doubt, | 13:36:54 |
| 22 | correct? | 13:36:57 |
| 23 | A.   Yeah.  I put on that event. | 13:37:06 |
| 24 | Q.   And that event was in 2016, correct? | 13:37:07 |
| 25 | A.   That's correct.  To celebrate his 20-year | 13:37:10 |

Page 215

CONFIDENTIAL UNDER THE TERMS OF PROTECTIVE ORDER

1           I declare under penalty of

2       perjury under the laws of the State

3       of California that the foregoing is

4       true and correct.

5           Executed on _____, 2022, at

6       _____, _____.

7

8

9

10      _____

11             SIGNATURE OF WITNESS

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 296

CONFIDENTIAL UNDER THE TERMS OF PROTECTIVE ORDER

```
 1    STATE OF CALIFORNIA        ) ss.
 2    COUNTY OF LOS ANGELES      )

 3

 4           I, Lori M. Barkley, CSR No. 6426, do hereby
 5    certify:
 6           That the foregoing deposition testimony
 7    taken before me at the time and place therein set
 8    forth and at which time the witness was administered
 9    the oath;
10           That the testimony of the witness and all
11    objections made by counsel at the time of the
12    examination were recorded stenographically by me, and
13    were thereafter transcribed under my direction and
14    supervision, and that the foregoing pages contain a
15    full, true and accurate record of all proceedings and
16    testimony to the best of my skill and ability.
17           I further certify that I am neither counsel
18    for any party to said action, nor am I related to any
19    party to said action, nor am I in any way interested
20    in the outcome thereof.
21           IN WITNESS WHEREOF, I have subscribed my
22    name this 15th day of March, 2022.

23

24

25           LORI M. BARKLEY, CSR No. 6426
```

Page 297

# Exhibit F

Excerpts from the March 4, 2022
Deposition of Shawn Carter

```
 1              UNITED STATES DISTRICT COURT
 2              CENTRAL DISTRICT OF CALIFORNIA
 3
 4        _____
                                         )
 5        SHAWN CARTER, also known as    )
          JAY-Z, an individual,          )
 6                                       )
 7                Plaintiff,             )
                                         )   Case No. 2:21-cv-04848-PA-KS
 8            vs.                        )
                                         )
          JONATHAN MANNION, an           )
 9        individual, and JONATHAN       )
          MANNION PHOTOGRAPHY LLC, a     )
10        New York limited liability     )
          company,                       )
11                                       )
                  Defendants.            )
12        _____)
13
14
15                  ** CONFIDENTIAL **
16          REMOTE VIDEOTAPED DEPOSITION OF
17                SHAWN C. CARTER
18             Friday, March 4, 2022
19                   Volume I
20
21
22        Reported by:
          NADIA NEWHART
23        CSR No. 8714
24        Job No. 5107613
25        PAGES 1 - 222
```

Page 1

CONFIDENTIAL

```
1      tough question to ask me.

2          Q    This is a photo of you, correct?

3          A    Yes, yes.

4          Q    And this photo appears on Ms. Kwon website?

5          A    I don't know.  I've never been to Ms. Kwon's      08:15:18

6      website.

7          Q    Are you generally aware that it's common for

8      photographers to use photographs they took on their

9      websites?

10         A    I don't know what photographers do.  I'm not      08:15:31

11     a photographer.

12         Q    Do you have any awareness of how

13     photographers use photographs that they took in

14     terms of promoting themselves?

15         A    Promoting themselves with your photos?          08:15:45

16         Q    Yes.  Do you have awareness of how

17     photographers typically use photographs of

18     themselves to promote their work?

19         A    I don't know what they typically do.  I don't

20     know what -- I can't say whether -- I'm not an         08:15:55

21     expert to say what a photographer typically does.

22         Q    Are you aware that photographers use

23     photographs of you on their websites?

24         A    I'm not.

25         Q    Do you know who owns the copyrights of this     08:16:17
```

Page 58

CONFIDENTIAL

```
 1

 2

 3

 4              I, SHAWN C. CARTER, do hereby declare under

 5     penalty of perjury that I have read the foregoing

 6     transcript; that I have made any corrections as

 7     appear noted, in ink, initialed by me, or attached

 8     hereto; that my testimony as contained herein, as

 9     corrected, is true and correct.

10              EXECUTED this _____ day of _____,

11     20____, at _____, _____.
                        (City)                  (State)

12

13

14

15             _____

               SHAWN C. CARTER

16             Volume I

17

18

19

20

21

22

23

24

25

                                             Page 218
```

CONFIDENTIAL

1          I, the undersigned, a Certified Shorthand

2     Reporter of the State of California, do hereby

3     certify:

4          That the foregoing proceedings were taken

5     before me at the time and place herein set forth;

6     that any witnesses in the foregoing proceedings,

7     prior to testifying, were administered an oath; that

8     a record of the proceedings was made by me using

9     machine shorthand which was thereafter transcribed

10    under my direction; that the foregoing transcript is

11    a true record of the testimony given.

12         Further, that if the foregoing pertains to the

13    original transcript of a deposition in a Federal

14    Case, before completion of the proceedings, review

15    of the transcript [ ] was [ ] was not requested.

16         I further certify that I am neither financially

17    interested in the action nor a relative or employee

18    of any attorney or any party to this action.

19         IN WITNESS WHEREOF, I have this date subscribed

20    my name.

21

22    Dated: March 5, 2022

23

24                _Nadia Newhart_

                  NADIA NEWHART

25                CSR NO. 8714

                                        Page 219