QUINN EMANUEL URQUHART
   & SULLIVAN, LLP
Alex Spiro (*pro hac vice*)
   alexspiro@quinnemanuel.com
Cory D. Struble (*pro hac vice*)
   corystruble@quinnemanuel.com
51 Madison Avenue, 22nd Floor
New York, New York 10010
Telephone:  (212) 849-7000
Facsimile:   (212) 849-7100

Robert M. Schwartz (Bar No. 117166)
   robertschwartz@quinnemanuel.com
Dylan C. Bonfigli (Bar No. 317185)
   dylanbonfigli@quinnemanuel.com
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017-2543
Telephone:  (213) 443-3000
Facsimile:   (213) 443-3100

*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| SHAWN CARTER, also known as JAY-Z, an individual,<br><br>        Plaintiff,<br><br>        v.<br><br>JONATHAN MANNION, an individual, and JONATHAN MANNION PHOTOGRAPHY LLC, a New York limited liability company,<br><br>        Defendants. | Case No.  2:21-cv-04848-PA-KS<br><br>**PLAINTIFF'S MOTION IN LIMINE NO. 3 (PRE-LAWSUIT NEGOTIATIONS); DECLARATION OF DYLAN C. BONFIGLI**<br><br>The Honorable Percy Anderson<br><br>Date:      July 11, 2022<br>Time:     1:30 p.m.<br>Courtroom: 9A<br><br>Trial Date:  July 19, 2022 |

TO THE COURT, ALL PARTIES, AND THEIR COUNSEL OF RECORD:

PLEASE TAKE NOTICE that on July 11, 2022, at 1:30 p.m. or as soon as the matter may be heard, in Courtroom 9A of the above-titled Court, located at 350 W. 1st Street, Los Angeles, California 90012, Plaintiff Shawn Carter will, and hereby does, move *in limine* for an order excluding all evidence about negotiations between Plaintiff and Defendants that took place in May and June of 2021.

This motion is made on the grounds that evidence about the negotiations are not relevant to any claim or defense in this right-of-publicity case, *see* Fed. R. Evid. 401, 402, and will serve only to confuse the fact-finder and prejudice Plaintiff. *See* Fed. R. Evid. 403. This motion is also made on the ground that evidence about the negotiations is barred by Rule 408 of the Federal Rules of Evidence.

The document and deposition evidence subject to this motion includes: JX-30, JX-31, JX-32, JX-33, JX-34, JX-49, JX-85, JX-88, JX-105, JX-133; Davidov Tr. 34:5-18, 35:10-36:1, 36:2-37:12, 40:10-20, 40:17-41:23, 42:24-44:2, 116:20-117:15, 125:8-126:18, 127:13-128:22.

This motion is based on this notice; the memorandum of points and authorities; the declaration of Dylan C. Bonfigli; all pleadings, records, and papers on file in this action; such other matters of which this Court may take judicial notice; and upon such other evidence and oral argument as may be considered by the Court before or at the hearing on this application.

This motion is made following a conference of counsel pursuant to Local Rule 7-3 and Section II.B of this Court's Civil Trial Scheduling Order (ECF No. 52), which took place on May 20, 2022.

1   DATED:  June 17, 2022

2

QUINN EMANUEL URQUHART
& SULLIVAN, LLP

3

4   By /s/ Robert M. Schwartz

5        Alex Spiro (*pro hac vice*)
         Robert M. Schwartz

6        Cory D. Struble
         Dylan C. Bonfigli

7        *Attorneys for Plaintiff*

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

I.     PRELIMINARY STATEMENT ................................................... 1

II.    BACKGROUND ......................................................................... 1

III.   EVIDENCE OF THESE PRE-LITIGATION NEGOTIATIONS IS
       NOT RELEVANT TO ANY CLAIM OR DEFENSE ............................ 2

IV.    EVIDENCE OF THE PRE-LITIGATION NEGOTIATIONS WILL
       CONFUSE THE ISSUES, MISLEAD THE JURY, AND WASTE
       TIME ................................................................................... 3

V.     EVIDENCE OF THE PRE-LITIGATION NEGOTIATIONS IS
       INADMISSIBLE UNDER RULE 408 .......................................... 4

VI.    CONCLUSION ......................................................................... 4

I.     INTRODUCTION ...................................................................... 5

II.    RELEVANT BACKGROUND .................................................... 5

III.   DISCUSSION .......................................................................... 8

IV.    CONCLUSION ...................................................................... 10

PLAINTIFF'S REPLY .................................................................... 11

CONCLUSION ............................................................................. 14

DECLARATION OF DYLAN C. BONFIGLI ..................................... 16

ATTESTATION STATEMENT ........................................................ 19

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# TABLE OF AUTHORITIES

**Page**

## Cases

## Cases

*Clark v. Am. Online Inc.*,
  2000 WL 33535712 (C.D. Cal. Nov. 30, 2000) .............................................. 13

*Deere & Co. v. Int'l Harvester Co.*,
  710 F.2d 1551 (Fed. Cir. 1983) .............................................................. 9

*Fahmy v. Jay Z*,
  2015 WL 5680299 (C.D. Cal. Sept. 24, 2015) .............................................. 3

*Genentech, Inc. v. Trustees of Univ. of Penn.*,
  2012 WL 762108 (N.D. Cal. Mar. 8, 2012) ................................................ 10

*Hudspeth v. Comm'r*,
  914 F.2d 1207 (9th Cir. 1990) .............................................................. 4

*Jones v. Corbis Corp.*,
  815 F. Supp. 2d 1108 (C.D. Cal. 2011), *aff'd*, 489 F. App'x 155 (9th Cir. 2012)..8

*Keller v. Elec. Arts Inc.*,
  724 F.3d 1268 (9th Cir. 2013) .............................................................. 2

*Koninklijke Philips Elecs. N.V. v. Nat'l Film Lab'ys Inc.*,
  2012 WL 12886833 (C.D. Cal. Dec. 4, 2012 ................................................ 9

*Resnick v. Hyundai Motor Am., Inc.*,
  2017 WL 1531192 (C.D. Cal. Apr. 13, 2017 .............................................. 14

*Telecom Asset Mgmt., LLC v. FiberLight, LLC*,
  730 F. App'x 443 (9th Cir. 2018) ........................................................ 10

## Statutes

Cal. Civ. Code § 3344.................................................................. 11

## Federal Cases

Fed. R. Evid. 401 ...................................................................... 2

Fed. R. Evid. 402 ...................................................................... 2

Fed. R. Evid. 403 ...................................................................... 3

Fed. R. Evid. 408(a) ................................................................... 4

1  **I.       PRELIMINARY STATEMENT**

2          Plaintiff Shawn Carter, p/k/a Jay-Z, moves to exclude evidence about

3  discussions and negotiations between Plaintiff and Defendants that took place on the

4  eve of the filing of this lawsuit, in May and June 2021.  They concerned copyrights

5  in photos of Jay-Z.  Defendants initially agreed that these conversations should not

6  come in as evidence, stating that ***Defendants*** themselves would move to exclude the

7  negotiations on the ground that "pre-litigation negotiations between representatives

8  for Plaintiff and representatives for Defendant are not relevant and not admissible."

9  (Bonfigli Dec. Ex. B at 3.)  Defendants correctly recognized that the negotiations

10 concerned "Defendants' copyrights," not "a license for Defendants to use Plaintiff's

11 name, image, and likeness [NIL]," such that the negotiations have no probative

12 value in this right-of-publicity case.  (*Id.*)  And Defendants correctly recognized that

13 there is "a significant risk that the jury would confuse Defendants' copyrights that

14 were the subject of the negotiations with Plaintiff's at-issue right of publicity, a

15 different right entirely." (*Id.*)

16         Moreover, evidence about the negotiations is inadmissible under Rule 408,

17 because, as Plaintiff testified, the offers made during those negotiations were to

18 "clear the slate" and [t]o come to some sort of resolution" regarding Defendants'

19 claims of copyright ownership.  (Carter Tr. [Bonfigli Dec. Ex. C] 170:5-171:7;

20 184:16-185:16, 186:21-187:18.)  Yet, when the parties met and conferred regarding

21 motions *in limine*, Defendants reversed course without explanation and insisted on

22 offering this evidence at trial.

23         For these reasons and those set forth below, the Court should exclude all

24 evidence about the negotiations between Plaintiff and Defendants that took place in

25 May and June 2021.

26 **II.      BACKGROUND**

27         Starting in 1996, Plaintiff and his record companies hired Mannion to take

28 photos of Jay-Z for use on album covers and for other commercial purposes.  While

doing so, Mannion took thousands of photos. (Mannion Tr. [Bonfigli Dec. Ex. D] at 243:3-6.) Mannion understood that the purpose of these shoots was to take photos of Jay-Z that would be used to promote Jay-Z and his recordings. (*Id.* 166:10-15.) Nevertheless, years after those shoots, Mannion registered the copyright to some of the Jay-Z photos and asserts that he owns the copyright to them. (*Id.* 61:2-15.)

In May 2021, Mannion asked one of Jay-Z's employees about an idea to use photos from the photoshoot for Jay-Z's debut album, *Reasonable Doubt*, to create and sell non-fungible tokens (also known as "NFTs"). (Bonfigli Dec. Ex. E.) When Jay-Z learned of this, he was taken aback by Mannion's suggestion that Mannion had the right to create NFTs from photos of Jay-Z, and Jay-Z told the employee to speak with Mannion "[t]o come to some sort of resolution." (Carter Tr. [Bonfigli Dec. Ex. C] 170:5-171:7; 184:16-185:16, 186:21-187:18.)

Negotiations ensued. At one point, the parties believed they had reached an agreement in principle. But the parties were unable to resolve the dispute. Shortly thereafter, Jay-Z filed this lawsuit.

## III. <u>EVIDENCE OF THESE PRE-LITIGATION NEGOTIATIONS IS NOT RELEVANT TO ANY CLAIM OR DEFENSE</u>

Only relevant evidence is admissible. Fed. R. Evid. 402. "Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Fed. R. Evid. 401. "The elements of a right-of-publicity claim under California common law are: '(1) the defendant's use of the plaintiff's identity; (2) the appropriation of plaintiff's name or likeness to defendant's advantage, commercially or otherwise; (3) lack of consent; and (4) resulting injury.'" *Keller v. Elec. Arts Inc.*, 724 F.3d 1268, 1273 (9th Cir. 2013). "The same claim under California Civil Code § 3344 requires a plaintiff to prove 'all the elements of the common law cause of action' plus 'a knowing use by the defendant [and] a direct connection between the alleged use and the commercial purpose.'" *Id.*

1        Here, as Defendants admitted, in stating their intent to exclude the very same

2  evidence at issue, "[t]he pre-litigation negotiations … are not relevant," because

3  they concerned "copyrights" and "[t]he parties were not negotiating a license for

4  Defendants to use [Jay-Z's] [NIL]." (Bonfigli Dec. Ex. B at 3.)  Contrary to what

5  Defendants may argue now, the copyright negotiations do not reflect a tacit

6  admission that Jay-Z consented to Defendants' use of his NIL.  As Defendants

7  admitted, Jay-Z's "at-issue right of publicity" is "a different right entirely" from the

8  "copyrights that were the subject of the negotiations." (*Id.*)  And even if Defendants

9  could argue that the negotiations reflect an a tacit acknowledgment by Jay-Z that

10  Defendants hold the *copyright* to any photos of him, copyright ownership is

11  irrelevant to Jay-Z's right-of-publicity claims.  *See, e.g.*, *Fahmy v. Jay Z*, 2015 WL

12  5680299, at *14 (C.D. Cal. Sept. 24, 2015) (excluding evidence of plaintiff's

13  copyright interest in sound recordings when copyright claim was based on written

14  composition).  Accordingly, evidence of the May and June 2021 negotiations are

15  irrelevant and thus inadmissible.

**IV.**    **EVIDENCE OF THE PRE-LITIGATION NEGOTIATIONS WILL**

16

17        **CONFUSE THE ISSUES, MISLEAD THE JURY, AND WASTE TIME**

18        "The court may exclude relevant evidence if its probative value is

19  substantially outweighed by a danger of … undue prejudice, confusing the issues,

20  misleading the jury, undue delay, [and] wasting time." Fed. R. Evid. 403.  Here,

21  before reversing course, Defendants correctly recognized that "[t]here is a serious

22  risk that the jury would confuse Defendants' copyrights that were the subject of the

23  negotiations with Plaintiff's at-issue right of publicity, a different right entirely."

