QUINN EMANUEL URQUHART
  & SULLIVAN, LLP
Alex Spiro (*pro hac vice*)
  alexspiro@quinnemanuel.com
Cory D. Struble (*pro hac vice*)
  corystruble@quinnemanuel.com
51 Madison Avenue, 22nd Floor
New York, New York 10010
Telephone:  (212) 849-7000
Facsimile:   (212) 849-7100

Robert M. Schwartz (Bar No. 117166)
  robertschwartz@quinnemanuel.com
Dylan C. Bonfigli (Bar No. 317185)
  dylanbonfigli@quinnemanuel.com
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017-2543
Telephone:  (213) 443-3000
Facsimile:   (213) 443-3100

*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| SHAWN CARTER, also known as JAY-Z, an individual, <br><br> Plaintiff, <br><br> v. <br><br> JONATHAN MANNION, an individual, and JONATHAN MANNION PHOTOGRAPHY LLC, a New York limited liability company, <br><br> Defendants. | Case No.  2:21-cv-04848-PA-KS <br><br> **PLAINTIFF'S MOTION IN LIMINE NO. 1 (COPYRIGHT); DECLARATION OF DYLAN C. BONFIGLI** <br><br> The Honorable Percy Anderson <br><br> Date:       July 11, 2022 <br> Time:       1:30 p.m. <br> Courtroom: 9A <br><br> Trial Date:  July 19, 2022 |

## REDATED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

**TO THE COURT, ALL PARTIES, AND THEIR COUNSEL OF RECORD:**

PLEASE TAKE NOTICE that on July 11, 2022, at 1:30 p.m. or as soon as the matter may be heard, in Courtroom 9A of the above-titled Court, located at 350 W. 1st Street, Los Angeles, California 90012, Plaintiff Shawn Carter will, and hereby does, move in limine for an order excluding any argument, testimony, or evidence regarding Defendants' claim that Defendant Mannion is the owner of the copyright in photos of Jay-Z, including any assertions that Defendants granted copyright licenses to Plaintiff or nonparties.

This motion is based on the grounds that the question of whether Defendant Mannion owns any interest in the copyright to any photograph, and any issues related to any such copyright interest, are not relevant to any claim or defense in this right-of-publicity case, *see* Fed. R. Evid. 401, 402, and will serve only to confuse the fact-finder and prejudice Plaintiff.  *See* Fed. R. Evid. 403.

The documentary evidence subject to this motion includes: JX-14, JX-232, JX-238, JX-241, JX-242, JX-243, JX-244, JX-245, JX-246, JX-247, JX-248, JX-249, JX-250, JX-275, JX-277, JX-278, JX-301.

The deposition evidence includes: Kempler Tr. 25:6-26:4, 26:17-27:17, 45:23-45:25, 46:2-46:5, 51:6-51:12, 52:8-24, 54:25-55:8, 58:15-20, 55:21-56:15, 57:16-25, 58:2-22, 59:10-20; 60:6-9, 62:23-25, 63:5-22, 63:23-64:15, 65:1-12, 66:3-7, 67:24-68:17, 70:10-70:12, 72:1-21, 76:1-18, 77:25-78:2, 78:9-20, 79:10-14, 79:16-79:22, 80:22-81:5, 81:19-82:2, 81:19-83:10, 81:19-82:2, 83:18-22, 83:23-84:5, 84:9-13, 84:14-20, 84:21-85:5, 85:7-18, 88:7-89:5, 89:6-90:6, 90:25-91:17, 91:20-92:1, 92:13-93:1, 105:21-106:10, 106:15-106:23, 108:5-108:10, 110:4-110:14; and Patrick Tr. 29:11-15, 30:10-31:20, 34:13-35:25, 40:3-41:12, 42:14-24; 43:1-16, 44:4-45:10, 46:21-47:19, 50:11-23, 51:1-52:25, 53:1-5, 53:13-24, 54:9-15, 54:16-57:15, 57:17-58:4, 58:5-60:25, 61:22-62:1, 61:2-6, 66:10-20, 71:10-12, 71:19-72:1.

1     This motion is based on this notice; the memorandum of points and
2  authorities; the declaration of Dylan C. Bonfigli; all pleadings, records, and papers
3  on file in this action; such other matters of which this Court may take judicial
4  notice; and upon such other evidence and oral argument as may be considered by the
5  Court before or at the hearing on this application.
6     This motion is made following a conference of counsel pursuant to Local
7  Rule 7-3 and Section II.B of this Court's Civil Trial Scheduling Order (ECF No.
8  52), which took place on May 20, 2022.
9
10  DATED:  June 17, 2022              QUINN EMANUEL URQUHART
11                                        & SULLIVAN, LLP
12
13                                 By /s/ Robert M. Schwartz
                                      Alex Spiro (*pro hac vice*)
14                                      Robert M. Schwartz
                                        Cory D. Struble
15                                      Dylan C. Bonfigli
16                                      *Attorneys for Plaintiff*
17
18
19
20
21
22
23
24
25
26
27
28

# **TABLE OF CONTENTS**

**Page**

I.    PRELIMINARY STATEMENT ................................................................. 1

II.   THE COURT SHOULD EXCLUDE EVIDENCE AND ARGUMENT
      REGARDING DEFENDANTS' CLAIM TO COPYRIGHT IN THE
      PHOTOS OF THE PLAINTIFF ............................................................ 1

III.  CONCLUSION ......................................................................................... 4

DEFENDANTS' OPPOSITION ........................................................................ 5

I.    INTRODUCTION .................................................................................... 5

II.   RELEVANT BACKGROUND ................................................................ 5

      A.    Defendants' Photographs of Plaintiff .......................................... 5

      B.    Apartment 4B ............................................................................... 6

      C.    The Pre-Litigation Negotiation .................................................... 7

      D.    This Lawsuit ................................................................................. 8

      E.    Discovery Concerning Island Def Jam ....................................... 9

III.  THIS MOTION VIOLATES THE FOUR-MOTION LIMIT ................. 10

IV.   LICENSING AND APARTMENT 4B ARE RELEVANT ...................... 10

V.    EVIDENCE OF DEFENDANTS' COPYRIGHTS IS NEEDED ............ 11

VI.   CONCLUSION ....................................................................................... 12

PLAINTIFF'S REPLY .................................................................................... 13

      A.    Plaintiff's motion does not violate the four-motion limit. ......... 13

      B.    Defendants licensing of copyrights does not show consent. ...... 14

      C.    Plaintiff did not place copyright licensing at issue. .................. 14

      D.    Defendants' "laches" argument is moot. .................................... 15

      E.    Plaintiff will present evidence of copyright ownership only to
            rebut Defendants' assertions of copyright ownership. .............. 15

CONCLUSION ............................................................................................... 16

DECLARATION OF DYLAN C. BONFIGLI ................................................ 17

ATTESTATION STATEMENT ...................................................................... 20

# TABLE OF AUTHORITIES

**Page**

## CASES

*Danjaq LLC v. Sony Corp.*,
    263 F.3d 942 (9th Cir. 2001) ................................................................ 11

*Downing v. Abercrombie & Fitch*,
    265 F.3d 994 (9th Cir. 2001) ................................................................ 10

*Galindo v Tassio*,
    2014 WL 12693525 (N.D. Cal. June 19, 2014) ........................................ 2

*In re NCAA Student-Athlete Name & Likeness Licensing Litig.*,
    990 F. Supp. 2d 996 (N.D. Cal. 2013) ................................................ 1, 14

*Jones v. Corbis Corp.*,
    815 F. Supp. 2d 1108 (C.D. Cal. 2011) ................................................ 10

*Muirbrook v Skechers USA Inc.*,
    CV 12-8762 GAF PLAX, 2012 WL 5456402 (C.D. Cal. Nov. 6, 2012) ........ 1

---

I.    **PRELIMINARY STATEMENT**

Plaintiff Shawn Carter, p/k/a Jay-Z, moves to exclude any argument, testimony, or evidence regarding Defendants' claim that Defendant Mannion is the owner of the copyright in photos of Jay-Z, including any assertions that Defendants granted copyright licenses to Plaintiff or nonparties.  The question of whether Defendant Mannion owns any interest in the copyright to any photograph, and any issues related to any such copyright interest, are not relevant to any claim or defense in this right-of-publicity case.  Evidence regarding copyright ownership and licensing will serve only to confuse the fact-finder and prejudice Plaintiff.

Such evidence would also require a distracting and prejudicial trial-within-a-trial regarding whether Mannion actually owns any copyrights, as he cannot satisfy his burden of proving he does and Defendants' evidence establishes a pattern and practice of transferring copyright to Plaintiff's former record label, Def Jam.

II.    **THE COURT SHOULD EXCLUDE EVIDENCE AND ARGUMENT REGARDING DEFENDANTS' CLAIM TO COPYRIGHT IN THE PHOTOS OF THE PLAINTIFF**

This is a right-of-publicity case alleging statutory and common law claims of misappropriation of Jay-Z's name, image, and likeness ("NIL").  There are no claims for copyright infringement.  Whether Mannion, Jay-Z, or Jay-Z's record label own the copyrights in the photos at issue has no bearing on whether Mannion violated Jay-Z's right of publicity.  "[T]he rights [of publicity] [Jay-Z] seek[s] to assert in the present case are fundamentally different from those protected by the Copyright Act."  *In re NCAA Student-Athlete Name & Likeness Licensing Litig.*, 990 F. Supp. 2d 996, 1008 (N.D. Cal. 2013); *Muirbrook v Skechers USA Inc.*, CV 12-8762 GAF PLAX, 2012 WL 5456402, at *1 (C.D. Cal. Nov. 6, 2012) ("The issue here is not ownership of the photographs—Plaintiff claims none—or Defendants' alleged use of any copyrighted material owned by Plaintiff.  Rather, this lawsuit focuses on the misappropriation of Plaintiff's right of publicity and control over the

use of his likeness."). Indeed, Defendants themselves initially sought to exclude evidence pertaining to copyright ownership, contending that copyright is "a different right entirely" from the right of publicity, and that "[t]here is a significant risk that the jury would confuse" the two. (Bonfigli Dec. Ex. B at 4.)

Allowing evidence of copyright ownership will risk confusing issues and will prejudice Plaintiff. The factfinder could be misled into believing that ownership of copyright carries legal significance when it does not. The pertinent inquiry is whether Mannion used Jay-Z's NIL without his permission. The copyright status of the photos at issue plays no role in that analysis.

Were Mannion allowed to introduce evidence that he was the copyright owner, that evidence would necessarily be subject to rebuttal evidence demonstrating that he is not. For instance, the record is clear that Mannion and Jay-Z's record label, Def Jam, had a pattern and practice of entering into a standard template agreement whereby Mannion agreed that all copyrights in promotional photos taken of Jay-Z belonged to Def Jam. (E.g., Bonfigli Dec. Exs. F at 2.) Def Jam's lawyer at the time testified that, as a matter of routine practice, photography agreements were not subject to negotiation and that it would have been "a poorly received anomaly" if Def Jam had hired Mannion without having the standard agreement in place. (Kempler Tr. [Bonfigli Dec. Ex. C] 101:9-14.) Allowing irrelevant evidence concerning copyright will therefore necessarily require "a mini trial within a trial" that "risks confusion of the issues, misleading the jury, and waste of time." *Galindo v Tassio*, 2014 WL 12693525, at *2 (N.D. Cal. June 19, 2014).