24  (Bonfigli Dec. Ex. B at 3.)  Moreover, if Defendants present evidence regarding the

25  negotiations, there is a substantial risk of confusion, undue delay, and wasting time.

26  The parties will be forced to put on a mini-trial concerning which photographs were

27  the subject of the negotiations and the various offers that were made during the

28  negotiations.  Finally, evidence of the negotiations may unduly prejudice the parties

because the negotiations involved counsel of record for both Jay-Z and Mannion (Robert Schwartz and Sarah Hsia, respectively).

## V.  EVIDENCE OF THE PRE-LITIGATION NEGOTIATIONS IS INADMISSIBLE UNDER RULE 408

Under Rule 408 of the Federal Rules of Evidence, evidence of "offering … valuable consideration in compromising or attempting to compromise [a] claim" or "conduct or a statement made during compromise negotiations about the claim" is inadmissible to "prove or disprove the validity … of a disputed claim." Fed. R. Evid. 408(a).  This rule is based on two principles: (1) "[t]he evidence is irrelevant, since the offer may be motivated by a desire for peace rather than from any concession of weakness of position" and (2) "promotion of the public policy favor[s] the compromise and settlement of disputes." *Hudspeth v. Comm'r*, 914 F.2d 1207, 1213 (9th Cir. 1990).

Here, because Defendants contend the negotiations between Jay-Z and Defendants show that Jay-Z consented to Defendants' use of his NIL or that Mannion owns the copyright, that evidence is barred by Rule 408.  The parties discussed was "clear the slate" over their dispute because Jay-Z did not "believe [Mannion is] entitled to own [the] images." (Carter Tr. [Bonfigli Dec. Ex. C] 186:21-187:18.)  Thus, the negotiations are irrelevant since "the offer [was] motivated by a desire for peace rather than from any concession of weakness of position." *Hudspeth*, 914 F.2d at 1213.  And allowing Mannion to use these compromise negotiations to argue that Jay-Z consented to Mannion's use of Jay-Z's NIL would undermine Rule 408's policy of promoting "the compromise and settlement of disputes." *Id.*

## VI.  CONCLUSION

The Court should exclude all evidence about negotiations between Plaintiff and Defendants that took place in May and June of 2021.

# DEFENDANTS' OPPOSITION

## I.  INTRODUCTION

The pre-litigation negotiation between the parties is plainly relevant. To begin, the negotiation is the most recent of a 25-year relationship where Plaintiff recognized Defendants' open exploitation of the at-issue photographs ("Disputed Photos"). Not only did Plaintiff never object, but he also recognized that, to use the images himself, Plaintiff had to get licenses—permission—from Defendants. In other words, the pre-litigation negotiation helps show that Plaintiff cannot prove the lack-of-consent element of his claims.

The pre-litigation negotiation is also relevant to rebut Plaintiff's contention that he owns the copyrights in the Disputed Photos. In addition, Plaintiff's damages expert relies on evidence of the negotiation for his opinion, and Plaintiff himself plans to use communications from the negotiation as trial exhibits.

Moreover, the pre-litigation negotiation is not subject to Federal Rule of Evidence 408 because there was no offer to compromise any known claim. It was only after the negotiation ended that Plaintiff revealed his right-of-publicity claims by filing this lawsuit.

Plaintiff cannot seriously contest the relevancy of the pre-litigation negotiation. His Motion in Limine No. 3 should be denied in its entirety.

## II.  RELEVANT BACKGROUND

### A.  Defendants' Photographs of Plaintiff

In 1996, Plaintiff released his debut album, Reasonable Doubt. Miyake Decl. Ex. B ("Burke Dep. Tr.") at 32:8-14; First Am. Compl. (ECF 15) ¶ 12. Defendant Jonathan Mannion was the photographer at the Reasonable Doubt photoshoot, where he created photographs that would be used for the album. Miyake Decl. Ex. C ("Carter Dep. Tr.") at 87:1-21. Over the years, Mr. Mannion created more photographs of Plaintiff, some of which were used for Plaintiff's other albums. First Am. Compl. ¶ 21.

1      Since at least 2006, Defendants have licensed Mr. Mannion's photographs of
2   Plaintiff to others for a fee. For example, on three occasions from 2006 to 2009,
3   Plaintiff and S. Carter Enterprises, a company that handles Plaintiff's personal
4   affairs, separately licensed or sought a license for some of the Disputed Photos from
5   Defendants. *See* Carter Dep. Tr. at 147:24-149:15; Miyake Decl. Ex. H; Miyake
6   Decl. Ex. D ("Perez Dep. Tr.") at 22:18-25; Mannion Decl. in Supp. Resp. to Pl.'s
7   Mot. in Limine (June 10, 2022) Ex. B. Companies affiliated with Plaintiff—such as
8   Plaintiff's music and management company, Roc Nation—have also licensed or
9   sought licenses from Defendants. Mannion Decl. in Supp. Resp. to Pl.'s Mot. in
10  Limine (June 10, 2022) Ex. C.

11      **B.     The Pre-Litigation Negotiation**

12      On May 17, 2021, Plaintiff's lawyer Ryan Klarberg of Pryor Cashman LLP
13  reached out to Defendants to discuss Plaintiff's interest in another "potential
14  licensing arrangement" with Defendants. Miyake Decl. Ex. K; *id.* Ex. E (Davidov
15  Dep. Tr.) at 116:20-117:11. Defendants' licensing agent, Uri Davidov, and Mr.
16  Klarberg negotiated options for Plaintiff to license photographs of Plaintiff from
17  Defendants for five years and the associated fees. *Id.* Ex. K.

18      Plaintiff later wanted, instead, to purchase the photographs, and negotiations
19  continued into mid-June 2021. On June 13, 2021, Brad Rose of Pryor Cashman LLP
20  emailed Defendants' representatives because he believed the parties reached a deal
21  for Defendants to sell to Plaintiff the entire Reasonable Doubt portfolio. *See* Perez
22  Dep. Tr. at 225:2-226:1, Ex. 49. But the parties actually disagreed as to what
23  photographs would be sold and the price. Miyake Decl. Ex. G at 1-3; *id.* Ex. F
24  (Santiago Dep. Tr.) at 176:21-186:17. When Defendants refused Plaintiff's terms,
25  Plaintiff concocted this lawsuit. *See id.* Ex. G at 4-5.

26      **C.     Plaintiff's Claims**

27      On June 15, 2021, Plaintiff filed his initial Complaint, revealing that he was
28  asserting right of publicity claims against Defendants. *See generally* Compl. (ECF

1). Plaintiff contends that he became aware that Defendants were using his name, image, or likeness in May 2021. Miyake Decl. Ex. N at 8-10 (interrogatory nos. 7-11). His claims concern the Disputed Photos:

1. The "Got You All in Check" photograph (1995);
2. The Reasonable Doubt cover photograph (1996);
3. The "Beyond a Reasonable Doubt" photograph (1996), also from the Reasonable Doubt photoshoot;
4. The Reasonable Doubt slipmat photograph (1996), also from the Reasonable Doubt photoshoot;
5. The "Chess Not Checkers" photograph (1998);
6. The "New Blue Yankee" photograph (1998);
7. The "Last Laugh" photograph (2002); and
8. The "Fame Wall" photograph (2021).

Mannion Decl. in Supp. of Defs.' Mot. in Limine (June 3, 2022) ¶¶ 3-9.

Plaintiff's purpose in filing this lawsuit is "[t]o make a clear record that [he] own[s] the images." Carter Dep. Tr. 213:14-215:15. As Plaintiff explains:

> I created this -- these works, this imaging, the music, the lyrics. . . .
> How could [Mr. Mannion] own these images? He didn't even understand why these things came to be. . . .
> He couldn't explain them to you, but he'll make -- he'll make claims that -- you know, that these images are his? . . .
> I want the record to show that I own these photographs because I do.

*Id.* Despite conceding no written contract applies to photographs taken at the Reasonable Doubt photoshoot (*id.* at 99:8-23) and failing to produce in discovery any contract that applies to any of the Disputed Photos, Plaintiff's representatives contend that Mr. Mannion created the photographs under a "work for hire" arrangement (Perez Dep. Tr. at 81:11-83:21).

The relief that Plaintiff seeks include (1) a permanent injunction barring Defendants from any uses of any photograph (not just the Disputed Photographs) including Plaintiff's name, image, or likeness, without Plaintiff's permission; (2) damages from Defendants' profits generated from any uses of the Disputed Photographs, including licenses to third parties; and (3) damages based on a hypothetical license fee that Plaintiff contends Defendants would have had to pay to use his name or likeness. *See* Miyake Decl. Ex. A (Plaintiff's counsel's June 2, 2022 email).

## III.   DISCUSSION

### A.   The Pre-Litigation Negotiation Is Relevant

Evidence of the pre-litigation negotiation is relevant, and this Motion should be denied. *First*, evidence of the pre-litigation negotiation is critical to rebutting Plaintiff's contention that he did not consent to Defendants' uses of the Disputed Photos. Defendants openly exploited the Disputed Photos for decades, and Plaintiff has had to seek licenses from Defendants to use the images for his purposes. The pre-litigation negotiation, during which Plaintiff initially wanted to discuss another license and then tried to buy all photographs from the Reasonable Doubt photoshoot as well as other photoshoots, is a continuation of Plaintiff's acknowledgment that Defendants did not need his permission to use the Disputed Photos. *See Jones v. Corbis Corp.*, 815 F. Supp. 2d 1108, 1113-16 (C.D. Cal. 2011), *aff'd*, 489 F. App'x 155 (9th Cir. 2012) (finding plaintiff's years of non-objection constituted implied consent that defeated right-of-publicity claim).

Had Plaintiff actually objected to Defendants' uses of the Disputed Photographs, the pre-litigation negotiation would certainly have proceeded differently. Even assuming Plaintiff is correct that he first learned about the at-issue uses of the Disputed Photographs in May 2021, when the negotiation was ongoing, he never sent a cease-and-desist letter or otherwise discussed his then-unfiled claims while the parties were working on a business deal. Evidence of the negotiation

1   should be permitted so the jury can decide whether Plaintiff's conduct was

2   consistent with the notion that he did not consent to Defendants' uses of the

3   Disputed Photos.

4       *Second*, Plaintiff contends that he owns the Disputed Photos simply because

5   they relate to his music. But what Plaintiff wanted to gain through the pre-litigation

6   negotiation was Defendants' ownership rights, a goal that contradicts the position

7   that Plaintiff already owns the images.

8       *And third*, Plaintiff himself relies on the pre-litigation negotiation in his case

9   in chief. Plaintiff's damages expert, Jon Albert-Levy, expressly depends on the pre-

10  litigation negotiation for his opinion. *See* Miyake Decl. Ex. M ¶¶ 34-38, 42. And

11  Plaintiff intends to use communications from the pre-litigation negotiation—

12  communications that Plaintiff has not identified as being subject to this Motion—at

13  trial. *See* Jt. Pre-Trial Exhibit List (ECF 115) at 5, 7, 8, 10 (joint exhibit nos. 28-31,

14  84, 85-88, 105, 106). Plaintiff cannot, on the one hand, rely on the pre-litigation

15  negotiation in his case in chief, while on the other, claim that evidence of the

16  negotiation is irrelevant for Defendants' purposes.

17      The pre-litigation negotiation is undeniably relevant to core issues in this

18  lawsuit.

19      **B.    Rule 408 Does Not Apply**

20      Evidence of the pre-litigation negotiation is not barred by Federal Rule of

21  Evidence 408 because the rule "is limited to actual disputes over existing claims."

22  *Koninklijke Philips Elecs. N.V. v. Nat'l Film Lab'ys Inc.*, 2012 WL 12886833, at *3

23  (C.D. Cal. Dec. 4, 2012) (quoting *Deere & Co. v. Int'l Harvester Co.*, 710 F.2d

24  1551, 1557 (Fed. Cir. 1983)). The negotiation was initially about a potential

25  licensing deal between Plaintiff and Defendants. It then became a discussion about

26  Plaintiff's potentially buying out Defendants' ownership in Reasonable Doubt and

27  other photographs. The negotiation was never about compromising the right-of-

28  publicity claims asserted in this lawsuit.