This motion also encompasses any evidence that Mannion purported to grant licenses to copyrights in photos of Jay-Z to nonparties or Jay-Z or his companies. Whether Mannion did so is similarly irrelevant to the issues in dispute for the reasons stated above, and as Plaintiff has made clear to Defendants, he does not seek redress for such licensing of copyrights. ECF No. 94 at 26 n.5 ("Jay-Z does not seek to prevent Mannion from licensing the copyrights to any photos.").

1    Evidence of Mannion's copyright licensing includes not only the license

2  agreements themselves but any evidence pertaining to, for example, Mannion's

3  licensing of copyrights to Kareem Burke.  That Burke used the Jay-Z photos in

4  connection with an event (called "Apartment 4B") to celebrate the 25th anniversary

5  of the *Reasonable Doubt* album's release does not bear on the statute of limitations.

6  Burke's uses of Jay-Z's NIL, in the absence of a license from Mannion to use Jay-

7  Z's NIL, is not probative of whether Jay-Z knew Mannion was exploiting Jay-Z's

8  NIL.  In fact, it proves the opposite.  ████████████████████████████

9  ██████████████████████████████████████████████

10 ████████████████████████████████████████

11 ██████████████████████████████████████████████

12 ██████████████████████████████████████████████

13 ██████████████████████████████████████████████

14 ██████████████████████████  Moreover, the record is clear that

15 Jay Z did not object to Burke—a Jay-Z friend and at times business partner—

16 making limited use of his NIL in connection with the 25th anniversary celebration of

17 *Reasonable Doubt*.  (Perez Tr. [Bonfigli Dec. Ex. D] 122:13-23 ("Jay definitely

18 approved for [Burke] to do whatever [he] was doing," including "the Apartment 4B

19 show")].)

20    Nor do any other licenses support Mannion's statute of limitations defense.

21 ██████████████████████████████████████████████

22 ██████████████████████████████████████████████

23 ████████████████████████████████████████

24 ██████████████████████████████████████████

25 ██████████████████████████████████████████

26 ████████████████████████████████████████

27 ████████████████████████████████████████  So, to the

28 extent Plaintiff had access to these agreements, nothing about them would have put

Plaintiff on notice that Mannion was exploiting his NIL.  Similarly, to the extent Mannion granted copyright licenses to Jay-Z or his companies, that too is irrelevant to the statute of limitations because Mannion cannot explain why that activity would put Jay-Z on notice that Mannion was exploiting his NIL in sales of prints and merchandise.

## III.   <u>CONCLUSION</u>

The Court should exclude any argument, testimony, or evidence regarding Defendants' claim that Defendant Mannion is the owner of the copyright in photos of Jay-Z, including any assertions that Defendants granted copyright licenses to Plaintiff or nonparties.

# DEFENDANTS' OPPOSITION

## I.   INTRODUCTION

Plaintiff's Motion in Limine No. 1 should be denied in its entirety. As an initial matter, Plaintiff has ignored the Civil Trial Scheduling Order's limitation of four motions in limine per side. Plaintiff is filing three other motions in limine. And with this Motion, he is shoehorning three distinct categories of evidence—(1) Defendants' ownership of the copyrights in the photographs at issue ("Disputed Photos"); (2) Defendants' licensing of the Disputed Photos to Plaintiff, his related companies, and third parties; and (3) the Apartment 4B event—into Plaintiff's fourth and final motion in limine.s

In any case, those three categories are highly relevant to the lack-of-consent element of Plaintiff's claims, to Defendants' laches defense, and to rebut Plaintiff's contention that he owns the copyrights. Critically, Plaintiff's counsel recently confirmed that he seeks damages from Defendants' licensing activity:

> We are seeking the following relief: . . .
> 2. Damages in the form of: (a) Defendants' revenues from any uses of Plaintiff's NIL, including ***revenues Defendants' received from licensing third parties the right to make any uses of any photograph*** in which Plaintiff's NIL is visible[.]

Miyake Decl. Ex. A (Plaintiff's counsel's June 2, 2022 email) (emphasis added). He cannot argue that licensing, which he put directly at issue, is prejudicial.

Accordingly, this Motion should be denied.

## II.   RELEVANT BACKGROUND

### A.   Defendants' Photographs of Plaintiff

In 1996, Plaintiff, Kareem Burke, and Damon Dash co-founded Roc-a-fella Records. Miyake Decl. Ex. B ("Burke Dep. Tr.") at 29:12-30:12. That year, Roc-a-fella Records released Plaintiff's debut album, Reasonable Doubt. *Id.* at 32:8-14; First Am. Compl. (ECF 15) ¶ 12. Defendant Jonathan Mannion was the photographer at the Reasonable Doubt photoshoot, where he created photographs

1  that would be used for the album. Miyake Decl. Ex. C ("Carter Dep. Tr.") at 87:1-
2  21. The Disputed Photos include three images from the Reasonable Doubt
3  photoshoot. Mannion Decl. in Supp. of Defs.' Mot. in Limine (June 3, 2022) ¶¶ 3-9.
4  Over the years, Mr. Mannion created more photographs of Plaintiff, some of which
5  were used for Plaintiff's other albums. First Am. Compl. ¶ 21.

6        Since 2006, Defendants have openly licensed Mr. Mannion's photographs of
7  Plaintiff to others for a fee. For example, on three occasions from 2006 to 2009,
8  Plaintiff and S. Carter Enterprises, a company that handles Plaintiff's personal
9  affairs, separately licensed or sought a license for some of the Disputed Photos from
10  Defendants. *See* Carter Dep. Tr. at 147:24-149:15; Miyake Decl. Ex. H; Miyake
11  Decl. Ex. D ("Perez Dep. Tr.") at 22:18-25; Mannion Decl. in Supp. Resp. to Pl.'s
12  Mot. in Limine (June 10, 2022) Ex. B. Companies affiliated with Plaintiff—such as
13  Plaintiff's music and management company, Roc Nation—have also licensed or
14  sought licenses from Defendants. Mannion Decl. in Supp. Resp. to Pl.'s Mot. in
15  Limine (June 10, 2022) Ex. C.

16      **B.**    **Apartment 4B**

17        In 2016, Mr. Burke hosted a "pop-up" event at a Los Angeles venue called
18  Apartment 4B to celebrate the 20th anniversary of Reasonable Doubt. Burke Dep.
19  Tr. 87:21-88:5, 96:11-99:10, 109:18-21. He obtained from Defendants prints of
20  photographs from the Reasonable Doubt photoshoot, including several of the
21  Disputed Photos, to display at the event. *Id.* at 108:14-109:17, 110:2-14, 125:23-
22  126:20, 129:1-130:11, Ex. 11; Carter Dep. Tr. 209:19-210:10. Shirts featuring
23  photographs from the Reasonable Doubt photoshoot, which Mr. Burke licensed
24  from Defendants, were sold at the event. Burke Dep. Tr. 96:25-97:21, 131:11-
25  132:24.

26        Plaintiff attended the Apartment 4B event for one to two hours. *Id.* at 113:5-
27  13. He never objected to the prints on display that included some of the Disputed
28  Photos or to the sale of shirts with photographs licensed from Defendants. *Id.* at

113:21-25, 115:4-18; Carter Dep. Tr. 209:19-211:3, Miyake Decl. Ex. J. In fact, Plaintiff saw Mr. Burke wearing one of the shirts and did not object to that use of Defendants' photograph. Burke Dep. Tr. 117:3-118:4; Carter Dep. Tr. 208:12-209:7; Miyake Decl. Ex. I.[1] The reason was that Plaintiff's "thinking of this was Mr. Mannion was -- had the negatives and *was creating images and maybe getting paid*. [Plaintiff] didn't -- [he] would have no reason to send [Mr. Mannion] anything to say stop doing anything." Carter Dep. Tr. 209:8-16 (emphasis added).

In November 2018, Mr. Mannion and Circle of Success, LLC, a different company of Mr. Burke, entered a Confidential Settlement and License Agreement. Bonfigli Decl. Ex. I. This agreement was entered over two years after the Apartment 4B event and has nothing to do with that event. *See id.* In the agreement, however, Mr. Mannion licensed several of the Disputed Photos to Mr. Burke to use on clothing. *Id.* Ex. I ¶ 3.a. & Sched. A. Plaintiff obtained a copy of the agreement and objected to Mr. Burke's use of irrelevant photographs, but not to the use of the Disputed Photos, and Plaintiff never made an objection to Defendants. *See* Miyake Decl. Ex. O; Perez Dep. Tr. 68:17-70:3.

### C. The Pre-Litigation Negotiation

On May 17, 2021, before this action was filed, Plaintiff's lawyer Ryan Klarberg of Pryor Cashman LLP reached out to Defendants to discuss Plaintiff's interest in another "potential licensing arrangement" with Defendants. Miyake Decl. Ex. K; *id.* Ex. E (Davidov Dep. Tr.) at 116:20-117:11. Defendants' licensing agent, Uri Davidov, and Mr. Klarberg negotiated options for Plaintiff to license photographs of Plaintiff from Defendants for five years. *Id.* Ex. K.

---

[1] Exhibits I and J of the Miyake Declaration are screenshots from Joint Exhibit 10, a video that Fourth of November, one of Mr. Burke's companies, put together about the Apartment 4B event. Burke Dep. Tr. 104:11-105:4, 106:7-108:6.

Plaintiff later wanted, instead, to purchase the photographs, and negotiations continued into mid-June 2021. On June 13, 2021, Brad Rose of Pryor Cashman LLP emailed Defendants' representatives because he believed the parties reached a deal for Defendants to sell to Plaintiff the entire Reasonable Doubt portfolio. *See* Perez Dep. Tr. at 225:2-226:1, Ex. 49. But the parties actually disagreed as to what photographs would be sold and the price. Miyake Decl. Ex. G at 1-3; *id.* Ex. F (Santiago Dep. Tr.) at 176:21-186:17. When Defendants refused Plaintiff's terms, Plaintiff concocted this lawsuit and filed it on June 15, 2021. *See id.* Ex. G at 4-5.

### D.   This Lawsuit

Plaintiff contends that he became aware that Defendants were using his name, image, or likeness no earlier than May 2021. Miyake Decl. Ex. N at 8-10 (interrogatory nos. 7-11). His right-of-publicity claims concern the Disputed Photos: (1) the "Got You All in Check" photograph (1995); (2) the Reasonable Doubt cover photograph (1996); (3) the "Beyond a Reasonable Doubt" photograph (1996), also from the Reasonable Doubt photoshoot; (4) the Reasonable doubt slipmat photo (1996), also from the Reasonable Doubt photoshoot; (5) the "Chess Not Checkers" photograph (1998); (6) the "New Blue Yankee" photograph (1998); (7) the "Last Laugh" photograph (2002); and (8) the "Fame Wall" photograph (2021). Mannion Decl. in Supp. of Defs.' Mot. in Limine (June 3, 2022) ¶¶ 3-9.

Plaintiff's purpose in filing this lawsuit is "[t]o make a clear record that [he] own[s] the images." Carter Dep. Tr. 213:14-215:15. As Plaintiff explains:

> I created this -- these works, this imaging, the music, the lyrics. . . .
> How could [Mr. Mannion] own these images? He didn't even understand why these things came to be. . . .
> He couldn't explain them to you, but he'll make -- he'll make claims that -- you know, that these images are his? . . .
> I want the record to show that I own these photographs because I do.

1  *Id.* Despite conceding that no written contract applies to photographs from the

2  Reasonable Doubt photoshoot (*id.* at 99:8-23) and failing to produce in discovery

3  any contract that applies to any of the Disputed Photos, Plaintiff's representatives

4  contend that Mr. Mannion created the photographs under a "work for hire"

5  arrangement (Perez Dep. Tr. 81:11-83:21).