Plaintiff agrees. By his account, the pre-litigation negotiation was about a business deal to purchase copyrights, not about his right of publicity. *See* Mot. 1:16-19; Bonfigli Decl. Ex. C at 170:5-171:7, 184:16-185:16, 186:21-187:18. Accordingly, Rule 408 does not apply, and evidence of the pre-litigation negotiation is admissible. *See Telecom Asset Mgmt., LLC v. FiberLight, LLC*, 730 F. App'x 443, 446 (9th Cir. 2018) (finding Rule 408 did not apply because admitted evidence concerned "pre-dispute business negotiations and not negotiations for the settlement of a future legal claim"); *Genentech, Inc. v. Trustees of Univ. of Penn.*, 2012 WL 762108, at *2 (N.D. Cal. Mar. 8, 2012) (finding Rule 408 inapplicable to licensing proposal that was not related to a claim that was disputed at the time).

## IV.   CONCLUSION

For all these reasons, the Court should deny Plaintiff's Motion in Limine No. 3 in its entirety.

DATED:  June 17, 2022              WILLENKEN LLP


By */s/ Paul J. Loh*
   Paul J. Loh
   *Attorneys for Defendants*

## **PLAINTIFF'S REPLY**

The Court should exclude evidence of the parties' pre-suit negotiations, which occurred a few days and weeks before Plaintiff sued, as irrelevant, confusing, prejudicial, and a waste of time.  Defendants designated page after page of deposition testimony going into the fine intricacies of the back-and-forth between the parties.  None of that matters to the case, which concerns whether Mannion exploited Plaintiff's name, image, and likeness ("NIL") without authorization.  He clearly did, and nothing about the pre-suit negotiations to avoid litigation supports a claim that Plaintiff consented to these uses.  That Plaintiff was, at the time, interested in buying out any claim by Mannion of copyright ownership to the photos at issue here lends no support to Mannion's consent defense.  And such evidence runs headlong into Rule 408's prohibition against using an offer of compromise to prove the invalidity of a claim.  The Court should exclude the evidence.

### A.    The pre-litigation negotiations are not relevant.

**Consent.**  Defendants' opposition makes no attempt to reconcile their current position with their past statements.  Defendants previously stated that that the pre-suit negotiations "are not relevant" because they "concerned the licensing or purchase of Defendants' copyrights."  Bonfigli Dec. Ex. B at 3.  For whatever reason, Defendants now claim that the negotiations are "critical to rebutting Plaintiff's contention that he did not consent to Defendants' uses of the Disputed Photos." *Supra* at 8.  That makes no sense.  In this right-of-publicity case, Plaintiff seeks to prevent Defendants from using his name, image, and likeness (NIL) on products and to advertise.  *See* Civ. Code § 3344.  That Plaintiff sought to buyout Defendants' claim to *copyright* ownership in photos—to stop Defendants from using the photos—does not show that Plaintiff approved of Defendants' use of Plaintiff's *NIL* on products or to advertise.  Pointedly, as Defendants have already admitted, "[t]he parties were *not* negotiating a license for Defendants to use Plaintiff's [NIL]."  Bonfigli Dec. Ex. B at 3 (emphasis added).

Defendants are unable to explain how Plaintiff's willingness to settle this dispute by buying out Mannion's claim to own the photos is evidence Plaintiff consents to Defendants' commercial exploitation of his NIL.  Indeed, in even making this argument, Defendants make clear they seek to do what Rule 408 forbids.  *See infra* at 13-14.  Defendants claim Plaintiff's willingness to enter into a transaction with them "is a continuation of Plaintiff's acknowledgment that Defendants did not need his permission to use the Disputed Photos."  *Supra* at 8.  That is incorrect.  At most, the negotiations would reflect an acknowledgment that Plaintiff cannot use the photos without acquiring Defendants' interests in them, which is irrelevant to a case arising from Defendant's unauthorized use of Plaintiff's NIL rights.  As a Rule 408 communication, they are not even admissible for that.

**Ownership.**  Defendants contend that the pre-suit negotiations rebut Plaintiff's claim that he "owns the images." *Supra* at 9.  But ***Defendants*** pulled that contention from Plaintiff during his deposition, and Plaintiff has moved to exclude evidence of copyright ownership and licensing from this right-of-publicity case. *See* Pl.'s MIL No. 1.  If the Court grants that motion, Plaintiff will have no need to present evidence of copyright ownership and will not do so.

**Plaintiff's Exhibits.**  Defendants contend that, based on Plaintiff's exhibit list, Plaintiff intends to introduce evidence of the pre-litigation negotiation. *Supra* at 9.  But Plaintiff designated those exhibits as ones he "may offer" and will use them only if the Court allows evidence of the pre-litigation negotiations.[1]

**Damages.**  Defendants contend that Plaintiff's damages expert, Jon Albert, relied on the pre-litigation negotiations. *Supra* at 9.  That is incorrect.  Mr. Albert's analysis relies, in part, on Defendants' internal valuation of the photos at issue and how much money they stood to gain from selling Jay-Z merchandise over time.  Nothing about the back-and-forth between the parties bears on Mr. Albert's

---

[1]   Those exhibits are Joint Exhibit Nos. 29-31, 84, 85-88, 105, 106.

analysis.  *See* Miyake Dec. Ex. M ¶ 35 (relying on the fact that Mannion told *his licensing agent* that he could earn $1 million from "print sales of a single image, but over time").  Defendants' own valuation of their ability to profit from Jay-Z's NIL is relevant to the value of Plaintiff's NIL, as used by Defendants.  *See, e.g.*, *Clark v. Am. Online Inc.*, 2000 WL 33535712, at *8 (C.D. Cal. Nov. 30, 2000) ("[T]he standard for measuring lost profits in a right of publicity case is the fair market value of the right to use plaintiff's name or likeness in the manner in which it was used by defendant.").  Similarly, Mr. Albert relied on testimony from Defendants' licensing agent that—apart from the negotiations—he believed that $1,000,000 "would be an acceptable fee" for the *Reasonable Doubt* cover photo.  Miyake Dec. Ex. M ¶ 39.  In any event, as Mr. Albert testified at deposition, this evidence merely "confirm[ed]" his independent determination as to the value of Plaintiff's NIL, given that Defendants used it.  Albert Tr. (Bonfigli Dec. Ex. F) at 201:23-202:19.

### B. Rule 408 requires exclusion of the pre-suit negotiations.

Rule 408 also bars evidence of the pre-suit negotiations.  Defendants' opposition did not address Plaintiff's showing that his "offer [of compromise] [was] motivated by a desire for peace rather than from any concession of weakness of position." *Supra* at 4.  Yet Defendants make clear they wish to use Plaintiff's attempt to "clear the slate," *id.*, as an admission that he does not own the photos and that he consented to Defendants' commercial exploitation of them—the very thing Rule 408 forbids.

Defendants claim the rule does not apply because "when the negotiation was ongoing, [Plaintiff] never … discussed his then-unfiled claims." *Supra* at 8.  That is incorrect.  Plaintiff's lawyer prepared a draft settlement agreement stating that Mannion's "use of certain photographs and/or Carter's likeness therein has exceeded the scope of Mannion's rights."  Bonfigli Dec. Ex. G.  Mannion's licensing agent and Plaintiff's employee discussed litigation during their negotiations.  Davidov Tr. (Bonfigli Dec. Ex. I) at 20:1-20 ("they threatened to sue"), 125:17-128:3 ("they

1  were going to sue"); Santiago Tr. (Bonfigli Dec. Ex. H) at 157:4-25 ("legal battle").

2  And Plaintiff's lawyer and Mannion's licensing agent also discussed the potential

3  for litigation. Davidov Tr. (Bonfigli Dec. Ex. I) at 37:6-12 ("he threatened to sue"),

4  39:12-40:3 (he "said he was going to sue").

5         **C.**    **Rule 403 requires exclusion of the pre-suit negotiations.**

6        Plaintiff argued that "if Defendants present evidence regarding the

7  negotiations, there is a substantial risk of confusion, undue delay, and wasting time."

8  *Supra* at 3. Defendants did not address that argument. *See supra* at 5-10. Nor did

9  they address their now-abandoned argument that the "[t]here is a significant risk that

10  the jury would confuse Defendants' copyrights that were the subject of the

11  negotiations with Plaintiff's at-issue right of publicity, a different right entirely."

12  Bonfigli Dec. Ex. B at 3. In failing to address these arguments, Defendants forfeited

13  the right to do so. *See, e.g.*, *Resnick v. Hyundai Motor Am., Inc.*, 2017 WL

14  1531192, at *22 (C.D. Cal. Apr. 13, 2017).

15        In any event, confusion will ensue if Defendants present evidence of the pre-

16  litigation negotiations. The jury will be confused as to whether Mannion's alleged

17  copyright ownership gives him the right to exploit Plaintiff's NIL. It does not. But

18  Defendants plainly want to present evidence of the negotiations in the hopes the jury

19  will draw that impermissible inference. *Supra* at 5. Thus, the Court should grant

20  Plaintiff's motion based on Rule 403 too.

21                                    **CONCLUSION**

22        The Court should grant Plaintiff's Motion in Limine No. 3.

23

24

25

26

27

28

1

DATED:  June 17, 2022

QUINN EMANUEL URQUHART
& SULLIVAN, LLP

2

3

4

By /s/ Robert M. Schwartz

Alex Spiro (*pro hac vice*)
Robert M. Schwartz
Cory D. Struble
Dylan C. Bonfigli
*Attorneys for Plaintiff*

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## DECLARATION OF DYLAN C. BONFIGLI

2      I, Dylan C. Bonfigli, declare as follows:

3      1.      I am an attorney admitted to practice before this Court.  I am associated

4  with Quinn Emanuel Urquhart & Sullivan, LLP, counsel of record for Plaintiff

5  Shawn Carter, professionally known as Jay-Z.  I make this declaration in support of

6  the Joint Motion in Limine No. 3.  I make this declaration on personal, firsthand

7  knowledge, and if called and sworn as a witness, I could and would testify

8  competently to the facts set forth below.

9      2.      The Joint Motion in Limine No. 3 seeks to exclude all evidence about

10  negotiations between Plaintiff and Defendants that took place in May and June of

11  2021.

12      3.      The subject matter of the Joint Motion in Limine No. 3 has been

13  discussed with opposing counsel, and opposing counsel stated that such matter may

14  be mentioned or displayed in the presence of the jury before it is admitted in

15  evidence and has refused to stipulate that such matter will not be mentioned or

16  displayed in the presence of the jury unless and until it is admitted in evidence.

17      4.      Plaintiff will be prejudiced if the Plaintiff's Motion in Limine No. 3 is

18  not granted because evidence about negotiations between Plaintiff and Defendants

19  that took place in May and June of 2021 is not relevant and, if presented, it will

20  likely cause unfair prejudice to Plaintiff, confuse the issues, mislead the jury, and

21  waste trial time.  As Defendants acknowledged, "[t]he pre-litigation negotiations …

22  are not relevant," because they concerned "copyrights," and "[t]he parties were not

23  negotiating a license for Defendants to use Plaintiff's name, image, and likeness."

24  And there is "a significant risk that the jury would confuse Defendants' copyrights

25  that were the subject of the negotiations with Plaintiff's at-issue right of publicity, a

26  different right entirely."  Moreover, Plaintiff would suffer prejudice if evidence

27  about the pre-litigation negotiations is permitted, because evidence about those

28  negotiations is barred by Rule 408 of the Federal Rules of Evidence.

5.      Attached as **Exhibit A** is a true and correct copy of a letter that I sent to defense counsel on May 13, 2022.  In that letter, I state that, absent an agreement between the parties obviating the need to do so, Plaintiff would move to exclude "evidence about negotiations between Plaintiff and Defendants that took place in May and June of 2021 and that concerned a potential transaction regarding certain photographs of Plaintiff."

6.      Attached as **Exhibit B** is a true and correct copy of a letter from defense counsel, dated May 13, 2022.  In that letter, defense counsel stated that they would move in limine to exclude evidence of pre-litigation negotiations between Plaintiff and Defendants concerning "the licensing or purchase of Defendants' copyrights" on the ground that "[t]here is a significant risk that the jury would confuse Defendants' copyrights that were the subject of the negotiations with Plaintiff's at-issue right of publicity, a different right entirely."  During a meet and confer on May 20, 2022, defense counsel stated that they were abandoning this position.