6       The relief that Plaintiff seeks include (1) a permanent injunction barring

7  Defendants from any uses of any photo including Plaintiff's name, image, or

8  likeness, without Plaintiff's permission; (2) damages from Defendants' profits

9  generated from any uses of the Disputed Photographs, including licenses of the

10  copyrights to third parties; and (3) damages based on a hypothetical license fee that

11  Plaintiff contends Defendants would have had to pay to use his name or likeness.

12  *See* Miyake Decl. Ex. A.

13       **E.    Discovery Concerning Island Def Jam**

14       Six photography agreements between Defendants and Island Def Jam ("IDJ

15  Agreements") were produced in this lawsuit. *See* Mannion Decl. in Supp. of Defs.'

16  Mot. in Limine (June 3, 2022) Exs. A-F. None of the IDJ Agreements apply to the

17  Disputed Photos. *Id.* ¶¶ 11-16. No other photography agreement with Island Def

18  Jam has been located and produced in discovery.

19       Jeffrey Kempler was an attorney at Island Def Jam from 2000 to 2004

20  (Miyake Decl. Ex. L ("Kempler Dep. Tr.") at 23:22-24:3), overlapping with none of

21  the Disputed Photos except for the "Last Laugh" photograph. At deposition, Mr.

22  Kempler testified that he did not recall the IDJ Agreements at all, much less what

23  photographs or photoshoots the IDJ Agreements applied to. Kempler Dep. Tr.

24  57:14-25, 63:23-64:9, 70:25-72:16, 78:9-20, 80:22-81:5, 83:23-84:5, 84:21-85:6. He

25  also did not know whether additional contracts between Defendants and Island Def

26  Jam ever existed. *Id.* at 84:21-85:6, 88:7-16. Mr. Kempler made clear that that he

27  "generally ha[s] a lack of recollection about the dealings between Island Def Jam

28  and Jonathan Mannion when it comes to photography agreements." *Id.* at 88:7-16.

### III.   THIS MOTION VIOLATES THE FOUR-MOTION LIMIT

The Motion violates Section II.B.2. of the Civil Trial Scheduling Order, which limits each party to four motions in limine. Plaintiff is separately filing three other motions in limine. This Motion, however, is actually three additional motions, covering (1) Defendants' copyrights in the Disputed Photos; (2) Defendants' licensing the photographs to Plaintiff, his related companies, and third parties; and (3) the Apartment 4B event. Plaintiff should not be permitted to skirt the four-motion limit by shoehorning three distinct categories into a single motion in limine.

### IV.   LICENSING AND APARTMENT 4B ARE RELEVANT

Evidence regarding Defendants' licensing of the Disputed Photos and the Apartment 4B event are relevant to various issues in this lawsuit.

#### 1.   *Plaintiff Has Put Licensing Directly at Issue*

There is no dispute that Defendants' licensing of the Disputed Photos is relevant to Plaintiff's request for damages from Defendants' licensing revenue. *See* Miyake Decl. Ex. A. Having put licensing directly at issue, Plaintiff cannot now contend that the subject would confuse the jury or prejudice him.

#### 2.   *Lack of Consent*

Additionally, Defendants' licensing activity and the Apartment 4B event are relevant to the lack-of-consent element of Plaintiff's right-of-publicity claims. *See Downing v. Abercrombie & Fitch*, 265 F.3d 994, 1001 (9th Cir. 2001) (explaining that common law and Cal. Civ. Code § 3344 right-of-publicity claims require proving lack of consent). "Consent to use a name or likeness need not be express or in writing, but it may be implied from the consenting party's conduct and the circumstances of the case." *Jones v. Corbis Corp.*, 815 F. Supp. 2d 1108, 1113 (C.D. Cal. 2011), *aff'd*, 489 F. App'x 155 (9th Cir. 2012) (finding decades of nonobjection constituted implied consent).

Here, Defendants' licensing activity and the Apartment 4B event make Plaintiff's implied consent to the uses of the Disputed Photos even more apparent.

For at least 25 years, Defendants openly exploited the Disputed Photos, and Plaintiff has had to seek licenses from Defendants to use the images for his purposes. The pre-litigation negotiation in May and June 20021 is a continuation of Plaintiff's acknowledgment that Defendants did not need his permission to use the Disputed Photos. Indeed, had Plaintiff actually objected to Defendants' uses of the Disputed Photographs, the pre-litigation negotiation would certainly have proceeded differently, as Plaintiff contends he learned about Defendants' uses in May 2021. But he never sent a cease-and-desist letter or otherwise discussed his then-unfiled claims while the parties were working on a business deal.

Similarly, while at the Apartment 4B event in 2016, Plaintiff saw but did not object to prints and shirts featuring Defendants' photographs of him. Nor did Plaintiff object to the uses in the Circle of Success agreement. It is only through this lawsuit that Plaintiff did an about-face and claim that those uses caused him harm. But Plaintiff's many years of not objecting, and of affirmatively licensing from Defendants, show that he cannot prove the lack-of-consent element of his claims.

### 3. Laches

Defendants' copyrights and licensing activity and the Apartment 4B event are also relevant to Defendants' laches defense. This defense requires showing (a) an unreasonable delay by Plaintiff and (b) prejudice to Defendants. *Danjaq LLC v. Sony Corp.*, 263 F.3d 942, 951 (9th Cir. 2001). As with lack of consent, Defendants' retaining the right to exploit the Disputed Photos and Plaintiff's knowledge but failure to object to the uses for many years establish the first element of laches.

## V.   EVIDENCE OF DEFENDANTS' COPYRIGHTS IS NEEDED

To bolster his case, Plaintiff contends that he owns the Disputed Photos simply because they relate to his music. *See* Carter Dep. Tr. 213:14-215:15 ("I created this -- these works, this imaging, the music, the lyrics. . . . I want the record to show that I own these photographs because I do.") Defendants should be

permitted to present contrary evidence of their copyright ownership. Other than for rebuttal, Defendants do not otherwise intend to offer evidence of their copyrights.

To be sure, Plaintiff cannot seriously contest Defendants' copyright ownership. He points to two categories of evidence that supposedly show Defendants transferred away their copyrights: (1) the IDJ Agreements and (2) Mr. Kempler's testimony. Neither supports Plaintiff's position at all.

*1. The IDJ Agreements*. Recognizing that the IDJ Agreements are irrelevant, Plaintiff contends that they show Defendants and Island Def Jam had a "pattern and practice" of entering similar contracts that apply to the Disputed Photos. *See* Mot. 2:12-15. But this begs the question. In any case, Plaintiff conceded that there was no contract for the Reasonable Doubt shoot. *See* Carter Dep. Tr. 99:8-23. There is no evidence that any of the IDJ Agreements pertain to any of the Disputed Photos. And there is no evidence that other photography contracts with Island Def Jam existed.

*2. Mr. Kempler's Testimony*. Mr. Kempler's testimony has no bearing on Defendants' copyrights in the Disputed Photos. The sole statement Plaintiff cites in the Motion is not about either party, but about a hypothetical photographer and recording artist. *See* Bonfigli Decl. Ex. D at 101:9-14. In fact, Mr. Kempler lacks knowledge about dealings involving Defendants. Kempler Dep. Tr. 88:7-16.

In short, Plaintiff lacks evidence to dispute Defendants' copyrights in the Disputed Photos. Allowing evidence of Defendants' copyright ownership will therefore not require a "mini trial within a trial."

VI.   **CONCLUSION**

The Court should deny Plaintiff's Motion in Limine No. 1 in its entirety.

DATED:  June 17, 2022              WILLENKEN LLP

                                   By */s/ Paul J. Loh*
                                   Paul J. Loh
                                   *Attorneys for Defendants*

1

**PLAINTIFF'S REPLY**

2       Defendants do not dispute, as they previously argued before reversing course,

3 that copyright is "a different right entirely" from right of publicity and that "[t]here

4 is a significant risk that the jury would confuse" the two. *Supra* at 2, quoting

5 Bonfigli Dec. Ex. B at 4. Instead, they offer invalid relevance arguments to mask

6 the obvious prejudice of injecting copyright into this right-of-publicity trial. First,

7 they contend Plaintiff put the matter at issue by asserting ownership of the photos.

8 But Defendants never raised this in meet-and-confer, and Defendants are referring to

9 deposition testimony *they* elicited from Plaintiff. Plainly, by this motion Plaintiff

10 seeks to exclude any evidence of copyright, regardless who the owner may be.

11 Second, Defendants claim copyright is relevant to laches, but they have since

12 abandoned that defense. Third, Defendants claim their licensing of copyright to

13 Plaintiff and others shows that Plaintiff consented to Defendants' sale of Jay-Z

14 prints and merchandise to the public. Defendants offer no cognizable link between

15 the two; that Plaintiffs sought copyright licenses from Defendants for his own use of

16 the photos says nothing of whether he authorized Defendants' exploitation of his

17 publicity rights. Finally, Defendants claim Plaintiff will seek damages based on

18 licensing revenue. But that is no basis to permit evidence of copyright ownership.

19 In any event, Plaintiff will not seek this category of damages if the Court agrees that

20 copyright, including copyright licensing, is irrelevant and therefore inadmissible.

21     **A.**     **Plaintiff's motion does not violate the four-motion limit.**

22       Contrary to Defendants' assertions, Plaintiff's four-page initial motion is not

23 three motions in one. Plaintiff seeks to exclude evidence of copyright from trial,

24 which necessarily encompasses any evidence about ownership of copyright,

25 including rights attendant to ownership such as licensing of copyright (including any

26 licensing to third-party Kareem Burke regarding the Apartment 4B event). As

27 Plaintiff demonstrated, evidence of copyright has no place in this right-of-publicity

28

1   case.  If the Court agrees, all evidence regarding copyright, including the licensing

2   of copyrights, should be excluded.

3         **B.**    **Defendants licensing of copyrights does not show consent.**

4         Defendants contend that their copyright licensing is relevant to consent.

5   *Supra* at 10-11.  It is not.  Plaintiff demonstrated, and Defendants did not address,

6   that "[t]he rights [of publicity] [Plaintiff] seek[s] to assert in the present case are

7   fundamentally different from those protected by the Copyright Act."  *In re NCAA*,

8   990 F. Supp. 2d at 1008.  Defendants agreed with that position before Plaintiff filed

9   this motion, stating that their "copyrights" and "Plaintiff's at-issue right of

10  publicity" are "different right[s] entirely."  Bonfigli Dec. Ex. B at 4.  Defendants

11  make no attempt to reconcile their current position with their prior one.

12        In any event, Plaintiff's knowledge of Defendants licensing copyright to him

13  or others has no bearing on whether Plaintiff consented to Defendants' use of his

14  NIL, the basis for this lawsuit.  Defendants explicitly excluded Plaintiff's right of

15  publicity from such licenses.  *Supra* at 3.  Thus, even if Plaintiff knew of them, he

16  had no reason to suspect Defendants were granting his NIL rights to others, or

17  selling unauthorized Jay-Z merch.

18        With respect to the Apartment 4B event in particular, contrary to Defendants'

19  assertions, the event is not relevant to their "consent" defense.  Kareem Burke, one

20  of the founders of Roc-A-Fella Records, hosted the event—not Defendants.  Burke,

21  not Defendants, sold shirts bearing Plaintiff's likeness at the event.  And Plaintiff

22  "approved" of Burke doing so.  Perez Tr. (Bonfigli Dec. Ex. D) at 122:13-23.  That

23  Plaintiff approved of ***Burke's*** use of photos from the *Reasonable Doubt* shoot, some

24  of which include Burke, does not show that Plaintiff approved of ***Defendants'*** use of

25  those photos.