7.      Attached as **Exhibit C** is a true and correct copy of excerpts from the deposition of Shawn Carter taken on March 4, 2022.

8.      Attached as **Exhibit D** is a true and correct copy of excerpts from the deposition of Jonathan Mannion taken on March 13, 2022.

9.      Attached as **Exhibit E** is Joint Trial Exhibit 28, which bears Bates No. MANNION001557.

10.      Attached as **Exhibit F** is a true and correct copy of excerpts from the deposition of Jon Albert, taken on April 6, 2022.

11.      Attached as **Exhibit G** is a true and correct copy of the first page of Deposition Exhibit 134.

12.      Attached as **Exhibit H** is a true and correct copy of excerpts from the deposition of Felix Leonard Santiago, taken on March 2, 2022.

13.    Attached as **Exhibit I** is a true and correct copy of excerpts from the deposition of Uri Davidov, taken on March 10, 2022.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on June 17, 2022, at Los Angeles, California.

By    */s/ Dylan C. Bonfigli*
      Dylan C. Bonfigli

**<u>ATTESTATION STATEMENT</u>**

I, Robert M. Schwartz, the filer of this Joint Motion in Limine, attest pursuant to Civil L.R. 5-4.3.4(a)(2) that all other signatories listed, and on whose behalf the filing is submitted, concur in the filing's content and have authorized the filing.

DATED:  June 17, 2022                QUINN EMANUEL URQUHART
                                     & SULLIVAN, LLP


                                By  /s/ Robert M. Schwartz
                                    _____
                                    Robert M. Schwartz
                                    *Attorneys for Plaintiff*

# Exhibit A

May 13, 2022 Letter from Bonfigli to Defense Counsel

**quinn emanuel** trial lawyers | los angeles

865 South Figueroa Street, 10th Floor, Los Angeles, California 90017-2543 | TEL (213) 443-3000 FAX (213) 443-3100

WRITER'S DIRECT DIAL NO.
**(213) 443-3610**

WRITER'S EMAIL ADDRESS
**dylanbonfigli@quinnemanuel.com**

May 13, 2022

<u>VIA E-MAIL</u>

Paul J. Loh                                 Steven A. Marenberg
Lika C. Miyake                              Kiaura Clark
Kenneth Michael Trujillo-Jamison            Paul Hastings LLP
Willenken LLP                               1999 Avenue of the Stars 27th Floor
707 Wilshire Boulevard Suite 3850           Los Angeles, California 90067
Los Angeles, California 90017

Sarah C. Hsia
Rockstone Legal
229 West 36th Street 8th Floor
New York, New York 10018

**Re:**   ***Carter v. Mannion**, Case No. 2:21-cv-04848-PA-KS*

Counsel:

Pursuant to Section II.B.3 of the Court's Civil Trial Scheduling Order (ECF No. 52), we write to request that the parties meet and confer regarding motions in limine Plaintiff Shawn Carter may file absent an agreement between the parties obviating the need to do so.

Plaintiff's anticipated motions in limine include:

1.      A motion to exclude any testimony from Jeffrey Sedlik on the ground that his opinions are not relevant, *see* Fed. R. Evid. 401, and do not satisfy the requirements of Rule 702 of the Federal Rules of Evidence and *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993).

2.      A motion to exclude evidence about negotiations between Plaintiff and Defendants that took place in May and June of 2021 and that concerned a potential transaction regarding certain photographs of Plaintiff.  This motion will be based on Rules 401, 403, and 408 of the Federal Rules of Evidence.

**quinn emanuel urquhart & sullivan, llp**
ATLANTA | AUSTIN | BOSTON | BRUSSELS | CHICAGO | DOHA | HAMBURG | HONG KONG | HOUSTON | LONDON | LOS ANGELES | MANNHEIM |
MIAMI | MUNICH | NEUILLY-LA DEFENSE | NEW YORK | PARIS | PERTH | RIYADH | SALT LAKE CITY | SAN FRANCISCO | SEATTLE | SHANGHAI |
SILICON VALLEY | STUTTGART | SYDNEY | TOKYO | WASHINGTON, DC | ZURICH

3.      A motion to exclude any evidence about the copyright ownership of any of the photographs at issue and any evidence about Defendants' licensing the copyright of any photographs of Plaintiff, including any evidence regarding the Apartment 4B popup event.   This motion will be based on Rules 401 and 403 of the Federal Rules of Evidence.

4.      A motion to exclude any evidence regarding Mr. Mannion's claimed belief that his sale of prints and other products depicting persons, including Plaintiff, was lawful, or based on advice of counsel.  This motion will be based on Rules 401 and 403 of the Federal Rules of Evidence.

Please let us know of a few dates and times that you are available next week to discuss these potential motions.  Plaintiff reserves the right to raise additional potential motions in limine in advance of any conference of counsel, including, without limitation, on the basis of other pre-trial disclosures.

Best regards,

Dylan Bonfigli

2

# Exhibit B

May 13, 2022 Letter from Defense Counsel to Plaintiffs



707 Wilshire Blvd.
Suite 3850
Los Angeles, CA 90017

TEL  213.955.9240
FAX  213.955.9250

willenken.com

Paul J. Loh
ploh@willenken.com

May 13, 2022

**VIA E-MAIL ONLY**

Robert M. Schwartz                              Alex Spiro
Dylan C. Bonfigli                               Cory Struble
Quinn Emanuel Urquhart & Sullivan, LLP          Quinn Emanuel Urquhart & Sullivan, LLP
865 S. Figueroa St., 10th Fl.                   51 Madison Ave., 22nd Fl.
Los Angeles, California 90017-2543              New York, NY 10010
robertschwartz@quinnemanuel.com                 alexspiro@quinnemanuel.com
dylanbonfigli@quinnemanuel.com                  corystruble@quinnemanuel.com

Re:      *Shawn Carter v. Jonathan Mannion et al.*, Case No.: 2:21-cv-04848-PA-KS

Dear Counsel,

We write pursuant to Paragraph II.B.3 of the Civil Trial Scheduling Order ("CTSO") entered in this matter to request a Local Rule 7-3 conference to discuss the motions in limine that Defendants intend to file. Below we describe the testimony, exhibits, or other matters that will be the subjects of the motions in limine, and provide brief summaries of Defendants' positions and the terms of the orders that Defendants will seek.

Relatedly, as raised during the parties' May 6, 2022 conference, the Court ordinarily permits up to four motions in limine to be filed per side. CTSO ¶ II.B.2. Should the parties be unable to resolve the issues identified below, Defendants would like to confer about whether Plaintiff will stipulate that the parties be permitted to file up to eight motions in limine per side.

Absent Plaintiff's agreement to exclude the following evidence from the trial, Defendants intend to file motions in limine regarding the following:

**1.      Expert Testimony of Jon Albert-Levy**

Plaintiff cannot show that Mr. Albert-Levy and his opinions meet the requirements of Federal Rule of Evidence 702. *See Stilwell v. Smith & Nephew, Inc.*, 482 F.3d 1187, 1192 (9th Cir. 2007) (expert testimony must be reliable and helpful to fact finder). Mr. Albert-Levy does not have the scientific, technical, or other specialized knowledge to render an expert opinion about potential damages in this lawsuit. His experience with endorsement deals is not relevant to this lawsuit between the subject of photographs and the photographer over the use of the subject's name, image, or likeness in the photographs. Thus, Mr. Albert-Levy's opinions will not be helpful to the jury.

Further, Mr. Albert-Levy's opinions are not supported by sufficient facts or data and are not based on reliable principles and methods. For example, he did not review deals between



May 13, 2022
Page 2

photographers and Plaintiff or other celebrities. Rather, Mr. Albert-Levy compares the selling of prints and physical goods on which photographs are imprinted by Defendants, who run a small business, with endorsement agreements requiring Plaintiff to render significant personal services to multimillion- or multibillion-dollar corporations. With those inapt "comps," Mr. Albert-Levy makes leaps of logic to conclude that Plaintiff is somehow entitled to millions in damages.

Defendants will move for an order to exclude the expert testimony of Mr. Albert-Levy.

### 2.      Expert Testimony of Megan Mahn Miller

Plaintiff cannot show that Ms. Mahn Miller and her opinions meet the requirements of Rule 702. *See Stilwell*, 482 F.3d at 1192. Ms. Mahn Miller does not have the scientific, technical, or other specialized knowledge to render an expert opinion about fine art photography or the primary marketability and economic value of prints of the at-issue photographs. Also, Ms. Mahn Miller's experience in the memorabilia industry is not relevant to Defendants' prints, so her opinions will not be helpful to the jury.

In addition, Ms. Mahn Miller's opinions are not supported by sufficient facts or data and are not based on reliable principles and methods. For example, she never conducted a study to determine the motivations of purchasers of prints, did not sufficiently research the markets for Defendants' prints and similar photographers' prints, and did not inspect an actual print of the at-issue photographs before reaching her opinions. Instead, Ms. Mahn Miller relies on tautology and confirmation bias to reach conclusions about purchaser motivations, the appropriate market for Defendants' prints, and the primary marketability and economic value of the prints.

Defendants will move for an order to exclude the expert testimony of Ms. Mahn Miller.

### 3.      Island Def Jam Photography/Illustration Agreements

The six Photography/Illustration Agreements[1] between Mr. Mannion and Island Def Jam are not relevant and are not admissible. *See* Fed. R. Evid. 401, 402. Island Def Jam is not a party to this lawsuit. Moreover, the only photographs that are at issue are photographs whose prints were sold within the applicable limitations period and photographs that were imprinted on physical goods that were sold within the applicable limitations period. The Photography/Illustration Agreements contracts do not apply to any of those photographs.

Moreover, the probative value, if any, of these contracts is substantially outweighed by the dangers of confusing the issues, misleading the jury, and causing unfair prejudice to Defendants.

---

[1] The six Photography/Illustration Agreements are dated (i) July 25, 2001; (ii) January 12, 2002; (iii) November 13, 2002, reissued December 16, 2002; (iv) November 19, 2002, reissued December 16, 2002; (v) January 23, 2002; and (vi) September 30, 2003.



210262.2

May 13, 2022
Page 3

That is, there is a significant risk the jury will be confused and misled that the Photography/Illustration Agreements apply to the at-issue photographs, that any contractual provisions were breached, that Plaintiff can enforce any of Island Def Jam's contractual rights, and that the Photography/Illustration Agreements have to do with Plaintiff's right of publicity.

Defendants will move for an order to exclude all documentary evidence, testimony, and argument regarding the six Photography/Illustration Agreements between Mr. Mannion and Island Def Jam (deposition exhibits 2-7, 22, and 107 and all other versions of these contracts).

4.    **Defendants' Internal Communications Regarding Generating Revenue**

Communications between Mr. Mannion and the employees of Jonathan Mannion Photography regarding their hopes to generate revenue are not relevant and not admissible. *See* Fed. R. Evid. 401, 402. Whether they desired to grow Defendants' business has nothing to do with whether Defendants have the right to publish or distribute Mr. Mannion's photographs and physical goods on which the photographs are imprinted.

Furthermore, the probative value, if any, of these communications is substantially outweighed by the dangers of confusing the issues, misleading the jury, and causing unfair prejudice to Defendants. *See* Fed. R. Evid. 403. The internal communications among colleagues were stated an ironic, humorous manner. But there is a significant risk that the communications can be improperly used to portray Defendants as excessively greedy or willing to commit unlawful acts to make money, causing unfair prejudice to Defendants.

Defendants will move for an order to exclude all documentary evidence, testimony, and argument regarding these internal communications regarding generating revenue (MANNION004495, MANNION009579, MANNION010720, MANNION008647, MANNION002651, MANNION003903, MANNION004100, MANNION004103, MANNION006365, MANNION009649, MANNION009654, MANNION009658, and all other versions of these documents, and any similar documents).

5.    **Pre-Litigation Negotiations**

The pre-litigation negotiations between representatives for Plaintiff and representatives for Defendants are not relevant and not admissible. *See* Fed. R. Evid. 401, 402. The negotiation concerned the licensing or purchase of Defendants' copyrights, or a portion of such the rights, to Plaintiff. The parties were not negotiating a license for Defendants to use Plaintiff's name, image, or likeness. Further, the negotiation concerned different photographs or sets of photographs at different times.