26        **C.**    **Plaintiff did not place copyright licensing at issue.**

27        Defendants' argument that Plaintiff placed copyright licensing "at issue" is

28  wrong.  *Supra* at 10.  Plaintiff proposed to not seek any damages based on licensing

1   if Defendants agreed to not present evidence of licensing.  Bonfigli Dec. ¶ 16.

2   Defendants rejected that proposal.  *Id.*  If the Court denies this motion and agrees

3   that Defendants' licensing activities implicate Plaintiff's right of publicity, Plaintiff

4   will seek damages based on those activities.  If the Court grants this motion,

5   Plaintiff will ***not*** pursue damages based on licensing activities.

6        **D.    Defendants' "laches" argument is moot.**

7        Defendants abandoned their laches defense, Dkt. 148 at 2, mooting their

8   argument that their copyright licensing activity and the Apartment 4B event are

9   relevant to that defense.  *Supra* at 11.

10       **E.    Plaintiff will present evidence of copyright ownership only to rebut**

11             **Defendants' assertions of copyright ownership.**

12       Finally, Defendants assert that evidence of copyright ownership is "needed"

13  to rebut Plaintiff's testimony that he owns the photos at issue.  *Supra* at 11.  During

14  the meet-and-confer, Defendants never raised this as a basis to introduce copyright

15  evidence at trial.  Had they, Plaintiff would have made clear he has no plan to

16  introduce such testimony.  In fact, Plaintiff has moved to exclude all evidence of

17  copyright ownership. *Supra* at 1.  If this motion is granted, Plaintiff will not present

18  evidence of copyright ownership.  The ***only*** reason Plaintiff would do so is to rebut

19  Defendants' assertions that they hold the copyright to the photos at issue.  *Supra* at

20  12 ("Plaintiff cannot seriously contest Defendants' copyright ownership").

21  Defendants do not "need[]" to put on evidence to rebut assertions that Plaintiff will

22  not make at trial.[2]

23

24

25

26  [2]   Defendants misrepresent Plaintiff's testimony in arguing that he "conceded that
    there was no contract for the Reasonable Doubt shoot." *Supra* at 12.  Plaintiff
27  testified that he did not know if there was a written contract and that he did not
    know who to ask about that.  Carter Tr. (Bonfigli Dec. Ex. K) at 99:8-23.
28

## **<u>CONCLUSION</u>**

The Court should exclude any argument, testimony, or evidence regarding Defendants' claim that Defendant Mannion is the owner of the copyright in photos of Jay-Z, including any assertions that Defendants granted copyright licenses to Plaintiff or nonparties.

DATED:  June 17, 2022

QUINN EMANUEL URQUHART
& SULLIVAN, LLP

By  /s/ Robert M. Schwartz
Alex Spiro (*pro hac vice*)
Robert M. Schwartz
Cory D. Struble
Dylan C. Bonfigli
*Attorneys for Plaintiff*

## DECLARATION OF DYLAN C. BONFIGLI

I, Dylan C. Bonfigli, declare as follows:

1.     I am an attorney admitted to practice before this Court.  I am associated with Quinn Emanuel Urquhart & Sullivan, LLP, counsel of record for Plaintiff Shawn Carter, professionally known as Jay-Z.  I make this declaration in support of the Joint Motion in Limine No. 1.  I make this declaration on personal, firsthand knowledge, and if called and sworn as a witness, I could and would testify competently to the facts set forth below.

2.     The Joint Motion in Limine No. 1 seeks to exclude any argument, testimony, or evidence regarding Defendants' claim that Jonathan Mannion is the owner of the copyright in photos of Jay-Z, including any assertions that Defendants granted copyright licenses to Plaintiff or nonparties.

3.     The subject matter of the Joint Motion in Limine No. 1 has been discussed with opposing counsel, and opposing counsel has stated that such matter may be mentioned or displayed in the presence of the jury before it is admitted in evidence and has refused to stipulate that such matter will not be mentioned or displayed in the presence of the jury unless and until it is admitted in evidence.

4.     Plaintiff will be prejudiced if Plaintiff's Motion in Limine No. 1 is not granted because evidence regarding copyright is not relevant and, if presented, it will likely cause unfair prejudice to Plaintiff, confuse the issues, mislead the jury, and waste trial time.  As Defendants have admitted, copyright is a "different right entirely" from Plaintiff's at-issue right of publicity and "[t]here is a significant risk that the jury would confuse" the two.

5.     Attached as **Exhibit A** is a true and correct copy of a letter that I sent to defense counsel on May 13, 2022.

6.     Attached as **Exhibit B** is a true and correct copy of a letter from defense counsel, dated May 13, 2022.

7.      Attached as **Exhibit C** is a true and correct copy of excerpts from the deposition of Jeffrey Kempler taken on February 25, 2022.

8.      Attached as **Exhibit D** is a true and correct copy of excerpts from the deposition of Desiree Perez taken on March 14, 2022.

9.      **Exhibit E** is intentionally omitted.

10.     Attached as **Exhibit F** is a true and correct copy of Joint Trial Exhibit 2.

11.     Attached as **Exhibit G** is a true and correct copy of Joint Trial Exhibit 3.

12.     Attached as **Exhibit H** is a true and correct copy of Joint Trial Exhibit 7.

13.     Attached as **Exhibit I** is a true and correct copy of Joint Trial Exhibit 14.

14.     Attached as **Exhibit J** is a true and correct copy of Joint Trial Exhibit 91.

15.     Attached as **Exhibit K** is a true and correct copy of relevant excerpts of the deposition transcript for Shawn Carter, taken on March 4, 2022.

16.     On June 10, 2022, the parties met and conferred regarding evidentiary issues.  I proposed that Plaintiff would agree to not seek damages based on Defendants' licensing activities if Defendants agreed to not present evidence of those activities.  Defendants rejected the proposal.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on June 17, 2022, at Los Angeles, California.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

By    */s/ Dylan C. Bonfigli*
       Dylan C. Bonfigli

# ATTESTATION STATEMENT

I, Robert M. Schwartz, the filer of this Joint Motion in Limine, attest pursuant to Civil L.R. 5-4.3.4(a)(2) that all other signatories listed, and on whose behalf the filing is submitted, concur in the filing's content and have authorized the filing.

DATED:  June 17, 2022

QUINN EMANUEL URQUHART
& SULLIVAN, LLP

By /s/ Robert M. Schwartz
Robert M. Schwartz
*Attorneys for Plaintiff*
e

Case No. 2:21-cv-04848-PA-KS
PLAINTIFF'S MOTION IN LIMINE NO. 1

# Exhibit A

May 13, 2022 Letter from Bonfigli to Defense Counsel

**quinn emanuel** trial lawyers | los angeles

865 South Figueroa Street, 10th Floor, Los Angeles, California 90017-2543 | TEL (213) 443-3000 FAX (213) 443-3100

WRITER'S DIRECT DIAL NO.
**(213) 443-3610**

WRITER'S EMAIL ADDRESS
**dylanbonfigli@quinnemanuel.com**

May 13, 2022

<u>VIA E-MAIL</u>

Paul J. Loh                                      Steven A. Marenberg
Lika C. Miyake                                   Kiaura Clark
Kenneth Michael Trujillo-Jamison                 Paul Hastings LLP
Willenken LLP                                    1999 Avenue of the Stars 27th Floor
707 Wilshire Boulevard Suite 3850                Los Angeles, California 90067
Los Angeles, California 90017

Sarah C. Hsia
Rockstone Legal
229 West 36th Street 8th Floor
New York, New York 10018

**Re:    *Carter v. Mannion*, Case No. 2:21-cv-04848-PA-KS**

Counsel:

Pursuant to Section II.B.3 of the Court's Civil Trial Scheduling Order (ECF No. 52), we write to request that the parties meet and confer regarding motions in limine Plaintiff Shawn Carter may file absent an agreement between the parties obviating the need to do so.

Plaintiff's anticipated motions in limine include:

1.      A motion to exclude any testimony from Jeffrey Sedlik on the ground that his opinions are not relevant, *see* Fed. R. Evid. 401, and do not satisfy the requirements of Rule 702 of the Federal Rules of Evidence and *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993).

2.      A motion to exclude evidence about negotiations between Plaintiff and Defendants that took place in May and June of 2021 and that concerned a potential transaction regarding certain photographs of Plaintiff.  This motion will be based on Rules 401, 403, and 408 of the Federal Rules of Evidence.

**quinn emanuel urquhart & sullivan, llp**

ATLANTA | AUSTIN | BOSTON | BRUSSELS | CHICAGO | DOHA | HAMBURG | HONG KONG | HOUSTON | LONDON | LOS ANGELES | MANNHEIM |
MIAMI | MUNICH | NEUILLY-LA DEFENSE | NEW YORK | PARIS | PERTH | RIYADH | SALT LAKE CITY | SAN FRANCISCO | SEATTLE | SHANGHAI |
SILICON VALLEY | STUTTGART | SYDNEY | TOKYO | WASHINGTON, DC | ZURICH

3.     A motion to exclude any evidence about the copyright ownership of any of the photographs at issue and any evidence about Defendants' licensing the copyright of any photographs of Plaintiff, including any evidence regarding the Apartment 4B popup event.   This motion will be based on Rules 401 and 403 of the Federal Rules of Evidence.

4.     A motion to exclude any evidence regarding Mr. Mannion's claimed belief that his sale of prints and other products depicting persons, including Plaintiff, was lawful, or based on advice of counsel.  This motion will be based on Rules 401 and 403 of the Federal Rules of Evidence.

Please let us know of a few dates and times that you are available next week to discuss these potential motions.  Plaintiff reserves the right to raise additional potential motions in limine in advance of any conference of counsel, including, without limitation, on the basis of other pre-trial disclosures.

Best regards,

Dylan Bonfigli

2

# Exhibit B

May 13, 2022 Letter from Defense Counsel to Plaintiffs



707 Wilshire Blvd.
Suite 3850
Los Angeles, CA 90017

TEL  213.955.9240
FAX  213.955.9250

willenken.com

Paul J. Loh
ploh@willenken.com

May 13, 2022

**VIA E-MAIL ONLY**

Robert M. Schwartz                          Alex Spiro
Dylan C. Bonfigli                           Cory Struble
Quinn Emanuel Urquhart & Sullivan, LLP      Quinn Emanuel Urquhart & Sullivan, LLP
865 S. Figueroa St., 10th Fl.               51 Madison Ave., 22nd Fl.
Los Angeles, California 90017-2543          New York, NY 10010
robertschwartz@quinnemanuel.com             alexspiro@quinnemanuel.com
dylanbonfigli@quinnemanuel.com              corystruble@quinnemanuel.com

Re:      *Shawn Carter v. Jonathan Mannion et al.*, Case No.: 2:21-cv-04848-PA-KS

Dear Counsel,

We write pursuant to Paragraph II.B.3 of the Civil Trial Scheduling Order ("CTSO") entered in this matter to request a Local Rule 7-3 conference to discuss the motions in limine that Defendants intend to file. Below we describe the testimony, exhibits, or other matters that will be the subjects of the motions in limine, and provide brief summaries of Defendants' positions and the terms of the orders that Defendants will seek.