In addition, the probative value, if any, of these communications is substantially outweighed by the dangers of confusing the issues, misleading the jury, and causing unfair prejudice to



707 Wilshire Blvd., Suite 3850, Los Angeles, CA 90017
TEL  213.955.9240    FAX  213.955.9250    willenken.com

May 13, 2022
Page 4

Defendants. *See* Fed. R. Evid. 403. There is a significant risk that the jury would confuse Defendants' copyrights that were the subject of the negotiations with Plaintiff's at-issue right of publicity, a different right entirely. There is also a significant risk the jury would be misled that the monetary amount that Defendants requested to sell their rights have any bearing on potential damages in this lawsuit or indicate that Defendants had any improper motive in refusing to sell their rights.

Defendants will move for an order to exclude all documentary evidence, testimony, and argument regarding the pre-litigation negotiation.

### 6.    Plaintiff's Deals With Puma, Tiffany & Co., and Caliva

Endorsement and sponsorship deals between Plaintiff and Puma, Tiffany & Co. and Caliva are not relevant and not admissible. *See* Fed. R. Evid. 401, 402. The claims and defenses here concern Plaintiffs' right of publicity and Defendants' rights to distribute the at-issue photographs that Mr. Mannion authored and physical goods on which those photographs were imprinted. Sponsorship and endorsement deals requiring Plaintiff to provide extensive personal services to multimillion- or multibillion-dollar corporations, are not relevant.

Moreover, the probative value, if any, of these deals is substantially outweighed by the dangers of confusing the issues, misleading the jury, and causing unfair prejudice to Defendants. *See* Fed. R. Evid. 403. There is a significant risk the jury would be confused that the deals between Plaintiff and Puma, Tiffany & Co., and Caliva show that Defendants must follow similar terms for their uses of Mr. Mannion's photographs. There is also a significant risk the jury would be misled that the fees Plaintiff received from the deals have any bearing on potential damages in this lawsuit.

Defendants will move for an order to exclude all documentary evidence, testimony, and argument regarding deals between Plaintiff and Puma, Tiffany & Co., and Caliva (CARTER0004372, CARTER0004400, CARTER0004436, and all other versions of these documents).

### 7.    Defendants' Deals With Aaliyah and DMX

Deals between Defendants and representatives of the estates of Aaliyah and DMX, including any cease-and-desist letter(s) that preceded the deals, are not relevant and not admissible. *See* Fed. R. Evid. 401, 402. Other subjects of Mr. Mannion's photographs are not parties to this lawsuit, and the unproven allegations in any cease-and-desist letters have no bearing on Defendants' alleged actions and omissions here.

Further, the probative value, if any, of these deals with the estates of Aaliyah and DMX is substantially outweighed by the dangers of confusing the issues, misleading the jury, and causing



May 13, 2022
Page 5

unfair prejudice to Defendants. *See* Fed. R. Evid. 403. There is a significant risk that the jury would view unproven allegations in cease-and-desist letters from the estates' representatives as evidence that Defendants have violated others' rights of publicity in the past. There is also a significant risk the jury would view terms to which Defendants and those estates agreed upon to settle the disputes and to develop their business relationships as legal requirements that Defendants must follow as to all subjects of Mr. Mannion's photographs, including Plaintiff.

Defendants will move for an order to exclude all documentary evidence, testimony, and argument regarding deals between Defendants and representatives of the estates of Aaliyah and DMX, including any cease-and-desist letters from the representatives that preceded to the deals.

### 8.      Defendants' Internal Communications Reacting to Plaintiff's Initiation of This Lawsuit

Communications between Mr. Mannion and the employees of Jonathan Mannion Photography using curse words or other strong language in reacting to the filing of this litigation are not relevant and not admissible. *See* Fed. R. Evid. 401, 402. Their emotional reactions to the filing of the lawsuit have nothing to do with the claims or defenses in this case.

Furthermore, the probative value, if any, of these communications is substantially outweighed by the dangers of misleading the jury and causing unfair prejudice to Defendants. *See* Fed. R. Evid. 403. The internal communications among colleagues sometimes included strong language in reference to this litigation and to Plaintiff. There is a significant risk that the communications can be improperly used to portray Defendants in an unflattering light.

Defendants will move for an order to exclude all documentary evidence, testimony, and argument regarding such internal communications (MANNION010940, MANNION010720, and any similar documents).

* * *

Under Paragraph II.B.3 of the CTSO, the Local Rule 7-3 conference regarding Defendants' anticipated motions in limine must take place within seven days of service of this letter. Please let us know your availability during the week of May 16, as soon as possible.

Very truly yours,

Paul J. Loh



707 Wilshire Blvd., Suite 3850, Los Angeles, CA 90017
TEL 213.955.9240   FAX 213.955.9250   willenken.com

# Exhibit C

Excerpts from the March 4, 2022 Deposition of
Shawn Carter

CONFIDENTIAL

```
 1              UNITED STATES DISTRICT COURT
 2              CENTRAL DISTRICT OF CALIFORNIA
 3
 4     _____
                                     )
 5     SHAWN CARTER, also known as   )
       JAY-Z, an individual,         )
 6                                   )
              Plaintiff,             )
 7                                   )  Case No. 2:21-cv-04848-PA-KS
          vs.                        )
 8                                   )
       JONATHAN MANNION, an          )
 9     individual, and JONATHAN      )
       MANNION PHOTOGRAPHY LLC, a    )
10     New York limited liability    )
       company,                      )
11                                   )
              Defendants.            )
12     _____)
13
14
15              ** CONFIDENTIAL **
16         REMOTE VIDEOTAPED DEPOSITION OF
17              SHAWN C. CARTER
18           Friday, March 4, 2022
19                  Volume I
20
21
22     Reported by:
       NADIA NEWHART
23     CSR No. 8714
24     Job No. 5107613
25     PAGES 1 - 222
```

Page 1

CONFIDENTIAL

```
 1    Jack Dorsey?

 2        A    An NFT idea by Jack Dorsey?  I don't.

 3        Q    Do you recall any NFT ideas involving Tidal?

 4        A    I don't.  Not specifically, no.

 5        Q    Did Mr. Mannion ever contact you about a          11:52:10

 6    potential NFT idea?

 7        A    Not related to the Derrick Adams piece.  This

 8    is something -- this is a new question?

 9        Q    Yes, not related to that piece.  For a

10    separate NFT idea.                                        11:52:28

11        A    Yeah.

12        Q    What do you recall about what he proposed?

13        A    Not much.  I just know, you know, that was

14    the last one.  It was, like, wait a minute.  Wait,

15    wait, wait.  What?  Why -- why -- why -- what do you      11:52:42

16    mean you don't own this?  How -- wait.

17             Why are you proposing an idea?  That's what

18    brought everything to a head, this particular idea.

19    But I don't remember the idea that he proposed

20    specifically.                                             11:53:01

21        Q    Great.  So can you explain more your reaction

22    to Mr. Mannion's proposal for an NFT in connection

23    with the 25th anniversary?

24        A    I don't remember much about it.  I just

25    remember the feeling of, you know, like, remember I       11:53:14
```

Page 170

1    said when Biggs was the -- the mental note that

2    sounded off the alarm?

3          This was the one that was like, oh, I've got

4    to do something about this, because I need to figure

5    out what is going on with all of -- with -- with      11:53:28

6    Mannion.  But I don't remember the idea

7    specifically, no.

8        Q   Did you ever reject Mr. Mannion's request to

9    do an NFT project?

10       A   Yeah.  I -- we didn't proceed with the        11:53:57

11   project, no, not at all.  That was -- again, when

12   the -- I think it was through Lenny, I'm almost

13   sure.  When he approached with it, that's when it

14   was, like, no, I'm not doing that.  What's going on

15   here?                                                  11:54:11

16         You know, that's what made me really get to

17   the bottom of him claiming to have ownership of my

18   shit -- my things, my -- sorry, my image.

19       Q   Sorry.  Just to clear the record, when you

20   said your shit, you're referring to which image?      11:54:28

21       A   My -- my works, any -- any of my works, you

22   know, Reasonable Doubt on.

23       Q   So including the -- all of the photos in the

24   Reasonable Doubt shoot?

25       A   Yes.                                           11:54:43

                                                Page 171

CONFIDENTIAL

```
 1    I think these took place in 2021.  Does that -- is
 2    that -- do you agree?
 3         MR. SPIRO:  Objection; vague.  I didn't
 4    understand that question.
 5         MR. TRUJILLO-JAMISON:  I'll rephrase it.      12:10:52
 6      Q   Are you aware that there were negotiations
 7    with Mr. Mannion about potentially acquiring
 8    photographs of you that he took in 2021?
 9         MR. SPIRO:  Objection; form, states a
10    conclusion.                                        12:11:05
11         But you can answer.
12         THE WITNESS:  I don't recall.  Can you show
13    me these photos?  I don't recall Mannion taking
14    photos of me in 2021.
15    BY MR. TRUJILLO-JAMISON:                            12:11:14
16      Q   In 2021, did you have any discussions with
17    Mr. Santiago about reaching out to Mr. Mannion to
18    acquire Mr. Mannion's rights in photographs of you
19    that he took?
20      A   You're messing with me now.  It's a little   12:11:25
21    trigger.  Don't call them his photos.
22         Yeah, we discussed my -- my images and my
23    artwork with -- through Lenny with Mannion.
24      Q   And what did you understand was the purpose
25    of the discussions with Mr. Mannion?               12:11:45
```

Page 184

CONFIDENTIAL

```
 1        A    To come to some sort of resolution.  I
 2   can't -- I don't have nothing -- I don't have
 3   ill-will towards Jonathan, and I appreciate him, you
 4   know, taking those photos and his collaboration.
 5   And I felt what I offered was more than fair, more    12:12:08
 6   than what was -- more than fair.
 7             I'll just leave it at that, because, again, I
 8   don't want to minimize his work.  And I wanted to --
 9   I thought -- you know, again, you don't know.  I
10   thought I was doing the right thing by him, by         12:12:27
11   trying to come to an agreement.
12             And, you know, whatever advice he was given,
13   I think it was bad advice.  You know, you probably
14   would disagree with me, but I think it was bad
15   advice, and, you know, now we're here today.  That's   12:12:42
16   my understanding of the conversation.
17        Q    What did you understand you would -- strike
18   that.
19             Did you offer Mr. Mannion any money in
20   connection with these discussions?                     12:13:00
21        A    Yes.
22        Q    And what did you understand you would get in
23   exchange for the money you would be giving
24   Mr. Mannion?
25        A    Something that was already mine, which is --  12:13:09
```

Veritext Legal Solutions
866 299-5127

CONFIDENTIAL

```
 1    which is the Reasonable Doubt photoshoot, which I'm
 2    saying which -- you know, again, I felt like I was
 3    being more than fair offering to him something that
 4    is mine.
 5       Q   Well, I guess I'm asking in more specific      12:13:29
 6    terms, what did you expect to get from Mr. Mannion
 7    in exchange for the amount that you offered him?
 8       A   Anything -- any photos of mine that he
 9    believed that he owned.
10       Q   Only with respect to the Reasonable Doubt      12:13:45
11    shoot?
12       A   Owned, period.  I don't know how far the
13    extent -- I actually don't know what he believes he
14    owns beyond Reasonable Doubt, as we sit here today.
15    I'm just being real honest with you.  I don't know   12:14:08
16    what -- for the claims he's making towards my work.
17       Q   So I just want to -- again, I'm trying to
18    clarify in my mind -- well, first off, how much did
19    you offer to Mr. Mannion?
20       A   A million dollars.                             12:14:27
21       Q   And in your view, that million dollars
22    applied to only the Reasonable Doubt shoot photos?
23       A   Anything.  Not only -- anything that he
24    believed -- again, I don't know what he believes he
25    owns.  Anything that he -- what I thought I was      12:14:40
```

Page 186

CONFIDENTIAL

1    doing was, you know, clearing our -- our record, you

2    know.