Relatedly, as raised during the parties' May 6, 2022 conference, the Court ordinarily permits up to four motions in limine to be filed per side. CTSO ¶ II.B.2. Should the parties be unable to resolve the issues identified below, Defendants would like to confer about whether Plaintiff will stipulate that the parties be permitted to file up to eight motions in limine per side.

Absent Plaintiff's agreement to exclude the following evidence from the trial, Defendants intend to file motions in limine regarding the following:

**1.       Expert Testimony of Jon Albert-Levy**

Plaintiff cannot show that Mr. Albert-Levy and his opinions meet the requirements of Federal Rule of Evidence 702. *See Stilwell v. Smith & Nephew, Inc.*, 482 F.3d 1187, 1192 (9th Cir. 2007) (expert testimony must be reliable and helpful to fact finder). Mr. Albert-Levy does not have the scientific, technical, or other specialized knowledge to render an expert opinion about potential damages in this lawsuit. His experience with endorsement deals is not relevant to this lawsuit between the subject of photographs and the photographer over the use of the subject's name, image, or likeness in the photographs. Thus, Mr. Albert-Levy's opinions will not be helpful to the jury.

Further, Mr. Albert-Levy's opinions are not supported by sufficient facts or data and are not based on reliable principles and methods. For example, he did not review deals between



May 13, 2022
Page 2

photographers and Plaintiff or other celebrities. Rather, Mr. Albert-Levy compares the selling of prints and physical goods on which photographs are imprinted by Defendants, who run a small business, with endorsement agreements requiring Plaintiff to render significant personal services to multimillion- or multibillion-dollar corporations. With those inapt "comps," Mr. Albert-Levy makes leaps of logic to conclude that Plaintiff is somehow entitled to millions in damages.

Defendants will move for an order to exclude the expert testimony of Mr. Albert-Levy.

### 2.     Expert Testimony of Megan Mahn Miller

Plaintiff cannot show that Ms. Mahn Miller and her opinions meet the requirements of Rule 702. *See Stilwell*, 482 F.3d at 1192. Ms. Mahn Miller does not have the scientific, technical, or other specialized knowledge to render an expert opinion about fine art photography or the primary marketability and economic value of prints of the at-issue photographs. Also, Ms. Mahn Miller's experience in the memorabilia industry is not relevant to Defendants' prints, so her opinions will not be helpful to the jury.

In addition, Ms. Mahn Miller's opinions are not supported by sufficient facts or data and are not based on reliable principles and methods. For example, she never conducted a study to determine the motivations of purchasers of prints, did not sufficiently research the markets for Defendants' prints and similar photographers' prints, and did not inspect an actual print of the at-issue photographs before reaching her opinions. Instead, Ms. Mahn Miller relies on tautology and confirmation bias to reach conclusions about purchaser motivations, the appropriate market for Defendants' prints, and the primary marketability and economic value of the prints.

Defendants will move for an order to exclude the expert testimony of Ms. Mahn Miller.

### 3.     Island Def Jam Photography/Illustration Agreements

The six Photography/Illustration Agreements[1] between Mr. Mannion and Island Def Jam are not relevant and are not admissible. *See* Fed. R. Evid. 401, 402. Island Def Jam is not a party to this lawsuit. Moreover, the only photographs that are at issue are photographs whose prints were sold within the applicable limitations period and photographs that were imprinted on physical goods that were sold within the applicable limitations period. The Photography/Illustration Agreements contracts do not apply to any of those photographs.

Moreover, the probative value, if any, of these contracts is substantially outweighed by the dangers of confusing the issues, misleading the jury, and causing unfair prejudice to Defendants.

---

[1] The six Photography/Illustration Agreements are dated (i) July 25, 2001; (ii) January 12, 2002; (iii) November 13, 2002, reissued December 16, 2002; (iv) November 19, 2002, reissued December 16, 2002; (v) January 23, 2002; and (vi) September 30, 2003.



210262.2

May 13, 2022
Page 3

That is, there is a significant risk the jury will be confused and misled that the Photography/Illustration Agreements apply to the at-issue photographs, that any contractual provisions were breached, that Plaintiff can enforce any of Island Def Jam's contractual rights, and that the Photography/Illustration Agreements have to do with Plaintiff's right of publicity.

Defendants will move for an order to exclude all documentary evidence, testimony, and argument regarding the six Photography/Illustration Agreements between Mr. Mannion and Island Def Jam (deposition exhibits 2-7, 22, and 107 and all other versions of these contracts).

### 4.   Defendants' Internal Communications Regarding Generating Revenue

Communications between Mr. Mannion and the employees of Jonathan Mannion Photography regarding their hopes to generate revenue are not relevant and not admissible. *See* Fed. R. Evid. 401, 402. Whether they desired to grow Defendants' business has nothing to do with whether Defendants have the right to publish or distribute Mr. Mannion's photographs and physical goods on which the photographs are imprinted.

Furthermore, the probative value, if any, of these communications is substantially outweighed by the dangers of confusing the issues, misleading the jury, and causing unfair prejudice to Defendants. *See* Fed. R. Evid. 403. The internal communications among colleagues were stated an ironic, humorous manner. But there is a significant risk that the communications can be improperly used to portray Defendants as excessively greedy or willing to commit unlawful acts to make money, causing unfair prejudice to Defendants.

Defendants will move for an order to exclude all documentary evidence, testimony, and argument regarding these internal communications regarding generating revenue (MANNION004495, MANNION009579, MANNION010720, MANNION008647, MANNION002651, MANNION003903, MANNION004100, MANNION004103, MANNION006365, MANNION009649, MANNION009654, MANNION009658, and all other versions of these documents, and any similar documents).

### 5.   Pre-Litigation Negotiations

The pre-litigation negotiations between representatives for Plaintiff and representatives for Defendants are not relevant and not admissible. *See* Fed. R. Evid. 401, 402. The negotiation concerned the licensing or purchase of Defendants' copyrights, or a portion of such the rights, to Plaintiff. The parties were not negotiating a license for Defendants to use Plaintiff's name, image, or likeness. Further, the negotiation concerned different photographs or sets of photographs at different times.

In addition, the probative value, if any, of these communications is substantially outweighed by the dangers of confusing the issues, misleading the jury, and causing unfair prejudice to



May 13, 2022
Page 4

Defendants. *See* Fed. R. Evid. 403. There is a significant risk that the jury would confuse Defendants' copyrights that were the subject of the negotiations with Plaintiff's at-issue right of publicity, a different right entirely. There is also a significant risk the jury would be misled that the monetary amount that Defendants requested to sell their rights have any bearing on potential damages in this lawsuit or indicate that Defendants had any improper motive in refusing to sell their rights.

Defendants will move for an order to exclude all documentary evidence, testimony, and argument regarding the pre-litigation negotiation.

### 6.      Plaintiff's Deals With Puma, Tiffany & Co., and Caliva

Endorsement and sponsorship deals between Plaintiff and Puma, Tiffany & Co. and Caliva are not relevant and not admissible. *See* Fed. R. Evid. 401, 402. The claims and defenses here concern Plaintiffs' right of publicity and Defendants' rights to distribute the at-issue photographs that Mr. Mannion authored and physical goods on which those photographs were imprinted. Sponsorship and endorsement deals requiring Plaintiff to provide extensive personal services to multimillion- or multibillion-dollar corporations, are not relevant.

Moreover, the probative value, if any, of these deals is substantially outweighed by the dangers of confusing the issues, misleading the jury, and causing unfair prejudice to Defendants. *See* Fed. R. Evid. 403. There is a significant risk the jury would be confused that the deals between Plaintiff and Puma, Tiffany & Co., and Caliva show that Defendants must follow similar terms for their uses of Mr. Mannion's photographs. There is also a significant risk the jury would be misled that the fees Plaintiff received from the deals have any bearing on potential damages in this lawsuit.

Defendants will move for an order to exclude all documentary evidence, testimony, and argument regarding deals between Plaintiff and Puma, Tiffany & Co., and Caliva (CARTER0004372, CARTER0004400, CARTER0004436, and all other versions of these documents).

### 7.      Defendants' Deals With Aaliyah and DMX

Deals between Defendants and representatives of the estates of Aaliyah and DMX, including any cease-and-desist letter(s) that preceded the deals, are not relevant and not admissible. *See* Fed. R. Evid. 401, 402. Other subjects of Mr. Mannion's photographs are not parties to this lawsuit, and the unproven allegations in any cease-and-desist letters have no bearing on Defendants' alleged actions and omissions here.

Further, the probative value, if any, of these deals with the estates of Aaliyah and DMX is substantially outweighed by the dangers of confusing the issues, misleading the jury, and causing



May 13, 2022
Page 5

unfair prejudice to Defendants. *See* Fed. R. Evid. 403. There is a significant risk that the jury would view unproven allegations in cease-and-desist letters from the estates' representatives as evidence that Defendants have violated others' rights of publicity in the past. There is also a significant risk the jury would view terms to which Defendants and those estates agreed upon to settle the disputes and to develop their business relationships as legal requirements that Defendants must follow as to all subjects of Mr. Mannion's photographs, including Plaintiff.

Defendants will move for an order to exclude all documentary evidence, testimony, and argument regarding deals between Defendants and representatives of the estates of Aaliyah and DMX, including any cease-and-desist letters from the representatives that preceded to the deals.

### 8.    Defendants' Internal Communications Reacting to Plaintiff's Initiation of This Lawsuit

Communications between Mr. Mannion and the employees of Jonathan Mannion Photography using curse words or other strong language in reacting to the filing of this litigation are not relevant and not admissible. *See* Fed. R. Evid. 401, 402. Their emotional reactions to the filing of the lawsuit have nothing to do with the claims or defenses in this case.

Furthermore, the probative value, if any, of these communications is substantially outweighed by the dangers of misleading the jury and causing unfair prejudice to Defendants. *See* Fed. R. Evid. 403. The internal communications among colleagues sometimes included strong language in reference to this litigation and to Plaintiff. There is a significant risk that the communications can be improperly used to portray Defendants in an unflattering light.

Defendants will move for an order to exclude all documentary evidence, testimony, and argument regarding such internal communications (MANNION010940, MANNION010720, and any similar documents).

* * *

Under Paragraph II.B.3 of the CTSO, the Local Rule 7-3 conference regarding Defendants' anticipated motions in limine must take place within seven days of service of this letter. Please let us know your availability during the week of May 16, as soon as possible.