3         I -- I, obviously, as you can hear, don't

4    believe he's entitled to own my images.  It doesn't

5    make any sense to me.  So what I was doing was          12:14:59

6    saying, hey, man, you know what?  You know, again, I

7    appreciate any work that we've done.  We've done a

8    lot of work, and, you know, I just don't want to --

9    I didn't want to be here.

10        That was my way of saying let's clear the          12:15:23

11   slate.  I don't want to be here in a deposition and

12   going to trial or whatever this thing ends up in,

13   because I'm not going to stop, you know.  I believe,

14   you know, if I'm fighting for something that's

15   right, I'm going to fight to the end.  And that's      12:15:41

16   just what it is.  So I felt I was doing the right

17   thing by Jonathan.  I thought I was being more than

18   fair.

19        MR. TRUJILLO-JAMISON:  Can I -- Ms. Miyake,

20   if you can put up Exhibit 32.                           12:16:02

21        MS. MIYAKE:  You should have it in your

22   exhibits folder.

23   BY MR. TRUJILLO-JAMISON:

24      Q   All right.  Mr. Carter, Exhibit 32 is a

25   document produced in this case bearing the Bates       12:16:35

Page 187

CONFIDENTIAL

```
 1

 2

 3

 4          I, SHAWN C. CARTER, do hereby declare under

 5    penalty of perjury that I have read the foregoing

 6    transcript; that I have made any corrections as

 7    appear noted, in ink, initialed by me, or attached

 8    hereto; that my testimony as contained herein, as

 9    corrected, is true and correct.

10          EXECUTED this _____ day of _____,

11    20____, at _____, _____.
                        (City)                    (State)

12

13

14

15          _____

            SHAWN C. CARTER

16          Volume I

17

18

19

20

21

22

23

24

25

                                            Page 218
```

CONFIDENTIAL

1          I, the undersigned, a Certified Shorthand

2     Reporter of the State of California, do hereby

3     certify:

4          That the foregoing proceedings were taken

5     before me at the time and place herein set forth;

6     that any witnesses in the foregoing proceedings,

7     prior to testifying, were administered an oath; that

8     a record of the proceedings was made by me using

9     machine shorthand which was thereafter transcribed

10    under my direction; that the foregoing transcript is

11    a true record of the testimony given.

12         Further, that if the foregoing pertains to the

13    original transcript of a deposition in a Federal

14    Case, before completion of the proceedings, review

15    of the transcript [ ] was [ ] was not requested.

16         I further certify that I am neither financially

17    interested in the action nor a relative or employee

18    of any attorney or any party to this action.

19    IN WITNESS WHEREOF, I have this date subscribed

20    my name.

21

22    Dated: March 5, 2022

23

24          NADIA NEWHART

         NADIA NEWHART

25          CSR NO. 8714

                                              Page 219

# Exhibit D

Excerpts from the March 13, 2022
Deposition of Jonathan Mannion

CONFIDENTIAL UNDER THE TERMS OF PROTECTIVE ORDER

```
1    **CONFIDENTIAL UNDER THE TERMS OF PROTECTIVE ORDER**
2
                 UNITED STATES DISTRICT COURT
3
                 FOR THE DISTRICT OF CALIFORNIA
4
5
6    _____
                              )
7    SHAWN CARTER, also known )
     as JAY-Z,                 )
8                              )
             Plaintiff,        )
9                              )
        vs.                    ) Civil Action No.
10                             ) 2:21-cv-04848-PA-KS
     JONATHAN MANNION,         )
11   et al.,                   )
                               )
12           Defendants.       )
     _____)
13
14
15
16        VIDEOTAPED DEPOSITION OF JONATHAN MANNION
17              Jersey City, New Jersey
18             Sunday, March 13, 2022
19                   Volume I
20
21
22   Reported by:
     LORI M. BARKLEY
23   CSR No. 6426
24   Job No. 5131261
25   PAGES 1 - 300

                                        Page 1
```

CONFIDENTIAL UNDER THE TERMS OF PROTECTIVE ORDER

```
 1    that day.                                          08:36:26
 2         Q.   So that means therefore that not only is  08:36:26
 3    there no signed contract by Mr. Carter authorizing 08:36:28
 4    you to sell copies of the photographs you took during 08:36:31
 5    the Reasonable Doubt photo shoot, there's no contract 08:36:34
 6    that authorizes you to spell any merchandise that  08:36:38
 7    incorporates any of the images you took during that 08:36:40
 8    photo shoot, correct?                              08:36:43
 9         A.   Well, sort of going back to my point, by  08:36:50
10    nature of me creating these images that copyright  08:36:52
11    would belong to me and those agreements wouldn't be 08:36:54
12    applicable.   The agreements would have further    08:36:58
13    clarified the usage that -- that would be controlled, 08:37:00
14    had there been language, but there was no contract to 08:37:05
15    be --                                              08:37:10
16         Q.   I want to make sure I understand what you're 08:37:10
17    telling me.   You're talking -- in your answer you're 08:37:13
18    talking about something, you used the term          08:37:15
19    "copyright."                                       08:37:19
20         A.   Um-hmm.                                  08:37:19
21         Q.   Correct?                                 08:37:20
22         A.   Yeah.   The images would belong to me.   08:37:21
23         Q.   Okay.                                    08:37:25
24         A.   He --
25              (Speaking simultaneously.)
```

Page 61

CONFIDENTIAL UNDER THE TERMS OF PROTECTIVE ORDER

```
1      Q.   All right.  Let's go back to the Reasonable      12:12:15

2    Doubt.  That was in 1996, correct?                      12:12:18

3      A.   That's correct.                                  12:12:20

4      Q.   And at that point you were -- that was your      12:12:20

5    first photo shoot for purposes of making a cover of a   12:12:25

6    record album, right?                                    12:12:27

7      A.   A specific album cover, yes.  There were         12:12:30

8    covers of like singles and that and magazine covers     12:12:34

9    prior, but that was the first album cover.              12:12:37

10     Q.   When you were hired to -- for the Reasonable     12:12:40

11   Doubt photo shoot, is it correct that you understood    12:12:44

12   that the photos you would be taking would be used to    12:12:46

13   promote Mr. Carter, Jay-Z and his music?                12:12:51

14     A.   For Reasonable Doubt at that time was what I     12:12:58

15   understood the usage to be.                             12:13:00

16     Q.   So in other words, the answer is yes, you        12:13:01

17   understood at the time you took the Reasonable Doubt    12:13:03

18   photo shoot that the photos were going to be used to    12:13:06

19   promote the Reasonable Doubt album by Mr. Carter?       12:13:09

20     A.   Yes.  I -- I understood that.  Sorry to talk     12:13:14

21   over you.                                               12:13:17

22          MR. SCHWARTZ:  And let's, Dylan, I'd like to     12:13:19

23   mark what, Dylan, you may have in the folder as 71A     12:13:31

24   and B.  I'm not sure why it's an "A" and a "B."         12:13:36

25     Q.   But I want to show you a portion of a video      12:13:39
```

Page 166

CONFIDENTIAL UNDER THE TERMS OF PROTECTIVE ORDER

```
 1              Do you see that?                      14:16:43

 2      A.    Yes, I do see that.                     14:16:47

 3      Q.    And was that a true statement or were those   14:16:49

 4   true statements when you wrote those?            14:16:51

 5      A.    I think I underestimated.  I think there   14:16:52

 6   were more images closer to 17,000 for Jay-Z projects.   14:16:54

 7      Q.    Okay.  Other than the fact that you believe   14:17:02

 8   maybe the 10,000 is closer to 17,000 photos, are the   14:17:09

 9   rest of the statements in the portion of this text   14:17:13

10   that I read to you correct?                      14:17:15

11      A.    Yes.  It -- the top choices would have also   14:17:20

12   increased, I think it was just a rough number, but   14:17:23

13   everything else is correct.                      14:17:27

14      Q.    All right.  And okay -- all right.  Let's   14:17:32

15   move on.                                         14:17:40

16           Now, as you sit here today, do you       14:17:41

17   understand that Jay-Z wants you to stop selling   14:17:43

18   prints of the photos you took of him?            14:17:47

19      A.    You know, I don't know what he wants.   14:17:50

20   Because he's never made that entirely clear.  I   14:17:52

21   think -- I've been told that -- I've been told a   14:17:59

22   number of things.  And we've offered a number of   14:18:05

23   things in response, but I don't know what he wants to   14:18:09

24   be honest.                                       14:18:11

25      Q.    Well, I could show you if it would be   14:18:11
```

Page 243

CONFIDENTIAL UNDER THE TERMS OF PROTECTIVE ORDER

1          I declare under penalty of

2     perjury under the laws of the State

3     of California that the foregoing is

4     true and correct.

5          Executed on _____, 2022, at

6     _____, _____.

7

8

9

10     _____

11            SIGNATURE OF WITNESS

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                    Page 296

CONFIDENTIAL UNDER THE TERMS OF PROTECTIVE ORDER

1    STATE OF CALIFORNIA        ) ss.

2    COUNTY OF LOS ANGELES      )

3

4            I, Lori M. Barkley, CSR No. 6426, do hereby

5    certify:

6            That the foregoing deposition testimony

7    taken before me at the time and place therein set

8    forth and at which time the witness was administered

9    the oath;

10           That the testimony of the witness and all

11   objections made by counsel at the time of the

12   examination were recorded stenographically by me, and

13   were thereafter transcribed under my direction and

14   supervision, and that the foregoing pages contain a

15   full, true and accurate record of all proceedings and

16   testimony to the best of my skill and ability.

17           I further certify that I am neither counsel

18   for any party to said action, nor am I related to any

19   party to said action, nor am I in any way interested

20   in the outcome thereof.

21           IN WITNESS WHEREOF, I have subscribed my

22   name this 15th day of March, 2022.

23

24

25           LORI M. BARKLEY, CSR No. 6426

Page 297

# Exhibit E

Joint Trial Exhibit 28

**From:** "Jonathan Mannion" <mannion@me.com>
**To:** "Lenny Santiago" <lennys@rocnation.com>
**Subject:** MANNION - Bitski, Prophecy & Ideas
**Date:** Tue, 11 May 2021 17:46:51 -0400
**Importance:** Normal
**Inline-Images:** 2005-07-21_10.21.55-2.jpg

| Exhibit 0028 |
| :---: |
| Santiago |

---

Good afternoon Lenny,

You are very kind for passing this email along to Jay. I appreciate you immensely, for this gesture, and for simply being you.

Thank you so very much.

———

Greetings Jay,

It has been too long since our paths have crossed, my friend, but hopefully that will change from this moment forward. I must begin by thanking you for the constant inspiration that you have provided through your example of a life well lived. I send blessing and light to you and your beautiful family.

It remains a distinct honor to have created countless meaningful visuals with you during our nearly decade long run. I know that Reasonable Doubt celebrates the 25th year anniversary on June 25th and I had an idea around your new NFT platform, Bitski, where we could offer NFTs of the silkscreens from a printmaking session that I did in London at Jealous Gallery which populated the walls of the 20th year anniversary of Reasonable Doubt at Marlborough Gallery in Chelsea. I thought that this would be a great way for you to stand strong with your platform, to amplify Bitski to the masses and to offer something that people would most certainly get excited about. There is certainly a bigger conversation around NFT opportunities, and perhaps we can explore in further detail as your time allows.

I will also say that the entire Reasonable Doubt show (22 art pieces) titled "Prophecy" is in climate controlled storage and this anniversary could be a great moment to share the work in a different setting to a new audience (LA, ATL, or perhaps where it all started, Brooklyn). I also have two of the pieces set aside for you that Biggs chose that I would love to deliver.

There have been many ideas that I have accumulated over the years that I have kept close to my heart because I didn't want to bother you with smaller plays as you are in another stratosphere of business dealings. That said, I think that there are important "legacy plays" and a major body of work to celebrate that would mean a great deal for the culture and creative community to feel. There are also massive lanes that could generate signifiant numbers that you would instantly have the infrastructure to support through the mighty Roc Nation or a new entity.

There are ideas and opportunities that I have had forever that I simply wouldn't want to do without you and I think that we would both be served well by "getting the band back together." It would mean the world to me to have your support and it would be a privilege to continue to create with you, my brother.

I appreciate you for allowing me to share a few thoughts and for taking a moment of your valuable time.