Very truly yours,



Paul J. Loh



707 Wilshire Blvd., Suite 3850, Los Angeles, CA 90017
TEL  213.955.9240    FAX  213.955.9250    willenken.com

# Exhibit C

Excerpts from the February 25, 2022 Deposition of
Jeffrey Kempler

CONFIDENTIAL

```
 1              UNITED STATES DISTRICT COURT
 2              CENTRAL DISTRICT OF CALIFORNIA
 3
 4    _____
                                     )
 5    SHAWN CARTER, also known as    )
      JAY-Z, an individual,          )
 6                                   )
              Plaintiff,             )
 7                                   )  Case No. 2:21-cv-04848-PA-KS
          vs.                        )
 8                                   )
      JONATHAN MANNION, an           )
 9    individual, and JONATHAN       )
      MANNION PHOTOGRAPHY LLC, a     )
10    New York limited liability     )
      company,                       )
11                                   )
              Defendants.            )
12    _____)
13
14
15                 * CONFIDENTIAL **
16         REMOTE VIDEOTAPED DEPOSITION OF
17               JEFFREY B. KEMPLER
18            Friday, February 25, 2022
19                    Volume I
20
21    Reported by:
      NADIA NEWHART
22    CSR No. 8714
23    Job No. 5072181
24    PAGES 1 - 117
25
```

                                              Page 1

CONFIDENTIAL

```
 1    then, you know, looking at the documents that you've

 2    shown me, sort of a tick-the-box menu of what rights

 3    are being acquired, so a pretty simplistic approach

 4    without a lot of bespoke negotiation.

 5        Q    Could you look at Exhibit 3, please.  It's        03:51:44

 6    already on the Exhibit Share.

 7        A    Okay.  Let me go back.

 8             Got it.  Okay.

 9        Q    And let me ask you, would it have been

10    against the general practice of Island Def Jam to        03:51:58

11    have no written agreement at all with a photographer

12    hired to take photos of a recording artist?

13        A    Yeah.  That -- that would have been an --

14    that would have been a poorly received anomaly.

15        Q    If I can draw your attention to paragraph 6       03:52:14

16    on the second page, the last typewritten sentence in

17    paragraph 6 I will read into the record.  It says

18    (as read):

19             "If pursuant to this purchase order,

20             you retain certain rights, you may            03:52:30

21             not exercise any such rights without

22             the specific written approval of the

23             recording artist involved."

24             Is that the type of provision that you, as a

25    general practice at Island Def Jam, would have been     03:52:47
```

Page 101

CONFIDENTIAL

```
 1

 2

 3

 4

 5          I, JEFFREY B. KEMPLER, do hereby declare

 6     under penalty of perjury that I have read the

 7     foregoing transcript; that I have made any

 8     corrections as appear noted, in ink, initialed by

 9     me, or attached hereto; that my testimony as

10     contained herein, as corrected, is true and correct.

11          EXECUTED this _____ day of _____,

12     20_____, at _____, _____.
                            (City)                    (State)

13

14

15

16          _____

                         JEFFREY B. KEMPLER

17                          Volume I

18

19

20

21

22

23

24

25

                                           Page 113
```

CONFIDENTIAL

```
 1              I, the undersigned, a Certified Shorthand
 2    Reporter of the State of California, do hereby
 3    certify:
 4         That the foregoing proceedings were taken
 5    before me at the time and place herein set forth;
 6    that any witnesses in the foregoing proceedings,
 7    prior to testifying, were administered an oath; that
 8    a record of the proceedings was made by me using
 9    machine shorthand which was thereafter transcribed
10    under my direction; that the foregoing transcript is
11    a true record of the testimony given.
12         Further, that if the foregoing pertains to the
13    original transcript of a deposition in a Federal
14    Case, before completion of the proceedings, review
15    of the transcript [X] was [ ] was not requested.
16         I further certify that I am neither financially
17    interested in the action nor a relative or employee
18    of any attorney or any party to this action.
19         IN WITNESS WHEREOF, I have this date subscribed
20    my name.
21
22    Dated: March 2, 2022
23
24
      NADIA NEWHART
25    CSR NO. 8714
```

Page 114

# Exhibit D

Excerpts from the March 14, 2022 Deposition of Desiree Perez

CONFIDENTIAL

```
 1              UNITED STATES DISTRICT COURT
 2              CENTRAL DISTRICT OF CALIFORNIA
 3
 4      SHAWN CARTER, also known as
        JAY-Z, an individual,
 5
                          Plaintiff,
 6         vs.                        No. 2:21-cv-04848-PA-KS
 7      JONATHAN MANNION, an individual,
        and JONATHAN MANNION, an
 8      individual, and JONATHAN MANNION
        PHOTOGRAPHY LLC, a New York
 9      limited liability company,
10                          Defendants.
        _____/
11
12              *** CONFIDENTIAL ***
13         VIDEOTAPED DEPOSITION OF DESIREE PEREZ
14      individually and as Rule 30(b)(6) representative of
15      Roc Nation LLC, Roc Nation Advertising LLC, Roc
16      Nation Management LLC, Roc Nation Publishing LLC,
17      Roc Nation Sports LLC, and S. Carter Enterprises LLC
18
19          appearing remotely at New York, New York
20                 Monday, March 14, 2022
21
22
23      Reported by:
        Natalie Y. Botelho
24      CSR No. 9897
25      Job No. 5100642
```

Page 1

CONFIDENTIAL

| | | |
|---|---|---|
| 1 | he was doing, Biggs. | 13:00:56 |
| 2 | Q.      Okay.  And that's fair.  I just want -- I | 13:00:59 |
| 3 | would like to just gain an understanding of your | 13:01:01 |
| 4 | understanding.  And I appreciate what you're doing. | 13:01:04 |
| 5 | Okay.  And so to your understanding, items or photos | 13:01:06 |
| 6 | bearing Mr. Carter's image from the Reasonable Doubt | 13:01:13 |
| 7 | shoot were being sold at the Apartment 4B show? | 13:01:17 |
| 8 | A.      I mean, I don't -- I don't, like, know | 13:01:21 |
| 9 | that, but I wouldn't be surprised if it was.  Like I | 13:01:24 |
| 10 | think -- I think Biggs was -- it was a commercial | 13:01:28 |
| 11 | moment for Biggs.  I think Biggs was trying to make | 13:01:30 |
| 12 | money. | 13:01:34 |
| 13 | Q.      And your understanding was that Mr. Carter | 13:01:35 |
| 14 | approved of Mr. Burke selling photos from the | 13:01:37 |
| 15 | Reasonable Doubt shoot of Mr. Carter at the | 13:01:43 |
| 16 | Apartment 4B show? | 13:01:46 |
| 17 | A.      I -- Jay definitely approved for Biggs to | 13:01:48 |
| 18 | do whatever Biggs was doing, yes. | 13:01:53 |
| 19 | Q.      And including what he was doing at the | 13:01:56 |
| 20 | Apartment 4B show, correct? | 13:01:58 |
| 21 | A.      Yeah.  Whatever he was doing, we were -- | 13:01:59 |
| 22 | I'm referencing what you're asking me, which is the | 13:02:01 |
| 23 | Apartment 4B show. | 13:02:06 |
| 24 | Q.      Okay.  And that -- did you have an | 13:02:08 |
| 25 | understanding that at the Apartment 4B show, there | 13:02:10 |

Page 122

CONFIDENTIAL

```
1              I, DESIREE PEREZ, do hereby declare under
2      penalty of perjury that I have read the foregoing
3      transcript; that I have made any corrections as
4      appear noted, in ink, initialed by me, or attached
5      hereto; that my testimony as contained herein, as
6      corrected, is true and correct.
7              EXECUTED this _____ day of
       _____,
8
       20__, at _____, _____.
9                   (City)                (State)
10
11
12
13
14
15          _____
16                       Desiree Perez
17
18
19
20
21
22
23
24
25
```

Page 238

CONFIDENTIAL

```
 1              CERTIFICATE OF REPORTER

 2

 3              I, Natalie Y. Botelho, a Certified

 4    Shorthand Reporter, hereby certify that the witness

 5    in the foregoing deposition was by me duly sworn to

 6    tell the truth, the whole truth, and nothing but the

 7    truth in the within-entitled.

 8              The said deposition was taken down in

 9    shorthand by me, a disinterested person, at the time

10    and place therein stated, and that the testimony of

11    said witness was thereafter reduced to typewriting,

12    by computer, under my direction and supervision;

13              That before completion of the deposition,

14    review of the transcript [X] was|[ ] was not

15    requested.  If requested, any changes made by the

16    deponent (and provided to the reporter) during the

17    period allowed are appended hereto.

18              I further certify that I am not of counsel

19    or attorney for either or any of the parties to the

20    said deposition, nor in any way interested in the

21    event of this cause, and that I am not related to

22    any of the parties thereto.

23    DATED: March 17, 2022

24    _____

25    Natalie Y. Botelho, CSR No. 9897
```

Page 239

# Exhibit E

Intentionally Omitted

# Exhibit F

Joint Trial Exhibit 2



ISLAND
Def Jam recordings
MUSIC GROUP

Photography/ Illustration Agreement

Jonathan Mannion
312 East 23rd Street
Suite 6C
New York, NY  10010

| | |
|---|---|
| Date | July 25, 2001 |
| Project Title | Jay-Z |
| Description | Photoshoot |

| | |
|---|---|
| Fee | $ 20,000.00 |
| Expenses | 27,236.34 |
| Total | $ 47,236.34 |

Rights Purchased (see following pages)

X  All Rights (except merchandising for sale)

  All Record-Related Rights and Publicity Rights (except album packaging)

  All Record-Related Rights and Publicity Rights (except front cover of album)

  Publicity Rights only

  Advertising Rights Only

  Merchandising Rights Option                  Merch. Option Fee

Accepted and Agreed To:

Island/Def Jam

By

Print Name

Telephone

Fax

Accepted and Agreed To:

The Island Def Jam Music Group

By

Print Name

Accepted and Agreed To:

By

Print Name   Mannion

Telephone   212 253 2023

Fax   212 253 9006

Federal Tax Number   06 1585390

**Exhibit
0002**
Patrick

UMG CONFIDENTIAL 000015

Standard Terms and Conditions

The Purchase Order on the reverse side is subject to the following terms and conditions which have been mutually agreed upon:

1. You, the photographer or illustrator, will deliver to Island Def Jam Records, no later than the due date, all photographs taken by you at the photo graphic session for which you are hereby engaged ~~including all prints, negatives and/or transparencies thereof~~, or the original illustration, and/or Sketch (as provided for below), for which you are hereby engaged (such ~~prints~~, photographs, ~~negatives and/or transparencies~~, or original illustration or Sketch, are hereinafter referred to as the "Artwork"). The Artwork will be created in accordance with the plans and the concept approved by us.

2. Promptly after the later of our receipt of the Artwork (together with all necessary releases, clearances and permissions) or the full execution of this agreement, we shall pay to you your fee (subject to Paragraph 3 below) and we shall reimburse you for the actual cost (i.e., without any "mark-up" or "service charge") of all expenses approved by us in writing for which you have submitted to us paid invoices (you will be solely responsible for all other expenses). In the event we request that you prepare a preliminary sketch(es) for our approval prior to creating and delivering a final illustration (the "Sketch"), then upon delivery to us by you of the Sketch, we shall pay you your sketch fee. If, after delivery of the Sketch to us, we request that you deliver a final illustration, then you shall do so under the terms of this agreement. If, however, after delivery of the Sketch to us, we do not request that you deliver a final illustration, then our only obligation to you shall be to pay your sketch fee and we shall have no rights with respect to the sketch.

3. We shall have the right to terminate your services hereunder and/or reject the Artwork. If we terminate your services prior to your delivery to us of the Artwork (providing the session has occurred) or if we reject, in our sole discretion, the Artwork as delivered by you to us, then (except in the case of the proper delivery of the Sketch) our only obligation to you shall be to pay you 50% of your fee and, in addition, to reimburse you, per paid invoices, for all expenses which were approved by us in writing and incurred by you through the date of such termination or rejection.

4. With respect to all Artwork delivered by you to us, we exclusively shall have the rights purchased as indicated on the Purchase Order on the reverse side (and no further money shall be payable to you in connection with our exercise of such rights).