MANNION001557

All my very best,

Jonathan



MANNION001558

# Exhibit F

Excerpts from the April 6, 2022
Deposition of Jon Albert

CONFIDENTIAL

```
 1              UNITED STATES DISTRICT COURT
 2             CENTRAL DISTRICT OF CALIFORNIA
 3
      SHAWN CARTER, also known as   )
 4    JAY-Z, an individual,         ) Case No.:
                                    ) 2:21-cv-04848-PA-KS
 5                                  )
           Plaintiff,               ) Pages 1 to 217
 6                                  )
           v.                       )
 7                                  )
      JONATHAN MANNION, an          )
 8    individual, and JONATHAN      )
      MANNION PHOTOGRAPHY LLC, a    )
 9    New York limited liability    )
      company,                      )
10                                  )
           Defendants.              )
11    _____)
12
13
14              ***** CONFIDENTIAL *****
15                  DEPOSITION OF:
16                 JON ALBERT-LEVY
17             WEDNESDAY, APRIL 6, 2022
18                    9:59 a.m.
19
20    REPORTED BY:
21    Vickie Blair
22    CSR No. 8940, RPR-CRR
23    JOB NO. 5164336
24
25    PAGES 1 - 220
```

Page 1

CONFIDENTIAL

| | | |
|---|---|---|
| 1 | assign his copyright to the "Reasonable Doubt" cover | 14:53:01 |
| 2 | photo for a million dollars, to assign that copyright | 14:53:05 |
| 3 | to Mr. Carter? | 14:53:08 |
| 4 | MR. BONFIGLI:  Objection. | 14:53:09 |
| 5 | THE WITNESS:  See, that's where I got | 14:53:11 |
| 6 | confused, is whether he thought it was giving up the | 14:53:13 |
| 7 | copyright to one photo or the -- just the right to sell | 14:53:17 |
| 8 | copies of the photo, and he would retain the copyright. | 14:53:20 |
| 9 | And even after reading it a couple times, | 14:53:24 |
| 10 | I still found it confusing, so it's hard -- I really | 14:53:32 |
| 11 | can't answer the question.  I'm not sure. | 14:53:34 |
| 12 | BY MR. LOH: | 14:53:37 |
| 13 | Q    So I want -- and I appreciate that | 14:53:37 |
| 14 | honesty, I really do, and, look, I'm not making a | 14:53:41 |
| 15 | representation about the clarity of the communication, | 14:53:44 |
| 16 | let's being clear; okay? | 14:53:46 |
| 17 | A    I can understand that. | 14:53:48 |
| 18 | Q    Now -- but what I do want to ask you is | 14:53:50 |
| 19 | that, in terms of using those communications to try to | 14:53:53 |
| 20 | infer Mr. Mannion's valuation of the photograph, I just | 14:53:57 |
| 21 | want to make sure that we have a clear conversation | 14:54:00 |
| 22 | about that. | 14:54:03 |
| 23 | Was Mr. Mannion's conception of how much | 14:54:07 |
| 24 | the photo was worth based on what he thought the value | 14:54:10 |
| 25 | of the copyright was or what the value of the name, | 14:54:13 |

Page 201

CONFIDENTIAL

| | | |
|---|---|---|
| 1 | image, and likeness were? | 14:54:16 |
| 2 | A     Oh. | 14:54:17 |
| 3 | MR. BONFIGLI:   Objection. | 14:54:17 |
| 4 | THE WITNESS:   It seemed to me that | 14:54:17 |
| 5 | Mr. Mannion felt he would receive a million dollars, | 14:54:22 |
| 6 | not for the copyright, but just for not being able to | 14:54:25 |
| 7 | sell it, not being able to sell the photos. | 14:54:29 |
| 8 | In other words, "All right, to not sell | 14:54:32 |
| 9 | the one photo, I guess I could take a million bucks." | 14:54:33 |
| 10 | So that's what I'm saying, he saw seven | 14:54:37 |
| 11 | figure value in just one photo. | 14:54:40 |
| 12 | So I felt that really confirmed my own -- | 14:54:42 |
| 13 | I didn't rely on that in any way to come up with my | 14:54:46 |
| 14 | numbers, to me, it's just in reading those, yeah, that | 14:54:50 |
| 15 | confirms my opinion. | 14:54:54 |
| 16 | But, again, I think he felt he would just | 14:54:55 |
| 17 | give up very nominal rights, not copyrights, just | 14:54:58 |
| 18 | nominal rights for which he'd get a million dollars for | 14:55:02 |
| 19 | each photo. | 14:55:05 |
| 20 | BY MR. LOH: | 14:55:06 |
| 21 | Q     Let me ask you this:  Let me change the | 14:55:06 |
| 22 | facts a little bit, and, again, I'm not here to contest | 14:55:10 |
| 23 | your understanding.  I appreciate you telling me what | 14:55:10 |
| 24 | you understood. | 14:55:14 |
| 25 | A     Well, I'm not totally -- I don't really | 14:55:14 |

Page 202

CONFIDENTIAL

DECLARATION

        I, JON ALBERT-LEVY, hereby declare that I
am the deponent in the within matter; that I have read
the foregoing deposition and know the contents thereof,
and I declare that the same is true of my knowledge,
except as to the matters which are therein stated.

        I certify under penalty of perjury of the
laws of the State of California that the foregoing is
true and correct.

        Executed this _____ day of_____,
2022, at _____, _____.

                          _____

                          JON ALBERT-LEVY

                                                    Page 216

CONFIDENTIAL

```
1    STATE OF CALIFORNIA      )

2                             )  ss.

3    COUNTY OF LOS ANGELES    )

4            I, Vickie Blair, CSR No. 8940, RPR-CRR, in

5    and for the State of California, do hereby certify:

6            That, prior to being examined, the witness

7    named in the foregoing deposition was by me duly sworn

8    to testify as to the truth, the whole truth, and

9    nothing but the truth;

10            That said deposition was taken before me

11   at the time and place therein set forth, and was taken

12   down by me stenographically and thereafter transcribed

13   via computer-aided transcription under my direction and

14   is a true record of the testimony given;

15            I further certify I am neither counsel

16   for, nor related to, any party to said action, nor

17   interested in the outcome thereof;

18            IN WITNESS WHEREOF, I have hereto

19   subscribed my name this 8th day of April, 2022.

20

21

22

23

24

25            Vickie Blair, CSR No. 8940, RPR-CRR
```

Page 217

# Exhibit G

Excerpt from Deposition Exhibit 134

## SETTLEMENT AGREEMENT AND
## COPYRIGHT ASSIGNMENT

This SETTLEMENT AGREEMENT AND COPYRIGHT ASSIGNMENT (the "**Agreement**"), dated as of [DATE], is made between Jonathan Mannion ("**Mannion**"), an individual with an address of 152 East 23rd Street, 6th Floor, New York, NY 10010, and S. Carter Enterprises, LLC ("**SCE**"), a Delaware limited liability company, c/o RocNation, 540 W. 26th Street, New York, NY 10001, the receiver of certain intellectual property assets of Mannion.

WHEREAS, Sean Carter, p/k/a Jay-Z ("**Carter**") and/or Carter's past and/or present professional representatives (including any agents, managers, record labels, press and/or communications representatives and/or similar business representatives, including without limitation Roc Nation LLC, Roc-A-Fella Records, Inc. and Priority Records, LLC; together, the "**Carter Parties**"), for Carter's benefit commissioned Mannion to produce certain photographs of Carter;

WHEREAS, SCE has asserted that Mannion's registration and/or use of certain photographs and/or Carter's likeness therein has exceeded the scope of Mannion's rights with respect thereto and/or has infringed SCE's, the Carter Parties', and/or Carter's rights therein;

WHEREAS, Mannion does not agree with SCE's assertions, but wishes to resolve this matter amicably with SCE, without any need for litigation or legal process, and with SCE having the undisputed right to display, reproduce, distribute, transmit, adapt and prepare derivative works of, perform (publicly and otherwise), and exploit in any manner the intellectual property in question and as more fully set forth in this Agreement, free and clear of any potential claim by Mannion.

NOW, THEREFORE, in consideration of the mutual obligations set forth below, and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, Mannion and SCE agree as follows:

1.      <u>Assignment</u>. Mannion hereby irrevocably conveys, transfers, and assigns to SCE, and SCE hereby accepts, all of Mannion's right, title, and interest in and to the following (the "**Assigned Copyrights**"), including without limitation:

(a)      the copyrights in and to each and every photograph produced by Mannion of or including Carter, or at Carter's or any Carter Party's direction (the "**Carter Photos**"), including without limitation those works set forth on <u>Schedule 1</u> hereto (as such schedule may be updated from time to time) and all issuances, extensions, and renewals thereof;

(b)      any and all rights of any kind whatsoever of Mannion with respect to the Assigned Copyrights accruing under the copyright and other applicable laws of the United States, the individual states thereof and jurisdictions foreign thereto, by international treaties and conventions, and otherwise throughout the world, including without limitation the exclusive rights of reproduction, distribution, display, performance, and/or adaptation of all works embodying the Assigned Copyrights in any and all media now existing or developed after the date of this Agreement, throughout the universe, including without limitation in digital media and non-fungible tokens;

**Exhibit 134**

CARTER0002478

# Exhibit H

Excerpts from the March 2, 2022
Deposition of Leonard Santiago

```
 1              UNITED STATES DISTRICT COURT
 2            FOR THE DISTRICT OF CALIFORNIA
 3
 4
 5      _____
                                )
 6      SHAWN CARTER, also known )
        as JAY-Z,                )
 7                               )
                 Plaintiff,      )
 8                               )
            vs.                  ) Civil Action No.
 9                               ) 2:21-cv-04848-PA-KS
        JONATHAN MANNION,        )
10      et al.,                  )
                                 )
11               Defendants.     )
        _____ )
12
13
14
15      VIDEOTAPED DEPOSITION OF LEONARD SANTIAGO
16               Hackensack, New Jersey
17             Wednesday, March 2, 2022
18                     Volume I
19
20
21
22      Reported by:
        LORI M. BARKLEY
23      CSR No. 6426
24      Job No. 5080100
25      PAGES 1 - 211
```

                                        Page 1

```
 1        Q.   You said "I personally don't think it's      13:36:57

 2    worth a war or some sort," correct?                    13:36:59

 3        A.   Yeah.                                          13:37:02

 4        Q.   And I take it by "war" you meant legal        13:37:02

 5    battle?                                                 13:37:04

 6        A.   Yes.   From my conversation with Jonathan and 13:37:05

 7    Uri, more, more so Uri, he mentioned that he was       13:37:09

 8    ready to go -- to go to legal with this, if it         13:37:14

 9    didn't -- and he said if that's -- if that's what      13:37:20

10    happens, then that's just what it's -- you know,       13:37:23

11    whatever, we're prepared for it, or that's what it's   13:37:25

12    going to be or something along those lines.            13:37:28

13            It was a phone conversation.  So that was      13:37:29

14    on -- he said that, he mentioned it.  I would never    13:37:32

15    mention that to Jonathan, like, just Jonathan and I    13:37:35

16    talking, we don't even come from a place like that.    13:37:38

17            So this came from his manager, so it's like,   13:37:42

18    oh, wow, like and I'm now talking to Jonathan after,   13:37:44

19    like, this -- is this worth going to, like, a legal    13:37:48

20    war or a battle, like this what?                       13:37:51

21            This is from a conversation with his manager   13:37:54

22    who said he was prepared for it.  I never called Uri   13:37:57

23    or stated or mentioned legal was going -- you know,    13:38:02

24    was going to come out, like never.  I was in this to   13:38:05

25    avoid legal.                                           13:38:09
```

Page 157

1          I declare under penalty of

2     perjury under the laws of the State

3     of California that the foregoing is

4     true and correct.

5          Executed on _____, 2022, at

6     _____, _____.