5. Definitions:
   All Rights: Rights to use the Artwork in any and all media or any other manner now or hereafter known, throughout the world, in perpetuity.
   Record-Related Rights: Rights to use the Artwork on packaging for phonograph records (including albums, EPs, maxi-singles and singles) in any configuration, including, without limitation, vinyl disc records, pre-recorded audio cassette tapes, compact discs, pre-recorded video cassette tapes, DVD's, so-called Enhanced CD's and all other forms of audio and/or audio/visual reproduction now or hereafter known (collectively "records"). In addition, Record-Related rights include rights to use the Artwork on printed sheet music, on record marketing materials, in promotional materials, in advertising and as part of any audio and/or visual presentations in any form now or hereafter known, throughout the world, in perpetuity.
   Publicity Rights: Right to use the Artwork for all publicity and advertising purposes including, without limitation, in websites, all publicity and advertising in newspapers, magazines, the internet and on television, and publicity and advertising for the artist's personal appearances. In addition, Publicity Rights includes the right to use the Artwork on printed sheet music, as illustrations in books, and in connection with set dressing for films, and as part of any audio and/or visual presentations in any form now or hereafter known, throughout the world, in perpetuity.
   Advertising Rights: Right to use the artwork for all advertising purposes including, without limitation, advertising in newspapers, websites, magazines, on the internet and on television and advertising for the artist's personal appearances and as part of any audio and/or visual presentations in any form now or hereafter known related to the artist, except as expressly provided for otherwise herein, throughout the world, in perpetuity.
   Merchandising Option: Right to use the Artwork in and for the distribution and exploitation of commercial merchandising endeavors, throughout the world, in perpetuity. Option is exercised immediately upon payment of merchandise fee. If no payment then Option not exercised.

6. You acknowledge that all prints of the Artwork shall be delivered to and retained by us. ~~You acknowledge that we shall have the right to retain possession of all transparencies and negatives resulting from the photographic session for which you are hereby engaged or the original illustration, as the case may be, provided, that if we do not retain possession of such transparencies, negatives or original illustration, you shall return them and furnish them to us promptly after our request at any time.~~ If, pursuant to this purchase order, you retain certain rights, you may not exercise any such rights without the specific written approval of the recording artist involved *Negatives will remain the property of JONATHAN MANNION PHOTOGRAPHY LLC with Island Def Jam scrap having full access to them.* (handwritten)

7. You shall be responsible for and shall obtain and deliver to us, at the same time you deliver the Artwork, all necessary releases (including model releases), clearances and permissions in connection with any original elements embodied in the Artwork that were created by you or at your direction and you agreed to indemnify us against all claims and expenses (including attorneys' fees) arising out of any failure to obtain such releases, clearances or permissions. Notwithstanding the preceding sentence, we acknowledge that to the extent the Artwork may embody any elements that were not created by you, or on your behalf, such non-original elements are being delivered to you to us on a quit claim basis i.e., (without any representation or warranty of any kind).

8. You acknowledge that the Artwork is being ordered as a contribution to a collective work, i.e., the record packaging and other materials created from the Artwork. You acknowledge that we shall own the right, title, and interest in and to all such record packaging and such other materials including, but not limited to, the worldwide copyrights therein. We shall have the right to retouch and/or electronically enhance the Artwork. *Jonathan Mannion will have the rights to publish works in books of any kind with permission from Island Def Jam. Photos may be used by Jonathan for self-promotion in terms of...* (handwritten)

9. We shall furnish you with a credit which shall be appropriately visible on all album packaging, and Island Def Jam's inadvertent failure to comply with the foregoing shall not be deemed a breach of this agreement; provided, however, if you notify Island Def Jam of such failure, Island Def Jam shall take action to cure such failure with respect to future album packaging where feasible.

10. This agreement contains the entire understanding of the parties and will be governed by the laws of New York State applicable to contracts entered into in New York and entirely performed there. No change of this agreement will be binding upon unless it is made by an instrument signed by you and our authorized signatory.

UMG CONFIDENTIAL 000016



# Exhibit G

Joint Trial Exhibit 3



ISLAND
MUSIC GROUP

Photography—Illustration Agreement

Jonathan Mannion
312 East 23rd Street #6C
NY,NY 10010

**FILE COPY**

Date                1.12.2002
Project Title       Jay Z/R. Kelly
Description         photography shoot date January 13,2002 in Chicago

Fee        $20,000 00
Expenses   $15,975..00
Total      $35,975.00

Rights Purchased (see following pages)

x      All Rights (except merchandising for sale)

       All Record-Related Rights and Publicity Rights (except album packaging)

       All Record-Related Rights and Publicity Rights (except front cover of album)

       Publicity Rights only

       Advertising Rights Only

       Merchandising Rights Option                          Merch. Option Fee

Accepted and Agreed To                           Accepted and Agreed To:
Island/Def Jam                                   By _____
By _____                       Print Name  JONATHAN MANNION
Print Name _____                        Telephone  212.253.2023
Telephone _____                         Fax  212.253.9006.
Fax _____                               Federal Tax Number  06.1585390

Accepted and Agreed To:                          ┌─────────────────────┐
Island/Def Jam Music Group                       │      **Exhibit**    │
By _____                       │      **0003**       │
Print Name _____                       │      Patrick        │
                                                 └─────────────────────┘

Standard Terms and Conditions
The Purchase Order on the reverse side is subject to the following terms and conditions which have been mutually agreed upon.

1.  You, the photographer or illustrator, will deliver to Island/Def Jam Records, no later than the due date, all photographs taken by you at the photo graphic session for which you are hereby engaged ~~including all prints, negatives and/or transparencies thereof,~~ or the original illustration, and/or Sketch (as provided for below), for which you are hereby engaged (such ~~prints,~~ photographs, ~~negatives and/or transparencies,~~ or original illustration or Sketch, are hereinafter referred to as the "Artwork").  The Artwork will be created in accordance with the plans and the concept approved by us.

2.  Promptly after the later of our receipt of the Artwork (together with all necessary releases, clearances and permissions) or the full execution of this agreement, we shall pay to you your fee (subject to Paragraph 3 below) and we shall reimburse you for the actual cost (i.e., without any "mark-up" or "service charge") of all expenses approved by us in writing for which you have submitted to us paid invoices (you will be solely responsible for all other expenses).  In the event we request that you prepare a preliminary sketch(es) for our approval prior to creating and delivering a final illustration (the "Sketch"), then upon delivery to us of the Sketch, we shall pay you your sketch fee.  If, after delivery of the Sketch to us, we request that you deliver a final illustration, then you shall do so under the terms of this agreement.  If, however, after delivery of the Sketch to us, we do not request that you deliver a final illustration, then our only obligation to you shall be to pay your sketch fee and we shall have no rights with respect to the sketch.

3.  We shall have the right to terminate your services hereunder and/or reject the Artwork.  If we terminate your services prior to your delivery to us of the Artwork (providing the session has occurred) or if we reject, in our sole discretion, the Artwork as delivered by you to us, then (except in the case of the proper delivery of the Sketch) our only obligation to you shall be to pay you 50% of your fee and, in addition, to reimburse you, per paid invoices, for all expenses which were approved by us in writing and incurred by you through the date of such termination or rejection.

4.  With respect to all Artwork delivered by you to us, we exclusively shall have the rights purchased as indicated on the Purchase Order on the reverse side (and no further money shall be payable to you in connection with our exercise of such rights).

5.  Definitions:
    All Rights: Rights to use the Artwork, in any and all media or any other manner now or hereafter known, throughout the world, in perpetuity.
    Record-Related Rights: Rights to use the Artwork on packaging for phonograph records (including albums, EPs, maxi-singles and singles) in any configuration, i.e., vinyl disc records, pre-recorded audio cassette tapes, compact discs, pre-recorded video cassette tapes, and all other forms of audio and/or audio/visual reproduction now or hereafter known (collectively "records").  In addition, Record-Related rights include rights to use the Artwork on printed sheet music, on record marketing materials, in promotional materials, in advertising and as part of any audio and/or visual presentations in any form now or hereafter known, throughout the world, in perpetuity.
    Publicity Rights: Right to use the Artwork for all publicity and advertising purposes including, without limitation, all publicity and advertising in newspapers, magazines, and on television, and publicity and advertising for the artist's personal appearances.  In addition, Publicity Rights includes the right to use the Artwork on printed sheet music, as illustrations in books, and in connection with set dressing for films, and as part of any audio and/or visual presentations in any form now or hereafter known, throughout the world, in perpetuity.
    Advertising Rights: Right to use the artwork for all advertising purposes including, without limitation, advertising in newspapers, magazines, and on television and advertising for the artist's personal appearances and as part of any audio and/or visual presentations in any form now or hereinafter known related to the artist, except as expressly provided for otherwise herein, throughout the world, in perpetuity.
    Merchandising Option: Right to use the Artwork in and for the distribution and exploitation of commercial merchandising endeavors, throughout the world, in perpetuity. Option is exercised immediately upon payment of merchandise fee. If no payment then Option not exercised.

6.  You acknowledge that all prints of the Artwork shall be delivered to and retained by us.  ~~You acknowledge that we shall have the right to retain possession of all transparencies and negatives resulting from the photographic session for which you are hereby engaged or the original illus tration, as the case may be; provided, that if we do not retain possession of such transparencies, negatives or original illustration, you shall retain them and furnish them to us promptly after our request at any time.~~  If, pursuant to this purchase order, you retain certain rights, you may not ever cise any such rights without the specific written approval of the recording artist involved. Negatives will remain the property Jonathan Mannion photography LLC with Island Def Jam group having full access to them.

7.  You shall be responsible for and shall obtain and deliver to us, at the same time you deliver the Artwork, all necessary releases (including model releases), clearances and permissions in connection with any original elements embodied in the Artwork that were created by you or at your direction and you agree to indemnify us against all claims and expenses (including attorneys' fees) arising out of any failure to obtain such releases, clearances or permissions. Notwithstanding the preceding sentence, we acknowledge that to the extent the Artwork may embody any elements that were not created by you, or on your behalf, such non-original elements are being delivered by you to us on a quit claim basis i.e.,(without any representation or warrantee of any kind )

8.  You acknowledge that the Artwork is being ordered as a contribution to a collective work, i.e., the record packaging and other materials created from the Artwork.  You acknowledge that we shall own the right, title, and interest in and to all such record packaging and such other materials including, but not limited to, the worldwide copyrights therein.  We shall have the right to retouch and/or electronically enhance the Artwork. Jonathan Mannion will not lose the rights to his own works in books of any kind with permission from Island def Jam. Photos may be used by Jonathan for self promotion in books or on card

9.  We shall furnish you with a credit which shall be appropriately visible on all album packaging, and Island/Def Jam's inadvertent failure to comply with the foregoing shall not be deemed a breach of this agreement; provided, however, if you notify Island/Def Jam of such failure, Island/Mercury shall take action to cure such failure with respect to future album packaging where feasible.

10.  This agreement contains the entire understanding of the parties and will be governed by the laws of New York State applicable to contracts entered into in New York and entirely performed there.  No change of this agreement will be binding upon unless it is made by an instrument signed by you and our authorized signatory.



# Exhibit H

Joint Trial Exhibit 7



**MUSIC GROUP**

Photography/ Illustration Agreement

Jonathan Mannion Photography
312 East 23rd Street, Suite 6C
New York, NY  10010

| | |
|---|---|
| Date | 9/30/03 |
| Project Title | Jay-Z The Black Album |
| Description | Photoshoot |

| | |
|---|---|
| Fee | $ 6,000.00 |
| Expenses | 14,130.00 |
| Total | $20,130.00 |

Rights Purchased (see following pages)

x   All Rights (except merchandising for sale)

   All Record-Related Rights and Publicity Rights (except album packaging)

   All Record-Related Rights and Publicity Rights (except front cover of album)

   Publicity Rights only

   Advertising Rights Only

   Merchandising Rights Option                    Merch. Option Fee

***photographer must deliver two(2) sets of contacts to the label***

| Accepted and Agreed To: | Accepted and Agreed To: |
|---|---|
| The Island Def Jam Music Group, | By _____ |
| a division of UMGRecordings,Inc. | Print Name  JONATHAN MANNION |
| By _____ | Telephone  (212) 253 - 2023 |
| Print Name _____ | Fax  (212) 253 - 9006 |
| Telephone _____ | Federal Tax Number  06 - 1585390 |
| Fax _____ | |

**Exhibit 0007**

Patrick

Standard Terms and Conditions

The Purchase Order on the reverse side is subject to the following terms and conditions which have been mutually agreed upon.