7

8

9

10        _____

11              SIGNATURE OF WITNESS

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                   Page 207

```
 1    STATE OF CALIFORNIA        ) ss.
 2    COUNTY OF LOS ANGELES      )
 3
 4          I, Lori M. Barkley, CSR No. 6426, do hereby
 5    certify:
 6          That the foregoing deposition testimony
 7    taken before me at the time and place therein set
 8    forth and at which time the witness was administered
 9    the oath;
10          That the testimony of the witness and all
11    objections made by counsel at the time of the
12    examination were recorded stenographically by me, and
13    were thereafter transcribed under my direction and
14    supervision, and that the foregoing pages contain a
15    full, true and accurate record of all proceedings and
16    testimony to the best of my skill and ability.
17          I further certify that I am neither counsel
18    for any party to said action, nor am I related to any
19    party to said action, nor am I in any way interested
20    in the outcome thereof.
21          IN WITNESS WHEREOF, I have subscribed my
22    name this 6th day of March, 2022.
23
24
25          LORI M. BARKLEY, CSR No. 6426
```

Page 208

# Exhibit I

Excerpts from the March 10, 2022
Deposition of Uri Davidov

CONFIDENTIAL

```
 1              UNITED STATES DISTRICT COURT
 2              CENTRAL DISTRICT OF CALIFORNIA
 3
 4
    _____
 5                                  )
    SHAWN CARTER, also known as    )
 6  JAY-Z, an individual,          )
                                    )
 7           Plaintiff,            )
                                    )  Case No. 2:21-cv-04848-PA-KS
 8        vs.                      )
                                    )
 9  JONATHAN MANNION, an           )
    individual, and JONATHAN       )
10  MANNION PHOTOGRAPHY LLC, a     )
    New York limited liability     )
11  company,                       )
                                    )
12           Defendants.           )
    _____)
13
14
15
16              ** CONFIDENTIAL **
17      REMOTE VIDEOTAPED DEPOSITION OF URI DAVIDOV
18             Thursday, March 10, 2022
19                  Volume I
20
21  Reported by:
    NADIA NEWHART
22  CSR No. 8714
23  Job No. 5123942
24  PAGES 1 - 165
25
```

                                            Page 1

CONFIDENTIAL

```
 1        Q    Was he surprised that he was sued, or did he
 2   expect that there was a lawsuit coming?
 3        A    I think there were several threats made of --
 4   of Mr. Carter suing, so I think -- but I think we're
 5   all kind of expecting it, every conversation we had      10:15:02
 6   with -- with just about every person threatened to
 7   sue.
 8        Q    And who would those individuals be that
 9   threatened to sue?
10        A    Robert and -- and Lenny.                        10:15:18
11        Q    Robert being an attorney from Pryor Cashman?
12        A    Yes.
13        Q    Okay.  What do you recall about the nature of
14   those threats?  Strike that.
15             What do you recall about those threats?        10:15:36
16        A    You know, in -- in both conversations, we
17   were talking about licensing content, and when --
18   when, you know, either Robert or Lenny didn't like
19   where the conversation was going or the negotiation
20   was going, they threatened to sue.                       10:16:05
21        Q    Uh-huh.  Okay.  I'm going to talk about
22   your -- I want to talk about your personal
23   background briefly and your professional background
24   after that.
25             Can you tell me where you grew up.             10:16:21
```

Page 20

CONFIDENTIAL

```
 1            And -- and -- and when we -- I mean, the
 2      conversation was -- was literally less than five
 3      minutes.  So I remember when -- when he didn't get
 4      the answer that I believe he was hoping for, he
 5      threatened to sue.                              10:46:38
 6         Q   And -- and what do you remember about that
 7      threat to sue?
 8         A   That he -- he just threatened to sue.  It was
 9      kind of like, you know, you're -- you're not going
10      to give us this, so we're going to sue you and get  10:46:59
11      it anyway.  And that was pretty much the way Lenny's
12      conversation also -- I would describe it as.
13         Q   Do you recall that you discussed in this
14      conversation the fact that Mr. Mannion had been
15      licensing the rights to these photographs for media  10:47:21
16      entities?
17         A   I don't think he used the word "media."
18         Q   No.  I -- I'm asking you if you had discussed
19      with him the fact that Mr. Mannion had been
20      licensing the pho- -- the rights to the photographs  10:47:41
21      for media.
22         A   Again, I -- I don't think he used the word
23      "media."
24         Q   Okay.  I mean, I'm asking you what you
25      discussed with him, not what Bobby told you.        10:47:55
```

Page 37

CONFIDENTIAL

```
 1    would you?

 2        A   I -- I don't think that question came up.

 3        Q   Uh-huh.  You didn't tell him that you knew

 4    you didn't have the right to -- to license

 5    merchandise?                                          10:49:20

 6        A   Again, that didn't come up.

 7        Q   Wasn't that a concern of his?

 8        A   No.  I think he -- he -- what -- the concern

 9    he had was Jonathan selling gallery prints.  And --

10    and my response was, every photographer in the world  10:49:37

11    does that.  That's the only thing we discussed.

12        Q   And what do you remember him saying about his

13    concern with Mr. Mannion selling gallery prints?

14        A   Well, when -- when the conversation kind of

15    went south and he didn't like what I was saying,       10:49:52

16    that's when he brought it up and said that he was

17    going to sue because of that, because of selling

18    prints.  I said, "Every photographer in the world

19    does that."

20            But then, I remember specifically kind of      10:50:07

21    getting him to back off and saying, "Listen, we

22    don't need to -- we don't -- you don't need to

23    threaten us.  We're -- we're trying to work this

24    out.  Let's continue to stay professional, and --

25    and, you know, there's no need for threats."           10:50:24
```

Page 39

CONFIDENTIAL

1     And -- and that's pretty much when the

2  conversation ended.  I -- I knew that it wasn't

3  really going anywhere.

4     Q   And -- and this threat to sue concerned the

5  sale of prints by Mr. Mannion, correct?                10:50:38

6     A   I -- I don't know, you know, what it

7  concerned.  It was -- it was a threat, and I -- and

8  that was -- that was pretty much when the

9  conversation ended.

10     Q   But you understood that Bobby felt that the    10:50:53

11  sale of prints needed to stop, correct?

12     A   No.

13         MR. LOH:  Objection; foundation.

14         Go ahead.

15         THE WITNESS:  No, I did not say that.          10:51:02

16  BY MR. STRUBLE:

17     Q   You felt Bobby was okay with you selling

18  prints of Mr. Carter?

19     A   He -- he didn't tell me to stop.  He just

20  said, "We're going to sue."  And...                   10:51:13

21     Q   If someone tells you that they're going to

22  sue relating to the sale of prints, in your mind,

23  that doesn't mean --

24     A   I mean, I would --

25     Q   -- that you need to stop -- sir, don't         10:51:23

Page 40

CONFIDENTIAL

```
 1              (Technical difficulty.)

 2      BY MR. STRUBLE:

 3          Q   Was there an answer?

 4          A   Oh, I'm sorry.  What was the question?

 5          Q   Do you have any notes of that conversation?    01:32:18

 6          A   No.  We were -- Mr. Santiago and I were --

 7      were texting.

 8          Q   Uh-huh.  And you believe that there is a text

 9      message where Mr. Santiago suggested just talking

10      about the cover shoot?                                 01:32:36

11          A   No.  I mean, at the end of the -- or towards

12      the end of the negotiation, there were several calls

13      between myself and Mr. Santiago.  And towards the

14      end of the negotiation, we had agreed to deal terms

15      which were for just one image.  And I believe there    01:32:53

16      was a text message that we shared with you.

17          Q   Uh-huh.  But you understand that Mr. Santiago

18      doesn't remember things that way, correct?

19          A   I understand that.  And when we received the

20      agreement and saw that it was -- that the agreement    01:33:10

21      said that it was more than just a cover art and it

22      referred to several -- several shoots, not just the

23      one Reasonable Doubt shoot, I called Mr. Santiago

24      right away and -- and told him that this was -- that

25      was not what we discussed, and he was backpedaling     01:33:35
```

Page 125

CONFIDENTIAL

```
1    quite honestly.
2          And he said -- and he said, "Well, you know,
3    all the other things that -- that we said no to,
4    like the NFTs or -- or the -- the prints with the
5    signatures, that's back on the table.  Let's just --    01:33:50
6    let's just make this happen."
7          And -- and I said, "Well, that's not what we
8    discussed."
9          And at the end of the conversation -- and I
10   remember this very clearly -- he said, "Trust me,     01:34:09
11   you want to do this, because I've seen this happen
12   before."  And he was referring to -- and he's --
13   he's mentioned it throughout the conversations,
14   that -- that Jay-Z was -- or Mr. Carter, rather,
15   would -- would sue.                                    01:34:28
16         And -- and I told him, "I can't -- I can't --
17   you know, I can't do anything on this end because
18   the entire shoot is not for sale."
19         (Ms. Hsia joined the proceedings.)
20         MR. STRUBLE:  I think we lost him.                01:34:50
21         MR. LOH:  Okay.  I guess we're all here, but
22   Mr. Davidov is having connection issues.
23         MR. STRUBLE:  Off the record.
24         MR. LOH:  Off the record.
25         THE VIDEOGRAPHER:  We're going off the            01:35:05
```

Page 126

CONFIDENTIAL

```
 1     record.  The time is 1:35.

 2             (Recess.)

 3             (Record read.)

 4             THE VIDEOGRAPHER:  We are back on the record.

 5     The time is 1:37 p.m.                              01:37:34

 6             THE WITNESS:  Okay.  So should I just

 7     continue?

 8     BY MR. STRUBLE:

 9        Q    Were -- had you finished your answer --

10        A    No.                                        01:37:43

11        Q    -- Mr. Davidov?

12             Please continue.

13        A    So I told him it wasn't for sale, but we

14     did -- you know, I did discuss it with Jonathan and

15     if -- and we had -- we had discussed a $20 million  01:37:55

16     number.  I remember this distinctly at the end of

17     the conversation, that he -- that he kept saying,

18     "You don't want to go there," referring to, you

19     know, not making this deal.

20             And -- and he had mentioned in the past     01:38:12

21     that -- that, you know, that, Mr. Carter had sued

22     others in the past and -- and that we would just be

23     like another one that he would sue over this.  And,

24     you know, when -- when I said, "I'm sorry, you know,

25     this is not what we discussed," his response was,    01:38:26
```

Page 127

CONFIDENTIAL

1    and I quote, "We just got it for cheaper," meaning

2    that they were going to sue and -- and get it for

3    whatever the lawsuit costs.

4        Q   Was this a text message?

5        A   No.  It was a conversation.  It was our last      01:38:44

6    conversation.

7        Q   Uh-huh.  And so, you know, when this alleged

8    threat to sue happened, how did you respond to him?

9        A   I didn't.  That was the end of the

10   conversation.                                             01:39:04

11       Q   Was there --

12       A   I said, "I'm sorry -- I'm sorry that you feel

13   that way, but we are -- we're still willing to work

14   this out and negotiate in good faith."

15       Q   Didn't you tell him that you would take it       01:39:17

16   on, see you in court?

17       A   No.

18       Q   Nothing to that effect?

19       A   No.  I would -- I would never say something

20   like that, because I -- I mean, first of all, I have     01:39:29

21   no authority to say that, but I would never say

22   anything like that.

23       Q   Uh-huh.  And you said that you had told him

24   that the entire shoot was never for sale but, in

25   fact, it was, sir, wasn't it?                            01:39:50

                                                   Page 128

CONFIDENTIAL

1

2

3

4          I, URI DAVIDOV, do hereby declare under

5     penalty of perjury that I have read the foregoing

6     transcript; that I have made any corrections as

7     appear noted, in ink, initialed by me, or attached

8     hereto; that my testimony as contained herein, as

9     corrected, is true and correct.

10          EXECUTED this _____ day of _____,

11     20_____, at _____, _____.
                         (City)                    (State)

12

13

14

15          _____
                       URI DAVIDOV

16                     Volume I

17

18

19

20

21

22

23

24

25

                                        Page 163

CONFIDENTIAL

1          I, the undersigned, a Certified Shorthand

2     Reporter of the State of California, do hereby

3     certify:

4          That the foregoing proceedings were taken

5     before me at the time and place herein set forth;

6     that any witnesses in the foregoing proceedings,

7     prior to testifying, were administered an oath; that

8     a record of the proceedings was made by me using

9     machine shorthand which was thereafter transcribed

10    under my direction; that the foregoing transcript is

11    a true record of the testimony given.

12         Further, that if the foregoing pertains to the

13    original transcript of a deposition in a Federal

14    Case, before completion of the proceedings, review

15    of the transcript [X] was [ ] was not requested.

16         I further certify that I am neither financially

17    interested in the action nor a relative or employee

18    of any attorney or any party to this action.

19         IN WITNESS WHEREOF, I have this date subscribed

20    my name.

21

22    Dated: March 15, 2022

23

24                        _____

                          NADIA NEWHART

25                        CSR NO. 8714

                                           Page 164