1.  You, the photographer or illustrator, will deliver to The Island Def Jam Records Music Group, a division of UMG Recordings, Inc. ("IDJ"), no later than the due date, all photographs taken by you at the photographic session for which you are hereby engaged including all prints, negatives and/or transparencies thereof, or the original illustration, and/or Sketch (as provided for below), for which you are hereby engaged (such prints, photographs, negatives and/or transparencies, or original illustration or Sketch, are hereinafter referred to as the "Artwork")   The Artwork will be created in accordance with the plans and the concept approved by us

2.  Promptly after the later of our receipt of the Artwork (together with all necessary releases, clearances and permissions) or the full execution of this agreement, we shall pay to you your fee (subject to Paragraph 3 below) and we shall reimburse you for the actual cost (i.e , without any "mark-up" or "service charge") of all expenses approved by us in writing for which you have submitted to us paid invoices (you will be solely responsible for all other expenses).  In the event we request that you prepare a preliminary sketch(es) for our approval prior to creating and delivering a final illustration (the "Sketch"), then upon delivery to us by you of the Sketch, we shall pay you your sketch fee.  If, after delivery of the Sketch to us, we request that you deliver a final illustration, then you shall do so under the terms of this agreement.  If, however, after delivery of the Sketch to us, we do not request that you deliver a final illustration, then our only obligation to you shall be to pay your sketch fee and we shall have no rights with respect to the sketch.

3   We shall have the right to terminate your services hereunder and/or reject the Artwork.  If we terminate your services prior to your delivery to us of the Artwork (providing the session has occurred) or if we reject, in our sole discretion, the Artwork as delivered by you to us, then (except in the case of the proper delivery of the Sketch) our only obligation to you shall be to pay you 50% of your fee and, in addition, to reimburse you, per paid invoices, for all expenses which were approved by us in writing and incurred by you through the date of such termination or rejection.

4.  With respect to all Artwork delivered by you to us, we exclusively shall have the rights purchased as indicated on the Purchase Order on the reverse side (and no further money shall be payable to you in connection with our exercise of such rights)

5.  Definitions:
    All Rights: Rights to use the Artwork, in any and all media or any other manner now or hereafter known, throughout the world, in perpetuity.
    Record-Related Rights: Rights to use the Artwork on packaging for phonograph records (including albums, EPs, maxi-singles and singles) in any configuration, i.e., vinyl disc records, pre-recorded audio cassette tapes, compact discs, pre-recorded video cassette tapes, and all other forms of audio and/or audio/visual reproduction now or hereafter known (collectively "records")   In addition, Record-Related rights include rights to use the Artwork on printed sheet music, on record marketing materials, in promotional materials, in advertising and as part of any audio and/or visual presentations in any form now or hereafter known, throughout the world, in perpetuity.
    Publicity Rights: Right to use the Artwork for all publicity and advertising purposes including, without limitation, all publicity and advertising in newspapers, magazines, and on television, and publicity and advertising for the artist's personal appearances.  In addition, Publicity Rights includes the right to use the Artwork on printed sheet music, as illustrations in books, and in connection with set dressing for films, and as part of any audio and/or visual presentations in any form now or hereafter known, throughout the world, in perpetuity.
    Advertising Rights: Right to use the artwork for all advertising purposes including, without limitation, advertising in newspapers, magazines, and on television and advertising for the artist's personal appearances and as part of any audio and/or visual presentations in any form now or hereinafter known related to the artist, except as expressly provided for otherwise herein, throughout the world, in perpetuity
    Merchandising Option: Right to use the Artwork in and for the distribution and exploitation of commercial merchandising endeavors, throughout the world, in perpetuity. Option is exercised immediately upon payment of merchandise fee  If no payment then Option not exercised.

6.  You acknowledge that all prints of the Artwork shall be delivered to and retained by us.  You acknowledge that we shall have the right to retain possession of all transparencies and negatives resulting from the photographic session for which you are hereby engaged or the original illustration, as the case may be, provided, that if we do not retain possession of such transparencies, negatives or original illustration, you shall retain them and furnish them to us promptly after our request at any time  If, pursuant to this purchase order, you retain certain rights, you may not exercise any such rights without the specific written approval of the recording artist involved.

7   You shall be responsible for and shall obtain and deliver to us, at the same time you deliver the Artwork, all necessary releases (including model releases), clearances and permissions in connection with any original elements embodied in the Artwork that were created by you or at your direction and you agree to indemnify us against all claims and expenses (including attorneys' fees) arising out of any failure to obtain such releases, clearances or permissions  Notwithstanding the preceding sentence, we acknowledge that to the extent the Artwork may embody any elements that were not created by you, or on your behalf, such non-original elements are being delivered by you to us on a quit claim basis i e ,(without any representation or warrantee of any kind.)

8.  You acknowledge that the Artwork is being ordered as a contribution to a collective work, i e , the record packaging and other materials created from the Artwork.  You acknowledge that we shall own the right, title, and interest in and to all such record packaging and such other materials including, but not limited to, the worldwide copyrights therein  We shall have the right to retouch and/or electronically enhance the Artwork.

9.  We shall furnish you with a credit which shall be appropriately visible on all album packaging, and IDJ's inadvertent failure to comply with the foregoing shall not be deemed a breach of this agreement; provided, however, if you notify IDJ of such failure, IDJ shall take action to cure such failure with respect to future album packaging where feasible

10. This agreement together with Rider A attached hereto and made a part hereof, contains the entire understanding of the parties and will be governed by the laws of New York State applicable to contracts entered into in New York and entirely performed there.  No change of this agreement will be binding upon unless it is made by an instrument signed by you and our authorized signatory.

UMG CONFIDENTIAL 000002

Rider to the Photography/Illustration Agreement (the "Agreement")
Between Jonathan Mannion ("Mannion") and
The Island Def Jam Music Group ("IDJ")

Notwithstanding anything to the contrary expressed or implied in the Agreement:

1.      Subject to IDJ's exclusive ownership and copyright in the Artwork and the limitations set forth below, Mannion will have the right to retain all original negatives, contact sheets and transparencies of the Artwork, in a safe, secure location that has been approved by IDJ.  Upon IDJ's reasonable request, Mannion will provide IDJ with immediate access to such negatives, contact sheets and/or transparencies, on an "as needed" basis.

2.      Insofar as IDJ is concerned (and subject to Mannion obtaining the consent of all necessary parties, including the artist(s) concerned, where necessary), Mannion will have the right to use the Artwork for the following non-commercial purposes to promote his work as a photographer, in any and all media now or hereafter known:

        a.      To include the Artwork in his professional portfolio as an example of his work; and

        b.      To exhibit the Artwork in galleries, museums, photography exhibitions, etc.

In each instance permitted under this paragraph 2 above, Mannion shall cause IDJ's copyright notice to be affixed to each such permitted reproduction of the Artwork, which notice shall be in the form: "© 2002 The Island Def Jam Music Group".

Mannion will indemnify and hold harmless IDJ and its parent, affiliates, licensees, successors and assigns from any and all claims or liabilities arising out of any such uses of the Artwork by Mannion.

3.      In the event of any inconsistency between the provisions of this Rider and the provisions of the Agreement, the provisions of this Rider shall govern.

# Exhibit I

Joint Trial Exhibit 14

# Exhibit J

Joint Trial Exhibit 91

# Exhibit K

Excerpts from the March 4, 2022 Deposition of
Shawn Carter

CONFIDENTIAL

1              UNITED STATES DISTRICT COURT

2              CENTRAL DISTRICT OF CALIFORNIA

3

4      _____
                                      )
5      SHAWN CARTER, also known as    )
       JAY-Z, an individual,          )
6                                      )
               Plaintiff,             )
7                                      )   Case No. 2:21-cv-04848-PA-KS
           vs.                        )
8                                      )
       JONATHAN MANNION, an           )
9      individual, and JONATHAN       )
       MANNION PHOTOGRAPHY LLC, a     )
10     New York limited liability     )
       company,                       )
11                                     )
               Defendants.            )
12     _____)

13

14

15              ** CONFIDENTIAL **

16         REMOTE VIDEOTAPED DEPOSITION OF

17              SHAWN C. CARTER

18           Friday, March 4, 2022

19                 Volume I

20

21

22     Reported by:
       NADIA NEWHART
23     CSR No. 8714

24     Job No. 5107613

25     PAGES 1 - 222

                                          Page 1

CONFIDENTIAL

1    Q    And you don't have any specific recollection

2  of what you discussed with him during the

3  photoshoot?

4    A    I don't.

5    Q    And you don't have any written documents that      09:20:15

6  would contain notes of what you discussed with him?

7    A    No.

8    Q    How was Mr. Mannion paid for the -- for his

9  work on the Reasonable Doubt photoshoot?

10   A    I don't remember, but during those days, like      09:20:30

11  I said, we always carried cash.  So he probably got

12  paid in cash.  If I had to guess, he probably got

13  paid in cash.

14   Q    Do you have any reason to think he didn't get

15  paid in cash?                                            09:20:44

16   A    I don't.

17   Q    Do you recall him signing any contracts for

18  his work on the photoshoot?

19   A    I don't.

20   Q    Can you identify any contract that would          09:20:56

21  memorialize the agreement with Mr. Mannion with

22  respect to his work on the photoshoot?

23   A    I can't.

24   Q    When Mr. Mannion took the photograph of you

25  during the photoshoot, was he an employee of            09:21:18

Page 99

CONFIDENTIAL

1

2

3

4          I, SHAWN C. CARTER, do hereby declare under

5     penalty of perjury that I have read the foregoing

6     transcript; that I have made any corrections as

7     appear noted, in ink, initialed by me, or attached

8     hereto; that my testimony as contained herein, as

9     corrected, is true and correct.

10          EXECUTED this _____ day of _____,

11     20____, at _____, _____.
                       (City)                  (State)

12

13

14

15          _____

           SHAWN C. CARTER

16         Volume I

17

18

19

20

21

22

23

24

25

                                        Page  218

CONFIDENTIAL

```
 1          I, the undersigned, a Certified Shorthand
 2   Reporter of the State of California, do hereby
 3   certify:
 4          That the foregoing proceedings were taken
 5   before me at the time and place herein set forth;
 6   that any witnesses in the foregoing proceedings,
 7   prior to testifying, were administered an oath; that
 8   a record of the proceedings was made by me using
 9   machine shorthand which was thereafter transcribed
10   under my direction; that the foregoing transcript is
11   a true record of the testimony given.
12          Further, that if the foregoing pertains to the
13   original transcript of a deposition in a Federal
14   Case, before completion of the proceedings, review
15   of the transcript [ ] was [ ] was not requested.
16          I further certify that I am neither financially
17   interested in the action nor a relative or employee
18   of any attorney or any party to this action.
19      IN WITNESS WHEREOF, I have this date subscribed
20   my name.
21
22   Dated: March 5, 2022
23
24
         NADIA NEWHART
25       CSR NO. 8714
```

Page 219